Foley, Cognetti, Comerford & Cimini
Scranton Electric Building
507 Linden Street, Suitte 700
Scranton, P.A. 18503
Attorney's for defendants,

**FILED**
**SCRANTON**

NOV 1 7 2003

Per_____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE. JOHN DOE SR., and JANE DOE,<br>      Plaintiffs,<br><br>   vs.<br><br>FATHER ERIC ENSEY, FATHER CARLOS, FATHER ERIC ENSEY, FATHER CARLOS, FATHER ERIC ENSEY, FATHER CARLOS URRUTIGOITY, DIOCESE OF SCRANTON, BISHOP JAMES C. TIMLIN, THE SOCIETY OF ST. JOHN, THE PRIESTLY FRATERNITY, ST. PETER and ST. GREGORY'S ACADEMY,<br>      Defendants. | Case No.: 3 CV 02-0444<br><br><br>JUDGE: HON. JONES<br><br><br><br>JURY TRIAL DEMANDED |

**DEFENDANTS' BRIEF IN OPPOSITION TO MOTION TO COMPEL PRODUCTION OF PSYCHOLOGICAL AND PSYCHIATRIC RECORDS AND EVALUATIONS OF FR. CARLOS URRUTIGOITY AND FR. ERIC ENSEY**

**TABLE OF CONTENTS**

Table of Contents . . . . . . . . . . . . . . . . . . . Pg.i

Table of Authorities. . . . . . . . . . . . . . . . . . Pg.ii
                                                        & iii

I.Procedural Background . . . . . . . . . . . . . . . . Pg.1

II.Relevant Factual Background  . . . . . . . . . . . . Pg.2

III.ISSUES:   . . . . . . . . . . . . . . . . . . . . . Pg.3

Issue A.   IS DISCOVERY OF DEFENDANTS PSYCHOLOGIC RECORDS
           RELEVANT?  . . . . . . . . . . . . . . . . . Pg.3

Issue B.   WHEN A CLIENTS' ATTORNEY DIRECTS HIS CLIENT
           TO SEEK PSYCHOLOGIC COUNSELING AND TREATMENT
           AND THE ATTORNEY IS THE ONLY THIRD PARTY WHO
           RECEIVES THE REPORT, CAN OPPOSING PARTY COMPEL
           DISCOVERY AFTER THE CLIENT INVOKES THE PSYCHIATRIC/
           PATIENT PRIVILEGE? . . . . . . . . . . . . . .Pg.5

Issue C    WHEN AN ATTORNEY REQUESTS THAT HIS CLIENTS
           GO FOR PSYCHOLOGIC CONSULTATIONS NOT ONLY
           FOR THE CLIENTS OWN COUNSELING AND TREATMENT
           BUT ALSO TO BE USED IN DEFENSE AND POSSIBLE
           USE AS EXPERT TESTIMONY, CAN THE PARTY COMPEL
           DISCOVERY AFTER INVOKING AN ATTORNEY-CLIENT/WORK-
           PRODUCT PRIVILEGE? . . . . . . . . . . . . . . Pg.11

IV.Conclusion  . . . . . . . . . . . . . . . . . . . . Pg.13

# TABLE OF AUTHORITIES

## Federal Rules:

1) Fed.R.Civ.Pro 26(c) . . . . . . . . . . . . . . . . . Pg.6

2) Fed.R.Civ.Pro 26(b)(5) . . . . . . . . . . . . . . . Pg.5

3) Fed.R.Civ.Pro.26(b)(1) . . . . . . . . . . . . . . . Pg.6

4) Fed.R.Evid. 401, 402. . . . . . . . . . . . . . . . Pg.3

4) Fed.R.Evid.501 . . . . . . . . . . . . . . . . . . . Pg.6

5) Fed.R.Civ.Pro.34. . . . . . . . . . . . . . . . . . Pg.6

6) Fed.R.Civ.Pro.26(b)(3) . . . . . . . . . . . . . . . Pg.11

## Pa. Statutes:

1) 42 Pa. C.S.A. section 5944. . . . . . . . . . . . . Pg.7,8
2) 42 Pa. C.S.A. section 5916. . . . . . . . . . . . . Pg.8
3) 42 Pa. C.S.A. section 5928. . . . . . . . . . . . . Pg.8

## Federal Authority:

1) American Health Systems,Inc., v. Liberty Health System, 1991 WL 42310 [E.D.PA.] . . . . . . . . . . . . . . Pg.8
2) Bower v. O'Hara, 759 F.2d. 1117, 1123, (1985) . . . . Pg.4
3) Emerson v. Wetherill, 1994 WL 37747, (E.D.Pa. 1994) . . Pg.4
4) Griswold v. Connecticut, 381 U.S. 479 85 S.Ct.1678, 14 L.Ed.2d.510 (1965) . . . . . . . . Pg.6
5) Hickman v. Taylor, 329 U.S. 495, 67S.Ct. 385, L.Ed.451 (1947) . . . . . . . . . . . . . . . . . . Pg.11
6) In re Cendant Corporation Securities Litigation, 343 F3d. 658, U.S.Ct. of App. (2003). . . . . . . . Pg.12
7) Lillian Barret v. Vojtas, 182 F.R.D.177, (W.D.Pa.1998). . . . . . . . . . . Pg.10
8) Raso v. CMC Equipment Rental, Inc., 154 F.R.D. 126, (E.D.Pa. 1994) . . . . . . . . . . Pg.12
9) United Steelworkers of Am. V. Allegheny Ludlum Corp., 2002 WL 31002836 (W.D.Pa.2002). . . . . . . . . . . Pg.3
10) Union Pacific Railroad Company v. Mower, 219 F3d. 1069 (9th Circ. Ct. Appeals, 2000) . . . . . . . . . . . Pg.6
11) Zuk v. Eastern Pa. Psychiatric Institute, 103 F.3d.294, 299 (3d.Cir.1996) . . . . . . . . . . .Pg.3

## Pennsylvania Authority:

1) Cohen v. Jenkintown Cab. Co.,238 Pa.Super.456,464, 357 A2d. 689, 693-94 (1976) . . . . . . . . . . . . .Pg.5
2) Commonwealth v. DeJohn, 486 Pa.Super.32, 44, 403 A2d. 1283 (1979) . . . . . . . . . . . . . . . . .Pg.6
3) Commonwealth v. Eck, 413 Pa.Super 538, 544, 605 A.2D 1248, 1252, (1992) . . . . . . . . . . . . .Pg.9
4) Commonwealth v. Fewell,439 Pa.Super. 541, 548, 654 A2d. 1109,1112 (1995) . . . . . . . . . . . . . .Pg.9
5) In Interest of Bender, 531 A2d. 504, 366 Pa. Super. 450, (1987) . . . . . . . . . . . . .Pg.10
6) In re "B", 482 Pa. 471,394, A.2d. 419 (Pa. SCt.1978). . . . . . . . . . . . . . . .Pg.7

7) In re Investigating Grand Jury, 527 Pa. 432,440
   593 A2d. 402,406 (1991) . . . . . . . . . . . . .Pg.5
8) In re Subpoena No.22, 709 A2d. 385
   (Pa. S.Ct.1998) . . . . . . . . . . . . . . . . .Pg.6
9) In re The June 1979 Allegheny County Investigating
   Grand Jury, 490 Pa. 143, 415 2d. 73 (1980. . . . . . Pg.9
10)M. v. State of Medicine, 725 A2d. 1266
   Pa Cmwlth. 1999). . . . . . . . . . . . . . . . .Pg.10
11)Matter of Adoption of Embrick, 351 Pa.Super.491,
   506 A2d. 455 (1986) . . . . . . . . . . . . . .Pg.10
12)Miller Oral Surgery, Inc. v. Dinello,416 Pa.Super.310,
   611 A2d. 232,235 (1992) . . . . . . . . . . . . .Pg.7

Other:

1) 6 Moore's Federal Practice, section 26.70[5][b],[e]
   (Mathew Bender 3rd ed.) . . . . . . . . . . . . . Pg.12

2) The Perceived Fairness of the Psychologist Trial Consultant,
Dennis P. Stolle, 20 Law & Psychol. Rev. 139, 169 (1996). Pg.12

3) Advisory Comm. Notes, 1970 amendment for
   Fed Rule Civ. Pro. 26 . . . . . . . . . . . . . .Pg.12

# I. PROCEDURAL BACKGROUND

On March 20th, 2002, the plaintiffs filed a complaint based on diversity jurisdiction alleging various causes of action against the defendants including assault and battery, negligence, invasion of privacy, breach of duty (in loco parentis), intentional infliction of emotional distress as well as negligent infliction of emotional distress.  The defendants have vigorously denied the allegations.  Invasion of privacy and breach of duty were dismissed pursuant to plaintiffs 12(b)(6) motion to dismiss.

During the discovery phase of this case, the plaintiffs requested the psychological records of defendants Father Ensey and Father Urrutigoity.  The plaintiffs repeatedly have attempted to pursue these records through written interrogatories and oral depositions of the defendants.  The defendants consistently invoked the psychiatric/patient privilege in response to the discovery requests. However, despite plaintiffs invocation of the psychiatric/patient privilege, plaintiffs have continued to press the defendants for this information.  The plaintiffs then scheduled a telephone conference before this court on Monday, October 20th, 2003.  This court advised both parties that this matter will require the submission of a motion along with supporting briefs.  The plaintiff has since filed a motion compelling discovery of psychiatric records.

Accordingly, the defendants hereby respectfully request this court to deny plaintiffs motion to compel discovery of the defendants' psychiatric records.

## II.  RELEVANT FACTUAL BACKGROUND

The defendants are victims of baseless allegations.  The
allegations supposedly occurred while the plaintiff was a
student at St. Gregory's Academy.  Bishop Timlin received
countless statements from every student who attended the academy
during the time period of the allegations.[1]

Defendant Father Urrutigoity had a psychologic evaluation
performed by Father Groeschal(psychologist) in response to
unsubstantiated conduct at a seminary which was later proved
unfounded.

Because of a criminal investigation instituted by the
District Attorney's office, the undersigned law firm was
retained.[2]  A set of psychological evaluations were sought
subsequent to the filling of this instant action and after
consultation at the suggestion of the defendants' attorneys. The
defendants voluntarily agreed to undergo psychiatric evaluations
with reasonable expectation that the results would remain
private.  The defendants believed that these psychiatric
evaluations would be useful in the preparation of the defense to
these false accusations.  The defendants sought the second set
of psychological counseling and treatment in Southdown, Canada.
The defendants at no time signed any consent to release the
records to the Diocese, and therefore the Diocese, including
Bishop Timlin, have never received written reports on the
defendant priests.  The Bishop did however receive verbal

---

FN1. Not a single person has come forward and corroborated
     the plaintiffs' allegations
FN2. After a thorough investigation, the District
     Attorney did not bring charges.

communications regarding the duration and location of the psychological counseling.

After the defendants' counsel received the psychological reports, they were subsequently incorporated into the attorney's work product, and are now part of the attorney's opinions, and mental thoughts on the case.

## III. ISSUES

### A. IS DISCOVERY OF DEFENDANTS PSYCHOLOGIC RECORDS RELEVANT?

SUGGESTED ANSWER: IN THE NEGATIVE

The defendants' psychological evaluations have neither relevance nor evidentiary probative value.  The defendants insist that the psychologic records are not relevant under Federal Rule of Evidence 401 and hence inadmissible under Federal Rule of Evidence 402.  Fed.R. of Evid. 401, 402. Fed.R.Civ.Pro.26(b)(1) requires the District Court, when considering a motion to compel, to determine whether the material sought is relevant to the "subject matter of the litigation." United Steelworkers of Am. V. Allegheny Ludlum Corp., 2002 WL 31002836 (W.D.Pa. 2002).  It is well settled that discovery cannot be used as a fishing expedition. Zuk v. Eastern Pa. Psychiatric Institute, 103 F.3d.294, 299 (3d.Cir.1996).

In Emerson, the plaintiff sought the defendant's psychiatric records after the plaintiff alleged a sexual assault.  The Court denied the motion to compel discovery based on grounds of relevance. Emerson v. Wetherill, 1994 WL 37747, (E.D.Pa. 1994).  The Emerson Court reasoned "unlike the plaintiff, the defendant has not put his physical and mental condition at issue by filing a lawsuit for damages".  Since the defendants in this case have not put their physical or mental state at issue unlike the plaintiff, this court should apply similar reasoning and deny the plaintiffs request of discovery on the basis of relevance to an allegation of assault and battery.

Further, In Bower, the Third Circuit Court of Appeal acknowledged that in a personal injury suit brought by a tavern patron against another patron who committed the assault, the tavern owner was not entitled to introduce evidence of the assailant's psychiatric condition, since such testimony was irrelevant to the claim that owner was negligent in not barring the assailant from the tavern. Bower v. O'Hara, 759 F.2d. 1117, 1123, (1985).  The Third Circuit Court reasoned that the assailants' psychiatric conditions were not relevant to the tavern owners' duty of care in a negligence action.  In the case at bar, the plaintiffs are seeking a psychiatric consultation

based on an action of negligence.   The similarities of these cases are striking and the defendants seek the same reasoning and logic to deny the plaintiffs motion to compel discovery on grounds of relevance in a negligence action.

   B. WHEN A CLIENT'S ATTORNEY DIRECTS HIS CLIENT
      TO SEEK PSYCHOLOGIC COUNSELING AND TREATMENT
      AND THE ATTORNEY IS THE ONLY THIRD PARTY WHO
      RECEIVES THE REPORT CAN OPPOSING PARTY COMPEL
      DISCOVERY AFTER THE CLIENT INVOKES THE
      PSYCHIATRIC/PATIENT PRIVILEGE?

      SUGGESTED ANSWER: IN THE NEGATIVE

   If a claim of privilege or work product protection is to be relied upon in order to resist disclosure or discovery otherwise required by the Rules, Federal Rule Civ.Pro. 26(b)(5) requires that the  party must expressly assert that claim, and must describe the documents, communications, or things not produced in a manner that will permit the other parties to access the applicability of the claimed privilege or protection.

   Once the party asserting a privilege shows that the privilege is properly invoked, the burden shifts to the party seeking the disclosure to show that the disclosure of the information will not violate the accorded privilege. In re Investigating Grand Jury, 527 Pa. 432, 440, 593 A2d. 402. 406 (1991). Also see Cohen v. Jenkintown Cab Co., 238 Pa.Super. 456,464,357 A2d. 689, 693-94 (1976), stating where a privilege exists for specific purpose, the party seeking disclosure has the burden of establishing prima facie case that purpose of the

privilege would be frustrated by the exercise of the privilege.
In the case at bar, the defendants have expressly and repeatedly
invoked the psychologic-patient privilege along with work-
product and attorney-client privilege. [Exhibit A deposition [3]
Urrutigoity  Pg.98 to 105] & [Exhibit B deposition Ensey Pg.57
to 62]. Discovery is considered to be very broad and the parties
can obtain discovery regarding any matter that is relevant to
the claim, which is "not privileged". Fed.R.Civ.Pro. 26(b)1.
The Court "may make any order which justice requires to protect
a party or person from annoyance, embarrassment, oppression, or
undue expense, including. . . . that the disclosure or discovery
not be had." Fed.R.Civ.Pro.26(c).  Evidentiary privileges are
covered under Rule 501 and therefore this diversity civil
proceeding "shall be determined under state law". Federal Rule
Civ. Pro. 501.

     The right to privacy has its foundations in the
Constitutional Bill of Rights. Griswold v. Connecticut, 381 U.S.
479, 85 S. Ct. 1678 14, L.Ed. 2d. 510 (1965).  The Pennsylvania
Supreme Court has held that the protection provided by Article
1, Section 8 of the Pennsylvania Constitution extends to "those
zones where one has a reasonable expectation of privacy".
Commonwealth v. DeJohn, 486 Pa. 32, 44, 403 A2d. 1283 (1979).

-------

     FN3. It should also be noted that when a privilege is
invoked, whether it be psychiatric-patient, 5th amendment, or
attorney-client privilege, it maybe unethical for opposing
counsel to pursue further questioning until resolved by the
competent Court. Union Pacific Railroad Company v. Mower, 219
F3d. 1069, (9th Cir. 2000)

The right to privacy has further been instilled into the
constitution of the Commonwealth of Pennsylvania.  As Justice
Manderino expressively explained " the nature of the psycho-
therapeutic process is such that disclosure to the therapist of
the patient's most intimate emotions, fears, and fantasies is
required . . . . In laying bare one's entire self, however, the
patient rightfully expects such revelations will remain a matter
of confidentiality exclusively between the patient and
therapist". In re "B", 482 Pa. 471, 394, A. 2d. 419 (1978).

The psych-patient relationship has been codified by _42 Pa._
_C.S.A. section 5944_: No psychiatrist or person who has been
licensed under the act of March 23, 1972 (P.L. 136, No. 52) [63
P.S. Section 1201 et seq.]. to practice psychology shall be,
without the written consent of his client, examined in any civil
or criminal matter as to any information acquired in the course
of his professional services in behalf of such client.  The
confidential relations and communications between a psychologist
or psychiatrist and his client shall be on the same basis as
those provided or prescribed by law between an attorney and
client.

This Pennsylvania statute codifying the psychologic/patient
relationship was designed to create a confidential atmosphere in
which a patient will feel free to disclose all possible
information which maybe useful in rendering appropriate
treatment." Miller Oral Surgery, Inc. v. Dinello, 416 Pa.Super.
310, 611 A.2d.232,235 (1992).  The statute is modeled after the
attorney-client privilege and is based on strong public policy
that confidential communications made by client to psychologist/
psychiatrist should be protected from disclosure, absent consent

or waiver.  <u>Commonwealth v Fewell</u>,  439 Pa.Super. 541, 548, 654
A2d. 1109,1112 (1995). See also <u>42 Pa.C.S.A Section</u> 5916 and
5928.

In civil cases, the privilege is not absolute and is vulnerable to
consent or waiver, Pennsylvania Supreme Court Justice Kelly
stated "The law in this Commonwealth makes clear that the
privilege accorded confidential communications between the
client and the psychotherapist must prevail under most
circumstances." <u>In re Subpoena No.22</u>, 709 A.2d. 385 (1998).

In civil cases, the privilege "<u>may</u>" be waived when the
client makes the information known to third parties, or when the
client places the confidential information at issue in the case
or where there is no longer expection of privacy regarding the
information because the client has made it known to third
persons.. <u>42 Pa.C.S.A.Section 5944</u>.  Presently the plaintiffs
have a displaced belief that any time a report is given to a
third party the privilege is automatically waived.[see Page 2
plaintiff's motion].  The plaintiffs' beliefs are misplaced
because the statute's wording clearly is "may be waived" not "is
waived".  This concept is supported because the psychiatric/
patient privilege is modeled after the attorney-client privilege
and it has long been recognized that information given to the
attorneys' agents (third parties) does not defeat the privilege.
<u>American Health Systems, Inc., v. Liberty Health System</u>, 1991 WL
42310 [E.D.PA.].  Furthermore, the defendants stated with
clarity in deposition that neither the Diocese nor Bishop Timlin
have any written report of the psychiatric evaluations. [see
Exhibit A deposition Urrutigoity, Page 103; line 9 to 21] and
[Exhibit B deposition Ensey, Page 59, line 20 to 23] and

[Exhibit C deposition Timlin, Page 97, line 18 to 25; and Page 99, line 17 to 18].

In Fewell, the fact that the defendant later repeated to a state trooper statements she had made to her psychiatrist regarding the death of her child did not result in waiver of the psychiatrist-patient privilege. Commonwealth v. Fewell, 439 Pa.Super. 541, 654, 654 A2d.1109 (1995). The Court further explained "Information which is protected by an absolute statutory privilege is not subject to disclosure. . .". citing Commonwealth v. Eck, 413 Pa.Super 538, 544, 605 A.2D 1248, 1252, (1992). The Fewell Court further explained the rationale for the psyciatric/patient privilege:

> "The privilege afforded by section 5944 was intended to inspire confidence in the client and to encourage full disclosure to the psychologist[and psychiatrist]. By preventing the later public any information which would result in humiliation, embarrassment or disgrace to the client, the privilege is designed to promote effective treatment and to insulate the client's private thoughts from public disclosure".

Also cited in Fewell is then Chief Justice Eagen who wrote for three members of the Pennsylvania Supreme Court In re The June 1979 Allegheny County Investigating Grand Jury, 490 Pa. 143, 415 2d. 73 (1980) and held:

> "Clearly, the privacy interest of the patients which Is implicated under the instant set of facts is the interest in avoiding disclosure of personal matters. This privacy interest finds explicit protection in the Pennsylvania Contsitution, Art. 1, section 1, which provides in part: "All men. . .have certain inherent and indefeasible rights, among which are those. . .of acquiring, possessing, and protecting property and reputation. . .."  Disclosure of confidences made by a patient to a physician, or even medical data could, under certain circumstances, pose such a serious threat to a patient's right not to have personal matters revealed that it would be impermissible under either the United States Constitution or the Pennsylvania Constitution."

The defendants in this case revealed information only to their counsel. In Fewell, the reasoning of Justice Eagen

clearly contradicts the plaintiffs contention of third party waiver of psychologic/patient privilege.  The defendants advocate that this Court apply the same logic and reasoning to deny the plaintiffs motion to compel discovery.

The plaintiffs reliance In Interest of Bender, 531 A2d. 504,366 Pa. Super. 450, (1987), In Mater of Embrick, 351 Pa.Super. 491, (1986), and M. v. State of Medicine, 725 A2d. 1266, (Pa.Cmwlth. 1999) is further misconstrued.  These cases are clearly distinguishable from the case at bar.  They involve either court ordered examinations, or governmental agency ordered examinations where there may not be a reasonable expectation of privacy.  " A court-ordered examination does not invoke the privilege because treatment is not contemplated in conducting the examination." M. v. State of Medicine, 725 A2d. 1266, (Pa.Cmwlth. 1999).

The Diocese and Bishop are neither government entities nor did they ever order an evaluation.  In Embrick, a child and her parents were examined by a licensed psychologist at the request of a county child and youth agency.  In Lillian Barret v. Vojtas, the Court was confronted with the issue " should the psychiatric privilege be applicable where appellants agreed to be examined by Dr. Piper (psychiatrist) at the request of the Agency"?  In Vojtas the Court noted:

> "The appellant was ordered to see Dr. Guinn and Dr. Pass. More importantly, the appellant had no expectation of Confidentiality in this treatment, as it was known that The psychiatrists would report back to Brentwood (Gov't Agency) on the results of their examinations".

Lillian Barret v. Vojtas, 182 F.R.D. 177, 180, (W.D.Pa. 1998).  The Vojtas Court continues by discussing Embrick and

clearly distinguishes the plaintiffs' cases which they heavily rely upon.  The defendants in this case were not ordered to obtain a psychologic evaluation by agency or governmental entity, and instead voluntarily sought consultation after conferring with the defendants' counsel.

Therefore Embrick, Bender, and State of Medicine are clearly erroneously relied upon by the plaintiffs given the facts of this case.  The defendants seek the same reasoning the Vojtas Court identified in distinguishing Embrick and the plaintiffs line of supporting cases to deny the motion to compel discovery.

C. WHEN AN ATTORNEY REQUESTS THAT HIS CLIENTS GO FOR PSYCHOLOGIC CONSULTATIONS, CAN THE OPPOSING PARTY COMPEL DISCOVERY AFTER INVOKING AN ATTORNEY-CLIENT/WORK-PRODUCT PRIVILEGE?

SUGGESTED ANSWER: IN THE NEGATIVE

If this court orders discovery of psychiatric records to be produced by the defendants' attorneys it will also violate the attorney-client and work-product privilege. The attorney/client privilege was also clearly invoked at deposition.  [Exhibit D deposition Ensey Pg.61; line 22].  Once the privilege is properly invoked the burden shifts to the party seeking discovery to show that it doesn't violate the privilege.

Although materials may not be privileged they may be held to be the work product of counsel and therefore are not discoverable. Hickman v. Taylor, 329 U.S.495, 67S.Ct.385, 91 L. Ed. 451 (1947).  Rule 26(b)(3) codified Hickman.  Materials "prepared in anticipation of litigation or trial" are protected from disclosure or discovery. Federal Rule Civ. Pro 26(b)(3).  In the case at bar, mental impressions and legal theories of the

attorney should also be protected since the evaluation may be used at trial and has been incorporated into the attorney's work product. <u>Advisory Comm. Notes</u>, 1970 amendment for <u>Fed Rule Civ. Pro.</u> 26.

Moreover, the work/product doctrine extends beyond materials reflecting an attorney's mental impressions to encompass materials in anticipation of litigation. <u>The Perceived Fairness of the Psychologist Trial Consultant</u>, Dennis P. Stolle 20 Law & Psychol. Rev. 139, 169 (1996). In <u>Raso</u>, plaintiffs sought discovery of reports on an accident investigation involving a crane. The plaintiffs in <u>Raso</u> had not filed a complaint against the defendants when the investigation took place and the defendants claimed there was enough reason for them to foresee litigation in the future. The Court agreed with the defendants and concluded that the reports were sought in anticipation of litigation and must be protected under work product. <u>Raso v. CMC Equipment Rental, Inc.</u>, 154 F.R.D. 126, (E.D..Pa. 1994). The present case is similar to <u>Raso</u> since the plaintiffs did not file a complaint and the defendants' reports were made in anticipation of a criminal investigation as noted above in footnote 2. Therefore the defendants seek equal work product protection by way of similar reasoning the Court reached in Raso.

Furthermore federal courts also recognize opinion work product and this reflects the mental opinions of the attorney and the showing needed for discovery is greater then that of the work-product. <u>6 Moore's Federal Practice</u>, section 26.70 [5] [b], [e](Mathew Bender 3d ed.).

<u>In re Cendant Corporation Securities Litigation</u>, 343 F3d. 658, (3rd Cir. 2003), a doctor who is a consulting expert in

trial strategy and deposition preparation was retained as a non-testifying expert to assist counsel in anticipation of litigation.  The District Court was reversed for ordering discovery of a third party assisting the attorney in litigation and the Court opined:

> "In performing his various duties, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel".

Therefore, since their counsel in preparation of litigation also sent the defendants for expert non-testifying defense strategies we seek the same reasoning that the Third Circuit applied to deny the plaintiffs' motion to compel discovery. Further, the plaintiffs have completely ignored the issues of attorney/client privilege, work/product protection and opinion product protection, and obviously have not sustained the burden necessary to compel discovery.

IV. CONCLUSION:

Therefore, the defendants respectfully request that this Court deny the plaintiffs' motion to compel discovery for all the above reasons.  The defendants also respectfully request that the testimony after invoking the privilege be stricken from the records.

Respectfully submitted,

FOLEY, COGNETTI, COMERFORD & CIMINI

BY _____
VINCENT S. CIMINI

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendants' Brief in Opposition to Motion to Compel Production of Psychological and Psychiatric Records and Evaluations of Fr. Carlos Urrutigoity and Fr. Eric Ensey was served this 17th day of November 2003 by U.S. Mail, postage prepaid, to the following:

James M. Bendell, Esquire
P.O. Box 587
Port Townsend, WA  98368

Harry T. Coleman, Esquire
148 Adams Avenue
Courthouse Square
Scranton, PA  18503

James O'Brien, Esquire
Kennedy, O'Brien, McCormack & Mulcahey
Scranton Life Building, Suite 504
538 Spruce Street
Scranton, PA  18503-1808

Joseph F. Leeson, Jr., Esquire
Post Office Box 1426
Bethlehem, PA  18016-1426

By_____

VINCENT S. CIMINI

A    There was no need for--for that kind of background check.

Q    Did you know that he was at the Institute of Christ the King?

A    Yes, I knew that.  I knew that.  And I--I--I thought that he left out--out of his own accord.  That's-- That's the--

Q    Did you ever ask anybody at the Institute of Christ the King why he left?

A    Well, no, because, I mean, you know, it would be gossiping at that time.  He was accepted back into the seminary for The Society of Pius the Tenth.  And I didn't do the investigation at that point.  You know, that's Bishop Williams, who was the rector in Winona.  So I was professoring in Winona.  And when they accept a student, you know, it's not up to you to make your own private investigation.  I'm not Jeffrey Bond, you know.

Q    Did Father Roberts ever form a close friendship with a student of St. Gregory's Academy, a student who later joined S.S.J.?

A    Yes, John Zoszak.

Q    Was there a period of time when John Zoszak was a novice that he actually lived in the same room with Father Roberts?

A    I think you asked that question of Father

96

Ensey.  I couldn't remember.  Because, as I said, we have, for awhile, we were fairly--fairly overcrowded, even without--with our own members.  So I know that all of us share a room with somebody else, but I don't know who with whom.  I don't remember exactly.  You know, I don't remember, at any point, he was in the same house or in the same room with Father Roberts.  I-- I don't recall that.

Q    Did you ever have a psychological evaluation requested by the seminary at Winona as a condition of becoming a candidate--

A    No,--

Q    --there?

A    --that's not--not a policy of The Society of St. Pius the Tenth.

Q    Have you ever had a psychological evaluation at the request of Bishop Timlin?

A    Twice.

Q    When was the first time?

A    The first time was October, 2001.  I think after Jeffrey Bond began sending all these e-mails and stuff like that.

Q    Who did he send you to?

A    First, it was a very informal request, you know, whether I would accept to do that.  And he asked me to go see Father Jroschel.

97

Q    He's a Franciscan--

A    He's a Franciscan.

Q    --in New York?

A    He's also a psychologist by profession, so I think he does a lot of work for the Diocese of New York that way.

Q    Did Bishop Timlin tell you the reason he wanted you to have the evaluation?

A    Yes.

He said, you know, "In the face of all of these," you know, "rumors and stuff like that, it would be good for you to have an evaluation.  Would you-- Would you comply with that?"

And I said, "Yes, no problem."

Q    Was it was your understanding that Father Jroschel would then relay the results of the evaluation to Bishop Timlin?

A    Definitely.  That was--.

Q    Did Bishop Timlin tell you what the results of the evaluation were?

A    He did not need to do that, because Father Jroschel sent me a copy of that same report.

Q    Do you have a copy of that report?

A    I don't--

MR. COGNETTI:    I object to anything,

98

at this point, psychological.  It's not relevant.  I direct him not to answer any questions.

MR. BENDELL:    At this point, I'm only asking if he has a copy of the report, not what's in it.

Q    Do you have copy of the report?

A    I don't think I kept a copy, no.

Q    Do you know if your attorney has a copy?

A    No, I don't think he has a copy.

Q    Do you know if a copy was sent to Bishop Timlin?

A    I told you he-- Yes.

Q    Okay.

MR. BENDELL:    Counsel, it seems to me, if this was sent to a third party, the privilege is waived.

MR. COGNETTI:    I'm not too sure of that.  That's a legal issue we'll both research.

MR. BENDELL:    It may come back.

MR. COGNETTI:    Okay.

MR. BENDELL:    We'll come back, anyway.

A    That's no problem, you can see.

Q    What's in the report?  You're more generous

99

than your attorney is.

     MR. COGNETTI:   I direct him not to answer anything about--

A    I follow-- I have to obey even my attorney.

     MR. COGNETTI:   You have to obey your attorney.

A    You probably can find out, if you wanted to read the report.

Q    Now, you said there was second evaluation--

A    Yes.

Q    --requested by Timlin?  When was that?

A    That was-- His first request to do another evaluation was after Mike Prorock's father's letter.  So that was sometime in January or February.

Q    Of 2002?

A    2002, you're right.

Q    This was evaluation requested by Timlin?

A    By Bishop Timlin, right.

Q    Where did he send you for that evaluation?

A    Southdown-- Southdown.  It's one word. --in Canada.

Q    Canada?

A    Correct.

Q    That's a facility known for treating priests who are alcoholic and sexual abusers, is that correct,--

100

MR. COGNETTI:   I object to the question.

Q    --do you know?

A    I think it's a--it's a--it's a place that is qualified to do thorough psychological evaluations.  I don't know what their, you know, other missions they have.

Q    How long did the evaluation by Father Jroschel last?

     MR. COGNETTI:   Go ahead.

A    I think, two days.

Q    Two days.  Was there oral interview, only, or was there also a battery of--

     MR. COGNETTI:   I'm going to direct that he stop answering any questions, because I don't know where we waive it subconscious, or I waive it on the record here.  So anything about psychologicals, I'm going to object to and direct he not answer.  I'm not trying to give you a hard time,--

     MR. BENDELL:   No.  No.  No, you're doing your job.

     MR. COGNETTI:   --you know.

Q    Now,-- This is just a how long question. --How long did the Southdown evaluation last?

     MR. COGNETTI:   Again, I don't know if

101

that's a waiver of it or not.  I'm directing that he stop answering all questions.

Q    That's in Canada?

     MR. COGNETTI:   I'll agree.

Q    Is that in Canada?

     THE WITNESS:   Do you want me to say?

     MR. COGNETTI:   Yes, it's in Canada.

A    Yes, in Canada.

Q    What town in Canada?

     MR. BENDELL:   He can answer what town in Canada.

     MR. COGNETTI:   I don't know if he knows what town in Canada it was.

Q    Do you know what town in Canada it was?

A    No, I don't know.

Q    Did you fly there?

A    I drove.

Q    You drove.  All right.  Did Bishop Timlin tell you what the result--

     MR. BENDELL:   Just asking if he told you.

     MR. COGNETTI:   Anything about psychological information, I'm going to object to and ask that he assert a privilege at this time.

102

     MR. BENDELL:   Except this, in order to do the motion practice, I need to know-- Part of my argument on whether or not there's waiver, I just need to know the limited question of whether or not he knows if Bisho Timlin was informed of the contents.  I'm no asking him the contents of the evaluation.

     MR. COGNETTI:   Okay.  Go ahead.

Q    Was Bishop Timlin informed of the results o the evaluation?

A    My lawyer decided, at that point, to coordinate all the psychological effort, because it was legal case and so he received the report, not Bishop Timlin.

Q    So Sal Cognetti received the report?

A    Correct.

Q    And as far as you know, Bishop Timlin has never received the results of that report?

A    No, he couldn't.  That would-- There is a confidentiality note there that it was to be given only to him.

Q    So Bishop Timlin paid for it.  You didn't pay for it, right?

A    No, they paid for it.

Q    So the Diocese of Scranton paid for the

103

Q    That's okay. Just the best you can recall.
A    A-- A man named Joseph. I don't remember his last name.
Q    When did he leave?
A    After we had left St. Gregory's.
Q    And the circumstances under which he left?
A    Of his own will.
Q    Anybody else that you can think of?
A    Lewis Massett.
Q    When did he leave?
A    While we were living at Shohola.
Q    What are the circumstances under which he left?
A    Of his own will.
Q    Do you know where he is, now?
A    At Christendom College, a student.
Q    Anybody else that you know of?
A    I-- I can't remember names. There were other people who left, but I can't remember the names.
Q    Was there anyone who The Society asked to leave?
A    To my knowledge, no.
Q    You mentioned a period of time when The Society of St. John was residing at St. Gregory's Academy. What period of time was that?

56

---

A    From the beginning of November of 1997 to September 15th, 1999.
Q    Physically, where did The Society of St. John priests sleep?
A    In their beds.
Q    Where were their beds, in private rooms?
A    Yes. Yes.
Q    It was one priest to a room?
A    To the best of my recollection, because of space, there may have been, at times, priests who--priests or deacons who shared a room with two beds, a bed--two beds in a room.
Q    Now, have you ever had a psychiatric evaluation for purposes of going to seminary?
A    No.
Q    When you were in grammar school or high school, did you ever receive psychiatric or psychological counseling?
A    No.
Q    How about when you were in college?
A    No.
Q    How about when you were in seminary?
A    No.
Q    Did you ever have any psychiatric or psychological evaluation at any time in your life?

---

A    Yes.
Q    When was that?
      MR. COGNETTI: We're going to assert a privilege to any psychiatric information.
      MR. BENDELL: First I'm asking when it was.
      MR. COGNETTI: Okay.
Q    When was that?
A    Okay. The first was here in Scranton while we were at St. Gregory's.
Q    What was the purpose of the exam?
      MR. COGNETTI: We're asserting privilege as to anything concerning psychiatric, anything--
Q    Let me ask you this. Were the conclusions of that exam given to Bishop Timlin?
A    No.
Q    Were they given to any person, other than yourself?
A    No.
Q    Without asking the purpose, who requested that you have the exam?
A    No one.
Q    So it was totally voluntary on your part?
A    Yes.

58

---

Q    As far as you know, did Bishop Timlin request that either you or Father Urrutigoity have any psychiatric or psychological exam?
A    Yes.
Q    Which one, you or Father Urrutigoity?
A    Me.
Q    Okay.
A    Both.
Q    Both of you. When did Bishop Timlin request that?
A    For which one of us?
Q    For you.
A    For me? In, I think, February or late January of 2002.
Q    Did you follow his instructions, and have the exam?
A    Yes.
Q    So you've had two psychological exams?
A    Yes.
Q    This second one, this one that you're talking about, now, were the results of that given to Bishop Timlin?
A    No.
Q    Were they given to anybody other than yourself,--

59

**Page 60**

```
 1              MR. COGNETTI:   Or his attorney.
 2    Q    --or your attorney?
 3              MR. BENDELL:   Right.
 4              MR. COGNETTI:   Okay.
 5    A    Yes.
 6    Q    Who were they given to?
 7    A    My attorney.
 8    Q    Other than your attorney?
 9    A    Oh, I'm sorry.  I'm sorry.  No, they were not
10   given to anyone other than me or my attorney.
11             MR. BENDELL:   Let me explain why I'm
12        asking this question.  This is for counsel.
13        I understand there's a therapist-patient
14        privilege.  But, of course, if third parties
15        are informed, it's waived.
16             I've seen literature put out by the
17        Diocese of Scranton that Bishop Timlin,
18        because of his great concern over this issue,
19        had both of these priests sent to--had the
20        psychiatric eval, and came back clean as a
21        whistle.
22             Now, unfortunately, I haven't gotten
23        discovery from the Diocese of Scranton, yet.
24        But I want to be very careful about this.
25        And, of course, you don't know what records
```

**Page 62**

```
 1              MR. BENDELL:   Right.
 2              MR. COGNETTI:   --both of them
 3        together.  So I've instructed him not to
 4        breach either privilege at this time.
 5              MR. BENDELL:   He doesn't really know,
 6        exactly, what may have gone to the Diocese,
 7        what documents, medical documents, may have
 8        gone to the Diocese.
 9              MR. COGNETTI:   I don't think any have
10        gone.
11             MR. BENDELL:   Maybe, this is a good
12        point.
13             MR. COGNETTI:   But I don't know if
14        the-- I don't know if they have any
15        information concerning that.  But I believe
16        no documents have gone--any documents have
17        gone to them.  I know of no documents that
18        have gone to them.
19             MR. BENDELL:   Just an informal
20        question to the Diocese, I guess, the
21        Fraternity, too, but mostly to the Diocese,
22        do you have any time line as to when you
23        think you might get the discovery responses
24        to us?
25             MR. JAMES O'BRIEN:   Next couple of
```

**Page 61**

```
 1        the Diocese of Scranton has.
 2    Q    But, Father Ensey, to your knowledge, no
 3   opinion or conclusions of these evaluations, either two of
 4   them, went to Bishop Timlin, or anybody else at The
 5   Society?
 6    A    No.
 7    Q    Other than the two psychological or
 8   psychiatric evals, has there been any other that you had?
 9    A    No.
10   May I ask a question of my counsel?
11             MR. BENDELL:   Sure.
12             (Discussion off the record.)
13             (In open hearing.)
14   Q    Ready to start, again?
15   A    Yes.
16   Q    Do you want to change your answer to any of
17   those questions?
18   A    No.
19             MR. COGNETTI:   You formulate that.  We
20        do not know what information has been
21        provided to the Bishop or his representative.
22        I know what has been provided in the
23        attorney/client relationship, and the
24        psychiatric/attorney privilege
25        relationship,--
```

**Page 63**

```
 1        weeks.
 2              MR. BENDELL:   Next couple weeks?
 3        Okay.  Thanks.
 4    Q    Prior to you being accepted be a member of
 5   The Society of St. John, was any type of character
 6   investigation, or fitness evaluation done by The Society
 7   of you?
 8    A    No.
 9    Q    How about when you were accepted into the
10   seminary at Winona?
11   A    I had a-- Yes.
12   Q    What type of investigation was done?
13   A    Well, a medical examination, and an interview
14   at the seminary.
15   Q    No psychological evaluation?
16   A    No.
17   Q    Any criminal investigation, do you know?
18   A    Not that I know of.
19   Q    Father Devillers--
20   A    Could I clarify?
21   Q    I'm sorry.
22   A    I should-- I should clarify.  I wasn't
23   accepted into The Society of St. John.  I help found The
24   Society of St. John.
25   Q    Devillers.  Is that the pronunciation,
```

**Q** And it says at the top, Delivered to Times Editorial Department. Is that a local ~~cular~~ paper?

**A** It's the local Scranton Times, yes. ~~he~~ Editorial Department, I don't know whether it ~~ent~~ -- it went to the Scranton Times. I don't know ~~ho~~ put that on there, that's not my writing.

**Q** But it went to the paper?

**A** It went to the paper, yes, because he ~~ade~~ a public, he put something out in the paper and ~~ave~~ something to the paper and it was billed as ~~ishop~~ Fails to Meet Duty in Abuse Cases, so we had ~~o~~ respond to that.

**Q** Now at the top part of the date was cut ~~f~~ I guess in the copy machine. It looks like it ~~ays~~ 3, 04. Can I assume this is 2003?

**A** That's 3/14 I would say.

**Q** 3/14, but I'm interested in the year, that '02 or '03, do you know?

**A** I think it would be -- I'm not sure ~~yself~~ now. I have to go back and think about when ~~was.~~ I think it was probably '03. The Dallas ~~harter~~ took place in Dallas of '02, correct? '02, ~~was~~ a year ago. It was '02, so this is saying ~~at~~ we're not following the policy here; apparently

93

~~at's~~ what he was saying. So that would have to be ~~3.~~ I'm going to put '03 there (indicated).

MR. BENDELL: Well, the record will reflect that the bishop very kindly altered Exhibit 44 so it accurately reflects the date.

' MR. BENDELL:

**Q** I appreciate you doing that. I'm going ~~show~~ you Exhibit 45. Now it's going to be ~~fficult~~ for me to ask questions about Exhibit 45 in ~~ew~~ of the objections. Let me just take a minute to ~~ink.~~ Okay. I'll let you read that and ask you a ~~w~~ questions.

**A** Yes.

**Q** You've heard the dialogue with the ~~dge.~~ Based upon the objection of the defense ~~wyers,~~ I'm not going to ask you the contents of any ~~ychological~~ eval, I'm going to ask you procedural ~~estions.~~ I think you testified before, did you ask ~~ther~~ Ensey and Father Urrutigoity to have a ~~ychological~~ or psychiatric eval?

**A** I did.

**Q** One of the previous letters refers to ~~~~ eval by Father Benedict Groeshal (phonetic). Now both the priests see Father Benedict Groeshal

94

1   first?
2       **A** Not to my knowledge, no.
3       **Q** It was just one of them?
4       **A** That's my recollection.
5       **Q** But then you asked both the priests to
6   go to some other --
7       **A** That was not in connection with this
8   second thing here, that was earlier.
9       **Q** Why did you ask them to go see Father
10  Groeshal?
11      **A** I think it was because of the visual
12  thing that happened, you know, that a man out in
13  Detroit --
14      **Q** Winona. Selinger?
15      **A** Selinger, yes.
16      **Q** So then you asked Father Ensey and
17  Father Urrutigoity to go to a separate facility or a
18  separate doctor for an evaluation?
19      **A** This was a preliminary thing, this is
20  not exactly what happened.
21      **Q** This is just launching these questions.
22  So you did ask them to have an evaluation?
23      **A** I did.
24      **Q** Now is it your testimony that it was a
25  request, not an order?

95

1       **A** Yes, I asked, I suggested that they go,
2   I asked them if they would go and they readily said
3   they would do it because I asked them.
4       **Q** Now was the purpose of this request to
5   determine any aspect of the validity of the Prorock
6   charges?
7       **A** It was in connection with that, of
8   course, it was connected with the whole business.
9   But that's the idea, I think there's something in the
10  Charter there that we have to do things like this to
11  find out what we can from a psychological report of
12  some type.
13      **Q** Now, without asking you the contents,
14  did you get the -- let me finish the question. Did
15  you get the results of that evaluation?
16      **A** I got a report somewhere along the line
17  but I never got the actual evaluation, no. I think
18  the attorneys for the priests said that they did not
19  want them to come to us, so that's okay.
20      **Q** You say you got the report but not the
21  evaluation?
22      **A** I heard something about the thing but
23  it was verbal, you know, that I said something in
24  there. I got some kind of a report about the thing
25  but it was not a written report, it was not anything

96

ever came to me as far as that goes, it was asked.

Q   The purpose of these psychological ...rams is to determine whether or not these men might ...e a danger to children, is that correct?

A   Yes.

Q   And as your role of bishop and the caretaker of souls, you want to make sure you find out the results of that evaluation?

A   Eventually we will when this thing comes to fruition and when it comes to a discovery of the truth. This is all part of the process. The process is an ongoing process. We haven't been able to come to any conclusions yet because of all the stuff that's been going on. I mean this whole lawsuit has thrown the thing into a tizzy. That's holding everything out.

Q   Are you saying that you have not requested the results of these psychological evaluations?

A   I have not gotten them. I don't know whether I asked for them or not. I think I may have asked for them, but when it was told that they did not want me to have them, then I just said no problem.

97

Q   So the priests told you that they didn't want you to have them?

A   The attorney, I think their counsel.

Q   Did the reports go to the attorney?

A   I'm not sure about that; I don't know where they went.

MR. JAMES O'BRIEN: Which attorneys are you speaking of?

MR. BENDELL: Any attorney.

MR. JAMES O'BRIEN: Not to me, but go ahead.

BY MR. BENDELL:

Q   Do you know if they went to Mr. Cognetti?

A   I don't know that they went to Mr. Cognetti; I don't know that.

MR. BENDELL: For purposes of motion, Mr. Cognetti, could you tell us whether you have copies of these reports?

MR. COGNETTI: No.

MR. BENDELL: Have you ever seen them?

MR. COGNETTI: I'm not answering, I not under the deposition. I have an attorney/client relationship and I'm not,

98

you know.

MR. BENDELL: I'm just asking.

BY MR. BENDELL:

Q   So have you been given verbal summaries of these reports?

A   I got some kind of a summary.

MR. COGNETTI: I believe we can stipulate he has not.

MR. BENDELL: Well, I'm going to ask him the question. I'm not going to stipulate to it.

BY MR. BENDELL:

Q   Have you been given verbal summaries of these evaluations?

A   I heard something someplace and I can't tell you where or how I got some of it, but I did hear something about the deposition. But I never got a report, I never got an official report.

Q   You said you heard something about a deposition?

A   I heard something about -- not a deposition, about the report from the facility. I don't remember getting any report in writing certainly and I don't recall where I heard these things, but I did hear something someplace along the

99

line, and it was okay. They were all right, the reports that I got. That's enough for me to get -- I shouldn't even say that.

Q   No, I just want the truth. Who gave you reports that they're okay?

A   I don't know.

MR. JAMES O'BRIEN: He doesn't know and I think he's --

MR. BENDELL: Well, I'm asking the question.

MR. JAMES O'BRIEN: But he's answered it a couple times that he doesn't know where he got it, he doesn't know who gave it to him.

BY MR. BENDELL:

Q   But you feel somebody reported to you that it was okay, they were okay --

MR. COGNETTI: I object to the form of the question. I think that falls within the privilege.

THE WITNESS: I got something in my mind of where I heard it from, I can't be absolutely certain because obviously this is a crucial point and I don't want to say something that would be a misstep on my

100

2      MR. BENDELL:   Right.
4      MR. COGNETTI:   Okay.
5   A   Yes.
6   Q   Who were they given to?
7   A   My attorney.
8   Q   Other than your attorney?
9   A   Oh, I'm sorry. I'm sorry. No, they were not
10  given to anyone other than me or my attorney.
11      MR. BENDELL:   Let me explain why I'm
12      asking this question. This is for counsel.
13      I understand there's a therapist-patient
14      privilege. But, of course, if third parties
15      are informed, it's waived.
16      I've seen literature put out by the
17      Diocese of Scranton that Bishop Timlin,
18      because of his great concern over this issue,
19      had both of these priests sent to--had the
20      psychiatric eval, and came back clean as a
21      whistle.
22      Now, unfortunately, I haven't gotten
23      discovery from the Diocese of Scranton, yet.
24      But I want to be very careful about this.
25      And, of course, you don't know what records

60

1      the Diocese of Scranton has.
2   Q   But, Father Ensey, to your knowledge, no
3   opinion or conclusions of these evaluations, either two of
4   them, went to Bishop Timlin, or anybody else at The
5   Society?
6   A   No.
7   Q   Other than the two psychological or
8   psychiatric evals, has there been any other that you had?
9   A   No.
10      May I ask a question of my counsel?
11      MR. BENDELL:   Sure.
12      (Discussion off the record.)
13      (In open hearing.)
14  Q   Ready to start, again?
15  A   Yes.
16  Q   Do you want to change your answer to any of
17  those questions?
18  A   No.
19      MR. COGNETTI:   You formulate that. We
20      do not know what information has been
21      provided to the Bishop or his representative.
22      I know what has been provided in the
23      attorney/client relationship, and the
24      psychiatric/attorney privilege
25      relationship,--

61

2      --both of them
3      together. So I've instructed him not to
4      breach either privilege at this time.
5      MR. BENDELL:   He doesn't really kn
6      exactly, what may have gone to the Dioces
7      what documents, medical documents, may ha
8      gone to the Diocese.
9      MR. COGNETTI:   I don't think any h
10      gone.
11      MR. BENDELL:   Maybe, this is a goo
12      point.
13      MR. COGNETTI:   But I don't know if
14      the-- I don't know if they have any
15      information concerning that. But I belie'
16      no documents have gone--any documents hav
17      gone to them. I know of no documents that
18      have gone to them.
19      MR. BENDELL:   Just an informal
20      question to the Diocese, I guess, the
21      Fraternity, too, but mostly to the Diocese
22      do you have any time line as to when you
23      think you might get the discovery response
24      to us?
25      MR. JAMES O'BRIEN:   Next couple of

62

1      weeks.
2      MR. BENDELL:   Next couple weeks?
3      Okay. Thanks.
4   Q   Prior to you being accepted be a member of
5   The Society of St. John, was any type of character
6   investigation, or fitness evaluation done by The Societ
7   of you?
8   A   No.
9   Q   How about when you were accepted into the
10  seminary at Winona?
11  A   I had a-- Yes.
12  Q   What type of investigation was done?
13  A   Well, a medical examination, and an intervi
14  at the seminary.
15  Q   No psychological evaluation?
16  A   No.
17  Q   Any criminal investigation, do you know?
18  A   Not that I know of.
19  Q   Father Devillers--
20  A   Could I clarify?
21  Q   I'm sorry.
22  A   I should-- I should clarify. I wasn't
23  accepted into The Society of St. John. I help found The
24  Society of St. John.
25  Q   Devillers. Is that the pronunciation,

63