FILED
SCRANTON

JAN 0 5 A.M. 2004

PER _____ _____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE, JOHN DOE, SR. and JANE DOE, | Case No.: 3 CV 02-0444 |
| Plaintiff, | Judge: Hon. Jones |
| vs. | PLAINTIFFS' REPLY BRIEF TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION RE: VIDEOCONFERENCE AND TELEPHONE DEPOSITIONS |
| FATHER ERIC ENSEY, FATHER CARLOS URRUTIGOITY, DIOCESE OF SCRANTON, BISHOP JAMES C. TIMLIN, THE SOCIETY OF ST. JOHN, THE PRIESTLY FRATERNITY OF ST. PETER and ST. GREGORY'S ACADEMY, | |
| Defendant. | |

## I. INTRODUCTION

Defendants Priestly Fraternity of St. Peter and St. Gregory's Academy have not

opposed Plaintiffs' Motion.  Defendant Diocese of Scranton objects to the use of the

deposition of Matthew Selinger but does not object to the remaining depositions referenced

in Plaintiffs' motion.  Only the two priests who molested John Doe, and their clerical

society (Society of St. John) object to the use of these depositions.   In order to understand

why,  it is necessary for the court to have an understanding of the procedural and factual

context in which these depositions were scheduled.

## II. BACKGROUND

Plaintiff John Doe was sexually molested by Fr. Carlos Urrutigoity and Fr. Eric

Ensey (*See* Complaint).  Not surprisingly, the defendant priests have denied sexually

molesting him.  However, the deposition testimony at issue in the present motion provides

strong corroborative proof of sexual misconduct of Fr. Urrutigoity, and also shows Fr.

Urrutigoity to be concealing evidence and having testified falsely under oath in this case.

For example, through discovery, counsel for Plaintiffs have uncovered evidence that Fr.

Urrutigoity repeatedly slept in bed with boys from St. Gregory's Academy.  In his

deposition Fr. Urrutigoity denied this fact (Plaintiffs' Exhibit 'I' – Fr. Urrutigoity

deposition).  This testimony is contradicted by the testimony of two witnesses whose

depositions are at issue in this motion – Steven Fitzpatrick and Patrick McLaughlin.

Steven Fitzpatrick testified that he slept in the same bed with Fr. Urrutigoity, and that other

boys did as well. (Plaintiffs' Exhibit 'J' – Fitzpatrick deposition).  Patrick McLaughlin

testified that he saw a boy sharing a bed with Urrutigoity (Plaintiffs Exhibit 'K' –

McLaughlin deposition).  What makes this deposition testimony of these two witnesses

especially critical is that these young men are unabashed supporters of these two priests

and the Society of St. John.    For example, they have permitted their names to be added to

the public website *Friends of the Society of St. John* (Plaintiffs' Exhibit 'L').

The testimony of Joseph Sciambra, Paul Hornak and Matthew Selinger, also at

issue in this motion, provide additional corroborative evidence for Plaintiffs' case.  The

depositions of Joseph Sciambra and Paul Hornak have not yet been transcribed and

received by counsel.  However, former seminarian Matthew Selinger testified that Fr.

Urrutigoity also molested him, and further testified that Fr. Ensey told Selinger that

Urrutigoity admitted to this molestation.  Later, Ensey attempted to explain away this

admission by setting forth the theory that Fr. Urrutigoity has the power to diagnose illness

by grabbing a man's penis (Plaintiffs' Exhibit 'M' – Deposition of Selinger).  In his

deposition, Selinger testified as to other peculiar perverted sexual practices of Fr. Urrutigoity, such as requesting that a rectal suppository be inserted in his presence as an act of humility (Ibid.).

Plaintiffs wish to take additional depositions of out of state witnesses by way of telephone and/or videoconference. Plaintiffs have not been successful in attempting to convince witnesses to fly to Scranton for depositions. In the case of Matthew Selinger, this witness was threatened by Fr. Ensey who suggested that he consider leaving the United States to avoid a deposition and also told him that his attorney has "strong ties to the Mafia (Exhibit 'E'). Other witnesses wish to put the SSJ unpleasantness behind them. With regard to supporters of SSJ, it is pointless to believe they would cooperate with plaintiffs' case by flying to Scranton.

In their opposition brief, the priest defendants are not only asking the court to prohibit the use of these depositions, but also asking that the court prohibit any future telephone depositions. This request, which belies their supposed concern over minor procedural details of the depositions at issue in this motion, demonstrates that their real intent is to prevent the jury in this case from hearing the compelling testimony of these non-resident witnesses and thus prevent Plaintiffs from obtaining a fair trial in this case. These witnesses are not going to voluntarily travel to Scranton for depositions.

### III. THE TRUE RELEVANT CHRONOLGY

Plaintiffs have set forth the deposition chronology in their originating brief and the supporting Exhibits referenced in that brief. Plaintiffs will now respond to Defendants' chronology. The Diocese of Scranton argues that it received no notice of the Matthew Selinger deposition until the day before it took place. This statement is false. Defendants

were provided with the deposition schedule in a letter dated August 26 (*See* SSJ Exhibit

'A'). The parties followed that deposition schedule. The deposition of Matthew

Selinger was scheduled to be taken by phone at the request of the defendants but was

moved to Thursday as a professional courtesy to Sal Cognetti (*See* Exhibits cited in

Plaintiffs' original motion as well as the additional Affidavit of James Bendell attached

hereto as Plaintiffs' Exhibit 'N'). As can be seen by SSJ's Exhibit 'Q', the defendants

received notice of the change in the deposition date. Note that Exhibit 'Q' contains no

objection to conducting the Selinger deposition by phone, only an objection to the

deposition being a perpetuation deposition as opposed to a discovery deposition.[1]

In understanding the chronology in this matter, footnote 3 on Page 4 of SSJ's

Opposition Brief contains perhaps the most important fact; namely, that defendants never

objected to the alleged lack of formality in Plaintiffs' previous deposition notices. The

depositions cited by SSJ in that footnote took place without difficulty or objection.

Defendants' flyspecking of Plaintiffs depositions at issue in this motion, therefore, does

not reflect any long-standing procedural fastidiousness in this case, but rather is an attempt

to find a hyper-technical reason to prevent this very damaging testimony by disinterested

third parties from being shown to the jury at trial (these witnesses reside more than 100

miles from the courthouse).

At Page 4 of its brief, SSJ suggests that the decision to conduct a telephone

deposition of Matthew Selinger was a unilateral decision by Plaintiffs' counsel. This is

false. As noted in Plaintiffs' original brief for this motion, it was the desire of Plaintiffs'

---

[1] The parties' debates over whether these depositions were to be discovery depositions versus perpetuation depositions is, of course, moot because the Federal Rules to not provide for perpetuation depositions except for pre-litigation and on appeal. All of the depositions at issue in this case are therefore merely discovery depositions.

PLAINTIFFS' REPLY BRIEF RE: MOTION TO RATIFY DEPOSITIONS – PAGE 4

counsel to fly to Pittsburgh for the Selinger deposition.  The defendants refused to travel and **the defendants** suggested that the deposition be telephonic.  For any defendant to now complain that the deposition is telephonic is an outrage – the type of thing that gives lawyers a bad name.

At Page 7 of its brief, SSJ again raises the red-herring of the reference to the videoconferencing depositions as perpetuation depositions.    In point of fact Plaintiffs' counsel specifically stated on the record that all of the depositions for the week of November 10 would be considered merely discovery depositions (*See e.g.*, Exhibit 'J' – Fitzpatrick deposition).

## IV. ARGUMENT

Plaintiffs are requesting that this court sign an order *nunc pro tunc* permitting the Selinger telephonic deposition and the four videoconference depositions to be used as discovery depositions in this case.   Clearly such orders are within the province of the court and Federal Civi Rule 30(b) as well as Civil Rule 1 which states:

> "They [the Civil Rules] shall be construed and administered to secure the just, speedy and inexpensive determination of every action."

As noted in Plaintiffs' original brief, the courts favor the use of telephonic depositions to save on litigation expenses. Jahr v. IU International, 109 F.R.D. 429 (N.C. 1986).  Where a party shows a legitimate reason for a telephonic deposition, then the burden shifts to the opposing party to demonstrate why a telephonic deposition should not take place. Cressler v. Neuenschwander, 170 F.R.D. 20 (Kansas, 1996).

With respect to the videoconference deposition the arguments are even more compelling.  Plaintiffs counsel expended close to $5000 so that defense counsel would

have the opportunity to observe the demeanor of the witnesses while questioning them.

These witnesses were sworn in the by court reporter who looked at them face-to-face.

SSJ's argument that the depositions should not be permitted because of alleged

improper notice is absurd.   The defense attorneys attended and asked questions at all the

depositions except for the Selinger deposition.  Similarly, the defense argument that the

Notice form did not contain the name of the reporter is an argument that has previously

been rejected by the courts.  *See,e.g.*, <u>Yonkers Raceway v. Standardbred Owners Asso.</u>, 21

F.R.D. 3 (D.C.N.Y. 1957).   Moreover, at the commencement of the video depositions, the

name of the videoconference operating, employer and other required information was read

into the record and is recorded on the videotapes.

As noted in Plaintiffs' original brief, the videoconference depositions were

scheduled to satisfy Sal Cognetti's post-Selinger request that he have the opportunity to

observe the witness' demeanor while at the same time satisfying his previous request not to

travel outside of the Scranton area.   No objection was received to these videoconference

depositions until Cognetti sent a November 7 letter to Plaintiffs' counsel (Plaintiffs'

Exhibit 'F' attached to original brief).   As noted in Plaintiffs' response letter (Exhibit 'G'),

that letter was sent late Friday after Plaintiffs counsel had expended thousands of dollars

for air reservations and other non-refundable videoconferencing costs for the week of

November 10 deposition trip to Scranton.

At no place in its briefing does SSJ explain why these video depositions failed to

provide an opportunity for full and fair cross-examination of these witnesses.  At Page 13

of its brief, SSJ merely states:

"Defendants believe that in order to fairly assess the deponents' demeanor and credibility it is important for the attorneys to be in the same room with the witnesses during their respective depositions."

Are defense counsel perhaps able to smell lack of credibility on the part of witnesses?

### CONCLUSION

This is a law suit involving a prep school with students attending from around the United States. It requires the critical testimony of out of state witnesses. Plaintiffs wished to take those depositions live in the respective states where they live. Defendants objected to traveling outside the Scranton area and requested telephonic depositions. Attorney Sal Cognetti specifically joined in this request. Plaintiffs acceded to this request and scheduled the telephonic deposition of Matthew Selinger. Thereafter, Sal Cognetti stated that he wished to observe the demeanor of the witnesses. Again, Plaintiffs acceded to this request and the earlier request not to travel by scheduling expensive videoconference deposition in which all counsel participated.

Plaintiffs request that the court Order, *nunc pro tunc*, that these depositions be considered discovery depositions which can be used at trial as any discovery deposition can be used at trial, no more and no less. Moreover, Plaintiffs request that the court permit additional out of state depositions to be conducted by telephone. In addition to the testimony of Fr. Oppenheimer, Plaintiffs wish to depose several other students who may have observed Fr. Urrutigoity sleeping with St. Gregory's students.

### CERTIFICATION OF COUNSEL

Attached to this Brief are true and correct copies of the following documents:

Exhibit 'I' – Portions of the deposition of defendant Fr. Carlos Urrutigoity.

Exhibit 'J' – Portions of the deposition of Stephen Fitzpatrick.

Exhibit 'K' – Portions of the deposition of Patrick McLaughlin.

Exhibit 'L' – A downloaded web page from the Friends of the Society of St. John website.

Exhibit 'M' – Portions of the deposition of Matthew Selinger.

Exhibit 'N' – An original 5th Affidavit of James Bendell.

Dated this 30th day of December, 2003.

_____

James Bendell, WSBA # 20820
Co-counsel for Plaintiffs

I certify that I caused a true copy
of this pleading to be mailed to law firms
of Cognetti, Leeson and O'Brien on
12/30/03_____

JOHN DOE, JOHN DOE, SR., : IN THE UNITED STATES DISTRICT
and JANE DOE, : FOR THE MIDDLE DISTRICT OF PA
    Plaintiffs,

VS

FATHER ERIC ENSEY, FATHER
CARLOS URRUTIGOITY, DIOCESE
OF SCRANTON, BISHOP C.
TIMLIN, THE SOCIETY OF ST.
JOHN, THE PRIESTLY FRATERNITY
OF ST. PETER, and ST.
GREGORY'S ADADEMY,
    Defendants. :NO. 2000 CIVIL 2961

TRANSCRIPT OF DEPOSITION of
FATHER CARLOS URRUTIGOITY, a witness of lawful age, taken
on behalf of the plaintiffs in the above-entitled cause,
wherein John Doe, et al, are the plaintiffs and Father
Eric Ensey, et al, are the defendants, pending in the
District Court of the United States for the Middle
District of Pennsylvania, pursuant to notice, before Neil
A. Helfant, a notary public in and for the County of
Lackawanna, at the business offices of the Lackawanna
County Bar Association, 338 North Washington Avenue,
Scranton, Pennsylvania and the law offices of Harry
Coleman, Esquire, 148 Adams Avenue, Scranton,
Pennsylvania, on the 2nd day of May, 2003, commencing and
concluding at 9:04 a.m. to 12:00 p.m. and 1:38 p.m. to
2:22 p.m., respectively, of said day.

NEIL A. HELFANT REPORTING SERVICE - 570-586-0346

---

S T I P U L A T I O N

It is hereby stipulated by and between counsel for
the respective parties that sealing, certification, and
filing are waived.

It is further stipulated by and between counsel for
the respective parties that all objections, except to the
form of the questions, are reserved to the time of trial.

I N D E X
W I T N E S S E S
Examination of Father Urrutigoity by Mr. Bendell....P. 3

E X H I B I T S
Father Urrutigoity Exhibit No. 1, a declaration,
marked for identification...............................P. 153
Father Urrutigoity Exhibit No. 3, an affidavit,
marked for identification...............................P. 156
Father Urrutigoity Exhibit No. 4, an affidavit,
marked for identification...............................P. 158
Father Urrutigoity Exhibit No. 5, an affidavit,
marked for identification...............................P. 161
Father Urrutigoity Exhibit No. 6, an affidavit,
marked for identification...............................P. 166
Father Urrutigoity Exhibit No. 7, a letter,
marked for identification...............................P. 167

2

---

A P P E A R A N C E S:

FOR THE PLAINTIFFS:      JAMES BENDELL, ESQUIRE

     HARRY COLEMAN, ESQUIRE

FOR DEFTS. ENSEY/

URRUTIGOITY/ST. JOHN:      SAL COGNETTI, ESQUIRE

FOR DEFTS. DIOCESE OF

SCRANTON/BISHOP TIMLIN:      JOSEPH O'BRIEN, ESQUIRE

     JAMES O'BRIEN, ESQUIRE

FOR DEFTS. FRATERNITY OF ST.

PETER/ST. GREGORY'S ACADEMY:      JOSEPH LEESON, ESQUIRE

     JOSEPH GAUGHAN, ESQUIRE



---

1   F A T H E R    C A R L O S    U R R U T I G O I T Y,

2      702 Route 434, Shohola, Pennsylvania, a witness

3      called by the plaintiffs, being first duly sworn,

4      was examined and testified as follows:

5 EXAMINATION BY MR. BENDELL:

6      Q      Father Urrutigoity, you were here yesterday

7 during Father Ensey's deposition.

8      A      Uh-huh.

9      Q      You have to say the word.

10      A      Yes.

11      Q      You heard the introductory language I gave

12 about what a deposition is, that it's under oath, and that

13 if there's any differences between your testimony now and

14 a trial, the jury can be shown that.

15      Do you understand that?

16      A      Yes. Yes.

17      Q      Just do the best you can. We don't want you

18 to guess. Just tell us what you know. You have to give

19 verbal answers. If you say, "Uh-huh," he doesn't know

20 whether that's a "Yes" or a "No."

21      A      Yes. Sorry.

22      Q      State your full name?

23      A      Carlos Roberto Urrutigoity.

24      Q      Have you ever been known by any other name?

25      A      No.

3

1    among ourselves.

2        Q      Now, before Father Devillers allowed you--or
3    asked you to go to the school, did he conduct any fitness
4    investigation as to The Society of Priests?

5        A      It was not necessary.  He knew us from before
6    as priests of The Society of St. Pius the Tenth.

7        Q      So it's your understanding that under Rome's
8    policy, Father Devillers did not have an obligation to
9    make an inquiry because all of you were priests
10   previously--

11       A      Correct.

12       Q      --with The Society of Pius the Tenth,
13   correct?

14       A      Correct.

15       Q      How long did you physically--did The Society
16   of St. John physically reside at the school?

17       A      As I said, I think from the beginning of
18   November, 1997 until September 15th of 1999, I believe.

19       Q      Where did you go to then?  Where did The
20   Society move to then, if you left the school?

21       A      We went to our--we brought our own property
22   in Shohola, Pennsylvania.

23       Q      What was your function, what was the function
24   of all The Society priests, while you were living at the
25   St. Gregory's Academy?

                         28

1        A      At first, none.  Then Father Bisig and Father
2    Devillers requested that we become chaplains to the school
3    for a year.  And that was from the fall of 1998 through
4    the spring of 1999.

5        Q      What does that mean, chaplains for the
6    students?

7        A      You know, to celebrate Mass, to attend to
8    their spiritual needs, and also to teach religion class.

9        Q      Then after that period of time, did the
10   function change?

11       A      Yes; because they were able to provide
12   for--with The Fraternity priests.  And so we had agreed
13   that we would do that function only for a year.  Yes, that
14   was it.

15       Q      After that one year expired, did you still
16   perform any liturgical or spiritual function with the
17   students at St. Gregory's Academy?

18       A      No.

19       Q      When you moved to the Shohola property, was
20   that within that one-year period, or after that one-year
21   period?

22       A      Right after.  Because we finished the
23   chaplaincy in the late spring of 1999, and we moved out of
24   the school when we bought the new property in September of
25   1999.

                         30

1        A      Well, that changes, you know, according to
2    seasons and needs.

3        Q      Why don't you give me--list the different
4    functions that you had?

5        A      That I have or the other priests?

6        Q      Both?

7        A      Well,--

8        Q      Start with your functions, first.

9        A      First, I guess I was just a priest of the
10   community.  Then I become Superior of the community in
11   March, 1998, and I remained so until March of 2002.  And
12   then, for the other members, Father Daniel Pullerton was
13   the Superior before me.  Then our-- His functions were, I
14   think, after that, he was a member of our counsel, he took
15   care of finances at certain points, then he took care of
16   fundraising at certain points, he-- What else would he
17   have done? --and then he was, for awhile, in charge of the
18   novicia for our community.  I-- I believe those are his
19   main functions.  But if you want me to go into--

20       Q      Actually, I could spare you a lot of effort
21   here.  I'm not asking for the functions internally at The
22   Society of St. John.

23              What I'm asking for, what were the duties of The
24   Society of St. John priests with regard to students at St.
25   Gregory's Academy?

                         29

1        Q      At any time that you were at The Society of
2    St. John, whether it's Shohola, St. Gregory's Academy, or
3    even on trips, did you ever sleep in the same bed with a
4    student of the St. Gregory's Academy?

5        A      No.

6        Q      Did you ever sleep in the same sleeping bag
7    with a student of St. Gregory's Academy?

8        A      No.

9        Q      Did you ever sleep on the floor in a futon,
10   or some other type of floor bed with a student of St.
11   Gregory's Academy?

12       A      If you mean that I slept next to somebody?
13   Yes.

14       Q      On how many occasions did that happen?

15       A      But with the students of Academy, you said?
16              Then the answer is, "No."

17       Q      Let me then go back and ask the questions
18   more broadly.

19              While you were a priest at The Society of St. John,
20   whether on the property or off the property, did you ever
21   sleep in bed with any male?

22       A      No.

23       Q      Did you ever sleep in a sleeping bag with any
24   male?

25       A      No.

                         31

1      Q      That means also two sleeping bags zipped
2  together?
3      A      No.
4      Q      Did you ever sleep on the floor with any
5  male?
6      A      Next to somebody else?  Yes.
7      Q      How many times did that happen?
8      A      I would say, several times.
9      Q      "Several" could be you-- Do you think it's
10  less than five?
11     A      I don't-- What-- Whenever there was a need to
12  do something like that, I guess, you know.
13     Q      How often would there be a need to do
14  something like that?
15     A      Well, you--you know, they would have like a
16  big coming of people, you know, to your community like for
17  retreats or Holy Week or Christmas, those opportunities.
18     Q      Now, are you talking about the Academy or
19  over the Shohola property when this occurred?
20     A      No, on the--our--our property.
21     Q      The Shohola property?
22     A      Right.
23     Q      Could you describe to me how many square feet
24  the building was that the priests resided in at the
25  Shohola property?

32

1  you slept next to him on the floor?
2      A      My room.
3      Q      Do you remember who else was in that room?
4      A      Yes.  Probably, Father Carey, you know,
5  because we shared rooms with Father Carey.  Probably, Paul
6  McCleary, you know, other--other faculty of St. Gregory's.
7  Friends.  You know, I don't know how many friends would be
8  there, because we--we usually have between ten to 50
9  people, so--.
10            MR. JOSEPH O'BRIEN:   Is this at St.
11       Gregory's or Shohola?
12            THE WITNESS:   Shohola.
13            MR. COGNETTI:   Shohola.
14            THE WITNESS:   Shohola.
15     Q      Now, were any of the other rooms of the house
16  occupied that evening for people with people sleeping?
17     A      Yes.
18     Q      Is there some sort of a living room or dining
19  room where people could have slept on the floor?
20     A      They did sleep on the floor there, too.
21     Q      So as far as you know, were people
22  distributed on the floor equidistant throughout the house?
23     A      Yes.  Yes.  Although some--sometimes we got
24  into some problems, because like, you know, we get up
25  fairly early for liturgy, and so forth, and our offices

34

1      A      Well, we have a pretty changing situation
2  with buildings, you know.  At one time, we had only one
3  house, because we lend the other house to the Community of
4  Sisters who needed some housing.  Then we got-- We
5  developed all the way to four houses.  Then we got reduced
6  back to two houses.  So it--it was kind of changing, you
7  know, constantly, so to speak.
8      Q      Do you remember the first time that you slept
9  on a floor next to a male at the Shohola property?
10     A      No.
11     Q      Can you remember any instance in which you
12  did?
13     A      Not particularly, no.
14     Q      So you cannot recall-- You know that it
15  happened several times, but you cannot recall even one of
16  them?
17     A      I may not recall it did happen.  I don't
18  recall exactly, you know, the-the circumstances, you
19  know--you know, necessarily.  That-- That doesn't--.
20     Q      Can you remember the name of any male that
21  you slept next to on the floor?
22     A      Yes.
23     Q      Give me names.
24     A      Luke Culley.
25     Q      Do you remember what room you were in when

33

1  began to open fairly early.  So then when we got up, we
2  had to move everybody that was sleeping downstairs
3  upstairs, so that we could, you know, go through
4  regular--our regular life.
5      Q      Do you remember the name of any other male
6  that you slept next to on the floor?
7      A      No, not at this point.
8             MR. COGNETTI:   One minute.
9             (Discussion off the record.)
10            (In open hearing.).
11     A      He's asking me to explain the circumstances.
12     Q      "He" being your attorney.  You just conferred
13  with your attorney?
14            MR. COGNETTI:   Yes.
15     A      That's correct.
16     Q      You want to supplement your answer?
17     A      I believe that you understood the answer.
18  But, you know, there was a need because of the amount--the
19  flow of people or, you know, the circumstances in which
20  things happened to--to do that kind of--.
21     Q      But you don't want to add to that answer?
22            THE WITNESS:   Is that what you me to
23       explain?
24            MR. COGNETTI:   That's fine.
25     A      Why don't we take a little break?

35

1    Q    Sure.

2                (Recess taken.)

3                (In open hearing.)

4    Q    Do you know Matthew Sellinger?

5    A    Yes.

6    Q    How do you know him?

7    A    He was a seminarian at--at Winona, Minnesota.

8    Q    Now, do you know that Matthew Sellinger, at

9    some point, made an allegation that you committed or

10   attempted to commit a sexual impropriety with him?

11   A    Yes, I think that he accused me that I tried

12   to touch him in his private parts.

13   Q    Is that allegation true?

14   A    No.

15   Q    When was the first time that you heard that

16   allegation?

17   A    From Matthew, a few days after the incident,

18   you know, he claimed took place.

19   Q    He said it to your face?

20   A    Yes.

21   Q    What did you say in response?

22   A    That that was not the case.

23   Q    Do you remember, roughly, what his words were

24   when he made this accusation?

25   A    That I have tried to touch him in his private

---

1    parts.

2    Q    And you tried to explain the fact that it did

3    not happen?

4    A    I didn't have to explain the fact, you know,

5    that.

6    Q    You just said, "It did not happen"?

7    A    There was-- There was-- There was no fact,

8    you know.

9    Q    What I'm trying to get at is, was there

10   something he could have confused with that, something

11   innocent that happened that he thought was an

12   inappropriate attempt?

13   A    I didn't ask him that question.

14   Q    So you never inappropriately touched him,--

15   A    No.

16   Q    --or you never tried to inappropriately touch

17   him?

18   A    No.

19   Q    Did you sleep in the same bed ever with

20   Matthew Sellinger?

21   A    No, I don't think so.

22   Q    Did you sleep in the same bed with any man

23   while you were at Winona?

24   A    No, we have everybody their own rooms.

25   Q    Did you ever, at any time, state that

---

1    sleeping in the same bed with a student, or a novice was a

2    way of spiritual direction?

3    A    No.

4    Q    You don't believe that to be the case?

5    A    No.

6    Q    Do you know an Aaron Maderford.

7    A    Yes, I know him.

8    Q    He was a seminarian at Winona, is that right?

9    A    Yes.

10   Q    Did you ever inappropriately touch him in a

11   sexual way?

12   A    No.

13   Q    Do you know whether not Mr. Maderford told

14   Sellinger that you had molested him?

15   A    Never heard that before.

16   Q    As far as you know, did any of the seminary

17   candidates at The Society of Pius the Tenth sleep with

18   other candidates or with instructors?

19   A    No.

20   Q    Do you know Dorm Father Fred Frazier?

21   A    Yes.

22   Q    Did you ever sleep in the same bed with Mr.

23   Frazier?

24   A    Yes.

25   Q    Okay.

---

1    A    And--

2    Q    Tell me the circumstances.

3    A    Well, we were talk-- I think he was waiting

4    for me one night when I was busy with something else.  And

5    I think he was waiting for me.  He fell asleep on my bed,

6    then I came in, we sat down and began talking, and then I

7    fell asleep, and I guess he kept talking, and then he fell

8    asleep.  And that's the way it happened.

9    Q    How many times did you sleep in the same bed

10   with him?

11   A    I think that one episode that I can remember.

12   Q    Forgive me.  I may have fouled up my

13   questioning.

14        But I thought I had asked you first whether you

15   ever slept in the same bed with any male at Shohola and

16   you said, "No," but that you had slept on the floor?

17   A    Yes.

18   Q    Let me go back and ask the same question

19   again.

20        Other then Fred Frazier, did you sleep in the same

21   bed with any other male while you were with The Society of

22   St. John, either at Shohola, St. Gregory's Academy, or at

23   some other location?

24   A    Not that I can recall at this point, no.

25   Q    So Fred Frazier would be the only one?

1     A     Yes, you just reminded me.
2     Q     I've got some other names.  They may remind
3  you too.  It's probably a worthwhile exercise.
4           Did you John Clark, the son of Howard Clark?
5     A     Yes, I know him.
6     Q     Did you ever sleep in the same bed with John
7  Clark?
8     A     No.
9     Q     Did you ever sleep on the floor next to him?
10    A     Yes.  Yes.
11    Q     Do you remember the circumstances when that
12 occurred?
13    A     I think it was we were coming back from a
14 trip with him and other St. Gregory graduates.  And,
15 again, the same type of thing that we stopped at our
16 property, and, you know, we--there were, you know, a need
17 for space or whatever, and then I think he was with him,
18 and--
19    Q     "He was with him"?  Who's "he"?
20    A     I think--
21    Q     You--
22    A     --Dan--Dan Kerr--Daniel Kerr.  I think it was
23 very close to us, too.  I don't remember who else was
24 there.  But there was, you know, a group of people.
25    Q     How many people in this group?

                              40

1     A     I don't recall, exactly.
2     Q     But the group was so large that they had to
3  be congregated in your room?
4     A     I don't think it wasn't in my room, because--
5  I-- I don't know what reason it was.  But I think we were
6  in some--in some--in our--I think in our living room or
7  something like that.  He wasn't in my room.
8     Q     This group of people, did they come in one
9  motor vehicle?
10    A     No.  I mean, probably, it was two or three
11 cars.  I don't remember.
12    Q     Two car or three cars?
13    A     I-- I think, you know.
14    Q     As far as you know, there were no vacant beds
15 throughout the Shohola property for them to sleep in?
16    A     No, not--I--I don't think so, you know.
17    Q     Did you ever sleep in the same bed with Simon
18 Tanner?
19    A     No.
20    Q     Did you ever sleep on the floor next to him?
21    A     Let me think about that, if I can recall.  I
22 think, once.  I think, once.
23    Q     What were the circumstances when that
24 happened?
25    A     I think they were coming after graduation at

                              41

1  St. Gregory's.  They-- They were there, you know, like
2  visiting.  And they came to The Society for like a little
3  retreat, if I remember well.  And they came.  And I--I
4  guess, you know, took different spaces.  I-- I wasn't
5  really sleep when they--when they came back--when they
6  came that night, I think.  And he-- I think he brought his
7  own sleeping bag and, you know, he--he slept, you know,
8  next to me.
9     Q     Now, you testified earlier that there was a
10 one-year period of time where S.S.J. was actually residing
11 at St. Gregory's Academy, and it was about the time that
12 you were leaving that that one-year chaplaincy ended, is
13 that correct?
14    A     Yes.
15    Q     Now, was there any additional reason--was
16 there any reason for students to be--students from St.
17 Gregory's Academy to be visiting The Society of St. John
18 at the Shohola property after that one-year period?
19    A     Definitely, because of the parents.  We would
20 come with parents.  You know, sometimes parents would be
21 together with this groups of people, so some of the
22 parents would be sleeping in, you know, like the guest
23 room that we--we dedicate to them, and some of their sons,
24 you know, would be sleeping in whatever, in our living
25 room or whatever sleeping quarters.

                              42

1     Q     But did students ever come alone without
2  their parents?
3     A     I think once for a camping trip.  But I don't
4  think that they stayed at The Society.  They just walked
5  through the property, and went on their way to Shohola
6  Falls, I think.  It was a camping trip.  And they came, I
7  think, with-- I don't think I was there that day.  But
8  they came for a camping, and they asked permission whether
9  they could walk the property.
10          And we said, "Yes, you could walk the property."
11          And I think they brought some dorm fathers and,
12 probably, some faculty.  I don't remember, you know,
13 because I wasn't there, I think.
14    Q     So after that one-year period when you left
15 the Academy, and you were with the Shohola property, there
16 was no students making overnight visits, for example?
17    A     No, I don't think so, unless with parents
18 or--you know.
19    Q     I mean, without parents.
20    A     No, I don't-- No; because they couldn't leave
21 the school.  They have to do their school.
22    Q     Did any students stay overnight in your room
23 while you were at Shohola?
24    A     Of St. Gregory's?
25    Q     Yes.

                              43

111003Fitz.txt

JOHN DOE, JOHN DOE, SR.,  :  IN THE UNITED STATES DISTRICT
and JANE DOE,
              Plaintiffs  :  FOR THE MIDDLE DISTRICT OF PA


        VS            :


FATHER ERIC ENSEY, FATHER :  CIVIL ACTION - LAW
CARLOS URRUTIGOITY, DIOCESE
OF SCRANTON, BISHOP C.    :
TIMLIN, THE SOCIETY OF ST.
JOHN, THE PRIESTLY        :
FRATERNITY OF ST. PETER,
and ST. GREGORY'S ACADEMY, :

        Defendants    :  No.  2000-CIVIL-2961


:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::



        TRANSCRIPT OF DEPOSITION of STEPHEN FITZPATRICK, as

taken on behalf of the PLAINTIFFS, pursuant to notice,

before Gloria Anzalone, a certified shorthand reporter in

and for the County of Lackawanna, Commonwealth of

Pennsylvania, at The Video-Conferencing Facility at

Marywood University, 2300 Adams Avenue, Scranton, PA

18503, on the 10th day of November, 2003, commencing at

1:17 p.m. and concluding at 1:53 a.m., of said day.




                        1




A P P E A R A N C E S:
              Page 1

111003Fitz.txt

8       The Society of Saint John's, I object to the
9       methods used for taking of this deposition.  We
10      will even submit that this deposition is being
11      taken in contravention of Rule 30(b)7 of the
12      Federal Rules of Civil Procedures.
13              In addition, we object because we
14      believe that there has not been adequate notice
15      pursuant to 30(b)1 of the Federal Rules of
16      Civil Procedure.  And, finally, we object
17      because it is against the spirit of Rule
18      30(b)4, that live testimony is preferred over
19      video testimony.
20              I state those objections on the
21      record.  We are here, we will participate, but
22      by our participation we are not waiving any of
23      our objections to the method used for this
24      deposition.  In addition, I'm not sure that the
25      method being used is technically correct.

4

1       Saying that, I am now asking you, Mr. Bendell,
2       if you'll give us an offer of proof as to this
3       witness.
4               MR. BENDELL:  First as to an offer of
5       proof, I have stipulated earlier this morning
6       that the depositions for this week can be
7       simply considered discovery depositions;
8       however, I'm also willing to make an offer of
9       proof anyway, and that would be Exhibit 1 of
10      which is the only information I assume this

111003Fitz.txt

14          MR. BENDELL:  James?

15          MR. O'BRIEN:  Yes, we would join in

16     the objection with regard to what we would see

17     as a violation of 30(b)7.  That's all I have.

18

19          STEPHEN FITZPATRICK, called as a witness,

20  having been first duly sworn, was examined and

21  testified as follows:

22                    EXAMINATION

23  BY MR. BENDELL:

24          Q     Good morning, Mr. Fitzpatrick.  Could you

25  tell me where you reside at the present time?

                              6

□

1          A     My home is in Ottawa, Canada, but right now

2  I'm going to school in Santa Paula.

3          Q     And that's at Thomas Aquinas College?

4          A     That's correct.

5          Q     What year are you in?

6          A     I'm a senior.

7          Q     And did you at one time attend Saint

8  Gregory's Academy?

9          A     I did.

10          Q     Was that from 1996 to 2000?

11          A     It was.

12          Q     Would you please look at Exhibit 1 for a

13  moment and tell us if you recognize that document.

14          A     I do.

15          Q     Is this a copy of a letter you sent to

16  Bishop Timlin in February of 2002?

111003Fitz.txt

```
 6              Cognetti points out the rules provide that

 7              discovery depositions in some cases can be used

 8              at trial.  However, I didn't write the rules,

 9              so this is a discovery deposition.  Anyway, the

10              witness says --

11    BY MR. BENDELL:

12         Q     What was your answer, there was no

13    cigarettes that you know of?

14         A     To which question?

15         Q     Did Father Urrutigoity buy any tobacco for

16    the young men?

17         A     I'm sorry, the volume cut out for a second.

18         Q     Did Father Urrutigoity buy any tobacco for

19    the boys?

20         A     No.

21         Q     Now you're not willing to tell me whose

22    house you stayed at.  Can you tell me if the owner of the

23    house was at the house?

24         A     I don't understand why -- no, I don't want

25    to answer that.
```

                                    14

```
 1         Q     So you won't tell me that, either?  Okay.

 2    Who else was in the house besides Saint Gregory's students

 3    and Father Urrutigoity?  Were there any other adults?

 4         A     I don't want to answer anything about the

 5    circumstances of anybody else involved with that, counsel,

 6    about the house and who it belonged to.

 7         Q     Without answering the question, can you

 8    tell me why it is you want to talk to an attorney before
```

                                Page 13

111003Fitz.txt

15    I keep repeating who I am, I don't know why, but I'm going

16    to go through your statement in a little bit more detail

17    if I may.  Do you know of any improper conduct on the part

18    of Father Urrutigoity or the part of Father Ensey?

19        A    No.

20        Q    Did Father Urrutigoity or Father Ensey ever

21    make any sort of improper sexual advances towards you?

22        A    No.

23        Q    Did you ever see Father Urrutigoity or

24    Father Ensey ever make sexual advances against any

25    student?

17

0

1        A    No.

2        Q    Do you believe Father Urrutigoity or Father

3    Ensey is a homosexual?

4        A    No.

5        Q    Has any student ever told you that they

6    have been engaged in any improper sexual conduct with

7    Father Urrutigoity or Father Ensey?

8        A    No.

9        Q    Now you stated that you stayed in the same

10    bed with Father Urrutigoity, is that correct?

11        A    Yes.

12        Q    Were there other people in the bed?

13        A    Yes.

14        Q    How many other people?

15        A    One.

16        Q    And were there other people in the room?

17        A    I don't recall but it's most likely.

Page 16

111003McLau.txt

```
JOHN DOE, JOHN DOE, SR.,  :  IN THE UNITED STATES DISTRICT
and JANE DOE,
           Plaintiffs     :  FOR THE MIDDLE DISTRICT OF PA


           VS             :


FATHER ERIC ENSEY, FATHER :  CIVIL ACTION - LAW
CARLOS URRUTIGOITY, DIOCESE
OF SCRANTON, BISHOP C.     :
TIMLIN, THE SOCIETY OF ST.
JOHN, THE PRIESTLY         :
FRATERNITY OF ST. PETER,
and ST. GREGORY'S ACADEMY, :

           Defendants     :  No.  2000-CIVIL-2961
```

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

TRANSCRIPT OF DEPOSITION of PATRICK

MCLAUGHLIN, as taken on behalf of the PLAINTIFFS, pursuant

to notice, before Gloria Anzalone, a certified shorthand

reporter in and for the County of Lackawanna, Commonwealth

of Pennsylvania, at The Video-Conferencing Facility at

Marywood University, 2300 Adams Avenue, Scranton, PA

18503, on the 10th day of November, 2003, commencing at

1:54 p.m. and concluding at 2:14 a.m., of said day.

A P P E A R A N C E S:

    FOR THE PLAINTIFFS:    JAMES BENDELL, ESQUIRE

    FOR DEFENDANTS ENSEY:  SAL COGNETTI, ESQUIRE
    AND URRUTIGOITY/
    SOCIETY OF ST. JOHN

    FOR DEFENDANTS:        JAMES O'BRIEN, ESQUIRE
    DIOCESE OF SCRANTON/
    BISHOP TIMLIN
                    Page 1

EXHIBIT
K

111003McLau.txt

24     attend Saint Gregory's Academy?

25             A     Before I answer any of your questions,

6

1      I just want to tell you that anything I say here now

2      is subject to change because I haven't had an

3      opportunity to get counsel yet.  You've given me

4      three days which were weekend days, so I just want

5      you to know that.

6             Q     That's fine.  I instructed the process

7      server to serve you as soon as possible but that

8      didn't happen so I apologize for that.  Getting back

9      to the first question, did you attend Saint Gregory's

10     Academy at one time?

11            A     Yes, I did.

12            Q     What years?

13            A     I believe my freshman year there was

14     1995 through 1999 when I graduated.

15            Q     And where are you attending school now?

16            A     I'm attending school at Thomas Aquinas

17     College, Santa Paula, California.

18            Q     What year are you in?

19            A     I'm a junior.

20            Q     When you were at Saint Gregory's

21     Academy, did you know Father Urrutigoity?

22            A     I did.

23            Q     Did you know Father Ensey?

24            A     Yes.

25            Q     Did you know any other priests of the

111003McLau.txt

```
 1              get to those but once he answers the first
 2              question then I'm going to go on one, two,
 3              three, four, five.
 4    BY MR. BENDELL:
 5         Q     Mr. McLaughlin, what part of my
 6    question don't you understand about sleeping in a
 7    bed?
 8         A     The, in the bed, part.
 9         Q     What part of that is not clear?
10         A     Does with simply mean in the bed or in
11    the room or?
12         Q     In the bed, actually in the bed.
13         A     To the best of my knowledge I think I
14    have witnessed maybe one instance, but that's it.
15         Q     And when was that?
16         A     I can't recall when it was.
17         Q     Well, was it while you were a student
18    at Saint Gregory's Academy?
19         A     Yes.
20         Q     Where did this sleeping incident occur?
21         A     In the bedroom of one of the priests.
22         Q     And was that at the Shohola property?
23         A     No.
24         Q     Where was it, at Saint Gregory's
25    Academy building?
```

9

```
 1         A     Yes.
 2         Q     And who was the priest?
 3         A     Father Urrutigoity.
```

Page 8

111003McLau.txt

4          Q        And who was the student who slept with

5     him?

6          A        I don't recall.

7          Q        And how is it that you were able to

8     witness this?

9          A        I came by looking for Father

10    Urrutigoity.

11         Q        And you went to his room?

12         A        Yes.

13         Q        And you saw the student in bed with

14    him?

15         A        I did not see the student in bed with

16    him, I saw the student in his bed.

17         Q        And was anybody else in the room

18    besides the two of them?

19                  MR. COGNETTI:  I object to the form

20             of the question.  He didn't say Father

21             Urrutigoity was there.

22    BY MR. BENDELL:

23         Q        Was Father Urrutigoity there?

24         A        I don't recall.  He did return to his

25    room, he might have been in the bathroom.

                                10

1          Q        What time of night was this?

2          A        Anywhere between the hours of 12:00 and

3     3:00.

4          Q        Was the person, the boy in his room

5     asleep?

6          A        Yes.

Page 9

# FRIENDS OF THE SOCIETY OF ST. JOHN

## QUESTIONS???

To submit a new question send an e-mail by clicking here.

## Who initiated the formation of the "Friends"?

The Friends of SSI was formed by it's members at our own suggestion. We felt that priests in the proper order of things should not be distracted from their daily prayers to defend themselves. In fact we felt it was fitting that the faithful defend it's priests, particularly in such a sad case as this where the detractors are Catholic.

> "It is no small prudence to be silent in the evil time, and to turn within to Me, and not to be disturbed with the judgment of men."--Thomas a Kempis *My Imitation of Christ*

We as the "Friends" feel compelled to defend the priests of SSI because we see this attack as one against not just a small seedling within the Church, but rather an attack on Holy Mother Church herself, by way of her chief representative in the Diocese of Scranton, Bishop James Timlin. It is our duty to defend our Bishop and our priests while they remain committed to their duty of daily re-enacting Calvary.

## Why the "i" in Friends of SSI?

SSI has simply been the acronym used to refer to the Society. SSI are the initials for the Latin translation of Society of Saint John. The Latin translation is Societas Sancti Ioannis.

## Who are the Friends of SSI?

The Friends of SSI are men women and children, laity and religious alike who support the Society of St. John's mission and attest to that support by formally submitting their names to this website. To date they include:

Alexander, David L.
Anderson, Robert Charles
Auro, Fadi Thomas Maria
Ayala, Craig & Barbra & Family
Baird, Andrew
Baird, Megan
Balbi, John
Balbi, Rosemary
Baron, Michell
Bateman, Russell & Family
Beck, Michael & Cecilia
Bissex, Maria Virginia
Blonski, John & Rebecca
Brown, Mr. Jim
Buckley, Christopher




Russell Bateman is the President of
Friends of SSI

Burrus, Derk
Bryant, Kevin M.
Byrne, Paul
Cacich, Milvia
Cadrin, Phillip
Cain, Mr. Gilbert B.
Castro, Fr. Erwin
Chegwidden, James
Chijioke, Anabidom Charles
Chow, Augustine K. C.
Cintorino, Mr. & Mrs. Jack J. & Family
Cleveland, Benjamin
Consoli, Remedios
Creager, Vanessa
Cruz, John
Cuseo, Deacon Tony
Dang, Rose Marie
Daly, Mary Ann & Gerry
DeBarbieri, John
DeCaro, Gregory and Mary
DeCruz, Ann and Savio
de Fernandez, Lilian Castellani
Delaplace, Christine & Family
DiGiovanni, Dr. Angelo Gino
Dinovo, Tony
Drummond, Bob & Ann
du Boiss, Alfred J.
Dufourq, Esteban
Dufourq, Teresa
Edmunds, Delores
Elliot, Jane S
Espinosa, Gabriel
Fahey, Antoinette
Fahey, Francesca
Fahey, Jean
Fitzpatrick, Sean.
Fitzpatrick, Stephen
Flannery, Timothy
Fraser, Fred
Freeman, Grant
Freeman, Mellda
Fullerton, Maryanne
Fullerton, Rebecca
Gaetano, Maria T.
Gajewski, Bob & Barbara
Goyette, Mary & Gilles
Graves, Martha B.
Guth, Bob & Geri
Haller, Stephen and Christiana
Hamilton, Nicholas
Hamilton, Pam
Hamilton, Suzette
Helguera, Roberto
Hewko, Dr. Walter & Lucette
Holmes, Jeremy & Jacinta
Hudson, Gareth
Hudson, Natalie
Jones, Frederick
Kerr, Daniel
Klassen, Joseph

he is available via e-mail at:
7barefootkids@socantel.net

he is also available via snail mail at:
P.O. Box 105
South Canaan, PA 18459

Board Members of Friends of SSI

Joseph Mioni
Nancy Price
Arnold Swanson
Andrew Zuranski
Terry Zuranski


Advisors

Anthony Mioni

Kramer, Kirk
Lally, Sheree
Landell, Brendan
Lawrence, Justin
Lieberman, Charles & Bette Rose
Lillard, Jackie
Long, Carol
Mace, Robert H. Jr
Manssur, Bret
Marsh, Janet
Martin, Bryan
Massett, Louis
McAdoo, Mr. Nicholas
McAdoo, Patsy & Andy
McCaffery, Brendan
McCaffery, Jason
McCaffery, Justin
McCaffery, Kevin
McCaffery, Vanessa
McCarthy, Mr & Mrs Patrick G. & Family
McInerney, Stephen
McLaughlin, Patrick
McSheffrey, Michael
Mehu, Anne
Miller, Christopher & Family
Miller, Michael A.
Miller, Sharon A.
Mioni, Anne Marie Massett
Mioni, Anthony
Mioni, Joseph & Family
Monroe, Daniel
Morgan, Ann
Mylott, Mr. and Mrs. Raymond L. Jr., Esq.
Nardi Henry & Family
O'Brien, Irene
O'Sullivan, Michael & Family
Overkamp, Robert
Payne, Tony
Peterson, Julia
Price, Nancy & James
Ranieri, Eileen
Ranieri, Thomas
Rappel, Russ & Suzanne
Rauschert, Malinda & Philip
Riccio, Richard
Robinson, Alan
Robinson, Linda
Rush, Adam
Rush, June
Sarweh, Wassim
Schimpf, William
Schwerdt, Mark
Schwerdt, Thomas
Shelton, br. Chris
Sheridan, Anne
Smegelski, Fr. John
Sr. Anna Marie
Stedman, Timothy D.
Sullivan, Charles
Sureev, Denis

Swanson, Cate & Arnold
Tanner, Simon
Utietiang, Bekeh
van Beek, Garret "Gumby"
Venette, Rev. Howard J.
Walker, Tom & Family
Walsh, Mary Ann
Wasilewski, Keith J.
Watson, Jill M.
Waymouth, Ami & Tray
Wayne, and Alison Marone
Wittemann, Erick
Yellico, Glenn and Lissette
Young, Alex
Young, Brendan
Zelinski, Corey Vincent
Ziming, Alex Ren
Zuranski, Andrew & Therese

The Friends held their inaugural meeting
February 21, 2002



Previous Page            Home            Join Friends of SSI

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3                      - - -

JOHN DOE,                              )
4                                      )
                Plaintiff,             )
5                                      ) Civil Action
        vs.                            ) No. 02-0444
6                                      )
FR. ENSEY, FR. URRUTIGOITY,            )
7  DIOCESE of SCRANTON, et al,         )
                                       )
8              Defendants.             )

9                      - - -

10          Deposition of MATTHEW SELINGER

11           Friday, October, 24, 2003

12                     - - -

13        The deposition of MATTHEW SELINGER, called as a
   witness by the plaintiff, pursuant to notice and the
14  Federal Rules of Civil Procedure pertaining to the
   taking of depositions, taken before me, the
15  undersigned, Jessica L. Tapia, a Notary Public in and
   for the Commonwealth of Pennsylvania, at the office of
16  Marks, O'Neill, O'Brien, & Courtney, P.C.,
   3200 Gulf Tower, 707 Grant Street, Pittsburgh,
17  Pennsylvania  15219, commencing at 10:10 o'clock a.m.,
   the day and date above set forth.
18
                       - - -
19
            COMPUTER-AIDED TRANSCRIPTION BY
20          MORSE, GANTVERG & HODGE, INC.
              PITTSBURGH, PENNSYLVANIA
21                 412-281-0189

22                     - - -

23

24

25



1          And I says, "I don't have any, you know,

2    trunks or anything."  And Jason said the same thing.

3          And he says, "We're all men.  You never

4    been naked in front of a guy, your buddies?"

5          I'm like, "No.  Showers, locker room," I

6    says, "but I hardly want to jump into a cold river

7    naked."

8          That was the first incident.  Didn't think

9    much of it.  I thought he was a weird Argentinean

10   priest trying to learn how Americans were and trying

11   to be cool with us.

12          Then I was -- during Lent, I wanted to give

13   up meat for 40 days.  And I thought it would be very

14   hard, but I wanted to try it.  And I did it for a

15   couple weeks.

16          And I got constipated, I got real sick,

17   because I was living off of soup and vegetables.

18          So there was a guy in the seminary,

19   Anthony, I forget his last name, he was Italian, he

20   always had a pill for everything.

21          And I went to Father's room and I says, you

22   know, "I'm sick and I haven't went to the bathroom in

23   two weeks."  I said, "I need something to, you know,

24   go to the bathroom."  And I says, "I know Anthony got

25   Metamucil.  Can I get some?"

1          He said, "Well, I'll go ask for you."

2          He went and asked and he came back and he

3    said he didn't have any, which threw my mind real

4    quick.  I figured, the guy's always got it, but why

5    would the father lie?

6          And he says, "I'll go to the store and get

7    you some."

8          So he came back with a depository.

9    Q     You are talking about Father Urrutigoity

10   now?

11   A     Yeah.  He came back and he gave it to me.

12   And I went to put it in my mouth, I didn't know what

13   it was.

14         And he says, "No, that goes in your rear."

15   I don't know if that's the word he used, but --

16         And I says, "All right.  I never heard of

17   these."

18         And he says, "They're common and they work

19   the best."

20         All right.  So I went to the bathroom and

21   he says, "What are you doing?"

22         And I says, "I'm guess I'm going to do

23   this."

24         And he said, "What; I'm not your friend?"

25         I says, "Well, yeah."

1          He says, "Why do you have to go secret to

2   do something like that?"

3          I says, "Well, I have many friends, but

4   I don't want them watching me pee."

5          And he says, "Well, I think that's" -- and

6   this is the big thing with Father U, is, "That's part

7   of your pride, Matt.  You know, you come from a rough

8   background and you depend on your own strength to do

9   everything, and you have to break your pride to let

10  God get into your heart, because with self-love, God

11  can't get in there."

12          And all these things that he said is true.

13  But they don't apply, obviously, in this.

14          And reluctantly, I says, "Okay."  And I

15  kind of went into the bathroom and did it real quick.

16          And he came in, and I did it without him

17  and he got real mad at me.

18          And I just says, "Well, Father, it's going

19  to take me a while to be able to swallow that much

20  pride."

21          Does that answer the question?

22      Q    Yes.

23      A    Okay.

24      Q    Also, while you were at Winona, did

25  Father Urrutigoity ever express to you some sort of a

1   they needed their own bed and privacy.

2           And the seminarians and priests didn't want

3   to be downstairs.  We were told by the priests,

4   because, unless you sleep in your cassock, you know,

5   during the night, what if somebody, one of the women

6   or something, comes down to go to the bathroom and

7   she's not dressed properly or you're not dressed

8   properly?

9           We kind of wanted to give everybody their

10  own privacy, and that's why I took the floor.

11      Q     What happened that night, later?

12      A     I was sleeping and pretty much I woke up

13  and his hand was on my private area.

14      Q     I know this is embarrassing, but to be

15  specific, what organ was his hand on?

16      A     What do you call it?  The unvulgar word is

17  "penis."

18      Q     Was it the penis or testicles; which was

19  it?

20      A     It was the top, you know.

21      Q     The top of the penis?

22      A     Well, no, the actual penis.

23      Q     Okay.  His hand was on the penis.

24            Now, how do you know it was

25  Father Urrutigoity's hand?

1      A      Well, I felt it and I noticed it.  You

2  know, a guy's sleeping and they wake up, the first

3  thing they notice?

4      Q      Yes.

5      A      Okay.  Well, when I woke, I was in that

6  state.

7      Q      You had an erection?

8      A      Yeah.

9      Q      And then what happened?

10     A      And his hand was on the bottom of it.

11            Well, I knew it.  And I opened my eyes and

12  he was kneeling beside me with his hand on the bottom

13  of my penis and I was erected.

14     Q      "He," being Father Urrutigoity?

15     A      Yes.  Basically, I was caught between two

16  things.  I wanted to jump off and rip his head off,

17  and unless I could do that, I could do nothing.

18            I thought about it and I might have been

19  okay to do it, but my dad told me once a guy hit a

20  priest and his arm was frozen forever.

21            Now, Father U, regardless, whether he's a

22  killer, a rapist, a mass murderer, whatever, he's a

23  priest.

24            And I'm afraid to hit someone who was,

25  although he's that kind of a man, he is an

1   Alter Christi.  And you know, you don't lightly maim

2   or kill a priest, regardless of what they do, unless

3   you are trying to save a life or whatever.

4             I was hurt because everything in the back

5   of my head that I started to think about him was

6   confirmed at that minute.

7             And I basically wrestled in my sleep, like

8   I was waking up, to scare him.  He took his hand off

9   me.  I rolled on my side and I just laid there.

10            He crawled back up in the bed real quietly

11   and I laid on the floor for the rest of the night.

12            And my basic question was:  When I came to

13   the seminary and I offer myself to do the best that I

14   can, and he's my spiritual director, and I put my

15   spiritual life in his hands, but I did it through our

16   Lady and our Lord, how in the heck can they let this

17   happen?  The very person I'm supposed to trust and do

18   trust, and they let this priest do this to me.

19            So that was my confusion, not so much

20   Father U, because it all came clear to me what he was,

21   what his intentions were.  And that was something

22   where, either beat the hell out of him or walk away.

23       Q     So how long did you continue to stay in

24   that house?

25       A     Well, the next night, obviously, what I

1    left, I don't want to know why."  But he already

2    knew.  He said, "You just need time to get away.  Do

3    you want to come out to California?"

4            "Yeah.  That would be great."

5            I flew out, I got there.  After a couple

6    days, we were on the beach and it was at night, we

7    were walking and he asked me how things were going and

8    I came out and I just told him.  I told him

9    everything, what Father did, everything.

10           When we were done, Father Ensey looked at

11   me and he said, "Obviously, I can never go with this

12   man.  I can never talk to him; nothing."

13      Q       Referring to Father Urrutigoity?

14      A       Yeah.  I said, "Well, no kidding."

15           So, the next couple days, we didn't really

16   talk too much about the details, again, and I went

17   home.

18           When I got home, he called me and he said

19   that he was going to Scranton to confront Father U.

20           I said, "Well, go ahead and call me when

21   you're done."

22           He called me from Scranton and said

23   Father U was in Rome, when he got back he would talk

24   to him.  He called me a week, two weeks later, and he

25   says, "I've talked to Father U, I told him what you

1   confronted Father U and Father U admitted it.

2           And I says, "What the hell are you still

3   doing there?"

4           He says, "We still have things to talk

5   about."

6           I says, "Well, when you figure that out,

7   then you can call."  Pretty much, "Well, obviously you

8   don't believe me now, or you do and you don't care,

9   and so therefore, why am I still talking to you?

10  Bye."

11          He later came back down, wanted to talk

12  about it more and everything and he told me that it

13  happened like it did, but Father U said that I was

14  sick and he was doing that because he can tell if

15  you're aroused, you're sick, or like, if you look at

16  someone's tongue and it's all cracked then there's

17  something going wrong in the soul, because it's so

18  connected to your innard organs, and stuff like that.

19          It was a medical reason that he said that

20  he was doing this.

21      Q   Father Urrutigoity had some sort of medical

22  protocol involving touching a man's penis to see if

23  he's sick?

24      A   This is what he claims.  He would do a

25  bunch of things like that.  He said he would give

1   communion and look at people's tongues and tell if

2   that person was suffering more than the next person

3   with, you know, a smooth tongue.  And he said he could

4   do this, you feel this guy, whatever, and you can tell

5   that there was something being bothered.  And my thing

6   was, "Father, every guy knows when you wake up or when

7   you're sleeping, if you're comfortable, it happens."

8       Q     Right.

9       A     That's a bunch of bull.

10            You know, Father Ensey was asked, this is

11  where he first denied me telling him, because

12  Father Ensey was asked by Bishop Timlin if I ever told

13  him.  Father Ensey said, "No."

14            And he told me the reason he said no was

15  because he was my spiritual director and felt in

16  confidence that couldn't tell Father Ensey that --

17  Bishop Timlin that.

18      Q     I see.

19            So at this point, Father Ensey had become

20  your spiritual director?

21      A     Father U told him to take care of me.

22  Father Ensey listened to me when I was out in

23  California, talked me through with it.  After that,

24  there was really no other things in friendship.

25            Honestly, I never really looked at him as

1        And I says, "I ain't going to ask you if

2   you did, obviously what?"

3        He's like, "Of course not."

4        And I said, "I know, I know, I just, you

5   know -- formality."

6        And he said basically, if I'm subpoenaed,

7   and he made it sound like it would be a thing just

8   against Father U.  And if I answered the subpoena, and

9   went to court and I told my story, it would bury

10  Father U, which in turn would bury him, because he's

11  associated with him, he's my friend, and if I bury

12  Father U, then it's going to bury Father Ensey, him.

13       I says, "Yeah, that's a possibility."

14  I said, "Father, you kind of had many chances to get

15  out of this."

16       "Well, you know, I have.  I went to this

17  diocese," and so forth.

18       And then he said to me, "You know, if they

19  subpoena you, you can't get out of it.  Now, you can

20  leave the county."

21       And I says, "Well, you know, my wife and

22  kids; I have a family, I have a job.  You just can't

23  pack up and leave.  I mean, if it was to save

24  somebody's life, a friend, and I had to move, that's

25  something to consider, but not to not go to court

1   because Father U might go to jail or get money.  Not

2   only do I not care, but good.  And, you know, maybe

3   this won't happen to somebody else."

4           And he says, "I know.  I know.  I was just

5   telling you that that's the only way to get out of the

6   subpoena."

7           And he said, it was along the lines of,

8   "You know, you really can't lie."

9           And I said, "Father, you know I don't lie,

10  you know I'm not going to lie, especially in court and

11  especially when I have no reason to lie.  I'm not

12  getting anything out of it and I got no agenda.  I

13  tried to walk away from this five years ago.

14  Everybody keeps calling, 'Tell your story again.  Tell

15  your story again.  Tell your story again.'  And every

16  time I do, no one believes me anyhow or they do, like

17  Bishop Timlin or his guys said they believed me, but I

18  wasn't asking money so they left me alone and they

19  figured I would just go away, which I tried.  Now Bond

20  and all of this happens again.  So I'm not going lie."

21          And I started thinking, well, he threw two

22  things out on the table, get out of the country, lie.

23  Okay.

24      Q    Right.

25      A    The third was, he says, "Well, my lawyer,

1   he's a very" -- first he discredited this guy.

2   I don't know this guy, but basically, he said he's a

3   mental case.

4       Q      You mean the guy who was charging

5   molestation?

6       A      Right.  "He's a mental case and he's

7   looking for sympathy and a buck."

8              And I says, "Okay.  But you know what,

9   Father, you know, he may be, but not everybody that's

10  been accusing Father U" -- and we're not talking one

11  or two, we're talking three or four, and I know,

12  myself, another person who was molested by Father U,

13  who nobody knows about, and this guy, if came out and

14  told, his reputation is impeccable.

15             I asked him, I says, "If it ever comes to

16  something, do I bring up your name?"

17             And he said, "No."

18             And I said, "Why?"

19             And he said, quote, "Because I don't want

20  to deal with the shit you're going through," end

21  quote.

22             So he told me that this lawyer, his lawyer

23  Father Ensey's and Father U's lawyer is a good man,

24  Catholic, he wants to know the truth, he would like t

25  talk to me.

1           And I says, "All right."

2           He says, "Of course, you know if anybody

3    knew this was going on, we could get in trouble."

4           Basically, he could get in trouble.

5    Q       Father Ensey or the lawyer?

6    A       Father Ensey and Father U, because they're

7    pretty much coming to me, knowing that I'm going to be

8    subpoenaed and trying to get as much information, and

9    try to get me on whatever, to do whatever before I get

10   subpoenaed.  He says because he can't talk to me

11   definitely after I get subpoenaed or it's an

12   interference or something like that.

13          So he says, "This guy is a good guy, he's

14   everything."  And then he says, and this is what

15   struck up red flags, "He's a good guy.  He's got

16   strong ties to the Mafia.  He's not in the Mafia, but

17   he's got good strong ties to the Mafia," and left it

18   at that.

19          And then it hit me, the format that he was

20   going, he said, one, "You can get out of the country

21   to avoid the subpoena."

22          Two, "If you don't do that, and you have to

23   go, what about lying?"  I mean, he didn't ask me to do

24   it, but he brought it up.

25          Three, "My lawyer wants to talk you and

1   he's tied with the Mafia."

2          So to me, in my head, there was a format of

3   trying with the least, where you leave the country,

4   get him out of the way, "Would you lie?"

5          I'm saying this is the format that I'm

6   picking up.

7          And last, was the threat, I think was an

8   outright threat.  Why would he tell me that his lawyer

9   is in the Mafia, which I think is just stupid, because

10  he knows me.

11         Do you think I'm going to get scared and

12  say, you know, "Okay.  That was enough.  Boy, they

13  might come kill me."

14         I'm got going do anything.  And that's

15  when -- that's when I made my judgement of

16  Father Ensey.  Whether he came up with that himself or

17  was sent to do that, I don't know.  The guy hasn't

18  talked to me for a year and all of a sudden, he comes

19  down and says, "If you're subpoenaed, these are the

20  things that's going to happen."

21         So I told him -- right away, I thought to

22  myself, The Godfather.  Keep your friends close, keep

23  your enemies closer.

24         I told Father Ensey, "Sure, I'll talk to

25  your lawyer.  I'm telling the truth.  I can tell

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE, JOHN DOE, SR. and JANE DOE,<br><br>          Plaintiff,<br><br>vs.<br><br>FATHER ERIC ENSEY, FATHER CARLOS URRUTIGOITY, DIOCESE OF SCRANTON, BISHOP JAMES C. TIMLIN, THE SOCIETY OF ST. JOHN, THE PRIESTLY FRATERNITY OF ST. PETER and ST. GREGORY'S ACADEMY,<br><br>          Defendant. | Case No.: 3 CV 02-0444<br><br>FIFTH AFFIDAVIT OF JAMES BENDELL |

James Bendell, being first duly sworn, deposes and states as follows:

1.      I am one of the attorneys representing the plaintiffs in this case.

2.      This affidavit is made in response to the affidavit of Sal Cognetti dated December 18, 2003.  His affidavit is false.  As stated in my Affidavit dated October 27, 2003, the deposition of Matthew Selinger was moved from Friday to Thursday at the specific request of Mr. Cognetti so that he could attend the inauguration of the new president of Fordham University (see attached).  It is shocking that Mr. Cognetti would deny this fact in an affidavit.



EXHIBIT
N

3.      At the January 27, 2004 hearing in this case Plaintiffs will request that the court

place the other attorneys in this case under oath so that they may be questioned about this

fact.

James Bendell, WSBA # 20820
Co-counsel for plaintiffs

SUBSCRIBED AND SWORN to before me this 29ᵗʰ day of December, 2003.

NOTARY PUBLIC residing at Port Townsend, WA
My commission expires 1·29·07

I certify that I caused a true copy of
this pleading to be mailed to Cognetti,
O'Brien and Keeson on 12/30/03

FIFTH AFFIDAVIT OF JAMES BENDELL - 2



VISITOR :

Learning at Fordham    Life at Fordh

## The Inauguration

INAUGURATION       FORDHAM AT A GLANCE       FORDHAM'S JESUIT TRADITION
                   TOP STORIES

**The Inauguration**

President McShane's Inaugural Address

Official Greetings from the Federal Government

Official Greetings from the Governor of the State of New York, George E. Pataki

Official Greetings from the Mayor of the City of New York, Michael R. Bloomberg

Greetings On Behalf of the Alumni

Honorary Doctorate Recipient Vartan Gregorian's Keynote Address

**Inauguration Eucharist and Commissioning of the President**

**McGinley Lecture by Avery Cardinal Dulles, S.J.**

**Fordham Family Eucharist and Picnic**

**Student Inaugural Ball**

**Gallery Opening and Lecture**

**Student**

THE INAUGURATION OF THE 32ND PRESIDENT

**Inauguration of the Reverend Joseph M. McShane, S.J.**
Friday, October 24, 2003

| The Press Release | Media Assets |
|---|---|
| Click Here | Photos |



Photos: © Fordham University

More than 1,800 people attended the inauguration of Joseph M. McShane, S.J., as t president of Fordham University.