| | |
|---|---|
| JOHN DOE, JOHN DOE, SR. and JANE DOE, | Case No.: 3 CV 02-0444 |
| Plaintiff, | Judge: Hon. Jones |
| vs. | |
| FATHER ERIC ENSEY, FATHER CARLOS URRUTIGOITY, DIOCESE OF SCRANTON, BISHOP JAMES C. TIMLIN, THE SOCIETY OF ST. JOHN, THE PRIESTLY FRATERNITY OF ST. PETER and ST. GREGORY'S ACADEMY, | |
| Defendant. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS URRUTIGOITY AND ENSEY'S MOTION FOR RECONSIDERATION OF THE COURT'S MARCH 23, 2004 ORDER REGARDING THE PRIESTS' PSYCHOLOGICAL RECORDS

1. <u>Discoverability of the priests' psychological records does not hinge on a requirement that the priests sign a written release.</u>

In their brief, defendant priests rely upon the case of <u>Hahnemann University Hospital</u> v. <u>Edgar</u>, 74 F.3d 456 (3rd Cir. 1996) for the proposition that even an *in camera* inspection of a litigant's psychological records violates Pennsylvania law.    That case has no application to the case at bar because it involved the Pennsylvania commitment statute, Pennsylvania Mental Health Procedures Act (MHPA), Pennsylvania Statutes, Title 50,

Sections 7101 *et seq.* At footnote 7 of its March 23 Order, this court correctly noted that

this statute does not apply to this case. The reasons are as follows:

A.      The policy statement of the MHPA (§ 7102) makes it clear that the Act applies to the treatment of mentally ill persons who are either voluntarily or involuntarily committed to a mental health institution. Relevant case law holds the same. *See e.g.,* In Re McMullins, 462 A.2d 718 (Pa. Sup. 1983). The defendant priests were not sent to Southdown because they were mentally ill, but to determine if they were a danger to children (Timlin Dep., p. 97 – attached as Exhibit to Plaintiff's original Motion to Compel).   Not all persons who commit sex crimes are mentally ill. In fact, most persons who commit sex crimes are not mentally ill – they are simply criminals. Otherwise we would be sending rapists for counseling instead putting them in prison where they belong. The Act does not even apply to persons who are alcoholic, senile or drug dependent unless they are also mentally ill. 1977 Op. Atty Gen. No. 4.

B.      None of the defendants have stated that they are mentally ill.   It would interesting if the priest defendants, in their reply brief, would provide affidavits stating that they are mentally ill in order to support their position.

C.      The Southdown Institute is a Canadian facility, not a Pennsylvania mental institution, and therefore the Act does not apply. For example, the MHPA applies tort immunity to mental health providers for treatment given under the provisions of the Act. Allen v. Montgomery Hosp., 696 A.2d 1175 (Pa. Sup. 1995).   Can the defendants seriously assert that Canadian psychologists practicing in Canada would have immunity if the priest defendants sued them for negligence?

2. The Communications of the priests and Southdown personnel were not made with a
reasonable expectation of privacy and are therefore subject to discovery.

Attached as Exhibit 'D' to Plaintiffs' original Motion to Compel is a copy of the

11/28/01 letter from Bishop Timlin to the Papal Nuncio referencing the contents of the

psychological evaluation performed by Fr. Benedict Groeschel.      Attached as Exhibit 'B'

to that same pleading is correspondence between Bishop Timlin and Fr. Urrutigoity

regarding the evaluation to be performed at Southdown. In the latter correspondence

Urrugoity refers to the earlier Groeschel evaluation (undertaken at the request of Auxiliary

Bishop Dougherty) and he acknowledges that the diocese has the results of the

examination. How could he expect otherwise of the upcoming Southdown evaluation?

Urrugoity also states in that letter that he is willing to undergo the Southdown

examination for the Independent Review Board.    Attached hereto as Exhibit 'AA' is a

copy of the Scranton Diocese's  Policy concerning the investigation of sexual abuse.[1]

The Policy states:

> "If the evaluation of the accused indicates treatment is needed, the cleric will
> urged to enter an appropriate health care facility and cooperate with the treatment
> programs."

Clearly the Policy contemplates that the results of the evaluation be disclosed to the

diocese. Otherwise, how would the diocese know whether it should "urge" the cleric to get

treatment?    Attached hereto as Exhibit 'BB' is a copy of pages 96 to 103 of Fr.

Urrutigoity's deposition.[2]    At page 99 he concedes that the Fr. Groeschel report was sent

to Bishop Timlin.   At page 100 he concedes that the Southdown evaluation was also done

at the request of Bishop Timlin.  However, instead of the report being sent to Timlin, it

---

[1] This document was provided in Discovery by counsel for the Diocese of Scranton.

[2] The name of the victim has been blacked out.

was sent to attorney Cognetti because "My lawyer decided, **at that point,** to coordinate all

the psychological effort, because it was a legal case so he received the report, not Bishop

Timlin." (p. 103) (emphasis added).    Why would Urrutigoity say "not Bishop Timlin"

unless he knew that the report was originally intended to go to Timlin?

At page 2 of their original brief in opposition to plaintiffs' motion to compel, the

priests' attorneys falsely state:

> A set of psychological evaluations were sought subsequent to the filing
> of this instant action and after consultation at the suggestion of the
> defendants' attorneys. The defendants voluntarily agreed to undergo
> psychiatric evaluations with reasonable expectation that the results
> would be useful in the preparation of the defense of these false allegations.

In point of fact, every sentence in the above paragraph is false.

Plaintiffs' complaint was filed March 20, 2002 (*See* court file) and not served until

some time after that date .Motion to Compel shows that the Diocese had requested the

evaluation before the suit was filed.  Moreover, Exhibit 'B' to the original Motion to

Compel makes it abundantly clear that the examination was done at the request of the

Diocesan Independent Review Board, not at the request of the priests' criminal defense

counsel.  Attached as Exhibit "CC" is a copy of page 93 to 108 of Bishop Timlin's

deposition.   Timlin testified:

> "…I think there's something in the Charter where we have to do things like
> this to find out what **we can** from a psychological report of some type." (emphasis
> added) (p. 96).

> "I got some kind of report about the thing but it was not a written report…" (Id.).

When asked whether the reports were destined to go to the diocese, Timlin stated:

> "Yes, I would expect that I would normally do that. But in this case because of
> legal ramifications of it, that didn't happen." (p. 101).

In other words, after the priests were sent to the Southdown facility a lawsuit was

filed and the priests' attorney requested that the psychological records be sent to him

instead of the Diocese (which paid for them). This was a clear case of lawyer interruptus.

At that point Bishop Timlin was faced with a choice. On the one hand he could insist upon

following through with the standard procedure of obtaining the records and protecting the

bodies and souls of the children of the diocese from potential sexual predators. Or he

could acquiesce to the wishes of the priests' attorney in order to give them a tactical

advantage in civil litigation. Bishop Timlin chose the latter path, rationalizing:

> "Eventually we will [get the written evaluations] when this thing comes to
> fruition and when it comes to a discovery of the truth. This is all part of
> the process. The process is an ongoing process. We haven't been able to come
> to any conclusions yet because of all the stuff that's been going on. I mean this
> whole lawsuit has thrown the thing into a tizzy. That's holding everything out."
> (p. 97).

The defendants assert that the priest defendants were not "employees" of the

diocese. The record is clear that the priests are paid by the diocese and follow the

instructions of Bishop Timlin, their superior. No explanation is given by defendants as to

what distinguishes this relationship from conventional employment. In any case, the

categorization is irrelevant. The priests went to the Southdown facility at the Bishop's

request and to provide diocese information about their potential threat to children. There

was no expectation of privacy, whether they were employees, servants, serfs or vassals.

Defendants' argument that the two priests did not explicitly authorize Bishop

Timlin to receive this information is without merit. In Kemper v. Gray, 182 F.R.D. 597

(E.D. Mo. 1998), the court ordered defendants to produce the psychological records of a

policemen who underwent a psychological evaluation, as part of department policy, after

being involved in a fatal shooting.   In refusing to stop discovery of these records, the court

stated:

> It was understood that the results of these evaluations would be submitted to Gray's employer and, in fact, they were in the form of the two reports that are part of Grey's employment file.......
>
> Since he was aware that his evaluations would be reported to his employer, Grey had no reasonable expectation of confidentiality regarding his communications with Colarelly, Meyer and Associates....

182 F.R.D. at 599.

*See also* Barrett v Vojtas, 182 F.R.D. 177 (W.D. Pa. 1998).

The mere fact that the priests did not sign a written release does not mean they had an expectation of privacy.   For example, communications between a husband and wife are normally privileged.   However, if the communication occurs in the presence of a third party the privilege is waived.   The fact that the waiver occurs by conduct and is not in writing does not alter the fact that the privilege is waived.

Defendants further argue that the court may not draw any conclusions from the fact that Bishop Timlin composed a letter to the Vatican in which he discloses that the psychological report on Fr. Ensey "indicates problems with pornography and other characteristics which concern me given the allegations against him."   In his effort to further protect the defendant priests, without regard to the safety and welfare of the faithful in the Diocese, Bishop Timlin gave deposition testimony which is simply not credible.

First, it must be emphasized the Bishop Timlin cannot be considered a credible witness when it comes to testifying concerning diocesan documents.   For example, attached hereto as Exhibit 'DD' is a copy of letter that Bishop Timlin wrote to the INS to facilitate another Society of St. John priest, Fr. Bernardo Terrara. Attached as Exhibit 'EE'

is 'EE' is page 6 of Bishop Timlin's deposition in which he testifies he has no knowledge a

Fr. Bernardo Terrara. Moreover, as can be seen by the quotation from Bishop Timlin's

deposition above at page 5 of this brief, Timlin's testimony is to a great extent incoherent.

As always, a wise fact-finder looks to the paper trail which, unlike fallen human nature,

does not have the capacity to lie.

With regard to the first and unsent draft of the "pornography" letter to the Vatican,

Timlin's testimony that should be viewed in light of his statement that "My letters are

written by me alone and not by any PR person." (Exhibit 'FF', a copy of an email sent by

Bishop Timlin and provided in discovery by the Diocese of Scranton.).

Even if Bishop Timlin can be believed that "somebody else" inserted the language

about Ensey's problems with pornography, this still means that the diocese obtained that

information.   Whether the Bishop or the Auxiliary Bishop or the Diocesesan Chancellor

inserted the language does not matter. The point is that the Diocese obtained the

information from the report.

3. The court should not certify this decision for immediate appellate review.

Contrary to defendants' assertion, Bogosian v. Gulf Oil Corp., 738 F.2d 587 (3rd

Cir. 1984), which was cited in Hahnemann, *supra*, does not stand for the proposition that

Certification and a stay is mandated in every case where the court overrules a privilege

objection.   Privilege disputes of varying degrees occur frequently in civil litigation. A

literal mechanistic application of defendants' theory would mean that large numbers of

civil cases would be tied up for years on appeal before going to trial.

In Bogosian, the court decided that the legal issue presented were new to the court

and therefore warranted mandamus review.   In Glenmede Trust Co. v. Thompson., et al,

stated:

> We did not intend, however, to establish a steadfast rule that protective orders must always issue to protect the privileged character of the materials sought in discovery until all avenues of appeal, including appeal from a final judgment, are exhausted. Requiring the issuance of a protective order in all circumstances where a district court has determined that an exception to the attorney-client privilege applies thwarts our policy of open proceedings absent a showing of good cause to close them. See Pansy, 23 F.3d 772; Miller, 16 F.3d 549. Such a rule would be tantamount to permitting the parties to control the use of protective orders.[*fn14]

Significantly, footnote 14 of the <u>Glenmede Trust</u>, decision, issued in 1995, references a proposed but rejected modification of Civil Rule 26 (c) which would provide for protection orders for civil litigants during the course of litigation. However, the current version of Rule 26 (c) contains ample protection for litigants and offers the court a variety of methods to prevent the disclosure of the protected information to unauthorized persons. In fact, this court has already ruled from the bench that the litigants may not disclose the contents of the priests' psychological records. It is true that those records may ultimately be used at trial. However, the court is well aware of the fact that 95% of tort cases settle short of trial. Moreover, the court has yet to rule on the admissibility of these records. It may be that they are not admissible at trial.

Accordingly, adequate means exist for the court to protect the confidentiality of these records. The court should deny the defendant priests' request for an immediate appeal and should instead allow the young man molested by these priests to have his day in court.

////

////

Dated this 12th day of May, 2004.

_____

James Bendell, WSBA # 20820
Co-counsel for Plaintiffs

I certify that I caused to be mailed
to Joseph Leeson a true copy of this
pleading on May 12, 2004, and to the
remaining defendants by electronic mail
on that same day.

_____



DIOCESE OF SCRANTON
300 WYOMING AVENUE
SCRANTON, PENNSYLVANIA 18503-1279

OFFICE OF THE BISHOP

## POLICY OF THE DIOCESE OF SCRANTON

## CONCERNING CLERICS ACCUSED OF SEXUAL ABUSE

The matter of clerics becoming involved sexually with minor boys or girls or other persons has received much attention in the past few years. The general public and the law enforcement agencies have shown little tolerance for sexual abuse, especially of children. The potential for scandal and harm is increased if the alleged perpetrator is a cleric.

Because of the complexity of these issues, a standardized method of dealing with allegations and actual incidents is needed in the Diocese of Scranton. The Diocese will maintain a primary concern for the victims and their families. At the same time, we recognize that the sexual abuse of minors and others can be the result of psychological factors with tragic consequences for the abusers as well as the victims. To this end the Diocese is truly concerned for the overall welfare of those accused of some form of sexual abuse.

## I.    THE INVESTIGATION OF AN INCIDENT

When a cleric is accused of sexual abuse of a minor or another person, the matter will be discretely investigated by a diocesan official under the supervision and direction of the Ordinary.

When an incident is reported to a pastor or diocesan official or other person connected to the diocese, the Ordinary is to be informed. The credibility of the accusation will be evaluated and if it is determined that there is some substance to the allegation the following steps will be taken:

a)    The accused cleric will be interviewed by the Ordinary or by a diocesan official so assigned by him. If he admits that the accusation is true or if the circumstances indicate that there is a high probability of their truth, the cleric will be temporarily relieved of his duties and asked to assume an alternative residence. He will not be allowed to publicly function in the ministry. N.B. The cleric will <u>not</u> be suspended nor will any punitive measures be taken against him at this stage of the investigation.

**EXHIBIT**

AA

b)      A person or persons designated by the Ordinary or the Ordinary himself will initiate pastoral contact with the victim of the abuse in order to assure that immediate pastoral and/or medical and psychological care is initiated.

c)      If it is a question of sexual abuse of a minor child, the appropriate child protection agency will be immediately notified. The accused will be advised to secure the services of an attorney who is not the diocesan attorney. The diocese will assist in finding an attorney if necessary.

d)      If the investigation confirms that the incident did take place, the cleric will be directed to submit to a diagnostic evaluation at an appropriate health care facility.

e)      If criminal and/or civil charges are preferred, the cleric will be assisted by legal counsel and will receive the support and assistance of the Ordinary and diocesan authorities.

f)      During the period that the accused cleric is under investigation and otherwise unable to function in the active ministry, residence will be provided as well as a monthly living stipend. Health care benefits will be continued.

## II.    THE DISPOSITION OF THE CLERIC

If the evaluation of the accused cleric indicates that treatment is needed, the cleric will be urged to enter an appropriate health care facility and cooperate with the treatment programs. If the cleric cooperatively completes an initial treatment program and if the recommendation following treatment is positive, indicating that some form of ministry is possible, the cleric will enter a four year supervised aftercare program.

a)      The Bishop will appoint a director or supervisor who will work with the cleric on a regular basis to assure accountability.

b)      A supervised living arrangement will be designed based on the recommendations of the health care facility.

c)      Although a permanent pastoral assignment will not be given, the cleric will be offered a specialized, supervised ministry in keeping with the recommendations of the treatment facility.

d)      The cleric will participate in regular evaluations as recommended by the health care facility where he received treatment.

e)      All of the elements of this aftercare program will be drawn up in the form of a contract between the Bishop and the cleric.

f)      At the completion of four or five years of successful aftercare, the cleric will be eligible for a permanent assignment subject to conditions recommended by the supervisor and the health care professionals involved with the cleric.   This assignment will require regular aftercare and supervision.

## III.   THE APPLICATION OF CANONICAL PENALTIES

Canonical penalties will not be applied if the accused cleric cooperates with the Bishop, diocesan officials involved with his case and the health care professionals.   If however, the cleric refuses to cooperate and persists in the inappropriate behavior, the Bishop will have no choice but to apply the appropriate canonical penalties either by means of an administrative decree or a tribunal process.

If, after consulting with the health care professions who have treated the cleric as well as law enforcement persons involved and if there has been serious scandal connected with the cleric's situation, the Bishop and the cleric will discuss the possibility of laicization.

a)      Laicization is possible only by petition of the cleric himself or as a result of a tribunal process.

b)      The cleric will be afforded canonical counsel and all of his rights in both civil and canon law will be respected.

c)      He will be urged to petition for laicization only as a last resort and when it is clearly probable that he cannot continue to function in the active ministry in any way without the possibility of grave risk to himself, to others and to the diocese.

March, 1993

1     A    There was no need for--for that kind of

2 background check.

3     Q    Did you know that he was at the Institute of

4 Christ the King?

5     A    Yes, I knew that. I knew that. And I--I--I

6 thought that he left out--out of his own accord. That's--

7 That's the--

8     Q    Did you ever ask anybody at the Institute of

9 Christ the King why he left?

10     A    Well, no, because, I mean, you know, it would

11 be gossiping at that time. He was accepted back into the

12 seminary for The Society of Pius the Tenth. And I didn't

13 do the investigation at that point. You know, that's

14 Bishop Williams, who was the rector in Winona. So I was

15 professoring in Winona. And when they accept a student,

16 you know, it's not up to you to make your own private

17 investigation. I'm not Jeffrey Bond, you know.

18     Q    Did Father Roberts ever form a close

19 friendship with a student of St. Gregory's Academy, a

20 student who later joined S.S.J.?

21     A    Yes, John Zoszak.

22     Q    Was there a period of time when John Zoszak

23 was a novice that he actually lived in the same room with

24 Father Roberts?

25     A    I think you asked that question of Father

1     Q    He's a Franciscan--

2     A    He's a Franciscan.

3     Q    --in New York?

4     A    He's also a psychologist by profession, so I

5 think he does a lot of work for the Diocese of New York

6 that way.

7     Q    Did Bishop Timlin tell you the reason he

8 wanted you to have the evaluation?

9     A    Yes.

10     He said, you know, "In the face of all of these,"

11 you know, "rumors and stuff like that, it would be good

12 for you to have an evaluation. Would you-- Would you

13 comply with that?"

14     And I said, "Yes, no problem."

15     Q    Was it was your understanding that Father

16 Jroschel would then relay the results of the evaluation to

17 Bishop Timlin?

18     A    Definitely. That was--.

19     Q    Did Bishop Timlin tell you what the results

20 of the evaluation were?

21     A    He did not need to do that, because Father

22 Jroschel sent me a copy of that same report.

23     Q    Do you have a copy of that report?

24     A    I don't--

25         MR. COGNETTI: I object to anything,

1 Ensey. I couldn't remember. Because, as I said, we have,

2 for awhile, we were fairly--fairly overcrowded, even

3 without--with our own members. So I know that all of us

4 share a room with somebody else, but I don't know who with

5 whom. I don't remember exactly. You know, I don't

6 remember, at any point, he was in the same house or in the

7 same room with Father Roberts. I-- I don't recall that.

8     Q    Did you ever have a psychological evaluation

9 requested by the seminary at Winona as a condition of

10 becoming a candidate--

11     A    No,--

12     Q    --there?

13     A    --that's not--not a policy of The Society of

14 St. Pius the Tenth.

15     Q    Have you ever had a psychological evaluation

16 at the request of Bishop Timlin?

17     A    Twice.

18     Q    When was the first time?

19     A    The first time was October, 2001. I think

20 after Jeffrey Bond began sending all these e-mails and

21 stuff like that.

22     Q    Who did he send you to?

23     A    First, it was a very informal request, you

24 know, whether I would accept to do that. And he asked me

25 to go see Father Jroschel.

1         at this point, psychological. It's not

2         relevant. I direct him not to answer any

3         questions.

4         MR. BENDELL: At this point, I'm only

5         asking if he has a copy of the report, not

6         what's in it.

7     Q    Do you have copy of the report?

8     A    I don't think I kept a copy, no.

9     Q    Do you know if your attorney has a copy?

10     A    No, I don't think he has a copy.

11     Q    Do you know if a copy was sent to Bishop

12 Timlin?

13     A    I told you he-- Yes.

14     Q    Okay.

15         MR. BENDELL: Counsel, it seems to me,

16         if this was sent to a third party, the

17         privilege is waived.

18         MR. COGNETTI: I'm not too sure of

19         that. That's a legal issue we'll both

20         research.

21         MR. BENDELL: It may come back.

22         MR. COGNETTI: Okay.

23         MR. BENDELL: We'll come back, anyway.

24     A    That's no problem, you can see.

25     Q    What's in the report? You're more generous

EXHIBIT
BB

1  than your attorney is.
2              MR. COGNETTI:  I direct him not to
3      answer anything about--
4      A     I follow-- I have to obey even my attorney.
5              MR. COGNETTI:  You have to obey your
6      attorney.
7      A     You probably can find out, if you wanted to
8  read the report.
9      Q     Now, you said there was second evaluation--
10     A     Yes.
11     Q     --requested by Timlin?  When was that?
12     A     That was-- His first request to do another
13 evaluation was after ▮▮▮▮▮▮▮ father's letter.  So
14 that was sometime in January or February.
15     Q     Of 2002?
16     A     2002, you're right.
17     Q     This was evaluation requested by Timlin?
18     A     By Bishop Timlin, right.
19     Q     Where did he send you for that evaluation?
20     A     Southdown-- Southdown.  It's one word. --in
21 Canada.
22     Q     Canada?
23     A     Correct.
24     Q     That's a facility known for treating priests
25 who are alcoholic and sexual abusers, is that correct,--

100

1              MR. COGNETTI:  I object to the
2      question.
3      Q     --do you know?
4      A     I think it's a--it's a--it's a place that is
5  qualified to do thorough psychological evaluations.  I
6  don't know what their, you know, other missions they have.
7      Q     How long did the evaluation by Father
8  Jroschel last?
9              MR. COGNETTI:  Go ahead.
10     A     I think, two days.
11     Q     Two days.  Was there oral interview, only, or
12 was there also a battery of--
13             MR. COGNETTI:  I'm going to direct
14     that he stop answering any questions, because
15     I don't know where we waive it subconscious,
16     or I waive it on the record here.  So
17     anything about psychologicals, I'm going to
18     object to and direct he not answer.  I'm not
19     trying to give you a hard time,--
20             MR. BENDELL:  No.  No.  No, you're
21     doing your job.
22             MR. COGNETTI:  --you know.
23     Q     Now,-- This is just a how long
24 question. --How long did the Southdown evaluation last?
25             MR. COGNETTI:  Again, I don't know if

101

1      that's a waiver of it or not.  I'm directing
2      that he stop answering all questions.
3      Q     That's in Canada?
4              MR. COGNETTI:  I'll agree.
5      Q     Is that in Canada?
6              THE WITNESS:  Do you want me to say?
7              MR. COGNETTI:  Yes, it's in Canada.
8      A     Yes, in Canada.
9      Q     What town in Canada?
10             MR. BENDELL:  He can answer what town
11     in Canada.
12             MR. COGNETTI:  I don't know if he
13     knows what town in Canada it was.
14     Q     Do you know what town in Canada it was?
15     A     No, I don't know.
16     Q     Did you fly there?
17     A     I drove.
18     Q     You drove.  All right.  Did Bishop Timlin
19 tell you what the result--
20             MR. BENDELL:  Just asking if he told
21     you.
22             MR. COGNETTI:  Anything about
23     psychological information, I'm going to
24     object to and ask that he assert a privilege
25     at this time.

102

1              MR. BENDELL:  Except this, in order to
2      do the motion practice, I need to know-- Part
3      of my argument on whether or not there's
4      waiver, I just need to know the limited
5      question of whether or not he knows if Bishop
6      Timlin was informed of the contents.  I'm not
7      asking him the contents of the evaluation.
8              MR. COGNETTI:  Okay.  Go ahead.
9      Q     Was Bishop Timlin informed of the results of
10 the evaluation?
11     A     My lawyer decided, at that point, to
12 coordinate all the psychological effort, because it was a
13 legal case and so he received the report, not Bishop
14 Timlin.
15     Q     So Sal Cognetti received the report?
16     A     Correct.
17     Q     And as far as you know, Bishop Timlin has
18 never received the results of that report?
19     A     No, he couldn't.  That would-- There is a
20 confidentiality note there that it was to be given only to
21 him.
22     Q     So Bishop Timlin paid for it.  You didn't pay
23 for it, right?
24     A     No, they paid for it.
25     Q     So the Diocese of Scranton paid for the

103

**EXHIBIT**

_CC_

**Page 93**

1    Q    And it says at the top Delivered to
2    the Times Editorial Department. Is that a local
3    secular paper?
4    A    It's the local Scranton Times, yes.
The Editorial Department, I don't know whether it
6    went -- it went to the Scranton Times. I don't know
7    who put that on there, that's not my writing.
8    Q    But it went to the paper?
9    A    It went to the paper, yes, because he
10   made a public, he put something out in the paper and
11   gave something to the paper and it was billed as
12   Bishop Fails to Meet Duty in Abuse Cases, so we had
13   to respond to that.
14   Q    Now at the top part of the date was cut
15   off I guess in the copy machine. It looks like it
16   says 3, 04. Can I assume this is 2003?
17   A    That's 3/14 I would say.
18   Q    3/14, but I'm interested in the year,
19   is that '02 or '03, do you know?
20   A    I think it would be -- I'm not sure
21   myself now. I have to go back and think about when
22   it was. I think it was probably '03. The Dallas
23   Charter took place in Dallas of '02, correct? '02,
24   it was a year ago. It was '02, so this is saying
25   that we're not following the policy here; apparently

**Page 94**

that's what he was saying. So that would have to be
2    '03. I'm going to put '03 there (indicated).
3         MR. BENDELL: Well, the record will
4    reflect that the bishop very kindly altered
5    Exhibit 44 so it accurately reflects the
6    date.
7    BY MR. BENDELL:
8    Q    I appreciate you doing that. I'm going
9    to show you Exhibit 45. Now it's going to be
10   difficult for me to ask questions about Exhibit 45 in
11   view of the objections. Let me just take a minute to
12   think. Okay. I'll let you read that and ask you a
13   few questions.
14   A    Yes.
15   Q    You've heard the dialogue with the
16   judge. Based upon the objection of the defense
17   lawyers, I'm not going to ask you the contents of any
18   psychological eval, I'm going to ask you procedural
19   questions. I think you testified before, did you ask
20   Father Ensey and Father Urrutigoity to have a
21   psychological or psychiatric eval?
22   A    I did.
23   Q    One of the previous letters refers to
24   an eval by Father Benedict Groeshal (phonetic). Now
25   did both the priests see Father Benedict Groeshal

**Page 95**

2    A    Not to my knowledge, no.
3    Q    It was just one of them?
4    A    That's my recollection.
5    Q    But then you asked both the priests to
6    go to some other --
7    A    That was not in connection with this
8    second thing here, that was earlier.
9    Q    Why did you ask them to go see Father
10   Groeshal?
11   A    I think it was because of the visual
12   thing that happened, you know, that a man out in
13   Detroit --
14   Q    Winona. Selinger?
15   A    Selinger, yes.
16   Q    So then you asked Father Ensey and
17   Father Urrutigoity to go to a separate facility or a
18   separate doctor for an evaluation?
19   A    This was a preliminary thing, this is
20   not exactly what happened.
21   Q    This is just launching these questions.
22   So you did ask them to have an evaluation?
23   A    I did.
24   Q    Now is it your testimony that it was a
25   request, not an order?

**Page 96**

1    A    Yes, I asked, I suggested that they go,
2    I asked them if they would go and they readily said
3    they would do it because I asked them.
4    Q    Now was the purpose of this request to
5    determine any aspect of the validity of the Prorock
6    charges?
7    A    It was in connection with that, of
8    course, it was connected with the whole business.
9    But that's the idea, I think there's something in the
10   Charter there that we have to do things like this to
11   find out what we can from a psychological report of
12   some type.
13   Q    Now, without asking you the contents,
14   did you get the -- let me finish the question. Did
15   you get the results of that evaluation?
16   A    I got a report somewhere along the line
17   but I never got the actual evaluation, no. I think
18   the attorneys for the priests said that they did not
19   want them to come to us, so that's okay.
20   Q    You say you got the report but not the
21   evaluation?
22   A    I heard something about the thing but
23   it was verbal, you know, that I said something in
24   there. I got some kind of a report about the thing
25   but it was not a written report, it was not anything

1 that ever came to me as far as that goes, it was
2 blocked.
3 Q The purpose of these psychological
4 exams is to determine whether or not these men might
— be a danger to children, is that correct?
5 A Yes.
6 Q And as your role of bishop and the
8 caretaker of souls, you want to make sure you find
9 out the results of that evaluation?
10 A Eventually we will when this thing
11 comes to fruition and when it comes to a discovery of
12 the truth. This is all part of the process. The
13 process is an ongoing process. We haven't been able
14 to come to any conclusions yet because of all the
15 stuff that's been going on. I mean this whole
16 lawsuit has thrown the thing into a tizzy. That's
17 holding everything out.
18 Q Are you saying that you have not
19 requested the results of these psychological
20 evaluations?
21 A I have not gotten them. I don't know
22 whether I asked for them or not. I think I may have
23 asked for them, but when it was told that they did
24 not want me to have them, then I just said no
25 problem.

97

Q So the priests told you that they
2 didn't want you to have them?
3 A The attorney, I think their counsel.
4 Q Did the reports go to the attorney?
5 A I'm not sure about that; I don't know
6 where they went.
7 MR. JAMES O'BRIEN: Which attorneys
8 are you speaking of?
9 MR. BENDELL: Any attorney.
10 MR. JAMES O'BRIEN: Not to me, but
11 go ahead.
12 BY MR. BENDELL:
13 Q Do you know if they went to Mr.
14 Cognetti?
15 A I don't know that they went to Mr.
16 Cognetti; I don't know that.
17 MR. BENDELL: For purposes of
18 motion, Mr. Cognetti, could you tell us
19 whether you have copies of these reports?
20 MR. COGNETTI: No.
21 MR. BENDELL: Have you ever seen
22 them?
23 MR. COGNETTI: I'm not answering, I
24 not under the deposition. I have an
25 attorney/client relationship and I'm not,

98

1 you know.
2 MR. BENDELL: I'm just asking.
3 BY MR. BENDELL:
4 Q So have you been given verbal summaries
5 of these reports?
6 A I got some kind of a summary.
7 MR. COGNETTI: I believe we can
8 stipulate he has not.
9 MR. BENDELL: Well, I'm going to
10 ask him the question. I'm not going to
11 stipulate to it.
12 BY MR. BENDELL:
13 Q Have you been given verbal summaries of
14 these evaluations?
15 A I heard something someplace and I can't
16 tell you where or how I got some of it, but I did
17 hear something about the deposition. But I never got
18 a report, I never got an official report.
19 Q You said you heard something about a
20 deposition?
21 A I heard something about -- not a
22 deposition, about the report from the facility. I
23 don't remember getting any report in writing
24 certainly and I don't recall where I heard these
25 things, but I did hear something someplace along the

99

1 line, and it was okay. They were all right, the
2 reports that I got. That's enough for me to get -- I
3 shouldn't even say that.
4 Q No, I just want the truth. Who gave
5 you reports that they're okay?
6 A I don't know.
7 MR. JAMES O'BRIEN: He doesn't know
8 and I think he's --
9 MR. BENDELL: Well, I'm asking the
10 question.
11 MR. JAMES O'BRIEN: But he's
12 answered it a couple times that he doesn't
13 know where he got it, he doesn't know who
14 gave it to him.
15 BY MR. BENDELL:
16 Q But you feel somebody reported to you
17 that it was okay, they were okay --
18 MR. COGNETTI: I object to the form
19 of the question. I think that falls within
20 the privilege.
21 THE WITNESS: I got something in my
22 mind of where I heard it from, I can't be
23 absolutely certain because obviously this
24 is a crucial point and I don't want to say
25 something that would be a misstep on my

100

**Page 101**

```
 1    part that I would give wrong information. I
 2    don't want to do that.
 3           I want to give the right
 4    information; I'm not withholding
 5    information. But I don't want to
 6    jeopardize a case because I make a mistake
 7    and say something that is not true. So
 8    that's where I am in the thing. I want to
 9    be very careful that I don't say something
10    that would damage a person's case if it's
11    not true.
12           I just don't know about those
13    things. I'm being careful here, you can
14    see that and you can appreciate that, I
15    hope.
16  BY MR. BENDELL:
17    Q    But it was your intention when you
18  requested these priests to have the evals that you
19  eventually get the results of the evals?
20    A    Yes, I would expect that I would
21  normally do that. But in this case because of the
22  legal ramifications of it, that didn't happen.
23    Q    So after this case is over, however it
24  ends, do you expect that then you will be sent the
25  evals?
```
101

**Page 103**

```
 2  was your intent to get the results of these
 3  evaluations?
 4    A    That's the usual practice, but as they
 5  say in this case because there is a legal case
 6  pending, it didn't happen the ordinary way. And
 7  that's what I say when you get into the legal
 8  ramifications like this it does hold things back.
 9    Q    You sent, you requested these priests
10  to have the evaluation before the lawsuit was filed,
11  is that correct?
12    A    I guess it was, yes.
13    Q    So before the lawsuit --
14    A    They had a lawyer.
15         MR. COGNETTI: I object to the form
16      because the allegations were made and there
17      was a pending criminal investigation at the
18      time.
19         MR. BENDELL: You're coaching the
20      witness. I ask that you --
21         MR. COGNETTI: I'm not coaching the
22      witness, you're misstating the historical
23      facts.
24         MR. BENDELL: No, it's not true.
25         MR. COGNETTI: You said lawsuit.
```
103

**Page 102**

```
 1    A    If the persons involved release them to
 2  them to me, sure I will get them, if they do it. I
 3  mean if they decide that they don't want these things
 4  to be out there, then I don't know that I can get
 5  them.
 6    Q    So your position is that you sent
 7  Father Ensey, for example, for a
 8  psychological evaluation --
 9         MR. COGNETTI: I object to the form
10      I sent. He denies that and father --
11         MR. JAMES O'BRIEN: He didn't send
12      anybody, he even told you that he --
13      (Whereupon, more than one person spoke at
14        the same time and this reporter could not
15        decipher any testimony.)
16         MR. COGNETTI: Let me speak. He
17      did not send Father Ensey or Father
18      Urrutigoity anyplace, he requested. It was
19      up to them after seeking whatever counsel
20      they wished to seek whether they would go
21      or not.
22  BY MR. BENDELL:
23    Q    You requested that they have these
24  evaluations?
25    A    Right.
```
102

**Page 104**

```
 1         MR. BENDELL: The lawsuit. The
 2      lawsuit was not filed.
 3  BY MR. BENDELL:
 4    Q    Was a lawsuit filed when you sent these
 5  priests for the evaluation?
 6    A    I don't remember the timeline here. I
 7  just know that -- certainly the Prorock letter had
 8  come, I know that. Now whether, exactly when it took
 9  place there, I don't know really know that, I'd have
10  to go back and look at all these papers and find out
11  exactly when it took place, and the timeline. But I
12  know it happened after we found out about the Prorock
13  letter.
14    Q    What was the purpose of requesting that
15  the priests have an evaluation?
16    A    It's our practice, and you can read
17  through our practice there as far as what we put into
18  effect in 2003. We had it in effect in 2002 -- in
19  '93 rather, that we would get a psychological
20  examination. That's standard operating procedure.
21  When somebody is accused of something like this, we
22  send them for an evaluation.
23    Q    You say we get, what does that mean, we
24  get?
25    A    The Diocese of Scranton, when an
```
104

1 allegation comes against a priest if it's a credible
2 allegation, then we send the person for an
3 evaluation. That's standard operating procedure.
4    Q    With the goal of getting a copy of the
5 evaluation?
6    A    Yes, sure. We asked them actually to
7 sign a release. When the person goes, we ask them to
8 sign a release that I would get the results.
9    Q    I presume that these priests both
10 signed releases?
11    A    I presume they did, too, but we never
12 got them because they say, in this case there was a
13 flag on the --
14        MR. COGNETTI: They never signed
15        any releases.
16 BY MR. BENDELL:
17    Q    I show you Exhibit 46.
18    A    I wonder where this came from.
19    Q    That's what I'm going to ask you. My
20 first question is: Do you recognize the handwriting?
21    A    No, I do not.
22    Q    Could it be Bishop Dougherty's
23 handwriting as far as you know?
24    A    It doesn't look like it to me.
25    Q    Could it be Mr. Earley's handwriting?

105

1    A    No, I don't think so. I don't know
2 whose it is. I say I don't know who it is; I'd be
3 guessing if --
4    Q    No, I don't want you to guess; I don't
5 want you to guess.
6    A    I don't know who it is; I don't
7 recognize it. It's not mine.
8    Q    I'm going to ask you some questions
9 about the issues that are raised here to see if you
10 know anything about them. At the top in the
11 right-hand corner it says, Hicks warns Father U, and
12 then right next to it, I can't, I can't read that
13 handwriting. But do you know anything about Mr.
14 Hicks warning Father Urrutigoity?
15    A    No, I do not.
16    Q    Going down about two-thirds of the way
17 down the page it says, there's a No. 2 that's
18 circled.
19    A    Right.
20    Q    And it says Chris Manuele, dash, quote,
21 Yes, he sleeps with boys, unquote. Do you know who
22 Chris Manuele is?
23    A    I do not.
24    Q    And do you know where that quotation
25 comes from?

106

2    Q    Right under that it says, Father U does
3 what he wants to do. Do you know what that refers
4 to?
5    A    No, I do not.
6    Q    Going to the second page, the page is
7 divided into four sections by a horizontal line. The
8 third section on the right-hand side, it says, Mat
9 Selinger claims that Father U had hand on penis.
10 Quote, assault at best, unquote. Do you know what
11 that refers to?
12    A    I have no idea.
13    Q    You don't know if it refers to Father
14 Urrutigoity?
15    A    Well, it says Father U, I presume
16 that's Father Urrutigoity but I don't know anything
17 about what, Mathew Selinger saying this at all. And
18 I don't know who said, Bishop is not doing anything.
19 I have no idea.
20    Q    I don't know, that's why I was asking.
21 I don't know who wrote it, either.
22    A    I have no idea who would say that. But
23 you'd get an argument from me if he did say it.
24    Q    I don't know who wrote this and I was
25 hoping you'd recognize the handwriting. Here's

107

1 Exhibit 47.
2    A    Okay.
3    Q    Do you know whose handwriting this is?
4    A    That's my handwriting.
5    Q    Do you remember when you wrote this?
6    A    I have no date on the thing so it's
7 probably sometime within the last year or two, but I
8 have no idea what date, I didn't put a date on it. I
9 don't know where this came from, this is something
10 that must have wound up in the files --
11    Q    I'm sorry, this is from the diocesan
12 file. The first sentence says, Allegations of
13 embracing women while going to confession. Who does
14 that refer to?
15    A    It refers to either Father Ensey or
16 Father Urrutigoity, and I've discussed that with them
17 and it was absurd. I think it refers to them, again,
18 I can't remember, but I do remember an allegation of
19 that nature being made and I looked into it and it
20 was absurd. I took it up with the priests and they
21 just were, that's incredible, absolutely incredible.
22 Untrue, not true at all.
23    Q    You talked to the priests about this?
24    A    Yes, I talked to the people that I
25 thought were involved with it, the Society of Saint

108



**DIOCESE OF SCRANTON**
300 WYOMING AVENUE
SCRANTON, PENNSYLVANIA 18503-1279

OFFICE OF THE BISHOP

June 3, 1998



UNITED STATES DEPARTMENT OF JUSTICE
IMMIGRATION AND NATURALIZATION SERVICE
Vermont Service Center
75 Lower Welden Street
St. Albans, Vermont 05470-0001

Re: Temporary visa as a Minister of Religion
Beneficiary: Father Carlos Bernardo Terrera



Dear Immigration Examiner:

I am writing this letter to request a temporary visa as a Minister of Religion on behalf of Father Carlos Bernardo Terrera. We desire to have Father Carlos Bernardo Terrera assume the duties as priest with the Society of Saint John. The Society of Saint John is a new order established in our Diocese of Scranton as a new clerical association of Christian faithful.

The Diocese of Scranton was formed and incorporated on March 3, 1868, as a religious corporation under the laws of the State of Pennsylvania. Our diocese has been granted exception from Pennsylvania income taxation by the State Department of Revenue. We are recognized as exempt under 501 (c) (3) of the Internal Revenue Code.



The Society of Saint John is a group of Catholic priests and clerics dedicated to serve the community. Their mission is to offer liturgical apostolate based on a full liturgical life, create Catholic communities in close cooperation with interested laity, where the life of faith and nature can find a proper setting, and also offer intellectual and spiritual support to Catholic youth going to college through University chaplaincy.



Father Carlos Bernardo Terrrera studied at St. Pius X Seminary, in Econe, Switzerland. He pursued his vocation as a member of the Society Saint Pius X, serving as a priest for four years in Buenos Aires, Argentina, and then for five years in Mendoza, Argentina, where he became the prior. Father Carlos Bernardo Terrera is now a founding member of the Society of Saint John where he will continue to serve as a Catholic priest.



UNITED STATES DEPARTMENT OF JUSTICE
IMMIGRATION AND NATURALIZATION SERVICE

Page Two
June 3, 1998

Father Carlos Bernardo Terrera was ordained as a priest on June 29, 1989. By virtue of his ordination he is authorized to perform as a pastor of the church conducting worship, celebrating Mass, officiating at weddings, funerals and other sacramental functions.



His duties at the Society of Saint John will be to carry out the tasks entrusted to the Society and described above. In addition, he will be of service to our community by serving as a chaplain at St. Gregory's Academy, a Catholic high school in our diocese. In this function, he will be required to say Mass, hear confessions, and offer spiritual guidance to the youth.



Father Carlos Bernardo Terrera will receive $20,000.00 a year. As a full-time priest, he will not be dependent on any kind of supplemental employment or solicitation of funds for his support.

Your prompt action on this petition is greatly appreciated.

Sincerely yours in Christ,



Most Reverend James C. Timlin, D.D.
Bishop of Scranton



1      Q      Do you recognize Exhibit 1?

2      A      I really have forgotten about it but

3  it's my letter apparently, yes.

4      Q      Who is Father Carlos Bernardo Terrera?

5      A      I think this is Father Carlos

6  Urrutigoity.  I don't know why he was using that name

7  or why that was in there; I don't have any

8  recollection of that.

9      Q      Let me show you Exhibit 2.  You wrote

10  an identical letter for Father Carlos, and if you'll

11  look at Exhibit 2 that may refresh your recollection

12  as to Exhibit 1 being for a different priest?

13      A      It certainly is not the same name so I

14  presume it's a different priest, but I really don't

15  have any recollection of it.

16      Q      So you don't know who Father Bernardo

17  is?

18      A      No.

19      Q      Has there ever been a Father Carlos

20  Bernardo Terrera incarnated as a priest in this

21  diocese?

22      A      Not to my knowledge.

23      Q      On page 2 of the letter, second

24  paragraph, it says, His duties at the Society of

25  Saint John will be to carry out the tasks entrusted



EXHIBIT

E E

http://webmail.epix.net:81/cgi-bin/gx.c...ic+mobmain?msgvw=SentMailMN382DELIM11



**WEBMAIL** anytime, anywhere... email access.   epix   JACK FLASH

**Read Message**                    Previous   Next   Back to: SentMail

**From:** <jchmil@epix.net>
**Date:** 2002/04/08 Mon PM 04:01:08 EDT
**To:** maryphenry@yahoo.com
**Subject:** The Diocese of Scranton

Reply   Reply All   Forward   Delete   Move To:   (Choose Folder)

Dear Mrs. Henry,

     I thought my last letter to was sympathic to your feelings and to the
point.  I was quite surprised, therefore, to receive your intemperate response
with your attack on me, seminaries and anyone else who got in your way!  And you
do not even know me!

     Your reference to me as "James" speaks volumes!

     My letters are written by me alone and not by any PR person.  And I do
reply to every letter I receive no matter how offensive they might be.  This is
why you are receiving this letter.

     Sending e-mail's seems to me to be a terribly informal way to communicate.
I would much rather speak to you by phone.  If you send me a number where you
can be reached I will gladly call you and answer any questions you may wish to
ask me.  Not that I have all the answers but you can certainly ask the questions
and I will do my best to answer them.

     I certainly do not want to respond to your letter in kind.  Please be
assured that I intend no offense.  But I would like to know what kind of a
person would write such a letter to a bishop - any bishop, or anyone for that
matter. Please pray for me and for the Diocese of Scranton.

          Sincerely,
          +Bishop Timlin

| Search Messages |   | Previous | Next |   **Back to: SentMail**



EXHIBIT
FF

© 1999-2001 Openwave Systems Inc. All Rights Reserved.          Help

For further information, please write to: info@epix .net

For further technical assistance, please write to: infotech@epix.net

epix® Internet Services Inc. | A Commonwealth Telephone Enterprises Company | Copyright 2001