IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE, JOHN DOE, SR. and JANE DOE, | Case No.: 3 CV 02-0444 |
| Plaintiff, | Judge:  Hon. John E. Jones |
| vs. | |
| FATHER ERIC ENSEY, FATHER CARLOS URRUTIGOITY, DIOCESE OF SCRANTON, BISHOP JAMES C. TIMLIN, THE SOCIETY OF ST. JOHN, THE PRIESTLY FRATERNITY OF ST. PETER and ST. GREGORY'S ACADEMY, | |
| Defendant. | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT FILED BY DIOCESE OF
SCRANTON AND BISHOP JAMES TIMLIN**

## TABLE OF CONTENTS

Table of Authorities…………………………………………………………3

Argument…………………………………………………………………………4

Conclusion………………………………………………………………………24

TABLE OF AUTHORITIES

A.L.M. v Diocese of Allentown, (June 24, 2004)…………………………………………20

Celotex v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 81 L.Ed. 265 (1986)………………4

Com. ex rel Patricia L.F. v Malbert, J.F., 278 Pa. Super. 343, 420 A.2d 572, (Pa. Super. 1980)………………………………………18

Patel v. Himalayan Int'l Inst. Yoga, 1999 WL 33747891 (M.D. Pa. 1999)……………13

R.A. v. First Church of Christ, 748 A.2d 692 (Pa. Super. 2000)………………………..5

S.H.C. v. Lu, 54 P.2d 174, (Wash. App., Div. 1, 2002)……..……………………………10

Seto v. Willits, 432 Pa. Super. 346, 638 A.2d 258 (1994)………………………………19

Stevens v. Roman Catholic Bishop of Fresno, 49 Cal. App. 3d 877, 124 Cal. Rptr. 171 (1975)………………………..12

## FACTUAL BACKGROUND

Plaintiff John Doe was a student attending St. Gregory's Academy, a boarding school operated by the Priestly Fraternity of St. Peter.    The school is located in the Diocese of Scranton.  At all material times hereto James Timlin was the Bishop of Scranton.

Fr. Eric Ensey and Fr. Carlos Urrutigoity were formally priests of the Society of St. Pius X.  They were expelled from that organization and eventually taken in by Bishop Timlin who allowed them to set up a diocesan organization known as the Society of St. John.  Bishop Timlin conducted no inquiry into the fitness or background of these priests. The Society of St. John is what one Scranton diocesan priest has termed "a homosexual cult" (Exhibit 'V' – Deposition of Fr. Richard Munkelt, p 43).

Eventually both priests sexually molested plaintiff John Doe.    The precise details of these events are referenced in the Argument below.

## ARGUMENT

For the convenience of the court, plaintiffs will respond to defendants' arguments using an identical numbering system.

I.  Standard for Summary Judgment

Defendants correctly cite Celotex v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 81 L.Ed. 265 (1986) as the landmark case setting forth the standards to be used by federal courts in evaluating a motion for summary judgment.

II. There is an abundance of Evidence Demonstrating Negligence on the Part of the Diocese of Scranton and Bishop James Timlin.

In R.A. vs. First Church of Christ, 748 A.2d 692 (Pa. Super. 2000), the

Pennsylvania Superior Court wrote:

> As a panel of this Court opined in Heller v. Patwil Homes, Inc., 713 A.2d 105 (Pa.
> Super. 1998), these Restatement[1] sections do no more than restate the existing tort
> law in Pennsylvania.  They impose on an employer the duty to exercise reasonable
> care in **selecting**, supervising and controlling employees. [emphasis added].

Bishop Timlin made absolutely no inquiry or investigation concerning the fitness of

Fr. Urrutigoity and Fr. Ensey prior to incardinating them into the Diocese of Scranton and

permitting them to be chaplains at St. Gregory's Academy under the name Society of St.

John.  In his deposition Timlin described the normal diocesan policy utilized in selecting

seminarians for the diocese, including psychological testing (Exhibit 'A' – Timlin dep. pp.

8-9).   However, in the case of Fr. Urrutigoity, Fr. Ensey and the other priests who had

been expelled from the Society of St. Pius X (hereinafter referred to as 'SSPX'), Timlin

made no inquiry whatsoever (Ibid.).    Timlin did not even bother to contact the SSPX to

determine why they were expelled (Timlin dep. p. 11-13).   He testified that he knew that

they left the Society of St. Pius X because they "wanted to be regularized in the Catholic

Church."  When asked how he knew this, Timlin testified:

"That's what they told me" (Ibid.)

It must be kept in mind that, at this time, the Diocese of Scranton was fully aware

of the spreading priest molestation crisis, and had established a diocesan policy concerning

pedophilia in 1993 (Timlin dep. p. 8).

From November, 1997 through September, 1999, the priests of the Society of St.

John, including Ensey and Urrutigoity, were allowed by Timlin to live at St. Gregory's

Academy (Diocese Statement of Facts, # 5).

---

[1] Referring to the Restatement of Torts.

Even though the Scranton diocese never contacted the SSPX concerning these priests, the SSPX eventually learned that that Bishop Timlin had taken them into the diocese.   Therefore, on February 10, 1999, Bishop Bernard Fellay of the SSPX courageously wrote a letter to Bishop Timlin warning him that Fr. Urrutigoity was "dangerous" and had molested a seminarian from St. Thomas Aquinas Seminary.  He also warned that Fr. Urrutigoity had been accused of the same acts at a seminary in Argentina. Finally, Bishop Fellay warned Timlin:

> The reason why he got into trouble with the Superiors of the Society of St. Pius X is mainly because we felt he had a strange, abnormal influence on the seminarians and priests, whom he seemed to attach to his brilliant, charismatic personality.  When he asked me to recognize the society he intended to found (sic), among the reasons of my refusal, I explicitly mentioned this strange personal, guru-like attachment between the disciples and their leader.
>
> [Exhibit 'B'].

Therefore, had Bishop Timlin not been negligent, and had he simply made one phone call to the SSPX prior to incardinating Fr. Urrutigoity and his followers, he would have learned that Urrutigoity had been involved in two instances of molesting seminarians. This inquiry would have also caused any reasonable person to require proper screening and psychological testing of the other priests who left the SSPX with Fr. Urrutigoity, including Fr. Ensey.[2]

Timlin's negligence is further demonstrated by the fact that, even after he received the warning letter from Bishop Fellay, he nevertheless allowed these priests live at a boy's

---

[2]  As the court is aware, Fr. Ensey's psychological records are being hidden by the Southdown Institute in Canada despite requests that the records be turned over to the court.   Plaintiffs have no doubt that such records will show that Ensey is a sexual deviant.  The court should therefore suspend ruling on this summary judgment until the records are obtained. Plaintiffs' counsel has secured the services of a Canadian attorney who is filing suit to obtain the records in Canada.

school (St. Gregory's Academy) and to continue acting as their chaplains (Timlin dep. p.
117).

Although the Catholic Church has semi-independent religious orders such as the
Dominicans, Franciscans and Jesuits, the Society of St. John is not such a an order, but is
rather an Public Association of the Faithful (*See* Decree of Erection of the Society of St.
John, Exhibit 'C'; *See also* Code of Canon Law, Canons 312 – 320, Exhibit 'D').  As can
be seen in these Canons, priests of Public Associations of the Faithful are bound in
obedience to their local bishop.  Canons 609 – 612 further demonstrate the authority of the
local bishop over the Society of St. John (Exhibit 'D').

At page 117 of his deposition Timlin argues that, although he assigned the priests
to live at the boy's school, he did not make them chaplains.  The point is really moot since
living at the boy's school gave them the opportunity to satiate their appetites with the boys
there.  Nevertheless, Timlin asserts that their activities at the school were "unofficial"
(Timlin dep. p. 117), as if that matters.

Defendants argue Timlin's failure to contact the SSPX before incardinating the
Society of St. John priests is moot because, after he eventually received the warning letter
from Bishop Fellay, he authorized an investigation which proved that the charges were
"inconclusive."  Defendants' argument has no merit.

First, let us examine the charges arising out of Fr. Urrutigoity's conduct with the
Winona seminarian.  Attached hereto as Exhibit 'E' is the October 24, 2003 "deposition"
of Matthew Sellinger.[3]  In his statement, former seminarian Matthew Sellinger testified

---

[3] Although the court eventually ruled that the deposition had to be retaken, it nevertheless constitutes a
statement made under oath having equal weight with affidavits, which are permitted to be used in summary
judgment motions.  Sellinger's deposition was eventually retaken but has not yet been transcribed and
received by counsel.

that Fr. Urrutigoity grabbed his penis after they had left the seminary at Winona (Exhibit

'E', pp. 21 – 23).   Sellinger stayed at the residence where this occurred for several more

days because Fr. Urrutigoity had led him to believe that he was bound by an oath

(Sellinger deposition/statement -- Exhibit 'E', pp. 24 – 29).  Defendants have filed portions

of the deposition of Auxiliary Bishop John Dougherty to the effect that Dougherty thinks

that Sellinger continued on the trip with Urrutigoity and had Urrutigoity visit his father's

home.  Bishop Dougherty's testimony is misleading.  Actually, what happened is that, after

being released from the 'vow,' Mr. Sellinger told Urrutigoity exactly what he thought of

him:

> I got out of it [the oath] and now I have no connection with you at
> all.  I know what you did.  I think you're a fag.  I think that you need to
> go see a priest, confess your sins, and never be a spiritual director to
> another seminarian or anybody ever again, or a confessor.  And you need
> help, from a priest first, and then maybe psychologically from a Catholic
> psychologist or something…..
>
> …..I took the car back to Rockford, Illinois, got back and Father Fullerton
> and Chris Manuele were there and they were leaving to go to Armada,
> where my brother was graduating from a Catholic school and my parents
> would be there.
>
> ….. I got there, left with my parents and never seen or talked to Father U.
> again.

Bishop Timlin testified that the diocese "could not come to a conclusion as to

whether he [Urrutigoity] was guilty or not" and could therefore not inflict a canonical

penalty on Urrutigoity (Timlin dep. p. 17).   Timlin wrote back to Bishop Fellay stating:

> "….In effect, I am left unable to ascertain the truthfulness of the allegations
> against Fr. Urrutigoity and, therefore, I am without the required certitude
> to take any action in his regard."   [Exhibit 'F']

However, the issue of negligence to go before the jury is not whether a canonical

penalty should have been imposed on Fr. Urrutigoity.  The issue is whether Timlin was

PLAINTIFFS' BREIF IN OPPOSITION TO DIOCESE'S
MOTION FOR SUMMARY JUDGMENT - 8

negligent in assigning him to reside at a boy's school and permitting him to be chaplain at

the school.   Bishop Timlin was confronted with this issue at his deposition.   His

incomprehensible answer was as follows:

> Q.   Now you felt there was no canonical penalties that you could inflict upon Father Urrutigoity. Question:  Did that mean that you had to leave him in a situation where he would have access to minor boys?

> A.   I wouldn't be obliged to do anything actually but I mean we did not feel that there was anything --- he was not in charge of boys at that time.  If I recall he was still living up at the Saint Gregory Academy. The Fraternity of the Society of St. John really had not begun to, it was beginning to function, just beginning, but they didn't have any house of their own.  He was not in charge of the boys at Saint Gregory's.

> [Timlin dep. p. 19]

> ATTEMPTED TRANSLATION – "No, I did not have to allow Fr. Urrutigoity to live at the boy's school but, after all, he wasn't in charge of the boys."

The second reason why the defendants' argument must fall is that it does not take

into consideration the fact that Bishop Timlin never bothered to investigate the molestation

charges leveled against Urrutigoity in Argentina (Timlin dep. p. 18).   The Argentina

connection also demonstrates that the Diocese cannot seriously argue that it has any

serious concern for screening out dangerous sexual predators.   The priest who was expelled

with Fr. Urrutigoity for homosexual conduct at the Argentine seminary was Fr. Bernardo

Terrara (Urrutigoity dep. pp. 5 – 8).   Fr. Terrara is still a member in good standing of the

Scranton-based Society of St. John, although he now is working for co-defendant

Fraternity of St. Peter in France (Idid.).   When Timlin was confronted at his deposition

with a letter he wrote to the U.S. Immigration and Naturalization Service in a successful

attempt to bring the priest into the U.S. [Exhibit 'U'], Timlin testified under oath that he

did not know any Fr. Bernardo Terrara and did not know that he had also become a priest

of the Society of St. John (Timlin dep. pp. 6 -7).

For the Diocese of Scranton to assert that all of this does not constitute evidence of

negligence on the part of Bishop Timlin and the Diocese is simply mind-boggling.   To

appreciate the absurdity of this position, one must imagine the final argument to the jury

that will be made by Bishop Timlin's attorney:

> "Now, ladies and gentlemen of the jury, the plaintiffs would have you believe
> that Bishop Timlin was negligent for not contacting the SSPX  seminary from
> which Fr.  Urrutigoity was expelled before assigning him to live at a boy's
> school.  It is true that a seminarian from there accused Fr. Urrutigoity of grabbing
> his penis.  But this was eventually investigated and was determined to be
> inconclusive, which means maybe it happened and maybe it didn't.  It is also true
> that a seminarian in Argentina accused Fr. Urrutigoity of grabbing his penis.
> But…Argentina…heck, what do they know?"

As a back-up argument defendants argue that the First Amendment prevents tort

damages from being assessed against a diocese because of sexual molestation committed

by one of its priests.  Curiously, defendants do not cite any Pennsylvania cases holding this

view.  A correct view of the law in this area is well-state in <u>S.H.C. v. Lu</u>, 54 P.2d 174, 177

(Wash. App. Div. 1, 2002):

> Clergy sexual misconduct and the consequences that flow from such misconduct
> continue to be the subjects of much litigation. [FN13] A principle question for
> religious institutions associated with clergy accused of sexual misconduct is
> whether the First Amendment bars vicarious liability for such institutions. [FN14]
> Resolution of this question has, by no means, been uniform either among or within
> jurisdictions that have considered the issue. [FN15]
>
> FN13. *See* James T. O'Reilly and Joann M. Strasser, *Clergy Sexual Misconduct:
> Confronting the Difficult Constitutional and Institutional Liability Issues,* 7 St.
> Thomas L.Rev. 31 (Fall 1994); Zanita E. Fenton, *Faith in Justice: Fiduciaries,
> Malpractice & Sexual Abuse by Clergy,* 8 Mich. J. Gender & L. 45 (2001).
>
> FN14. James T. O'Reilly and Joann M. Strasser, *Clergy Sexual Misconduct:
> Confronting the Difficult Constitutional and Institutional Liability Issues,* 7 St.
> Thomas L.Rev. 31, 43-45.

FN15. *See Doe v. Evans,* 718 So.2d 286 (1998) (surveying cases addressing negligent supervision claims and the First Amendment); *L.L.N. v. Clauder,* 209 Wis.2d 674, 563 N.W.2d 434 (1997) (reversing a lower court's decision on whether the First Amendment was a bar to a negligent supervision claim); *Swanson v. Roman Catholic Bishop of Portland,* 692 A.2d 441 (1997) (holding negligent supervision claim against church barred by First Amendment).


In Washington, *C.J.C. v. Corporation of Catholic Bishop of Yakima* presented this question. The state supreme court rejected the argument by a church that the First Amendment barred the court from imposing **178 a duty on the church to take reasonable measures to prevent harm intentionally inflicted on children by a church worker. In that case, the court considered three consolidated cases regarding negligence claims brought against church entities and individual church officials. The defendants included officials who did not themselves directly perpetrate intentional acts of childhood sexual abuse, but who allegedly failed to protect the child victims or otherwise prevent the abuse.

The court considered the question of First Amendment protections in its discussion of one of the three consolidated cases, *Funkhouser v. Wilson.* [FN16] In that case, three daughters of a former pastor of the Calvary Baptist Church of Twisp *520 (Church) sued the Church and Orin Wilson, a prominent member and onetime deacon of the Church. They claimed Wilson molested them when they were children. Although a Church elder had been warned that Wilson had had inappropriate sexual contact with a child, Wilson was "made a deacon and was entrusted with various leadership positions within the Church that allegedly provided extensive contact with and authority over children." [FN17] The Church elder who was warned failed to alert the plaintiffs or their father of the accusations against Wilson. The state supreme court held that the Church owed a duty of reasonable care to affirmatively act to prevent the harm the children suffered, in view of its special protective relationship to them, its relationship to Wilson, and the knowledge the Church allegedly possessed. [FN18]

FN16. *C.J.C.,* 138 Wash.2d at 720, 985 P.2d 262.


FN17. *C.J.C.,* 138 Wash.2d at 720, 985 P.2d 262.


FN18. *C.J.C.,* 138 Wash.2d at 727, 985 P.2d 262.


[4] The supreme court then considered whether the claims against the Church were barred by the First Amendment. The court stated that "[t]he First Amendment does not provide churches with absolute immunity to engage in tortious conduct. So long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs, it does not offend constitutional principles."

[FN19] The court held that because these principles were not offended by the case before it, there was no constitutional bar to the claim.
FN19. *C.J.C.*, 138 Wash.2d at 727-28, 985 P.2d 262 (citing *Sanders,* 134 F.3d at 336).

Plaintiffs' concede that, under the First Amendment, Bishop Timlin may choose anyone whatsoever on whom to confer the Sacrament of Ordination.   Even if he were to fly to California and ordain Charles Manson a priest, no tort liability could arise from the act of ordination itself.   However, tort liability in the case at bar is based not on the conferring of a Sacrament but upon assigning a sexual predator to live with children.

III.   Tort Liability may be Imposed upon the Diocese and Bishop Timlin for the Acts Committed by a Priest of the Diocese of Scranton.

The Catholic Church is well-known to be a hierarchical organization. A Catholic bishop has the authority to govern the acts of his priests.   This authority is conferred in the act of incardinating a priest in the diocese.   *See e.g.*, Stevens v. Roman Catholic Bishop of Fresno, 49 Cal. App. 3d 877, 885, 124 Cal. Rptr. 171 (1975).   Bishop Timlin incardinated all of the priests of the Society of St. John, including Fr. Ensey and Fr. Urrutigoity (Timlin dep. p. 116).   The Catholic Rite of Ordination to the Priesthood contains the following language:

16.   Then the candidate goes to the bishop and, kneeling before him,        places his joined hands between those of the bishop.   If this gesture seems less suitable in some places, the conference of bishops may choose another gesture or sign.

If the bishop is the candidate's own Ordinary [bishop], he asks:  Do you promise respect and obedience to me and my successor?

Candidate:  I do.

If the bishop is not the candidate's own Ordinary, he asks:  Do you promise respect and obedience to your Ordinary?

Candidate:  I do.

PLAINTIFFS' BREIF IN OPPOSITION TO DIOCESE'S
MOTION FOR SUMMARY JUDGMENT - 12

Therefore, whereas in most common employer/employee relationships obedience is simply expected or hoped for, in the Catholic Church the obedience of a priest to a bishop is imposed by a life-long vow, violation of which cannot only subject a priest to canonical penalties in this world but also to the much more rigorous punishment of the infernal regions in the world to come.

Defendants' brief correctly notes that an employer or principal is not vicariously liable for every act of an employee or agent, and cites several Pennsylvania cases which uphold the well-recognized rule that an employer is not liable for willful acts of an employee not within the scope of employment.   In the case at bar, however, the Diocese of Scranton and Bishop Timlin **are** vicariously liable for the sexual molestation committed by Fr. Ensey and Fr. Urrutigoity.   The Pennsylvania law most applicable to the facts in this case  was set forth in an opinion by Chief Judge J. Vanaskie in <u>Patel v. Himalayan International Institute of Yoga Science and Philosophy in the USA</u>, 1999 WL 33747891 (M.D. Pa., 1999).[4]  This decision arose out of a jury award of compensatory and punitive damages against a Yoga Institute for acts of sexual misconduct committed by one Swami Rama.   Like Fr. Urrutigoity, Swami Rama was a purported celibate who became involved in sexual antics with his devotees.   One of them sued.   The court upheld the jury award against the Himalayan International Institute and granted plaintiff's motion to increase damages.   Among the reasons for upholding the jury award against the Institute was the court's finding that:

> Swami Rama had indicated to Patel, herself, that sexual relations with him were part of his therapeutic regimen and had convinced her that he was simply "testing" her for her own good.....Dr. Clarke's wife and Deboarah Willoughby both suggested to Patel that Swami did things

---

[4]  A copy of this decision is attached hereto as Exhibit 'G'

for her own good, even if it made her uncomfortable…..

Vicarious liability extends even to intentional or criminal conduct of an agent.  *See* United States v. American Radiotr & Standard Sanitary Corp., 433 F.2d 174, 204 (3rd Cir. 1970), *cert. denied*, 401 U.S. 948 (1971) (agent who engaged in price-fixing conspiracy was motivated at least in part by a desire to serve his principal and was thus acting in the course and scope of his employment);  Barry v. Manor Care, No. Civ. A. 97-5883, 1999 WL 257663, at 3 (E.D. Pa. April 29, 1999) (whether nursing home employee was acting within the scope of his employment when he assaulted a patient while changing her diaper was a jury question).  In this case, there was considerable evidence on which to base a rational conclusion that Swami Rama intended to further the interests of the Himalayan Institute by engaging in sexual relations with those seeking treatment.

…………..

It has been recognized that "where tortuous conduct (of a sexual nature) arises out of and is reasonably incidental to the employees' legitimate work activities, the 'motivation to serve' tests (of vicarious liability) will have been satisfied.       [citations omitted]

The evidence at trial will show that Fr. Urrutigoity convinced his victims that

sleeping with him was an important part of overcoming their 'Puritanical' attitudes in order

to become good Catholic men.

At the outset it should be noted that the Catholic Church is opposed to Puritanism

because it denies the reality of the Incarnation.  As one Catholic writer has noted:

**The Incarnation**

One of the basic distinctions between the two views of the world is that the Catholic worldview is grounded firmly in the reality and ramifications of the Incarnation. God's universe, created perfect, is now broken -- but it is marbled with sanctification, especially since God Himself *took on flesh*. Many brands of Protestantism, on the other hand, tend to see (or at least *behave* as though they see) matter as evil and man only as "utterly depraved," leading to a Puritanism that strips Christianity of its rich lushness and very humane-ness. The soul is seen as totally distinct from the body, the latter being a prison to the former and a hindrance in every way to the desire to become holy. For Catholics, this dualism does not exist.

[Being a Catholic Website
http://www.kensmen.com/catholic/differences.html]

Attached as Exhibit 'H' is the definition of Puritanism found in *A Catholic Dictionary* (Tan Books and Publishers, 1997).   The definition includes the following:

> ii. An exaggerated rigorism which sees in remote or no occasions of sin proximate  occasions, and in proximate occasions actual sin: condemning the use of fermented liquors, betting and gambling, Sunday games, dancing and noisy amusements un-euphemistic speech, images of nudity, and so on, as bad in themselves.

In his deposition, former St. Gregory Academy student Steven Fitzpatrick testified that he had slept in a bed with Fr. Urrutigoity (Exhibit I, Fitzpatrick dep. p. 6, 9).   Fr. Urrutigoity denied under oath that this happened (Exhibit J, Urrugoity dep. p. 45). Fitzpatrick also saw another boy in bed with Urrutigoity (Fitzpatrick dep. p. 12).  Former St. Gregory Academy student Patrick McLaughlin also saw a boy in bed with Fr. Urrutigoity (Exhibit 'K', McLaughlin dep. p. 5, 8, 13, 14).   Fr. Urrutigoity testified that the only man or student he slept with was dorm father Fred Frazer (Urrutigoity dep. p. 62), which he claims happened quite by accident because they fell asleep while talking to each other on a bed (Ibid. p. 39).   At this point it should be noted that Fr. Urrutigoity's testimony has no credibility whatsoever.  This is a man who lies even when he doesn't have to.  For example, Urrutigoity testified under oath that he never gave tobacco to any of the St. Gregory's boys [5] (Urrutigoity dep. p. 121).  Yet, discovery in this case has unearthed a copy of a February 18, 1999 letter from Fr. Urrutigoity apologizing to teacher Paul Hornak for giving cigars to boys on a camping trip [Exhibit 'T'].

---

[5]  Providing alcohol and tobacco was part of the 'grooming' process of the child molesters at the Society of St. John.

Fr. Urrutigoity's nickname for St. Gregory student Conal Tanner was "my favorite little Puritan" (Exhibit 'L' – Conal Tanner dep. pp. 10, 11, 54). Tanner said that Urrutigoity lectured the class about the evils of Puritanism:

> He talked about how Puritanical the world or America is, how
> it's founded by the Puritans and Puritanism. He made it clear that,
> he meant this sort of repressiveness, don't have fun, don't relax,
> this sort of, you know, top button always done up tightly and,
> you know, sexually repressed. And he said that's grossly unhealthy
> and that we must combat that.

> (Conal Tanner dep. p. 56)

Fr. Urrutigoity convinced Tanner to sleep in bed with him and proceeded to place his arm around Tanner. Tanner then stiffened like "petrified wood" after which Urrutigoity moved his arm away (Conal Tanner dep. pp. 12-14).

Fr. Ensey also used the Puritanical pick-up line with plaintiff John Doe in order to convince him to sleep together (Doe dep. p. 144).[6] Fr. Urrutigoity utilized a phony veil of spirituality in order to try to convince Matthew Sellinger to provide him with sexual enjoyment. In his deposition/statement, Sellinger explained how Urrutigoity tried to convince him to insert an anal suppository in the presence of Urrutigoity because such an act would reduce pride (Sellinger dep. pp. 9 – 13). Fr. Urrutigoity also molested former St. Gregory student John Zoscak after he convinced him to sleep with him (Exhibit'M', Affidavit of John Zoscak). Urrutigoity told Zoscak that he was Puritanical and also had a relationship problem with his father, and that these could be healed by sleeping with Urrutigoity (Id.) Clearly, Urrutigoity was using the acts of sexual seduction and

---

[6] The entire deposition of John Doe was attached to the exhibits submitted by the Fraternity of St. Peter in support of its motion for summary judgment.

misconduct to further the goals of the religion of the Diocese of Scranton, although he did it in a perverse way.

The alleged therapeutic value of Urrigoity's sexual congress with young men is further exemplified by the statement of Fr. Ensey that Urrutigoity could make a medical diagnosis by grabbing a man's penis (Sellinger deposition, pp. 35). Diane Toler, a person receiving financial solicitations from the Society of St. John, was told by Fr. Dominic Carey of the Society of St. John that Fr. Urrutigoity sleeps with boys in order to spiritually bond with them (Exhibit 'R').

It is clear that, as in <u>Patel v. Himalayan International Institute of Yoga Science and Philosophy in the USA</u> (*supra* at 16), the diocese and Bishop Timlin are vicariously liable for the acts of defendant priests because those acts were committed, in part, to further the goals of the Catholic religion. To be more specific, this is a jury question not capable of resolution by summary judgment.

IV.  <u>The Court should not Dismiss Counts V and VI of Plaintiffs' Complaint</u>

The argument made by the Diocese with regard to these Counts of the complaint is not totally clear. Certainly plaintiffs are not entitled to duplicate damages, and the jury should so be instructed. However, the plaintiffs have a right to argue alternative theories of law based upon the same facts. Sexually molesting a minor or adult can constitute an assault, battery or intentional infliction of emotional distress.

V.  <u>The Court Should not Dismiss Count V Alleging Intentional Infliction of Emotional Distress.</u>

Defendants are correct that plaintiffs may not seek damages for emotional distress associated with the molestation of Matthew Sellinger, nor do plaintiffs allege that the negligent failure to investigate and screen the priest defendants was an outrageous act committed in the presence of the plaintiffs.[7]   However, the molesting of John Doe itself is an outrageous act for which tort damages may be awarded.  With regard to the need for expert testimony, attached hereto is the report of psychologist Dr. William Foote which details the harm suffered by plaintiff John Doe (Exhibit 'X').[8]

## VI.  The Court should not Dismiss Count VI of Plaintiffs' Complaint

The argument made by defendants in this section is a rehash of their previous arguments concerning which parties may claim damages for infliction of emotional distress.  These arguments were addressed previously in this brief .

## VII.  The Court should not Dismiss Plaintiffs' *in loco parentis claim* Against All Defendants.

The Pennsylvania courts have held that schools can assume the role of *in loco parentis*.  Com. ex rel Patricia L.F. vs. Malbert J.F., 278 Pa. Super. 343, 346, 420 A.2d 572, 574 (Pa. Super. 1980).   Being a boarding school for minors away from their families, a clearer case of acting *in loco parentis* does not exist than in the case of St. Gregory's Academy.  Therefore, although plaintiffs do not object to the *in loco parentis* claim being dismissed against the Diocese, plaintiffs do object to this claim being dismissed as to defendants St. Gregory's Academy and the Fraternity of St. Peter that runs the Academy.

---

[7]  Plaintiffs will, however, be asking the jury for an award of punitive damages because of the grossly negligent acts of the Diocese of Scranton and  Bishop Timlin.
[8]  Large portions of the report have been redacted to protect the privacy of John Doe.

VIII.  <u>Plaintiffs Claims should not be Dismissed based on the Statute of Limitations</u>

The first reason plaintiffs claim should not be dismissed on this ground is that the

Diocese of Scranton and Bishop Timlin did not comply with Civil Rule 8[9] which requires

that the statute of limitations defense be raised in the Answer.  Defendants failed to do so.

The particular justice of applying this rule in the case at bar is clear --- Bishop Timlin and

the diocese are attempting to escape liability on a technicality.  They argue that this suit

was filed too late under the old law, and the events did not occur late enough for the new

(2002) law to apply.  Therefore, defendants argue that the Does' suit should be barred

because it was filed during a gap period of several months wherein neither law the old law

nor the new law allows the case to proceed.  Well, if defendants are arguing a technicality

then they should be barred from doing so by an equally technical rule – Civil rule 8.  As it

is written in Scripture, "Why do you see the speck in your brother's eye, but do not notice

the log that is in your own eye." (Matthew 7:3).

The second reason this case should not be dismissed based on the statute of

limitations is that this is normally a question for the jury.  <u>Seto v. Willits</u>, 432 Pa. Super.

346, 638 A.2d 258 (1994).  A genuine issue of fact exists as to when John Doe realized

that he had been sexually molested by these priests.  A close reading of John Doe's

deposition (attached to The Fraternity of St. Peter's Motion for Summary Judgment) makes

it clear that he was under the influence of alcohol when these acts occurred and that he was

essentially kept in an alcoholic stupor at other times by Fr. Ensey (p. 109).  At page 72 of

his deposition Doe states "I had not fully come to grips with the fact that I had been

abused.  I had come to grips with certain events of the abuse, but not the entirety of it."

---
[9] Rule 8 (c) uses the word "shall" set forth, thereby making this obligation mandatory.

Fr. Urrutigoity forbade John Doe from attending AA meetings (pp. 64, 193).   John Doe

suffered from alcoholic blackouts (p. 100) and stated he often did not remember things

done when he was drinking (p. 101).   When asked why he didn't tell people what

happened he said, "The only reason I could think of why I would say that would be if I

either didn't remember or was trying to minimize what happened" (p. 106).   He drank

heavily on the night he was sodomized by Fr. Ensey (p. 127 – 131).

The third reason the case should not be dismissed is that there is, at minimum, a

genuine issue of fact as to when plaintiffs knew or should have known that they had a

cause of action against the Diocese of Scranton and Bishop Timlin.   This issue involves a

different analysis than the question of when plaintiffs knew or should have known that

they had a cause of action against Fr. Ensey and Fr. Urrutigoity (*See* the recently decided

Pennsylvania case <u>A.L.M. vs. Diocese of Allentown</u> (June 24, 2004), attached hereto as

Exhibit 'N').    After all, defendants point out that not every tort committed by an

employee or agent gives rise to vicarious liability.   The acts of negligence committed by

Bishop Timlin in failing to even conduct a minimal check of the priests' past was unknown

to the public at the time that John Doe was molested.   This information did not become

known until late 2001/early 2002 when Catholic activist Jeffrey Bond began his internet

and email campaign revealing the sordid history of Fr. Urrutigoity (Exhibit 'O').

The fourth reason why this case should not be dismissed is because there exists a

genuine issue of fact as to whether Bishop Timlin and the diocese fraudulently concealed

their negligence of failing to check the backgrounds of the priests of the Society of St.

John.   Again, the attached <u>A.L.M </u> decision recites the fact that Pennsylvania recognizes

that fraudulent concealment tolls the statute of limitations.   In the case at bar, the facts are
undisputed that Bishop Timlin not only failed to check into the background of the Society
of St. John priests, but further concealed from the public the fact that he was informed by
Bishop Fellay that Fr. Urrutigoity had molested a seminarian in Winona and had been
accused of molesting a seminarian in Argentina.   Timlin continued to lie about the facts
even after Jeffrey Bond's disclosures.   For example, attached as Exhibit 'P' is
correspondence between Bishop Timlin and one Christopher Grady.   Grady sent an email
to Timlin asking about the truth of  Bond's allegations about Urrutigoity molesting a
seminarian from Winona and an Argentina seminarian, as well as the truth of the
allegations concerning Fr. Ensey's molestation of John Doe..   Timlin wrote back to Grady
on December 10, 2001, stating:

> In reply to your e-mail about the Society of St. John, I am pleased
> to tell you that the information you sent contains gross misrepresentation
> of the truth.  You can be sure that there was no "cover-up."   And every
> allegation was thoroughly investigated and found to be unsubstantiated."

That is a flat out lie.  In point of fact, the cover-up was obviously still going on as
evidenced by this letter.   Timlin had conducted no investigation of the Argentina
molestation whatsoever.   He had not, and to this day has not, investigated the sodomy
allegations against Fr. Ensey made by John Doe (Timlin dep. p. 97).   On February 15,
2002, Timlin authored a statement of support for the Society of St. John (Exhibit 'Q').
Timlin's cover-up has been recently noted by respected Catholic columnist Michael Rose:

> Tridentine groups, for example, have had their share of lurid homosexual

scandals in recent years.  Rev. Carlos Urrutigoity, the founder and Superior

General of the Scranton-based Society of St. John was suspended for

sexual molestation of male students, but only after years of denials and

obfuscation by the priest, his society, and Scranton's Bishop Timlin

[Exhibit 'S' – *The Catholic Church's Abu Ghraib*, p. 4]

When Timlin learned that Society of St. John priests were sleeping with boys and

serving them alcohol, he did not start an investigation, but merely told them to stop doing

so [Timlin dep. pp. 47, 55].[10]   No investigation was started until the John Doe complained

to the Vatican and Jeffrey Bond exposed the Society.  Even still, Timlin refused to conduct

an investigation of the allegations against Urrutigoity and Ensey because a civil proceeding

has started in the Federal Court [Timlin dep. pp. 58 – 59].   Bishop Timlin's cover-up was

demonstrated in a rather cruel fashion.  Bishop Timlin attempted to discredit plaintiff John

Doe by alleging he was unstable even though the bishop had no evidence this was true:

Q.     Did you make any public statements that you said the boy was
unstable?

A.     I said that someone told me he was unstable.  I don't know the boy.

Q.     You said that publicly, didn't you bishop?

A.     I said it some place, I don't know where I said it.

Q.     And you don't know the boy and yet you made a public statement
that he was unstable, didn't you, Bishop?

---

[10]  Timlin does not believe that is a violation of the 'Dallas Charter' for priests to sleep with boys (Timlin dep. pp. 128 – 129)

A.     I didn't say he was.  I said I understand, that's what I was told…."

(Timlin dep. p. 35)

Meanwhile, even though Timlin publicly defended the Society of St. John he was forced to admit that, to this day, he does not know whether the priests are innocent or guilty (Timlin dep. p. 77).

IX     The Court should Not Dismiss this Case based on the Consent Theories Set Forth in Defendants' Argument No. IX.

Here defendants essentially argue that  John Doe consented to being sexually molested.   Defendants argue that because John Doe consented to remaining at a school he must therefore have consented to having his penis grabbed.   Or, in the alternative, because John Doe consented to sleeping in the same bed with Urrutigoity and Ensey, he was thereby consenting to have his penis grabbed.   This argument does not merit serious discussion.

CONCLUSION

The Court should reject defendants' Motion for Summary Judgment and allow the issues in this case to be tried before a jury.

Dated this 15th day of July, 2004.

James Bendell, Co-counsel for Plaintiffs

I certify that I caused a true copy of this pleading
to be sent my electronic mail to Joseph Leeson,
Joseph O'Brien on Sal Cognetti on 7/18 , 2004.

PLAINTIFFS' BREIF IN OPPOSITION TO DIOCESE'S
MOTION FOR SUMMARY JUDGMENT - 24