FRATERNITE SACERDOTALE
SAINT PIE X
SCHWANDEGG
CH 6313 MENZINGEN
TEL +41 41 755 3636
FAX +41 41 755 1444

+Menzingen, 10 Feb 1999

**CONFIDENTIAL**
Re : Fr. Urrutigoity, Society of St. John

Your Excellency,

As former superior of Fr. Urrutigoity, I see myself obliged in conscience to reveal to you the following matter. As the common good and the good of souls is involved, I do not hesitate any longer to communicate the following facts, stating here as clearly as possible that it is by no means a desire of revenge or any thing of that kind which is moving me, but my responsibility as the facts did happen while Fr. Urrutigoity was still a member of the Society of St. Pius X. The reason why I did not act before is that I only had a suspicion and was not able to verify the facts. Recently this has been the case.

The facts :
In 1997, just after Fr. Urrutigoity had left the St Thomas Aquinas Seminary in Winona, during a trip to Saint Louis or Kansas City, he was with a seminarian (whose name is Mathew Selinger) who had left the seminary with him at the same occasion. Fr. Urrutigoity was his spiritual director. They had made together the oath to never separate themselves whatever might happen.

At two occasions during this trip, as they were sleeping in the same hotel room, Fr. Urrutigoity approached the bed of the seminarian for obvious dishonest acts. The first time, the Seminarian did not react and left the impression that he was sleeping while Fr. Urrutigoity did touch him.
The second time, one or two nights afterward, as Selinger was not sleeping because of the anguish, such a thing could happen again, he did not allow Father Urrutigoity to go any further when Fr. Urrutigoity approached his bed for obvious similar action. He definitvely left Fr. Urrutigoity and contacted Fr. Ensey.

These actions certainly do fall under canon law and civil law.
Two Fathers of the Society of Saint John know the above mentioned facts, as Fr. Urrutigoity did admit it to them : Fr. Fullerton and Fr. Ensey.

Here it to be considered that Fr.Urrutigoity has been accused of similar action while he was still a seminarian in our argentinian Seminary (with a seminarian who is now member priest of the Society of St John). As the facts then were not absolutely proven and a certain obscurity remained, though he was asked *to leave our Seminary in Argentia, he was given a second chance by continuing his studies at St. Thomas Aquinas Seminary at Winona.*

EXHIBIT
B

Our conclusion is that there is a dangerous pattern in Fr. Urrutigoity and we feel obliged in conscience to reveal this to you as his present ecclesiastical superior especially also because he is the present Superior of the Society of St John and we have a certain fear, because of the above mentioned facts, that he could misuse (what God prevents !) his authority.

The reason why he got into trouble with the Superiors of the Society of St Pius X, is **mainly** because we felt he had a strange, abnormal influence on the seminarians and priests, whom he seemed to attach to his brilliant, charismatic personality. When he asked me to recognize the society he intended to found (sic), among the reasons of my refusal, I explicitly mentioned this strange personal, guru-like attachment between the disciples and their leader.

If you think necessary to investigate any further, we are at your disposal. Of course Mathew Selinger is ready to state under oath the facts mentioned above.

Sincerely Yours In Cordibus Jesu et Mariae,

+Bernard Fellay
Superior General of the
Society of St. Pius X

# Jacobus Clifford Timlin

DEI ET APOSTOLICÆ SEDIS GRATIA
EPISCOPUS SCRANTONENSIS

---

### Decree of Erection of the Society of Saint John

The call of sinners to the life on high in the communion of the Mystical Body is, doubtless, a miracle of Christ's love. This same miracle of love is being accomplished in a certain fashion even today when Dominic Carey, Eric Ensey, Daniel Fullerton, Brendan Kelly, Joseph Levine, Rhone Lillard, Christopher Manuele, Anthony Myers, John Nieto, Dominic O'Connor, Joseph Orlowski, Marshall Roberts, Basel Sarweh, Bernardo Terrera, and Carlos Urrutigoity seek Our approval for the formation of a new institute of common life, for the greater glory of God and the service of the Catholic Church. In spite of their sinfulness, the Lord and his Sorrowful Mother have strengthened them in their weakness and, by the power and grace of the sacraments, especially of Baptism and, for some, of Holy Orders, called them not only to the new life of righteousness, but also chosen them to found and establish in love (cf. Eph. 3:17) a new community.

They are, indeed, not only foreknown but also predestined and called (cf. Rom. 8:30) to the common life for the sake of their own sanctification and that of others. This call has not been given in vain (cf. Is. 45:19), as the Church now testifies through Our good pleasure. The Church certainly directs her maternal care and thoughts to the fostering of common life with the greatest hope of abundant fruits. This life She nurtures and cares for with appropriate laws. For we read in the Code of Canon Law that it is incumbent upon diocesan bishops to "discern new gifts of consecrated life granted to the Church through the Holy Spirit" and to "aid their promoters so that they can express their proposals as well as possible and protect them with suitable statutes" (canon 605). "This is also true in terms of discerning new gifts of apostolic life" (Letter of the Prefect of the Pontifical Commission *Ecclesia Dei*, Angelo Cardinal Felici of March 18, 1998).

Therefore, We, Bishop of Scranton by the grace of God and of the Apostolic See, to Whom the Lord has entrusted the power "to build and to plant" (Jer. 1:10) and the guarantee that "whatever you bind on earth shall be bound in heaven, and whatever you loose on earth shall be loosed in heaven" (Mt. 18:18), after having fittingly consulted the Holy See, and after studious and most diligent consideration and assiduous prayer to the Father of light, decree and will by Our Apostolic authority that the following come to pass.

The Society of Saint John, by this formal decree, is erected as a clerical association of Christian faithful of Diocesan right (cf. canons 302 and 312. §1), with the hope of reaching the status of a society of apostolic life (cf. the aforesaid Letter of March 18).



EXHIBIT
tabbies®
C

2

This Society is to be ruled by the general norms of law and its own proper Statutes. These same Statutes are given the name of "*Foundational Laws*" and are now sanctioned in a provisory way until the time when their definitive edition is presented for Our final approval. For We indeed will that the regulations of law be born from the experience of life. Moreover, We will that this be done with the necessary vigilance over both doctrine and pastoral activity, to ensure that neither the life nor the regulations born thereof ever depart from the faith and doctrine of Jesus Christ and the teachings of His Church.

The Society's seat of government is placed in Elmhurst, at the Academy of Saint Gregory the Great. Furthermore, We now confirm and ratify its superiors in their offices and terms.

We bestow by means of this decree Our blessing upon the members of this Society and all their benefactors, and entrust and consecrate them to the Sacred Hearts of Jesus and Mary, the Patriarch Saint Joseph, and the ever Blessed Apostle John.

Notwithstanding anything to the contrary.

Given in Scranton, at Our Cathedral Church of Saint Peter, the twenty-fourth day of May, in the year of Our Lord 1998.


+James Clifford Timlin
Bishop of Scranton


James B. Earley
Chancellor


Place + for the Seal

# CODE
## OF
# CANON LAW

## LATIN–ENGLISH EDITION

Translation prepared under the auspices of the
Canon Law Society of America



Canon Law Society of America
Washington, D.C. 20064



EXHIBIT

D

Case 3:0?-cv-0044?

## CAPUT II
## CHRISTIFIDELIUM CONSOCIATIONIBUS PUBLICIS

12 – § 1. Ad erigendas consociationes publicas auctoritas est:

1° ... consociationibus universalibus atque internationalibus, ...

2° ... Consociationibus nationalibus, quae scilicet ex ipsa erec... inatur ad actionem in tota natione excurrendam, Episco-... rendae in suo territorio;

3° ... Consociationibus dioecesanis, Episcopus dioecesanus in ... que territorio, non vero Administrator dioecesanus, iis tamen ... onibus exceptis quarum erigendarum ius ex apostolico privi... reservatum est.

§ 2. ... quandam erectionem consociationis aut sectionis consocia... ioecesi, etiamsi id vi privilegii apostolici fiat, requiritur con-... dioecesani scripto datus; consensus tamen ab Episcopo ... ritus pro erectione domus instituti religiosi valet etiam ... lam in eadem domo vel ecclesia ei adnexa consociationem ... stituti sit propria.

13 ... Consociatio publica itemque consociationum publicarum ... tio, ipso decreto quo ab auctoritate ecclesiastica ad normam can. 100... competit erigitur, persona iuridica constituitur et missionem ... atenus requiritur, ad fines quos ipsa sibi nomine Ecclesiae ... los proponit.

14 ... Cuiuslibet consociationis publicae statuta, eorumque ... vel mutatio, approbatione indigent auctoritatis ecclesiasticae ... it consociationis erectio ad normam can. 312, § 1.

15 ... Consociationes publicae incepta propria indoli congrua ... sua sumere valent, eademque reguntur ad normam statuto... altiore tamen directione auctoritatis ecclesiasticae, de qua ... 2, § 1.

16 ... § 1. Qui publice fidem catholicam abiecerit vel a com-... ecclesiastica defecerit vel excommunicatione irrogata aut de-... irretitus sit, valide in consociationes publicas recipi nequit.

...ui legitime adscripti in casum inciderint de quo in § 1, prae-... itione, a consociatione dimittantur, servatis eius statuti... ture recursus ad auctoritatem ecclesiasticam, de qua in ... § 1.

---

## CHAPTER II
## PUBLIC ASSOCIATIONS OF THE CHRISTIAN FAITHFUL

**Can. 312** — §1. The authority competent to erect public associations is:

1° the Holy See for universal and international associations;

2° the conference of bishops in its own territory for national associations, that is, those which are directed by their founding purpose toward action in the whole nation;

3° the diocesan bishop in his own territory for diocesan associations, but not the diocesan administrator; however, those associations are excepted for whose erection the right has been reserved to others by apostolic privilege.

§2. The written consent of the diocesan bishop is required for the valid erection of an association or a branch of an association in a diocese, even if this is done in virtue of an apostolic privilege; however, the consent given by a diocesan bishop for the erection of a house of a religious institute also allows for the erection in the same house or church attached to it, of an association proper to the institute.

**Can. 313** — A public association as well as a confederation of public associations is constituted a juridic person by the decree by which it is erected by competent ecclesiastical authority in accord with the norm of can. 312; it also thereby receives a mission to pursue the ends which it proposes for itself in the name of the Church, to the extent that such a mission is required.

**Can. 314** — The statutes of any public association as well as their revision or change require the approval of the ecclesiastical authority which is competent to erect the association in accord with the norm of can. 312, §1.

**Can. 315** — Public associations on their own initiative can begin undertakings in keeping with their character, and they can direct them in accord with their statutes, but under the further direction of the ecclesiastical authority mentioned in can. 312, §1.

**Can. 316** — §1. One who has publicly rejected the Catholic faith or abandoned ecclesiastical communion or been punished with an imposed or declared excommunication cannot be validly received into public associations.

§2. Those legitimately enrolled who fall into the situations mentioned in §1, are, after a warning, to be dismissed from the association, observing the association's statutes and reserving the right of recourse to the ecclesiastical authority mentioned in can. 312, §1.

**n. 317** – § 1. Nisi aliud in statutis praevideatur, auctoritatis ecclesiasticae, de qua in can. 312, § 1, est consociationis publicae moderatorem ab ipsa consociatione publica electum confirmare aut praesentatum instituere aut iure proprio nominare; cappellanum vero seu assistentem ecclesiasticum, auditis ubi id expediat consociationis officialibus maioribus, nominat eadem auctoritas ecclesiastica.

§ 2. Norma in § 1 statuta valet etiam pro consociationibus a sodalibus institutorum religiosorum vi apostolici privilegii extra proprias ... erectis; in consociationibus vero a sodalibus institutorum religiosorum in propria ecclesia vel domo erectis, nominatio aut confirmatio moderatoris et cappellani pertinet ad Superiorem instituti, ad normam statutorum.

§ 3. In consociationibus quae non sunt clericales, laici exercere ... munus moderatoris; cappellanus seu assistens ecclesiasticus ad ... ne assumatur, nisi aliud in statutis caveatur.

§ 4. ... publicis christifidelium consociationibus quae directe ad ... exercendum ordinantur, moderatores ne ii sint, qui ... politicis officium directionis adimplent.

**Can. 318** – § 1. In specialibus adiunctis, ubi graves rationes id ... potest ecclesiastica auctoritas, de qua in can. 312, § 1, designare commissarium, qui eius nomine consociationem ad tempus mo...

§ 2. Moderatorem consociationis publice iusta de causa removere ... qui eum nominavit aut confirmavit, auditis tamen tum ipso moderatore tum consociationis officialibus maioribus ad normam statutorum; cappellanum vero removere potest, ad normam cann. 192-195.

**Can. 319** – § 1. Consociatio publica legitime erecta, nisi aliud cautum sit, bona quae possidet ad normam statutorum administrat sub ... directione auctoritatis ecclesiasticae de qua in can. 312, § 1, cui administrationis rationem reddere debet.

§ 2. Oblationum quoque et eleemosynarum, quas collegerit, eidem fidelem erogationis rationem reddere debet.

**Can. 320** – § 1. Consociationes a Sancta Sede erectae nonnisi a Sancta Sede supprimi possunt.

§ 2. Ob graves causas ab Episcoporum conferentia supprimi possunt consociationes ab eadem erectae; ab Episcopo dioecesano consociationes a se erectae, et etiam consociationes ex apostolico indulto ... thus institutorum religiosorum de consensu Episcopi dioecesani ...ae.

---

**Can. 317** — §1. Unless otherwise provided in the statutes, the ecclesiastical authority mentioned in can. 312, §1, has the right to confirm as moderator of a public association the person elected by the association or to install the one presented or to name the person by his own right; the same ecclesiastical authority also names the chaplain or ecclesiastical assistant, having heard the major officials of the association where this is expedient.

§2. The norm stated in §1 is also valid for associations erected outside their own churches or houses by members of religious institutes in virtue of apostolic privilege; however, in associations erected by members of religious institutes in their own church or house, the nomination or confirmation of the moderator and chaplain belongs to the superior of the institute, in accord with the statutes.

§3. In associations which are not clerical, lay persons can exercise the office of moderator; the chaplain or ecclesiastical assistant shall not assume that role unless the statutes provide otherwise.

§4. Those who exercise leadership in political parties are not to be moderators in public associations of the Christian faithful which are directly ordered to the exercise of the apostolate.

**Can. 318** — §1. In special circumstances where grave reasons require it, the ecclesiastical authority mentioned in can. 312, §1, can designate a trustee who is to direct the association temporarily in the name of the authority.

§2. The one who named or confirmed the moderator of a public association can remove the moderator for a just cause, having heard both the moderator and the major officials of the association in accord with the norm of the statutes; however, the one who named the chaplain can remove him in accord with the norm of cann. 192-195.

**Can. 319** — §1. Unless other provision has been made, a legitimately erected public association administers the goods which it possesses in accord with the norm of its statutes under the higher direction of the ecclesiastical authority mentioned in can. 312, §1, to whom the association must render an account of the administration each year.

§2. The association must also render to the same ecclesiastical authority a faithful account of the disposition of offerings and alms which it collects.

**Can. 320** — §1. Associations erected by the Holy See can be suppressed only by the Holy See.

§2. Associations erected by a conference of bishops can be suppressed by the same conference for grave reasons; associations erected by a diocesan bishop can be suppressed by him, and also associations erected through an apostolic indult by members of religious institutes with the consent of the diocesan bishop.

230

BOOK II – THE PEOPLE OF GOD

**Can. 609** – § 1. Instituti religiosi domum eriguntur ab auctoritate competenti iuxta constitutiones, praevio Episcopi dioecesani consensu in scriptis dato.

§ 2. Ad erigendum monasterium monialium requiritur insuper licentia Apostolicae Sedis.

**Can. 610** – § 1. Domorum erectio fit prae oculis habita utilitate Ecclesiae et instituti atque in tuto positis iis quae ad vitam religiosam sodalium rite agendam requiruntur, iuxta proprios instituti fines et spiritum.

§ 2. Nulla domus erigatur nisi iudicari prudenter possit fore ut congrue sodalium necessitatibus providetur.

**Can. 611** – Consensus Episcopi dioecesani ad erigendam domum religiosam alicuius instituti secumfert ius:

1° vitam ducendi secundum indolem et fines proprios instituti;

2° opera instituto propria exercendi ad normam iuris, salvis condicionibus in consensu appositis;

3° pro institutis clericalibus habendi ecclesiam, salvo praescripto can. 1215, § 3, et sacra ministeria peragendi, servatis de iure servandis.

**Can. 612** – Ut domus religiosa ad opera apostolica destinetur diversa ab illis pro quibus constituta est, requiritur consensus Episcopi dioecesani; non vero, si agatur de conversione, quae, salvis fundationis legibus, ad internum regimen et disciplinam duntaxat referatur.

**Can. 613** – § 1. Domus religiosa canonicorum regularium et monachorum sub proprii Moderatoris regimine et cura sui iuris est, nisi constitutiones aliter ferant.

§ 2. Moderator domus sui iuris est de iure Superior maior.

**Can. 614** – Monasteria monialium cuidam virorum instituto consociata propriam vitae rationem et regimen iuxta constitutiones obtinent. Mutua iura et obligationes ita definiantur ut ex consociatione spirituale bonum proficere possit.

**Can. 615** – Monasterium sui iuris, quod praeter proprium Moderatorem alium Superiorem maiorem non habet, neque alicui religiosorum instituto ita consociatum est ut eiusdem Superior vera potestate constitutionibus determinata in tale monasterium gaudeat, ad normam iuris peculiari vigilantiae Episcopi dioecesani committitur.

**Can. 616** – § 1. Domus religiosa legitime erecta supprimi potest a supremo Moderatore ad normam constitutionum, consulto Episcopo dioecesano. De bonis domus suppressae providet ius proprium insti-

---

231

TITLE II – RELIGIOUS INSTITUTES

**Can. 609** — §1. Houses of a religious institute are erected by the competent authority according to the constitutions with the previous written consent of the diocesan bishop.

§2. In order to erect a monastery of nuns the permission of the Apostolic See is also required.

**Can. 610** — §1. The erection of houses takes place with due regard for their usefulness for the Church and the institute and safeguarding those things which are required for the correct living out of the religious life of the members according to the specific purposes and spirit of the institute.

§2. No house is to be erected unless it can be prudently judged that the needs of the members will be suitably provided for.

**Can. 611** — The consent of the diocesan bishop to erect a religious house of any institute brings with it the right:

1° to lead a life according to its own character and the purposes of the institute;

2° to exercise the works proper to the institute according to the norm of law, with due regard for any conditions attached to the consent;

3° for clerical institutes to have a church, with due regard for the prescription of can. 1215, §3, and to perform sacred ministries, observing what by law to be observed.

**Can. 612** — In order that a religious house be converted to apostolic works different from those for which it was established the consent of the diocesan bishop is required, but this is not so if it is a matter of a change which refers only to internal government and discipline, with due regard for the laws of the foundation.

**Can. 613** — §1. A religious house of canons regular and monks under the governance and care of its own moderator is autonomous unless the constitutions state otherwise.

§2. A moderator of an autonomous house is by law a major superior.

**Can. 614** — Monasteries of nuns which are associated with an institute of men maintain their own order of life and governance according to the constitutions. Mutual rights and obligations are to be so defined that the association is spiritually enriching.

**Can. 615** — An autonomous monastery which has no other major superior or beyond its own moderator and is not associated with any other institute of religious in such a way that the superior of the latter enjoys true power over such a monastery determined by the constitutions is committed to the special vigilance of the diocesan bishop according to the norm of law.

**Can. 616** — §1. A legitimately erected religious house can be suppressed by the supreme moderator according to the norm of the constitutions after having consulted the diocesan bishop. The proper law of the institute is t-

1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3                    - - -
   JOHN DOE,                        )
4                                   )
               Plaintiff,           )
5                                   )  Civil Action
          vs.                       )  No. 02-0444
6                                   )
   FR. ENSEY, FR. URRUTIGOITY,      )
7  DIOCESE of SCRANTON, et al,      )
                                    )
8            Defendants.            )

9                    - - -

10        Deposition of MATTHEW SELINGER

11        Friday, October, 24, 2003

12                   - - -

13      The deposition of MATTHEW SELINGER, called as a
   witness by the plaintiff, pursuant to notice and the
14 Federal Rules of Civil Procedure pertaining to the
   taking of depositions, taken before me, the
15 undersigned, Jessica L. Tapia, a Notary Public in and
   for the Commonwealth of Pennsylvania, at the office of
16 Marks, O'Neill, O'Brien, & Courtney, P.C.,
   3200 Gulf Tower, 707 Grant Street, Pittsburgh,
17 Pennsylvania  15219, commencing at 10:10 o'clock a.m.,
   the day and date above set forth.

18                   - - -

19

20        COMPUTER-AIDED TRANSCRIPTION BY
       MORSE, GANTVERG & HODGE, INC.
         PITTSBURGH, PENNSYLVANIA
21             412-281-0189

22                   - - -

23

24

25



EXHIBIT
E

PAGE 2

2

```
1   APPEARANCES:
2       On behalf of the Plaintiff (telephonically):
3       Law offices of James Bendell:
4       James Bendell, Esquire
        P.O. Box 587
5       Port Townsend, Washington  98368
6       On behalf of the Defendants:
7       (No appearance.)
8                       - - -
    ALSO PRESENT:
9
        Justin Wiener, Videographer
10
11          ALSO RECORDED VIA VIDEOTAPE
12
13                  INDEX
14
15  EXAMINATION BY:                    PAGE
16  Mr. Bendell                         4
17
18                      - - -
19
20
21
22
23
24
25
```

PAGE 3

3

```
1       MR. WIENER:  The time is 10:10 a.m.
2       The court reporter may now administer the
3   oath.
4               - - -
5           MATTHEW SELINGER
6   called as a witness by the plaintiff, having been
7   first duly sworn, as hereinafter certified, was
8   deposed and said as follows:
9       MR. BENDELL:  Before we begin the
10  deposition, I need to put some procedural matters
11  on the record.
12      This deposition was originally scheduled,
13  by agreement of all counsel, for Friday at
14  1:00 p.m. earlier this week.  Mr. Cogniti asked
15  me if I could move the deposition, because he is
16  going to a swearing-in ceremony at
17  Fordham University, his alma mater.  At some
18  inconvenience to myself, as well as Mr. Selinger,
19  who was kind enough to move the deposition, we
20  agreed to move the deposition.  It was moved to
21  this morning at 10:00.
22      Yesterday, we received protest from
23  Mr. Cogniti's office that the deposition should
24  not go forward, because he didn't realize it was
25  a perpetuation deposition.
```

PAGE 4

4

```
1       On the phone, both to Mr. Cogniti, and to
2   Mr. Semini, on different calls, I said that was
3   fine, I will just make it a discovery deposition.
4   And so the attorneys, for whatever reason, have
5   chosen not to show up for this deposition.
6       They wanted to depose Jeff Bond at
7   9:00 o'clock, however, they were told by Mr. Bond
8   that he was not going to be here, because he
9   had -- he needed a delay in the deposition for
10  reasons of his own.
11      I would also like to state for the record,
12  that although nobody is here, I arrived at this
13  location approximately 20 minutes before 10:00,
14  at which time I saw Mr. Semini and Father Ensey
15  leaving the area of the building.
16      This appears to be another example of the
17  way the Post Conciliar Religion treats victims of
18  child molestation.
19      So with that, for the record, I will
20  proceed with my questions.
21          EXAMINATION
22  BY MR. BENDELL:
23  Q   Mr. Selinger, when were you born?
24  A   In '74.
25  Q   And what is your date of birth?
```

PAGE 5

5

```
1   A   February 22nd.
2   Q   And you are a Catholic; is that correct?
3   A   Yes.
4   Q   And at one time, did you attend the
5   seminary at Saint Pius X at Winona?
6   A   Let's see.  I graduated in '92.  I think it
7   was '94 to '96, and then I left for a year, year and a
8   half and I went back for another year and a half.
9   Q   And that was in Winona, Minnesota?
10  A   Yes.
11  Q   Now, at that seminary, did you get to know
12  a Father Carlos Urrutigoity?
13  A   Yes.
14      MR. BENDER:  Court reporter, that's
15  U-r-r-u-t-i-g-o-i-t-y.
16  Q   And who was he?
17  A   He was a seminary professor.
18  Q   And did you become friends with
19  Father Urrutigoity?
20  A   Yes.
21  Q   Did he have any spiritual relationship with
22  you?
23  A   He was my spiritual director.
24  Q   Was he also your confessor?
25  A   Yes.
```

**6**

1    Q    Did you ever take vacations with him?
2    A    He took them with me. The vacations we
3 went on, I'd go home. Like seminarians, I get two a
4 year and then the summer. And a couple times that I
5 went home with my family, he came with me.
6    Q    Now, did a practice begin wherein
7 Father Urrutigoity would sleep in the same bed with
8 you?
9    A    No.
10    Q    Did he ever sleep in the same bed with you?
11    A    One time we were in his office and just
12 talking, up late, and we ended up going into his room
13 and ended up laying on the floor and talking, and
14 everything like that. And we ended up sleeping in the
15 same bed.
16        He was intrigued with the idea that I grew
17 up with three brothers. And he told me -- he asked me
18 where we all slept. And we didn't have a lot of
19 money, we all slept in the same bed.
20        And other than that, he felt that because
21 we were friends, that why couldn't he bunk with me,
22 you know, hang out all night.
23        I relented for a while and then I figured,
24 well, big deal. You know, on a different level, to
25 me, I seen not a big deal with it. I mean, growing

**7**

1 up, through high school, a bunch of us would go
2 out -- and out of high school -- drinking and end up
3 staying at a guy's house, everybody sleeping on the
4 floor, or on the bed or something. It was not a big
5 deal to me.
6        And he felt that he wanted to be a part of
7 that, to be a buddy and said that, you know,
8 basically, it would be cool if he got to do it too.
9    Q    Now, was there a development at Winona
10 wherein some of the priests at Saint Pius X wanted to
11 start a new entity of some type?
12    A    You mean the Society of Saint John?
13    Q    Yes.
14    A    Yeah. I found out about it, I think, I
15 don't know -- I think it was at the end of my first
16 year. Father U had his computer and everything and he
17 had a bunch of priests that they used to talk to.
18        Basically, they got tired of -- they wanted
19 saints, and they wanted them now, and pretty much an
20 elite.
21        And he told me his ideas and asked me if I
22 had ideas and I says, "Well, if a man wants to try to
23 be a better man in the faith, how could that be bad?"
24        And that's kind of where it started. Just,
25 you know, instead of saying five decades of the rosary

**8**

1 today, you say 15. And it was of that nature that the
2 proposal that everybody was working on started.
3    Q    And what was the proposal?
4    A    It started out basically to be, they want
5 it to be within the Society of Saint Pius X, with no
6 intentions of ever going out of it, with the superiors'
7 okay.
8        And what it was, was just kind of like a
9 more rigorous training and contemplate of life and to
10 be done in the Society of Saint Pius X.
11        Well, when it came to head, the superiors
12 looked at it as something that was going to undermind
13 the society or they looked at it as something bad, not
14 bad in itself, but because he was leading it,
15 Father U, they looked at it as disobedient and
16 everything and they were pretty much kicked out.
17    Q    Now, when they were kicked out, did you go
18 with them?
19    A    Yes.
20    Q    And why was that?
21    A    Well, I'd say about 80 percent of it was
22 because whenever Father got kicked out, I think he
23 knew that it was coming and we talked about it and
24 I says, "Well, where I come from, Father, if your
25 buddy gets in trouble, you don't tuck tail and run,

**9**

1 you stick by him."
2        And it was good, and I agreed with what
3 they were trying to do and whatever. You know,
4 whenever it came down, they basically said, "Leave."
5        I was left with the decision of, do I just
6 stay here or do I go with my friend and what I thought
7 was right. So I got up and left with him.
8    Q    Now, while you were at Winona and
9 Father Urrutigoity was, was there an
10 incident with Father Urrutigoity in which he made a
11 request regarding a suppository?
12    A    To kind of make -- to sum it up, in about
13 the first two years of what happened with him and I,
14 the first day I met him at Winona, before I was a
15 seminarian, I came and he approached me and
16 Jason Winschel, a buddy of mine from Pittsburgh who
17 was going to enter the seminary, which he didn't for
18 another year, but he came across as someone who looked
19 like he wanted -- he was very intelligent, but kind of
20 awkward and he looked like we wanted to be cool.
21        And we went down to the river and he says,
22 you know, "It's cold, but tough guys can swim."
23        I says to my buddy, Jason, you know, "We're
24 from Pittsburgh, we can swim pretty well."
25        And he says, "Well, jump in."

**10**

1     And I says, "I don't have any, you know,
2 trunks or anything." And Jason said the same thing.
3     And he says, "We're all men. You never
4 been naked in front of a guy, your buddies?"
5     I'm like, "No. Showers, locker room," I
6 says, "but I hardly want to jump into a cold river
7 naked."
8     That was the first incident. Didn't think
9 much of it. I thought he was a weird Argentinean
10 priest trying to learn how Americans were and trying
11 to be cool with us.
12     Then I was -- during Lent, I wanted to give
13 up meat for 40 days. And I thought it would be very
14 hard, but I wanted to try it. And I did it for a
15 couple weeks.
16     And I got constipated, I got real sick,
17 because I was living off of soup and vegetables.
18     So there was a guy in the seminary,
19 Anthony, I forget his last name, he was Italian, he
20 always had a pill for everything.
21     And I went to Father's room and I says, you
22 know, "I'm sick and I haven't went to the bathroom in
23 two weeks." I said, "I need something to, you know,
24 go to the bathroom." And I says, "I know Anthony got
25 Metamucil. Can I get some?"

**11**

1     He said, "Well, I'll go ask for you."
2     He went and asked and he came back and he
3 said he didn't have any, which threw my mind real
4 quick. I figured, the guy's always got it, but why
5 would the father lie?
6     And he says, "I'll go to the store and get
7 you some."
8     So he came back with a depository.
9     Q   You are talking about Father Urrutigoity
10 now?
11     A   Yeah. He came back and he gave it to me.
12 And I went to put it in my mouth, I didn't know what
13 it was.
14     And he says, "No, that goes in your rear."
15 I don't know if that's the word he used, but --
16     And I says, "All right. I never heard of
17 these."
18     And he says, "They're common and they work
19 the best."
20     All right. So I went to the bathroom and
21 he says, "What are you doing?"
22     And I says, "I'm guess I'm going to do
23 this."
24     And he said, "What; I'm not your friend?"
25     I says, "Well, yeah."

**12**

1     He says, "Why do you have to go secret to
2 do something like that?"
3     I says, "Well, I have many friends, but
4 I don't want them watching me pee."
5     And he says, "Well, I think that's" -- and
6 this is the big thing with Father U, is, "That's part
7 of your pride, Matt. You know, you come from a rough
8 background and you depend on your own strength to do
9 everything, and you have to break your pride to let
10 God get into your heart, because with self-love, God
11 can't get in there."
12     And all these things that he said is true.
13 But they don't apply, obviously, in this.
14     And reluctantly, I says, "Okay." And I
15 kind of went into the bathroom and did it real quick.
16     And he came in, and I did it without him
17 and he got real mad at me.
18     And I just says, "Well, Father, it's going
19 to take me a while to be able to swallow that much
20 pride."
21     Does that answer the question?
22     Q   Yes.
23     A   Okay.
24     Q   Also, while you were at Winona, did
25 Father Urrutigoity ever express to you some sort of a

**13**

1 theory involving that you and he were one person or
2 something like that?
3     A   He had an idea that when you're buddies,
4 you do everything for each other. You know, you die
5 for your buddy. You're running from the cops, you
6 know, or whatever you do, you never leave youR buddy
7 hanging. So much so, friendship in the supernatural
8 realm, we're friends, you know, we are the same faith
9 and everything, it's deeper.
10     And Father believed that because both
11 Catholic, both in the family of God, so to say, and
12 everything, that we were so close spiritually, that we
13 were one.
14     And he used to write on his computer, the
15 screen saver, "Ego et pater unum sumus."
16     Q   Which means?
17     A   I and the Father are one.
18     Q   That's from the Bible; right?
19     A   Yes.
20     Q   Those are the words of Jesus?
21     A   Yes.
22     Q   And how did he apply that to you?
23     A   Basically, that we were of the same; we
24 were the same.
25     He said, "Kind of like, more so like

**14**

1 when" -- okay. "When you're married, that the two
2 become one flesh." Okay.
3       Which is true, but obviously, they're two
4 different people, but the one flesh is in the eyes of
5 God in a way.
6       And he said, "Well, if two people become
7 one, why can't two friends become one?"
8       So he took that to every level that you
9 could imagine, and in fact, he would actually confess
10 his sins to me.
11    Q    So, you are not an ordained priest; is that
12 right?
13    A    No.
14    Q    So did he -- what type of confession was
15 this?
16    A    Just, "Matthew, you know, I did some things
17 wrong."
18       You know, obviously, I'm not a priest and I
19 was never under the seal of confession, but I feel no
20 need to tell his sins.
21    Q    I'm not going to ask you that, but what was
22 the format?
23    A    He would just say, you know, "Matthew, you
24 know, I did something bad today. I was under a lot of
25 stress and I did this and, you know, I did this."

**15**

1    Q    Did you give him some form of forgiveness?
2    A    No. No. No. No. No. It was just kind
3 of like, he would say, "Hey, I messed up in these
4 areas. Please forgive me." In the sense of because
5 we were friends and because we're one and because we
6 are trying to get to heaven together, if I mess up,
7 I'm dragging you down.
8    Q    Do you remember when it was approximately
9 that you and the other future -- you and the other
10 persons at Winona left Winona to start this new group?
11    A    When?
12    Q    Yes.
13    A    Well, we didn't decide. It was --
14    Q    I'm sorry. I will withdraw the question.
15       After -- you said something about the
16 society -- the future society of priests were, quote,
17 "kicked out" of Winona?
18    A    Yes.
19    Q    My question is: Where did you all go?
20    A    Well, it was Easter, and I went home.
21 Easter night, I was playing basketball at the seminary
22 and I tore my ACL in my knee, so I had to get it
23 operated on. And I came back late on a plane, because
24 I was still healing.
25       And when I got back, I was immovable,

**16**

1 laying in bed. And from what I can remember, Father U
2 knocked at the door and he says, basically -- I forget
3 exactly what he said, but the shit hit the fan.
4       And he said that everybody -- somebody
5 found the document in the hall, the proposal, and
6 showed it to the bishop and the bishop kicked him out
7 and everybody that was in association with it.
8       And then he says, "What are you going to
9 do?"
10       And I looked at him, I said, "Well, I got
11 to go. I mean, you know, I can't leave you guys
12 hanging. I'll go."
13       So we left, I think it was the next day.
14    Q    And where did you first go?
15    A    I went to, I think the lady's name was
16 Maloney. I can't remember, it started with an M.
17    Q    And what city was this in?
18    A    That was in, I think, Rockford.
19    Q    Okay. And who all was there with you at
20 Rockford?
21    A    I know Father U was with me and -- well, it
22 was me, Father U, Chris Manuele and Father Fullerton,
23 that left together. Two were priests; and me and
24 Chris weren't.
25       I remember some of us staying all there at

**17**

1 once and then sometimes Father Fullerton would leave
2 with Manuele or just Manuele would leave, you know.
3 They would kind of take us to this house, because not
4 all four can stay in the same house because of space
5 all the time. So we'd go back and forth, you know.
6 Some people would stay here, some people would stay
7 there.
8       And we did that for a while, I think for
9 like three weeks or something. And finally, I think
10 it was Father U that knew a doctor in Rockford,
11 Illinois who was going on vacation, I believe out of
12 the country --
13    Q    Yes.
14    A    -- and he let us use his house.
15    Q    And did you all then go to that house?
16    A    Yeah. We all went to the house and that's
17 kind of where it started.
18    Q    Did you notice any peculiar artwork at the
19 house?
20    A    Yeah. That was my first complaint. I
21 mean, I'm a guy and you're constantly trying to fight,
22 you know, against such things, especially when you're
23 trying to do good and be in the seminary and they got
24 naked ladies all over the room.
25       Everybody's excuse was, "That's Picasso,"

or, "that's Leonardo."

I'm like, "Well, I don't care if it was Fred Flinstone. I mean, there's a naked girl on the wall, you know, you got to -- either you're going to look at it, or you got to try to fight not to look at it all the time. Can't we find a better place?"

Q Now, while you were at that place, what happened with regard to devotional practices such as the rosary and the breviary?

A That was what kind of started everything. We were there, and after about a week, I noticed myself and others that -- like, for instance, Father Fullerton would put on a T-shirt and a pair of Spandex and get on his bike and ride all day around Rockford.

You know, no one was wearing a cassock. Father U kept a cassock on mostly. But other than him, no one wore a cassock.

I didn't see anybody praying the breviary too much; of course, they could have done it in private.

I didn't see people praying the rosary too much, they could have done it in private.

But the whole point of everything that we were doing was to do things more and do it in

communion, so everybody pray the rosary, all 15 decades together every day, public office, doing extra. And that's the very reason why we left, or at least we started the Society of Saint John.

And I complained and I says, "Not only are we not doing more, but we're doing less than where we were."

And I says, "You know, I don't like to see you guys doing it, but it's not helping me. And we're living in the world, in this house with books filled with pornographic art and paintings on the wall and everything. How the heck are we going to do better?"

And the excuse that I was given was, "It's difficult right now, there's nothing set up for us, we're just going to have to get through it."

And tension started at that point. Then, Bassle, Sarlino and O'Connor, who are priests now for the Society of Saint John, they came to visit and I think it was Manuele's parents.

There was a bunch of us at the house. Well, there wasn't -- everybody couldn't get their own room.

And Father said, you know, "We'll get the same room because we're best friends and maybe we'll share it with two other guys, but they can sleep on

the floor."

And then that's when I says, "Well Father, why don't you sleep with Cary" -- no, Father Cary, he wasn't a priest then -- "and I'll just take the floor?"

And I was getting upset at everybody because I found myself doing much less and out of the seminary and more room and more time to myself. I started noticing Father U more.

He was getting upset because I was pulling away. And I was trying to do it to think, but not let him know that I was doing it, so that he would get off my back.

So I pushed for him to sleep with Cary and told him I'd take the floor. And the reason I gave was, because I wanted to sacrifice to sleep on the floor out of friendship.

Well, he bought it, I think, and he ended up sleeping with Cary.

Q Now, were there other places in the house to sleep, couches and things?

A Yeah, but most of them were -- no, I don't think, because there was many -- like I said, there was maybe six or seven seminarians and priests and there was a couple, Chris Manuele's parents, obviously

they needed their own bed and privacy.

And the seminarians and priests didn't want to be downstairs. We were told by the priests, because, unless you sleep in your cassock, you know, during the night, what if somebody, one of the women or something, comes down to go to the bathroom and she's not dressed properly or you're not dressed properly?

We kind of wanted to give everybody their own privacy, and that's why I took the floor.

Q What happened that night, later?

A I was sleeping and pretty much I woke up and his hand was on my private area.

Q I know this is embarrassing, but to be specific, what organ was his hand on?

A What do you call it? The unvulgar word is "penis."

Q Was it the penis or testicles; which was it?

A It was the top, you know.

Q The top of the penis?

A Well, no, the actual penis.

Q Okay. His hand was on the penis.

Now, how do you know it was Father Urrutigoity's hand?

**22**

1    A    Well, I felt it and I noticed it.  You
2  know, a guy's sleeping and they wake up, the first
3  thing they notice?
4    Q    Yes.
5    A    Okay.  Well, when I woke, I was in that
6  state.
7    Q    You had an erection?
8    A    Yeah.
9    Q    And then what happened?
10    A    And his hand was on the bottom of it.
11        Well, I knew it.  And I opened my eyes and
12  he was kneeling beside me with his hand on the bottom
13  of my penis and I was erected.
14    Q    "He," being Father Urrutigoity?
15    A    Yes.  Basically, I was caught between two
16  things.  I wanted to jump off and rip his head off,
17  and unless I could do that, I could do nothing.
18        I thought about it and I might have been
19  okay to do it, but my dad told me once a guy hit a
20  priest and his arm was frozen forever.
21        Now, Father U, regardless, whether he's a
22  killer, a rapist, a mass murderer, whatever, he's a
23  priest.
24        And I'm afraid to hit someone who was,
25  although he's that kind of a man, he is an

**23**

1  Alter Christi.  And you know, you don't lightly maim
2  or kill a priest, regardless of what they do, unless
3  you are trying to save a life or whatever.
4        I was hurt because everything in the back
5  of my head that I started to think about him was
6  confirmed at that minute.
7        And I basically wrestled in my sleep, like
8  I was waking up, to scare him.  He took his hand off
9  me.  I rolled on my side and I just laid there.
10        He crawled back up in the bed real quietly
11  and I laid on the floor for the rest of the night.
12        And my basic question was:  When I came to
13  the seminary and I offer myself to do the best that I
14  can, and he's my spiritual director, and I put my
15  spiritual life in his hands, but I did it through our
16  Lady and our Lord, how in the heck can they let this
17  happen?  The very person I'm supposed to trust and do
18  trust, and they let this priest do this to me.
19        So that was my confusion, not so much
20  Father U, because it all came clear to me what he was,
21  what his intentions were.  And that was something
22  where, either beat the hell out of him or walk away.
23    Q    So how long did you continue to stay in
24  that house?
25    A    Well, the next night, obviously, what I

**24**

1  tried to do was take naps during the day and stay up
2  at night.  And the only thing I had to figure out is,
3  what to do and how to do it.
4        The one thing was that he mentioned,
5  because of my addiction to snuff, that he wanted me to
6  quit.  And this was a little back.  And I couldn't
7  quit, I kept chewing.  There was seminarians that
8  chewed and I would bum one off of them.
9    Q    By "snuff," you mean chewing tobacco?
10    A    Yeah.  And I was mad that I couldn't beat
11  it, and I told Father I wanted to, but it was tough.
12        And I said, basically, "I'd like to," you
13  know, "I got to make a promise never to do it again."
14        And he says, "Well, don't take oaths
15  lightly, if you make an oath."
16        So how it unraveled was, I made an oath to
17  Father U to never chew again without his explicit
18  permission.
19        Later, that bothered me because I found out
20  exactly what oaths were and how they should be made.
21  And I made an oath to a priest and not to God, which
22  is wrong.
23        At this point, the only thing binding, and
24  the only thing that I had to figure out was one, how
25  to get out of this oath, because I knew I would chew

**25**

1  again.
2        And two, was that I pride myself in good
3  judgement in people and here I had a lot of time to
4  spend with this man and I judged him as to be okay.
5  He was a little different and a little weird, and
6  I figured it was because he was Argentinean.  I had to
7  get used to different cultures and that.
8        And I could never have been more wrong in
9  my judgment, which made me question how can I ever
10  judge somebody or trust somebody again when I think
11  I'm doing the best and I think I got God's help.  And
12  here I'm this wrong.
13        And there was pride there because this guy,
14  although I couldn't pretty much kick the snot out of
15  him, he beat me, and I wanted to beat him.  But I
16  wanted to beat him the way he beat me.
17    Q    And how's that?
18    A    Intellectually, through the mind.  He
19  twisted, turned and everything to my mind and finally
20  I found out.
21        Well, I wanted to get out, without him
22  knowing until the very end.  But how I had to do it
23  was get out of the oath.  And how do I get out of the
24  oath without him knowing I know what's going on?
25        So that night, I slept in another bed by

**26**

1 myself. I forget how I did it. I just said, you
2 know, "I'm not feeling well" or, "I got some thinking
3 to do. I want to sleep, you know, in a room by
4 myself, no seminarians, no priests, no nobody."
5 As I was sleeping there -- well, not
6 sleeping there, laying there all night he came into my
7 bed and knelt down beside me. He motioned forward,
8 obviously to do what he did the night before and I
9 said, "Oh, Father, what's wrong? Can't you sleep?"
10 And he says, "I been having temptations in
11 my sleep, dreams of girls or whatever, and I just came
12 to pray beside your bed."
13 I says, "Okay." I says, "Well, I have been
14 having trouble sleeping and I just fell asleep, so go
15 back to bed and I'll pray for you."
16 He said, "Thank you," and left.
17 We did that for a couple days and then he
18 had to go to St. Louis to talk to a couple priests.
19 Father Fullerton told me I had to go with him. I
20 said, "Well, Father," and I made up a couple excuses,
21 I wanted to stay here. I didn't want to go down
22 there. I didn't want to travel.
23 And he says, "Someone's got to go. He
24 requested you. Go ahead and go with him so he doesn't
25 fall asleep at the wheel," and so forth.

**27**

1 On the way down, we didn't talk for about
2 an hour. And then he said, "What's wrong?"
3 And I says, "Nothing." And I just
4 basically blamed it on my vocation, I didn't know what
5 I wanted to do.
6 I told him, "I want to make a request and I
7 want to be released of my vow of chewing."
8 He said, "No."
9 I says, "All right. Well, I don't think we
10 can go any further until I'm released of my vow of
11 chewing."
12 He said, "Why?"
13 And I says, "Because I think that I made a
14 vow to you and not to God and that bothers me and I
15 want to change that to be a clean slate so I can go
16 forward."
17 We fought the whole way to St. Louis,
18 telling me that I'm prideful, I'm backing down on our
19 friendship and all these things.
20 I said, "Fine."
21 And he never gave me the permission to get
22 out of the vow.
23 Finally, a couple days down there -- we
24 slept in an Argentinean house. He wasn't there most
25 of the time, I was. It was the same room, separate

**28**

1 beds. I stayed up every night. He never tried
2 anything when he was there.
3 Then one night that we were both -- I think
4 it was the night or two nights before I was supposed
5 to go -- we were both supposed to go, but we were
6 there, and I said my prayers and went to bed, and he
7 came over and he says, "What's wrong? I need to know
8 what's wrong."
9 I says, "I'm not talking until I'm released
10 of my vow."
11 And he said, "Okay. Fine." And he got
12 real mad. "You're released of your vow, you're
13 released of everything, you have no more connection
14 with vows or anything with me at all. Are you happy,"
15 you know, and all mad.
16 And I stood up and I said, "Yes, I am. And
17 since that's out of the way," and that's when I
18 confronted him.
19 I walked up to him and I says, "Father,
20 I know what you did that night. I woke up, your hand
21 was on me." I says, "You know it and I know it."
22 I says, "You tried it again the next night,
23 I faked like I was sleeping, you didn't know that.
24 And this whole time I've been trying to release myself
25 of that vow, and I did it." I, you know -- "I got out

**29**

1 of it and now I have no connection with you at all. I
2 know what you did. I think you're a fag. I think
3 that you need to go see a priest, confess your sins,
4 and never be a spiritual director to another
5 seminarian or anybody ever again, or a confessor. And
6 you need help, from a priest first, and then maybe
7 psychologically from a Catholic psychiatrist or
8 something."
9 I says, "I'm going to go back home. I'm
10 leaving and I never want to see you again or hear from
11 you."
12 I took the car back to Rockford, Illinois,
13 got back and Father Fullerton and Chris Manuele were
14 there and they were leaving to go to Armada, where my
15 brother was graduating from a Catholic school and my
16 parents would be there.
17 I asked them, "Hey I'm going to come with
18 you because I'm going to go home and see my family."
19 I played it off like nothing was bothering
20 me, nothing, because I didn't want to get into
21 anything, explain anything or stop where I was going.
22 Got in the U-Haul with them two, we went to
23 Armada. I got there, left with my parents and never
24 seen or talked to Father U again.
25 Q Now, sometime after this incident with

**30**

1  Father U, did you talk to Father Ensey about it?
2      A    What happened was, I got home and as far as
3  Father U, I was like, I had bad judgment, I trusted
4  this guy and not a priest.  I -- obviously, I got a
5  lesson that I learned here.  I don't know exactly what
6  it is, but I learned a lesson.  Pretty much, Father
7  U's a fag and I messed up, end of story, deal with it,
8  move on.
9          But my big thing was the whole idea was how
10  was I to trust in the church, in my faith, when I did
11  as best as I could and I messed up that bad.  So I was
12  struggling with that.
13          And as much as I wouldn't like to admit
14  there was, getting over the fact that I befriended
15  this fag.
16      Q    Right.  Right.
17      A    And, you know, who else is one that I don't
18  know, who I think is my buddy who's going to crawl in
19  and try to do something weird like that again?
20          So I didn't want to tell anybody for a
21  bunch of reasons.  One, pride; you were touched by a
22  queer, you know, this happened to you.
23          Two, if you tell Catholics or non
24  Catholics, right away they say, "Another priest,
25  another fag, they're all like that."

**31**

1          I didn't want to tell my family because
2  then they would play the, "Are you all right," and
3  they think that you need all these hugs and everything
4  like that, and I didn't want that kind of thing.
5          It was tough and I didn't know who to tell,
6  what they were going to do.  I didn't want it out.
7          So my dad noticed right away something was
8  wrong, he bugged me for a couple weeks.
9          Finally, I was out on the porch, smoking a
10  cigarette, and he came out and he asked and I told
11  him.  I told him to promise me he would never tell a
12  single person as long as he live.  He said, "Okay."
13          The next day, he called Father Ensey.  I
14  didn't talk to my dad for about a week.  And then he
15  explained to me that he did it because of the greater
16  good, although I didn't want anybody to know, but if I
17  didn't tell anybody, it might happen to somebody else
18  and that person might actually walk away from the
19  faith.
20      Q    Right.
21      A    Or just actually damage that person and
22  many other souls.
23          So he told Father Ensey.  I didn't know he
24  told Father Ensey.
25          Father Ensey called and said, "I know you

**32**

1  left, I don't want to know why."  But he already
2  knew.  He said, "You just need time to get away.  Do
3  you want to come out to California?"
4          "Yeah.  That would be great."
5          I flew out, I got there.  After a couple
6  days, we were on the beach and it was at night, we
7  were walking and he asked me how things were going and
8  I came out and I just told him.  I told him
9  everything, what Father did, everything.
10          When we were done, Father Ensey looked at
11  me and he said, "Obviously, I can never go with this
12  man.  I can never talk to him; nothing."
13      Q    Referring to Father Urrutigoity?
14      A    Yeah.  I said, "Well, no kidding."
15          So, the next couple days, we didn't really
16  talk too much about the details, again, and I went
17  home.
18          When I got home, he called me and he said
19  that he was going to Scranton to confront Father U.
20          I said, "Well, go ahead and call me when
21  you're done."
22          He called me from Scranton and said
23  Father U was in Rome, when he got back he would talk
24  to him.  He called me a week, two weeks later, and he
25  says, "I've talked to Father U, I told him what you

**33**

1  said and he admitted it."
2      Q    He said Father Urrutigoity admitted what?
3      A    He admitted that he touched me, he admitted
4  my whole story that I told Father Ensey.
5  Father U said that it was all true.
6      Q    About when were you having this discussion
7  with Father Ensey?
8      A    It was -- I was going to say it was in the
9  summer, but in California I guess it's always the
10  summer.  My brother graduated from Armada, Michigan
11  I'm going to guess in June.
12      Q    What year?
13      A    '98.
14      Q    I want to examine Exhibit No. 6.
15      A    All right.
16      Q    This is a letter that Father Ensey wrote to
17  Bishop Timlin in March of 1999.  If you look at the
18  second paragraph, about the fourth line down, it says,
19  there's a sentence that says as follows, quote, "It is
20  also true that Father Urrutigoity himself has always
21  denied having perpetrated any of the improprieties
22  with which he had been charged, and ever with the
23  greatest fidelity to his role as Matthew's spiritual
24  director and friend," end quote.
25          This conversation with Father Ensey that

1  you are talking about, in which he says that
2  Father Urrutigoity admitted the sexual touching, that
3  conversation took place before this letter was
4  written; is that right?
5      A   Hold on. I'm not -- Exhibit 6 -- I'm not
6  finding where you're at here. It says, it starts out
7  with, "As a close personal friend of both
8  Fr. Urrutigoity and Matt?"
9      Q   Yes.
10     A   And you said the fourth line down?
11     Q   There's a sentence there that starts with
12  the word "However."
13     A   Yes. "Is it true that Fr. U himself has
14  also denied" --
15     Q   "Always denied."
16     A   "Always denied." Yeah, that's wrong.
17     Q   So this letter that Father Ensey wrote in
18  March of '99 was written some lengthy time after his
19  conversation with you in which Ensey said Urrutigoity
20  admitted fondling you; is that right?
21     A   Yeah. The thing with Father -- with this
22  particular thing is that whenever -- just to finish
23  the end, and I don't have to keep going into it.
24         Whenever Father Ensey called me back, he
25  said that he told Father Fullerton and they both

1  confronted Father U and Father U admitted it.
2         And I says, "What the hell are you still
3  doing there?"
4         He says, "We still have things to talk
5  about."
6         I says, "Well, when you figure that out,
7  then you can call." Pretty much, "Well, obviously you
8  don't believe me now, or you do and you don't care,
9  and so therefore, why am I still talking to you?
10  Bye."
11        He later came back down, wanted to talk
12  about it more and everything and he told me that it
13  happened like it did, but Father U said that I was
14  sick and he was doing that because he can tell if
15  you're aroused, you're sick, or like, if you look at
16  someone's tongue and it's all cracked then there's
17  something going wrong in the soul, because it's so
18  connected to your innard organs, and stuff like that.
19         It was a medical reason that he said that
20  he was doing this.
21     Q   Father Urrutigoity had some sort of medical
22  protocol involving a man's penis to see if
23  he's sick?
24     A   This is what he claims. He would do a
25  bunch of things like that. He said he would give

1  communion and look at people's tongues and tell if
2  that person was suffering more than the next person
3  with, you know, a smooth tongue. And he said he could
4  do this, you feel this guy, whatever, and you can tell
5  that there was something being bothered. And my thing
6  was, "Father, every guy knows when you wake up or when
7  you're sleeping, if you're comfortable, it happens."
8      Q   Right.
9      A   That's a bunch of bull.
10         You know, Father Ensey was asked, this is
11  where he first denied me telling him, because
12  Father Ensey was asked by Bishop Timlin if I ever told
13  him. Father Ensey said, "No."
14         And he told me the reason he said no was
15  because he was my spiritual director and felt in
16  confidence that couldn't tell Father Ensey that --
17  Bishop Timlin that.
18     Q   I see.
19         So at this point, Father Ensey had become
20  your spiritual director?
21     A   Father U told him to take care of me.
22  Father Ensey listened to me when I was out in
23  California, talked me through with it. After that,
24  there was really no other things in friendship.
25         Honestly, I never really looked at him as

1  my spiritual director. I wasn't confessing to him,
2  I wasn't really confiding in. I talked to him about
3  that problem.
4         And whenever you're not in the seminary,
5  who has a spiritual director? You go to your church,
6  you confess to the priest that's there. If you have
7  big problems, you ask the closest priest available.
8  It's not like a spiritual director that you constantly
9  go to.
10        And although Father Ensey's right, if he is
11  my spiritual director, and I was talking to him, then
12  he could hold that back. So he wasn't lying per se.
13        I disagree, because obviously, if I went
14  and told Bishop Timlin or his chancellors or whoever,
15  myself, why couldn't Father Ensey tell them? But
16  that's left to his discretion, I guess.
17     Q   Now, after you hung up the phone with
18  Father Ensey, did you have additional conversations
19  with him?
20     A   Father Ensey?
21     Q   Yes.
22     A   We talked now and again, and it was more or
23  less, "How are you doing." I said -- I told him, my
24  father told him, "Listen, if you hang around with
25  Father U, he's colored pink, you're going to be

**38**

1 colored pink. He's obviously doing this stuff, so if
2 you hang around with him, people are going to think
3 you're doing it, so leave."
4        Whenever, finally, he got accused and
5 everything and started coming down to him, I looked to
6 him to be, my judgement was, he's being colored pink
7 like Father U.
8        But did he really do it? I don't think.
9        Again, I questioned my judgment now,
10 especially when it comes to that.
11        But if I was to guess did he do it; no.
12 But, I was concerned because he was there for me when
13 I needed somebody the most, so I was going to be
14 there.
15    Q    Backing up. If you had to guess what?
16 I got lost there.
17    A    I was going to say, in my head, when I
18 talked to Father Ensey and he was being accused of
19 these things --
20    Q    Are you talking about this lawsuit now?
21    A    Yeah.
22    Q    Okay. Ensey was not accused of molesting
23 you?
24    A    No.
25    Q    I'm sorry. Please continue.

**39**

1    A    No, I just -- basically the question was:
2 Is he a fag too?
3    Q    Right.
4    A    And he's obviously my friend and my
5 brothers' friend. He was their teacher in school.
6 I asked my brothers, they said, "No," you know.
7        And then we started thinking, well, we've
8 told him, told him to get away, he knows that Father U
9 did that to me. He told me he believed me, Father U
10 admitted it and he's still there. Why hasn't he
11 left?
12    Q    Now, was there an occasion that Father U
13 called you about a year ago?
14    A    No. He -- I read through these papers when
15 I got here --
16    Q    Yes.
17    A    -- and Exhibit No. 2
18    Q    Hold on a second, let me get that. Right.
19    A    Actually, no that was Fellay's letter. I'm
20 looking for Father U's letter.
21    Q    Exhibit No. 3 is one. I think there might
22 be a couple more. Yes. Exhibit 3 is the
23 Father Urrutigoity letter.
24    A    Okay. Yeah. He wrote, and this is -- "I
25 encouraged Matthew to take some time off at home to

**40**

1 make a week retreat in order to discern better his
2 vocation and his docility to whatever was God's will
3 for him. Although I stayed in touch with Matthew over
4 the next two months or so" -- that's just a lie,
5 because when I came home one time, an odd car was
6 parked in my driveway. I just figured it was him,
7 even if it wasn't, I wasn't taking a chance. I didn't
8 go home. I stayed at a buddy's because I did not want
9 to talk to him or ever see him.
10        And I told him I didn't want to talk to him
11 or ever see him, because the first time, I didn't hit
12 him, but if I'd see him now, maybe not. I don't
13 know.
14        I just told him I didn't know what I would
15 do. Like the first time, get out of jail for free.
16 If you try and follow me, I might not be able not to
17 beat the hell out of you.
18    Q    Right.
19    A    So that's a lie. I've never seen him and
20 I've never talked to him after that day.
21        And then it says, "I asked Father Ensey to
22 take care of his spiritual direction due to tension
23 that had surfaced with him." Maybe.
24        "Matthew did not make good use of his time
25 at home and his behavior began to deteriorate

**41**

1 noticeably."
2        Who was noticing a deterioration? Was it
3 him? I didn't talk to him, didn't see him.
4        Was it Father Ensey? I wasn't talking to
5 him, I mean, at the time.
6        And who was going to monitor my behavior,
7 other than my family? And I'll pull them all in right
8 now, and that wasn't the case. They noticed my
9 silence and that something was bothering me.
10 Obviously, he saying I'm going down the bad path or
11 something.
12    Q    That's what they're saying.
13    A    They're just trying to discredit me so
14 that -- then it says, "After a while, when his father
15 was confronting him because of such conduct" -- no,
16 not because of conduct, because he was asking
17 me, "Matt, why aren't you talking to me? What's
18 bothering you?"
19        "He accused me of approaching him with
20 dishonest intentions while he was asleep." Again, it
21 wasn't a dishonest intention I accused him of, it was
22 the act of him putting his hand on my penis.
23    Q    Right.
24    A    And then he goes on further, he says, "Back
25 into a life of disorder," you know, basically saying

**42**

1 that I went home and just started becoming a wild man,
2 and that's why, you know -- which is definitely a
3 lie.
4    That was one thing that I was upset about.
5 I've never seen this letter before.
6    Q    The question I was asking was not so much a
7 conversation with Father Urrutigoity. What I asked
8 was: About a year ago, did Father Ensey call you?
9    A    Probably. I don't know what time you're
10 talking about, but I kept in touch with and was
11 Father Ensey's friend up to his last visit that he
12 made to me.
13    Q    That's the visit I'm asking about. When
14 was that?
15    A    It was, I mean -- it was this summer
16 obviously. It was probably about a month and a half
17 ago.
18    Q    I'm sorry. I thought it was a year ago.
19 It was a month and a half ago.
20    And tell us how that visit came about?
21    A    Well, I had been calling Father Ensey,
22 e-mailing him for about a year, roughly.
23    Q    Okay.
24    A    Because I haven't heard anything from him,
25 and I know he's being accused of this too. He was

**43**

1 there for me so I'm offering my, you know -- and I'd
2 write him a letter, "Are you still alive? Are you in
3 the country? Just let me know you're okay, and that's
4 enough, you don't have to give me the whole spiel."
5    He never responded, never got a hold me.
6 Out of the blue, he calls me one evening and says,
7 "Hey, Matt, it's Father Ensey. I got a free weekend,
8 I want to come down and see you and the family."
9    My family was in South Carolina on
10 vacation, my mom, my dad, my brothers and sisters.
11    And I says, "Well, my family, you know, my
12 wife and kids, we're the only ones around, but you're
13 more than welcome to come down."
14    He said, "Okay. I'll come down Friday and
15 I got to leave Monday." He hung up the phone.
16    Well, I got off the phone and I thought to
17 myself, "That was a business call."
18    I don't talk to the guy for a year, all of
19 a sudden, he calls me up and says he has to talk to
20 me. Okay. There's something going on. It's
21 business.
22    I called my dad, told my dad and he said
23 right away, "You're right, something's going on."
24    Father Ensey called back and said he
25 couldn't come down Friday, he had paperwork, he'd be

**44**

1 down Saturday.
2    When he came down, I already promised a
3 picnic over at my buddy's house with his family, I
4 figured I'd take Father Ensey along, throw some
5 horseshoes, drink a couple beers. I didn't want to
6 talk about anything Saturday.
7    Sunday, I was going to spend with the
8 family and I wanted the last thing to talk with
9 Father Ensey about was the business, so that it would
10 be over, he would leave and I would have time to
11 think.
12    So we put it off until Sunday night. We
13 took a walk. That's when I figured -- it slowly hit
14 me what was going on.
15    Father Ensey said that there's a
16 possibility that I would be subpoenaed. If I was --
17 and it was for basically he got accused, he said, of
18 molestation.
19    I says, "What do you mean? Accused in what
20 way?"
21    And he said, "Well, of molesting a boy."
22    I said, "What are you saying, Father," I
23 says, "like molesting, like tried to kiss him or you
24 tried to, you know, get him up the rear?"
25    And he says, "B."

**45**

1    And I says, "I ain't going to ask you if
2 you did, obviously what?"
3    He's like, "Of course not."
4    And I said, "I know, I know, I just, you
5 know -- formality."
6    And he said basically, if I'm subpoenaed,
7 and he made it sound like it would be a thing just
8 against Father U. And if I answered the subpoena, and
9 went to court and I told my story, it would bury
10 Father U, which in turn would bury him, because he's
11 associated with him, he's my friend, and if I bury
12 Father U, then it's going to bury Father Ensey, him.
13    I says, "Yeah, that's a possibility."
14    I said, "Father, you kind of had many chances to get
15 out of this."
16    "Well, you know, I have. I went to this
17 diocese," and so forth.
18    And then he said to me, "You know, if they
19 subpoena you, you can't get out of it. Now, you can
20 leave the county."
21    And I says, "Well, you know, my wife and
22 kids; I have a family, I have a job. You just can't
23 pack up and leave. I mean, if it was to save
24 somebody's life, a friend, and I had to move, that's
25 something to consider, but not to not go to court

**46**

1 because Father U might go to jail or get money. Not
2 only do I not care, but good. And, you know, maybe
3 this won't happen to somebody else."
4        And he says, "I know. I know. I was just
5 telling you that that's the only way to get out of the
6 subpoena."
7        And he said, it was along the lines of,
8 "You know, you really can't lie."
9        And I said, "Father, you know I don't lie,
10 you know I'm not going to lie, especially in court and
11 especially when I have no reason to lie. I'm not
12 getting anything out of it and I got no agenda. I
13 tried to walk away from this five years ago.
14 Everybody keeps calling, 'Tell your story again. Tell
15 your story again. Tell your story again.' And every
16 time I do, no one believes me anyhow or they do, like
17 Bishop Timlin or his guys said they believed me, but I
18 wasn't asking money so they left me alone and they
19 figured I would just go away, which I tried. Now Bond
20 and all of this happens again. So I'm not going lie."
21        And I started thinking, well, he threw two
22 things out on the table, get out of the country, lie.
23 Okay.
24   Q    Right.
25   A    The third was, he says, "Well, my lawyer,

**47**

1 he's a very" -- first he discredited this guy.
2 I don't know this guy, but basically, he said he's a
3 mental case.
4    Q    You mean the guy who was charging
5 molestation?
6    A    Right. "He's a mental case and he's
7 looking for sympathy and a buck."
8        And I says, "Okay. But you know what,
9 Father, you know, he may be, but not everybody that's
10 been accusing Father U" -- and we're not talking one
11 or two, we're talking three or four, and I know,
12 myself, another person who was molested by Father U,
13 who nobody knows about, and this guy, if came out and
14 told, his reputation is impeccable.
15        I asked him, I says, "If it ever comes to
16 something, do I bring up your name?"
17        And he said, "No."
18        And I said, "Why?"
19        And he said, quote, "Because I don't want
20 to deal with the shit you're going through," end
21 quote.
22        So he told me that this lawyer, his lawyer,
23 Father Ensey's and Father Us lawyer is a good man,
24 Catholic, he wants to know the truth, he would like to
25 talk to me.

**48**

1        And I says, "All right."
2        He says, "Of course, you know if anybody
3 knew this was going on, we could get in trouble."
4        Basically, he could get in trouble.
5    Q    Father Ensey or the lawyer?
6    A    Father Ensey and Father U, because they're
7 pretty much coming to me, knowing that I'm going to be
8 subpoenaed and trying to get as much information, and
9 try to get me on whatever, to do whatever before I get
10 subpoenaed. He says because he can't talk to me
11 definitely after I get subpoenaed or it's an
12 interference or something like that.
13        So he says, "This guy is a good guy, he's
14 everything." And then he says, and this is what
15 struck out red flags, "He's a good guy. He's got
16 strong ties to the Mafia. He's not in the Mafia, but
17 he's got good strong ties to the Mafia," and left it
18 at that.
19        And then it hit me, the format that he was
20 going, he said, one, "You can get out of the country
21 to avoid the subpoena."
22        Two, "If you don't do that, and you have to
23 go, what about lying?" I mean, he didn't ask me to do
24 it, but he brought it up.
25        Three, "My lawyer wants to talk you and

**49**

1 he's tied with the Mafia."
2        So to me, in my head, there was a format of
3 trying with the least, where you leave the country,
4 get him out of the way, "Would you lie?"
5        I'm saying this is the format that I'm
6 picking up.
7        And last, was the threat, I think was an
8 outright threat. Why would he tell me that his lawyer
9 is in the Mafia, which I think is just stupid, because
10 he knows me.
11        Do you think I'm going to get scared and
12 say, you know, "Okay. That was enough. Boy, they
13 might come kill me."
14        I'm got going do anything. And that's
15 when -- that's when I made my judgement of
16 Father Ensey. Whether he came up with that himself or
17 was sent to do that, I don't know. The guy hasn't
18 talked to me for a year and all of a sudden, he comes
19 down and says, "If you're subpoenaed, these are the
20 things that's going to happen."
21        So I told him -- right away, I thought to
22 myself, The Godfather. Keep your friends close, keep
23 your enemies closer.
24        I told Father Ensey, "Sure, I'll talk to
25 your lawyer. I'm telling the truth. I can tell

PAGE 50

**50**

1 anybody the truth. And it shouldn't hurt, right, so
2 I'll tell your lawyer the truth."
3        Meanwhile, I know that he wants me to talk
4 to his lawyer, because that guy in court, if I ever
5 have to go there, that he's going to try to make me
6 look like the biggest idiot east of the Mississippi.
7 That's why he wants to talk to me, I'm guessing, so
8 that he can think about what I say, whatever, and then
9 try to come up with something, at least be prepared.
10       And so I told him, "Yeah, I'll talk to him,
11 sure."
12       That was the end of the conversation pretty
13 much. We went home; he left the next morning.
14   Q   Did his lawyer ever call you?
15   A   I don't think so. I seen a lot of phone
16 numbers. I get anything with 570 number, I usually
17 don't answer or I didn't.
18   Q   Did his lawyer ever send you a letter?
19   A   No.
20   Q   Have you talked to Father Ensey again since
21 this day?
22   A   No. He called continuously; probably for
23 the first week every day, for the second week, like
24 every other day, and maybe the third week, like once.
25       Just, you know, I told my wife, "He's not

PAGE 51

**51**

1 here," or, "He's in the bathroom, he'll call you back.
2 He's hunting," whatever.
3        But I never talked to him again. I didn't
4 want to talk to him because, one, personal reasons,
5 obviously.
6        You know, he knows what went on. He knows
7 and he's done nothing, and now it comes down to me and
8 it seems like he wants me to go even further and, you
9 know, he was just asking me to do ridiculous things.
10   Q   Let me ask you this: Was there an occasion
11 where the Diocese of Scranton sent some individuals to
12 interview you concerning the Father Urrutigoity
13 matter?
14   A   Yes. Well, when I went back to the
15 seminary the second time in Winona. Is that what
16 you're talking about?
17   Q   Right. Did the Diocese of Scranton send
18 some individuals to talk to you?
19   A   Yeah. When I got back to the seminary,
20 after I told Father Ensey and I told my dad and I went
21 back to work, then I started thinking, after about a
22 year. Okay.
23        All that happened, but the question was:
24 Do I have a vocation to be a priest? I don't know and
25 I never -- that was the reason I went in the first

PAGE 52

**52**

1 place and that's the only answer I never got. Maybe I
2 got to go back if I got and find out if I got to be a
3 priest and put this behind me.
4   A   So I talked to Father Iscara, who was
5 Father U's friend from Argentina, and he convinced me
6 to come back to find out if I had a vocation.
7        So I went back and when I got there,
8 obviously, there was -- everybody wanted to know why I
9 left, and I didn't tell. I told my superiors and that
10 was it.
11       And then, that's when, I think -- I can't
12 remember if it was the bishop or Father Iscara that
13 said -- I think it was the bishop at the seminary,
14 Bishop Williamson, told me to tell Bishop Fillay, the
15 General Superior of the Society.
16       So, I wrote a letter and told him. He
17 wrote me a letter saying that pretty much my duty was
18 to inform Father U's superior now, who was
19 Bishop Timlin. So I told Bishop Timlin, and I wrote
20 him a letter and I think he got back to the bishop.
21 Some letters were written to the bishop and some were
22 to me, not many.
23       They set up a meeting in Winona or a little
24 outside of Winona, between Winona and Rochester in one
25 of the houses for retired priests or something like

PAGE 53

**53**

1 that. And we were going to go. And it was me and
2 Bishop Williamson, and I think there was a lawyer
3 there and I think there was a chancellor and another
4 guy. There was a bishop there, a real old bishop.
5   Q   Is that Bishop Dougherty?
6   A   Yeah.
7   Q   He was the auxillary bishop of Scranton?
8   A   Yeah.
9   Q   What took place at that meeting?
10   A   We sat down and pretty much what we're
11 doing right now. The bishop asked me basically what
12 happened. We pretty much went through everything that
13 we're going through now. I told him everything that
14 happened. And at the end of it was pretty much,
15 "We're sorry."
16       I think it was the -- I can't remember if
17 it was the lawyer or the chancellor, because I said
18 something like -- they said, "Well, what do you want
19 to do?"
20       I says, "Listen, I don't want anything.
21 The only thing I want to do is tell the superior, put
22 it in his hands, and now it's on Bishop Timlin's
23 shoulders to do something. I'm done. Deal with it
24 accordingly," and that's it.
25       I said, "I don't care. I don't want

**54**

1 anything, I don't care if you believe me. I told my
2 story, I've done my duty. When I stand in front of
3 God, God's not going to turn around and say, 'Why
4 didn't you warn this person, because so and so had to
5 deal with it after you.' I wanted that off my
6 conscious. I got it off my conscious. I didn't want
7 to sit there and keep dealing with it."
8        And I told them, and then the one said -- I
9 can't remember who it was, it was the chancellor or
10 one of the three said, "We believe you."
11        And I said, "I don't want anything."
12        And the impression I got was, looked like
13 they were going to say -- now, this is a judgement, a
14 total judgment on my part, I could be completely
15 wrong -- but it looked like they were saying, "Do you
16 want money? And what are you going to do? Are you
17 going to sue?"
18        And as soon as said I don't want anything,
19 it was briefcase closed, and they were out. "He
20 doesn't want anything, now we know. Bye."
21        And as far as I know, they went back and
22 said, "Father U, did you do it?"
23        "No."
24        "Okay. Let's roll with it."
25        And, of course, I was upset because there

**56**

1 didn't -- really didn't know what to think. I should
2 have been watching, especially when you guys got to be
3 friends." He says, "I should have been watching." He
4 says it's his fault, because he was the superior at
5 the time and he should have seen it better.
6        But Father U -- superiors like Father U
7 because, and that's what Bishop Williamson told me.
8 Because the guy is smart, intellectually, and he knows
9 human nature, and when you talk to him, you know, he's
10 a little odd, a little weird, but he comes across as
11 someone who knows a little more than you, and
12 everybody wants to know that. And that's what the
13 bishop said, that they looked past the fact of what he
14 is and what he's been doing, because they're getting a
15 smart guy under their wing.
16    Q    Let me ask you, going back to your
17 relationship with Father Urrutigoity, did he talk --
18 ever talk about Frodo and Saruman?
19    A    Yes.
20    Q    What was that about?
21    A    Just Lord of the Rings, you know, a lot of
22 seminarians were reading it at the time because they
23 used things that were going on in the world today.
24 And Frodo and Saruman were the hobbits that were
25 friends and he, you know, made that analogy as that we

**55**

1 was another guy, he goes to Argentina, get's accused,
2 and he says, "I didn't do it," and everybody says,
3 "Okay."
4        Then he goes to the United States, and
5 I know of two people and then, you know, including
6 myself, in the seminary and he's accused, and he says,
7 "I didn't do it."
8        Then he goes to Scranton and he's touching
9 boys around when they're sleeping and everything else.
10 And they're saying, "He touched me," and he's saying
11 he didn't do it. And everybody is saying, "Okay."
12        So, yeah, I'm mad that he keeps doing it
13 and people keep getting it done to them and everybody
14 just says, "Okay." Nothing gets done.
15    Q    Well, Bishop Fillay did something, didn't
16 he?
17    A    Bishop Fillay, once he found out what was
18 going in, he was already gone, so he couldn't do
19 anything.
20    Q    Right. Do you know if he informed
21 Bishop Timlin?
22    A    Yes. He informed Bishop Timlin. And
23 Bishop Williamson, he was good, he told me, he says he
24 knew of his background, he blames himself, because
25 he -- "I knew Father U was accused of it. We

**57**

1 were Frodo and Saruman. But he would always say, "I'm
2 Saruman, because although Frodo had the bigger tasks,
3 Saruman was his helper." So I was Sam because I was
4 Father U's best buddy and I was helping him.
5    Q    Did Father Urrutigoity ever tell you that
6 the Tolkien Trilogy has some spiritual significance
7 for him?
8    A    Yeah. I mean everybody, you know, all
9 Catholics that read it, because of what
10 J.R. Tolkien -- there was a story where he was invited
11 somewhere, and they all were saying, "What's the
12 answer to the world's problems?" And he said, "Become
13 a Catholic," and they booed him off the stage and he
14 never showed up in public again.
15        There was correlations where Gandolf is the
16 priest, because he never really does any battling or
17 anything, he's always there for direction, you know,
18 things like that.
19    Q    Now, when you went back to Winona, this is
20 the second time you were at Winona, did any other
21 seminarians tell you that Father Urrutigoity molested
22 them?
23    A    Yeah.
24    Q    And was this person still in the seminary
25 when he told you that or had he moved on beyond the

58

1 seminary?

2     A   The reason why I'm hesitating is because

3 if -- basically, this man does not want to be known.

4 If I give too much information, you might able to

5 whittle it down and I have to make a judgement on

6 whether --

7     Q   Let me ask you this: Was this person, at

8 least at one time, a seminarian at Winona; right?

9     A   Yeah.

10     Q   What did he tell you that

11 Father Urrutigoity did to him?

12     A   Pretty much the same thing that he did to

13 me, but I think -- I think he tried it in different

14 ways or something like that. It seemed to be that he

15 might have got a little bit worse off than me.

16     Q   Let me just check my notes. I think I'm

17 probably done, Matt. Hold on.

18     MR. BENDER: Madam court reporter, this

19 will end the deposition. I'd like to go off the

20 record and just take a moment to chat with Matt.

21     I just have a couple questions for you,

22 Matt. Are we off the record now?

23     MR. WIENER: Not yet, one moment.

24     The time is 11:18. Being that there are no

25 further questions, this deposition is now

59

1 concluded.

2     (Discussion off the record.)

3     THE WITNESS: I will waive signature.

4     - - -

5     (Thereupon, at 11:18 o'clock a.m., the

6 deposition was concluded, and signature was

7 waived.)

8     - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

60



1                  CERTIFICATE

2 COMMONWEALTH OF PENNSYLVANIA, )

3                        : SS:

COUNTY OF ALLEGHENY.    )

4

5     I, Jessica L. Tapia, do hereby certify that

before me, a Notary Public in and for the Commonwealth

6 aforesaid, personally appeared MATTHEW SELINGER, who

then was by me first duly cautioned and sworn to

7 testify the truth, the whole truth, and nothing but

the truth in the taking of his oral deposition in the

8 cause aforesaid; that the testimony then given by him

as above set forth was by me reduced to stenotypy in

9 the presence of said witness, and afterwards

transcribed by means of computer-aided transcription.

10     I do further certify that this deposition was

taken at the time and place in the foregoing caption

11 specified, and was completed without adjournment.

12     I do further certify that I am not a relative,

counsel, or attorney of either party, or otherwise

13 interested in the event of this action.

14     IN WITNESS WHEREOF, I have hereunto set my hand

and affixed my seal of office at Pittsburgh,

15 Pennsylvania, on this _____ day of _____, 2003.

16

17

18     Jessica L. Tapia

Notary Public in and for the

19     Commonwealth of Pennsylvania

My commission expires August 19, 2006.

20

21

22

23

24

25



**DIOCESE OF SCRANTON**
300 WYOMING AVENUE
SCRANTON, PENNSYLVANIA 18503-1279

OFFICE OF THE BISHOP

November 5, 1999









Most Reverend Bernard Fellay
Superior General
Society of St. Pius X
Schwandegg
6313 Menzingen
Switzerland

Dear Bishop Fellay,

On March 1, 1999, I acknowledged your letter of February 10, 1999, assuring you of my intention to be in touch with you after I looked into the concern you brought to my attention. While regretting the lengthy delay in getting back to you, I write now to relate to you both the steps taken to investigate the allegations you relayed to me regarding Father Carlos Urrutigoity and the results of that investigation.

Upon receipt of your letter, I personally interviewed Father Urrutigoity and Father Fullerton. I also reviewed the matter with the Independent Review Board of the Diocese of Scranton, a Board established to advise me in such affairs.

As a result of this review, my Auxiliary, Bishop Dougherty, Father Joseph Kopacz, Vicar for Priests of the Diocese, and Attorney F.X. O'Connor, a highly respected Catholic attorney living in the Diocese, met with Bishop Williamson and Matthew Selinger in Rochester, Minnesota, on July 28, 1999.

Subsequent to this interview, the information given by Matthew Selinger was presented to Fathers Urrutigoity, Fullerton and Ensey. Bishop Dougherty then conducted extensive and separate interviews with these priests regarding what was said by Matthew Selinger.

EXHIBIT
F

Most Reverend Bernard Fellay

Page Two
November 5, 1999









I have examined all that was said and written throughout the months spent on this investigation and, in my judgment, the testimony of all parties taken together is not conclusive.  There is before me the accusation by Matthew Selinger, an absolute denial by Father Urrutigoity, and observations by knowledgeable parties regarding both this accusation and denial.  In effect, I am left unable to ascertain the truthfulness of the allegations against Father Urrutigoity and, therefore, I am without the required certitude to take any action in his regard.

Let me assure you that, if any information develops which will clarify this matter, I will welcome it and be most willing to do whatever is required.

With heartfelt gratitude for your bringing this information to my attention and kindest personal regards, I am,

Sincerely yours in Christ,

Most Reverend James C. Timlin, D.D.
Bishop of Scranton

Westlaw.

Slip Copy
(Cite as: 1999 WL 33747891 (M.D.Pa.))

Page 1

Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.

Jasmine PATEL Plaintiff
v.
HIMALAYAN INTERNATIONAL INSTITUTE
OF YOGA SCIENCE AND PHILOSOPHY OF
THE USA
Defendant

No. 3:CV-94-1118.

Dec. 9, 1999.

Barry Nakell, Chapel Hill, NC, John M. Humphrey, Rieders, Travis, Humphrey, Harris, Waters & Waffenschmidt, Williamsport, PA, for Plaintiffs.

Irwin Schneider, Irwin Schneider & Associates, P.C., Clarks Summit, PA, Kathleen A. Walsh, Marshall, Dennehey, Warner, Coleman & Goggin, Scranton, PA, Robertson B. Taylor, Bethlehem, PA, Walter T. Grabowski, Holland, Brady & Grabowski, P.C., Wilkes-Barre, PA, for Defendant.

MEMORANDUM

VANASKIE, Chief J.

*1 On September 4, 1997, a jury returned an award against the defendant Himalayan International Institute of Yoga Science and Philosophy of the U.S.A. ("Himalayan Institute") in the amount of $275,000 in compensatory damages and $1.6 million in punitive damages for the sexual misconduct of the Himilayan Institute's former "spiritual leader," Brijkishor Kumar, popularly known as the "Swami Rama." Answering special verdict questions, the jury found that Swami Rama (a) had engaged in sexual relations with plaintiff Jasmine Patel, who was 1 9 years old at the time of

the sexual abuse; (b) had abused his position as Patel's guru to secure her consent to the sexual relations; (c) had breached the standard of care and fiduciary duties inherent in the relationship between him and Patel; (d) had intentionally inflicted emotional distress on Patel; (e) had acted maliciously and with conscious disregard for the welfare of Patel; (f) and was acting within the scope of his agency relationship with the Himalayan Institute when engaging in sexual relations with Patel. (*See* the Jury's Response to Special Verdict Questions 1, 3, 8 through 17, 25 and 26. (Dkt. Entry 361). In addition to holding the Himalayan Institute liable for compensatory and punitive damages on a *respondeat superior* theory, the jury also imposed direct liability on the Institute, finding that (a) it had been negligent in allowing Swami Rama to be a sexual predator for a number of years; (b) the actions and inactions of Himalayan Institute constituted the intentional infliction of emotional distress; and (c) the Himalayan Institute had acted maliciously and with conscious disregard for the welfare of Patel. (*Id.* Questions 4-7 and 27.)

The Himalayan Institute has moved for a new trial or a reduction in the punitive damage award. (Dkt. Entry 363.) While not contesting the sufficiency of the evidence insofar as the jury's findings on direct liability are concerned, the Himalayan Institute contends that the evidence was insufficient to impose vicarious liability. Because the verdict on punitive damages did not differentiate between the Himalayan Institute's vicarious and direct liability, the Himalayan Institute asserts that the erroneous decision on vicarious liability so infected the punitive damage award as to warrant a new trial. The Himalayan Institute also contends that it is entitled to a new trial based upon a combination of purportedly erroneous trial court rulings concerning such matters as (a) the extent of the evidence that Patel was permitted to introduce with respect to Swami Rama's past sexual exploits; (b) the admissibility of opinion testimony of Dr. Peter Rutter; and (c) purportedly improper and/or inflammatory remarks of plaintiff's counsel made during opening statements and closing arguments. Finally, the Himalayan Institute contends that the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



EXHIBIT
G

Slip Copy                                                          Page 2
(Cite as: 1999 WL 33747891 (M.D.Pa.))

punitive damage award is excessive.

Having carefully considered the comprehensive trial record in the context of the parties' respective arguments and the applicable law, I have concluded that the evidence was indeed sufficient to impose liability on the Himalayan Institute on a *respondeat superior* theory; the Himalayan Institute was not denied a fair trial in that the contested evidentiary rulings were indeed proper and the statements of Patel's counsel did not make it reasonably probable that the verdict was based on improper considerations; and the award of punitive damages for the egregious conduct of both Swami Rama and the Himalayan Institute was not excessive. Finally, I also find that Patel is entitled to "delay damages" on the compensatory damage award in accordance with Rule 238 of the Pennsylvania Rules of Civil Procedure from August 25, 1995 until September 4, 1997, the date of the verdict.

I. FACTUAL BACKGROUND

*2 As revealed during trial, the Himalayan Institute holds itself out "as a holistic health center" that seeks to combine Eastern and Western traditions. (Tr. 8/12/97 at 81.) [FN1] The Himalayan Institute is staffed by physicians, psychologists and nurses who share an interest in the application of yoga for health purposes. (*Id.*) The *Himalayan Institute Quarterly* for the Spring of 1992 explained the Himalayan Institute's purpose as follows:

> FN1. Herein, the trial transcript will be identified by the designation "Tr." followed by the date of the trial and the page of the transcript. Exhibits introduced by plaintiff will be referred to as "PX___"; exhibits introduced by the defendant will be referred to as "DX___."

Since its establishment in 1971, the Himalayan Institute has been dedicated to helping individuals develop themselves physically, mentally and spiritually, as well as contributing to the transformation of society. All the Institute programs--educational, therapeutic, research--emphasize holistic health, yoga and meditation as tools to help achieve those goals.... Students from around the world have joined us here for the past fifteen years to attend programs

in such diverse areas as biofeedback and stress reduction, hatha yoga, meditation, diet and nutrition, philosophy and metaphysics and practical psychology for better living. We see the realization of our human potentials as a lifelong quest, leading to increased health, creativity and happiness. We welcome all those who are interested in expanding their self-awareness and improving the quality of their life. [PX-225.5; Tr. 8/12/97 at 97.]

The Himalayan Institute was founded in 1971 by Swami Rama, and he served as its spiritual leader, or acharya, from its founding in 1971 through August of 1993. The spring, 1992 *Himalyan Institute Quarterly* described Swami Rama as follows:

> Swami Rama is the founder and spiritual head of The Himalayan Institute centers and training programs around the world. He was born in Uttar Pradesh, in northern India and trained in the tradition of the cave monasteries of the Himalayas. His experiences there are described in his autobiography, *Living With the Himalayan Masters*. From 1949 to 1952, he held the respected position of Shankaracharya of Karvirpitham, in the south of India. Later, he investigated Western psychology and philosophy in universities in Europe and England, teaching in Japan before coming to the United States in 1969. In 1970 he served as research consultant to the Menninger Foundation Research Project on Voluntary Control of Internal States. His demonstrations there, under laboratory conditions, of his precise control of his own autonomic functioning revolutionized scientists' understanding of the human ability to control the body. He founded the Himalayan Institute to create a bridge between the ancient teachings of the East and modern scientific approaches, and has played a major role in bringing the teachings of yoga to the attention of physicians, psychologists and researchers. [Tr. 8/12/97 at 98-99; PX-225.3.]

As the acharya, Swami Rama was the *de facto* and *de jure* head of the Himalayan Institute. (Tr. 8/19/97 at 155-56.) While the Himalayan Institute maintained a Board of Directors and had officers typical of any non-profit corporation, Swami Rama had total authority, choosing the members of the Board of Directors and the Institute's officers.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(Curry Dep. at 67-68.) [FN2] He had final, mandatory and recommending powers in all spiritual and administrative matters at the Himalayan Institute. (Tr. 8/19/97 at 158.) (Curry Dep. at 67-68.) The President of the Himalayan Institute, Dr. Rudolph Ballentine, acknowledged that his authority was limited as compared to Swami Rama's. Indeed, Ballentine viewed Swami Rama as a "god." (Tr. 8/20/97 at 116; Tr. 8/21/97 at 24.) He was considered by others at the Himalayan Institute to be an "enlightened being" possessing supernatural powers (Tr. 8/18/97 at 54-55); as an "evolved soul" (Tr. 8/27/97 at 102); and as the "greatest living yogi." (*Id.*)

> FN2. The videotape deposition of Rosalie Curry was played to the jury on August 15, 1997. Her husband had been a member of the Institute's Board from 1980 to 1982. He resigned when he learned that Swami Rama had a sexual relationship with his wife before they were married.

*3 Members of the Himalayan Institute Board of Directors believed Swami Rama to be celibate and a completely selfless, spiritual leader, whose actions were taken solely for the benefit of his disciples. (Tr. 8/12/97 at 78-79; Tr. 8/28/97 at 164.) While some of Swami Rama's teachings and tactics were difficult to accept, they were followed in the faith that Swami Rama was acting for the benefit of his disciples. (Tr. 8/12/97 at 127; Tr. 8/28/97 at 164.) Dr. Ballentine expressed the view that it was inconceivable that Swami Rama would take any action toward his students or disciples that would be harmful to them. (Tr. 8/20/97 at 180; PX-40.1.)

Jasmine Patel was introduced to the Swami Rama through her parents. (Tr. 8/25/97 at 30-32.) Patel's parents, who had emigrated to the United States from India, viewed Swami Rama as the family guru. (*Id.* at 32.) The family spent a considerable amount of time at the Honesdale facility, often vacationing there during the summer. (*Id.* at 32-35.) When Patel was approximately 13 or 14 years old, she was initiated by the Swami Rama into his spiritual tradition. At that time, she received her "mantra" from Swami Rama, signifying that he was her guru. ( *Id.* at 36-37.) Swami Rama, to whom Patel often referred as "baba," meaning grandfather, repeatedly

instructed Patel that it was a sin to disobey him. (*Id.* at 38-39.)

During the summer of 1989, Patel enrolled in the Himalayan Institute's "self-transformation program." During this summer, Swami Rama sometimes hugged her, patted her rear end, and put his hand up her shirt. (*Id.* at 39-40.) When she reacted by stating that she was scared, Swami Rama assured her that he would never hurt her. (*Id.*)

In the summer of 1991, prior to the beginning of her senior year in high school, Patel enrolled again in the self-transformation program. (*Id.* at 41.) During her participation in the program, she spent a considerable amount of time with Swami Rama. (*Id.* at 44.) This made her feel both privileged and apprehensive as she did not know what was expected of her. (*Id.*) He often spoke to her of love and trust. On one occasion, he forceably kissed her. (*Id.* at 45-49.) He did not become more aggressive after that incident, but did tell her that she should not disclose the incident to anyone else, that she should never doubt her guru, and that it was a sin to do so. (*Id.* at 50-52.)

Patel again enrolled in the self-transformation program in the summer of 1992, after she had graduated from high school. (*Id.* at 54-56.) While she had quite a bit of contact with Swami Rama during the summer of 1992, he was not sexually aggressive towards her. (*Id.* at 58-59.)

At the completion of the self-transformation program in the summer of 1992, Patel remained in residence at the Honesdale facility, staying there until July 31, 1993. Swami Rama had returned to India in the late summer of 1992 and did not return until the spring of 1993. [FN3] When Swami Rama returned to the Himalayan Institute in the spring of 1993, he had more contact with Patel. (*Id.* at 61-62.) During long walks, he continuously talked about his love for her and asked, "when will you give me love?" (*Id.* at 63-64.) When she said that she was not comfortable with what he was intimating, he responded by questioning, "why don't you trust me?" (*Id.* at 65.) Swami Rama reacted to her hesitancy by becoming cold and withdrawn, making Patel feel like she had lost her guru. (*Id.* at 70.) Ultimately, Swami Rama succeeded in having sexual relations with Patel. (*Id.* at 70-75.) [FN4]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN3. Swami Rama typically was annually in India from around September u ntil A pril (*Id.* at 60.)

FN4. Patel was a virgin. (*Id.* at 73.) Swami Rama's initial attempts to penetrate her were unsuccessful, but eventually he achieved penetration and had sex with her on a number of occasions.

**\*4** Shortly after the first incident, Patel informed Deborah Willoughby, a Himalayan Institute resident who was editor of the Institute's magazine. (*Id.* at 75-77.) Willoughby, who is now President of the Institute, informed Patel that she should either leave the Institute or accede to Swami Rama's demands because it was probably for Patel's own good. (*Id.* at 77-78.)

Patel opted for the latter course. She thought she was being tested by Swami Rama and had to persevere in her trust of him because he knew what was best for her. (*Id.* at 78-80.) S he eventually told Swami Rama of her conversation with Willoughby, and Swami Rama had Patel write a letter to Willoughby disavowing her earlier statement. (*Id.* at 80-84; PX-56.)

Swami Rama continued to engage in sex acts with Patel until July 29, 1993. (*Id.* at 102.) When she left t he H imalayan I nstitute o n July 3 1, 1993, Patel felt liberated, having passed Swami Rama's tests, and now ready t o b egin her life. (*Id.*) A few weeks later, however, she came to the realization that Swami Rama's actions were terribly wrong. (*Id.* at 104-05.) In an essay for school titled, "The Sacredless Place," Patel wrote of Swami Rama's behavior and sent copies of the essay to her friends at the Himalayan Institute. (PX-59; Tr. 8/25/97 at 107-08.)

Patel's essay was not the first notification to the officers and members of the Board of Directors of the Himalayan Institute of sexual improprieties by Swami Rama. Prior to becoming president of the Himalayan Institute in 1981, Dr. Ballentine had heard allegations of sexual abuse by Swami Rama. (Tr. 8/19/97 at 168.) In 1981, Robin Whitney reported abuse by Swami Rama to Brandt Dayton, who was a member of the Institute Board of

Directors. (Tr. 8/19/97 at 4-19.) A meeting involving Dayton, Dr. Ballentine, Dr. Clarke (Chairman of the Institute Board), and Swami Rama was conducted, during which Whitney was classified as "goofy" and "hysterical." (Curry Dep. at 62-63.)

Another member of the Institute Board, Dr. Edward Funk, broached the subject of Swami Rama's sexual proclivities with Institute residents. (Tr. 8/27/97 at 132-35.) Funk reduced his concerns to a letter that raised "serious questions of an ethical nature" pertaining to the Swami Rama and female residents of the Himalayan Institute. (PX-7; Tr. 8/21/97 at 127.) Funk resigned as a Board member as a result of the Institute's inaction on his allegations. (Tr. 8/27/97 at 135.)

In 1982, Alan Hymes, a doctor who had been associated with the Institute in the late 1970's, complained to Dr. Ballentine of a sexual relationship between Swami Rama and Hymes' daughter, Cary. (Tr. 8/18/97 at 114-18.) Dr. Ballentine stated that the daughter was emotionally disturbed and delusional, and that her allegations were figments of her imagination. (*Id.* at 117-18.) Hymes resigned from the Board. (*Id.* at 116.)

Sheila Culkin informed an Institute Board member of a sexual encounter with Swami Rama in the 1982-1983 time frame. (Tr. 8/18/97 at 160-63.) While the Board discussed Culkin's allegations, they did not give them much credence. (Tr. 8/14/97 at 31-32.) Swami Rama informed Board members that Culkin's allegations were part of a conspiracy against him and the Institute. (*Id.* at 30-31; Tr. 8/28/97 at 215-16.)

**\*5** In May of 1989, Robert Hughes, who had been associated with the Institute, wrote to Ballentine, repeating st ories of sexual abuse that he h ad heard. (Tr. 8/19/97 at 42-59; PX-9.) His letter concluded:
I would appreciate hearing from you as soon as possible if there are any other possible explanations for these dreadful stories about sexual abuse, seduction, exploitation, victimization, manipulation and rape, and equally disturbing, a systematic cover-up, which would be unethical, on the part of any professional psychologist, psychiatrist or counselor. [Tr. 8/19/97 at 61; PX-9.]
In reaction to Hughes' letter, Dr. Ballentine

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
**(Cite as: 1999 WL 33747891 (M.D.Pa.))**

Page 5

informed others at the Himalayan Institute that Hughes was making false accusations because he was gay and upset that Swami Rama would not marry him to another man. (Tr. 8/27/97 at 185-87.)

In December of 1989, Dina Capobianco, a disciple of Swami Rama, informed Dr. Ballentine of an intimate encounter with Swami Rama during the summer of 1989. (Tr. 8/18/97 at 66-70.) Dr. Ballentine did not believe her. (Tr. 8/20/97 at 109-13.)

In 1990, Dr. Leslie Smith McDaniel, who had been affiliated with the Institute from 1979 until 1981 before becoming a psychiatrist, wrote to various members of the Institute's Board. (PX-11.) In her letter, Dr. McDaniel informed the Board members that Swami Rama was engaging in a "form of psychological abuse and sexual abuse ..., which is clearly manipulative and exploitive in nature." (Tr. 8/15/97 at 74-76.) She related that her personal sexual relationship with Swami Rama lasted for almost three years, but was "quite coercive." (*Id.* at 76.) She explained that a "student of such a teacher is not in a position to freely refuse or consent to these requests; i.e., there was a significant coercive factor present." (*Id.* at 76-77.) She further asserted that "Swami Rama has clearly, over the past many years, been exploiting the trust, dependency and spiritual inclination of his female students, for his own gratification," and not for the benefit of the women. (*Id.*) She offered to put the Institute in contact with other abused women and accused the Institute of a complete refusal to investigate credible charges of abuse. (*Id.* at 78- 90.) No one from the Institute responded to Dr. McDaniel's letter. (Tr. 8/14/97 at 91-93.)

Also in early 1990, Dr. Ballentine received a report from Roseanne Emanuele of a sexual relationship with Swami Rama. (Tr. 8/20/97 at 126-27.) She had been in residence at the Institute 1980's. Emanuele made clear to Dr. Ballentine that the relationship was not voluntary. (Tr. 8/25/97 at 21-24.) Dr. Ballentine told Emanuele that sex with the guru greatly advanced the student. (*Id.* at 25.)

In April of 1990, Julia Robling Griest wrote to Dr. Ballentine, informing him that Swami Rama had abused her from 1979 through 1983 while she was a resident of the Institute. (PX-12.) Griest's letter stated:

I know that others had spoken to you about this matter, even before I was abused. If only you had responded to the first pleas, then, I wouldn't have had to undergone this devastating experience. But you enabled this to happen and, now, because you have continued to ignore the situation, women are still being hurt, even today. [Tr. 8/20/97 at 8.]

*6 In the latter part of 1990, an article in the *Yoga Journal* titled "The Case Against Swami Rama of the Himalayas," reported allegations of Swami Rama's exploitation of women. (PX-27.) This article, while using pseudonyms, detailed the accounts of several women who alleged to have been sexually exploited by Swami Rama. The Institute leadership reacted to this article by describing it as "deplorable and misguided," and indicating that a libel action had been considered. (PX-34; Tr. 8/14/97 at 43-46.)

In 1992, Dr. Ballentine learned that his former secretary, Rosalie Curry, and his ex-wife, Penel, had both had sexual relations with Swami Rama. [FN5] (Curry Dep. at 73-76.) Dr. Ballentine was inclined to believe these reports (8/20/97 at 191-94), but was not convinced that Swami Rama was acting for selfish purposes. (*Id.* at 80.) According to Dr. Ballentine, he had "difficulty in seeing the experiences that the women have talked about with Swami Rama as abusive ... because that's not what I saw. I saw these women mature and grow and blossom." (Tr. 8/21/97 at 101.)

> FN5. Dr. Ballentine's ex-wife was sexually intimate with Swami Rama before he married her. (Tr. 8/20/97 at 191.)

In response to Patel's essay, some members of the Board of Directors called for an investigation of the matter. (Tr. 8/14/97 at 47-55.) In December of 1993, Swami Rama telefaxed from India a letter in which he indicated that he was never returning to the United States. (PX-143.) Pandit Rajmani Tigunait, Ph.D., replaced Swami Rama as the Institute's acharya. (Tr. 8/27/97 at 156.) The Himalayan Institute did not conduct an investigation into Patel's charges. (Tr. 8/14/97 at 57-60.) Swami Rama reportedly passed away in India in November of 1996. (Tr. 8/28/97 at 56-60.)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 6
**(Cite as: 1999 WL 33747891 (M.D.Pa.))**

II. PROCEDURAL HISTORY

Patel commenced this lawsuit on July 15, 1994. On
that same date, Michaela Heinze, a former Institute
resident, also brought an action alleging sexual
abuse by Swami Rama. Both actions named as
defendants the Himalayan Institute, Swami Rama,
and Drs. Ballentine, Clarke and Tigunait. By Order
dated October 28, 1994, the two actions were
consolidated. (Dkt. Entry 41.)

Following oral argument, defendants' motions to
dismiss were denied by Order dated December 29,
1994. (Dkt. Entry 51.) There followed an extensive
period of discovery. Throughout the course of the
pretrial proceedings, plaintiffs were frustrated by
their inability to depose Swami Rama. On August 8,
1995, defense counsel moved to withdraw as
counsel for Swami Rama, citing his lack of
cooperation. (Dkt. Entry 9 8.) On October 1 3, 1995,
following oral argument, leave to withdraw as
counsel for Swami Rama was granted. (Dkt. Entry
112.)

Following completion of discovery, the represented
defendants moved for summary judgment. On
September 30, 1996, the motions were granted in
part and denied in part. (Dkt. Entry 201.)
Specifically, medical malpractice claims asserted
against Drs. Ballentine and Clarke and a sexual
harrassment claim under Title VII of the Civil Rights
Act of 1964, as amended, 42 U.S.C. § 2000e, *et.
seq.,* asserted against the Himalayan Institute were
dismissed. The case proceeded on liability theories
of negligence, intentional infliction of emotional
distress, breach of fiduciary duties arising out of the
counselor or guru/disciple relationship between
Swami Rama and Patel, and violations of the Fair
Housing Act, 42 U.S.C. § 3601, *et seq.*

*7 A summary jury trial and a referral to a
mediator in March of 1997 in order to effectuate an
amicable resolution of the controversy were
unsuccessful. By Order dated July 24, 1997, the
voluntary dismissal of the action as against Drs.
Ballentine, Clarke and Tigunait was granted. (Dkt.
Entry 285.) By Order dated July 28, 1997, various
motions in limine were decided. (Dkt. Entry 289.)
In particular, the motion to preclude references to
sexual conduct of Swami Rama prior to the
publication of the *Yoga Journal* article in late 1990
was denied, but plaintiffs were precluded from

introducing evidence regarding Swami Rama's
alleged sexual misconduct occurring prior to the
establishment of the Honesdale facility. Moreover,
evidence o f n otice o f S wami R ama's alleged sexual
misconduct received by the Himalayan Institute
after August of 1993 was precluded. A motion in
limine to bar introduction of the *Yoga Journal*
article also was denied, as was a motion to preclude
the admissibility of documents and letters giving the
Himalayan Institute notice of sexual improprieties.
[FN6]

> FN6. The Order was later amended to
> provide that the plaintiffs were precluded
> from introducing evidence pertaining to
> Swami Rama's alleged sexual misconduct
> prior to the move of the Himalayan
> Institute headquarters to Honesdale in
> 1978, unless notice of such alleged
> misconduct was provided to either Drs.
> Ballentine or Clarke after they became
> President and Chairman of the Institute.
> (Dkt. Entry 299.)

By Order dated August 7, 1997, plaintiff's motion
for voluntary dismissal of the action as against
Swami Rama was granted. (Dkt. Entry 309.) Prior
to trial, p laintiff M ichaela H einze accepted an offer
of judgment in the amount of $125,000. (Dkt.
Entries 420-425.) J asmine P atel rejected a n o ffer of
judgment in the amount of $350,000, and her claims
proceeded to a jury trial against only the Himalayan
Institute.

The trial was conducted from August 12, 1997
through September 4, 1997. As noted above, the
jury found in her favor on all claims, with the
exception of the Fair Housing Act claim, and
awarded her $275,000 in compensatory damages
and $1.6 million in punitive damages.

On September 8, 1997, the Himalayan Institute
moved for a new trial and/or remittitur. (Dkt. Entry
363.) Patel, on September 10, 1997, moved for
"delay damages" under Rule 238 of the
Pennsylvania Rules of Civil Procedure, asserting
that the offer of judgment did not affect her right to
recover such damages on the compensatory part of
the jury's award. (Dkt. Entry 396.) Following
completion of the trial transcript and after several

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

extensions of time were granted, briefing on the post-trial motions was completed in November of 1998.

## III. DISCUSSION

### A. Sufficiency of the Evidence of Vicarious Liability

The Himalayan Institute contends that "[w]hile the evidence could support a finding that the leadership of the Himalayan Institute was aware of Swami Rama's activities but looked the other way, Patel's evidence fell far short of proving how Swami Rama intended to further the Himalayan Institute's interests, activities or business by engaging in sexual relations with her." (Reply Brief in Support of Post-Trial Motions (Dkt. Entry 456) at 5-6.) In other words, the Himalayan Institute challenges the sufficiency of the evidence to support the jury's finding that Swami Rama was acting within the scope of his agency relationship with the Himalayan Institute when engaging in or attempting to engage in sexual relations with Patel.

**\*8** "Where the movant seeks a new trial on the basis that the verdict is against the weight of the evidence, the court's power to overturn the jury's award is severely circumscribed." *Henry v. Hess Oil Virgin Islands Corp.,* 163 F.R.D. 237, 242 (D.Vi.1995). Generally speaking, a "new trial must be necessary to avoid a miscarriage of justice." *Shanno v. Magee Industrial Enterprises, Inc.,* 856 F.2d 562, 567 (3d Cir.1988). In order to overturn a jury award as unsupported by the evidence the verdict must be "so unreasonable as to offend the conscience of the court." *Murray v. Morse,* 610 F.2d 149, 152 (3d Cir.1979). Of course, there must be more than a scintilla of evidence supporting the verdict; the jury's decision "must be plausible in light of the full evidentiary record ." *Henry,* 163 F.R.D. at 243. The evidence must be assessed in the context of the controlling legal precepts.

The pertinent legal principles on vicarious liability were set forth in the Jury Instructions as follows:
[Patel] claims that Swami Rama was acting as the agent of the Himalayan Institute at the time he engaged in sexual relations with her, which is denied by the Himalayan Institute. If you find that Swami Rama was the agent of the Himalayan Institute and was acting with the intent to further

the Himalayan Institute's interests, activities, or business in connection with his relations with the plaintiff, then the Himalayan Institute would be liable if you find that Swami Rama breached the standard of care of the counselor, breached a fiduciary duty or engaged in conduct that constitutes intentional infliction of emotional distress.
An agent is acting within the scope of his agency if such act is intended to be in furtherance of the principal's interests, activities, or business, or is designed to accomplish the purpose of the agency. It is not necessary that the act or omission have been specifically authorized, as long as it could reasonably be found to have been contemplated as part of his agency. An agent is not within the scope of his agency when he departs or substantially deviates from the business or service of his principal, pursuing some personal activity on his own account and not reasonably embraced within his agency or not directed towards advancing his principal's interests. In this case, the Himalayan Institute alleges that if Swami Rama engaged in sexual relations with the plaintiff, then Swami Rama was not acting in furtherance of its interests, activities or business. In determining the Himalayan Institute's liability based on the acts of Swami Rama you may consider whether sexual relations between Swami Rama and the plaintiff were in any way expected or anticipated based upon any prior notice the Himalayan Institute may have had regarding Swami Rama's alleged propensity to engage in sexual relations with Himalayan Institute residents. You must consider all of the evidence in this regard and determine whether Swami Rama's sexual relations with the plaintiff were in furtherance of the Himalayan Institute's interests, activities or business, so that such acts might be said to be impliedly within Swami Rama's authority, or were done solely for Swami Rama's personal benefit and had no connection with his duties with the Himalayan Institute and were, therefore, beyond the scope of his agency. [Tr. 9/3/97 at 158-60.]

**\*9** In this case, there was ample evidence to find vicarious liability in accordance with the instructions on the law. Swami Rama was ceded "final, mandatory and recommending powers in all spiritual and administrative matters." (Tr. 8/19/97 at 158.) Swami Rama claimed that the Institute was a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 1999 WL 33747891 (M.D.Pa.))

Page 8

"vehicle" for his own work. (Tr. 8/14/97 at 25.) The Himalayan Institute Board regarded Swami Rama as the Institute. (Id.) No other person within the Institute had authority greater than Swami Rama, including the Board of Directors. (Tr. 8/18/97 at 129; Curry Dep. at 67-68; Tr. 8/27/97 at 167.) As asserted by Patel at page 7 of her Brief in Opposition to the Motion for New Trial, "[t]he testimony ... quite directly demonstrated that the Himalayan Institute permitted Swami Rama to pursue his work for the benefit of the corporation, including his counseling and teaching, in whatever manner he chose and with absolute authority to determine the scope of his agency and conduct." In *Allen v. France Packing Co.,* 170 Pa.Super. 632, 635, 90 A.2d 289, 291 (1952), the court recognized that a corporate entity cannot disclaim vicarious liability when it delegates unrestrained authority to a corporate agent. In this case, Swami Rama made sex part of the Institute's "holistic health services" to Patel. Having given Swami Rama unfettered authority to counsel Institute residents as Swami Rama deemed appropriate, the Institute cannot now be heard to disclaim liability for Swami Rama's unorthodox and morally corrupt practices.

In this regard, the officers and directors of the Himalayan Institute perceived that *all* actions taken by Swami Rama were selfless and that even actions that seemed wrong or motivated by personal gratification were intended to benefit his disciples. One former Board member, Dale Colton, testified that while Swami Rama's tactics may have been difficult to understand, "it was taken in the faith that it was for our own good, so we were to accept his teachings." (Tr. 8/12/97 at 127). She also noted that it was expected that Swami Rama would "test" his disciples, and that one of the "tests" was to take actions that seemed wrong. (Tr. 8/14/97 at 17-18.) Swami Rama had told some of his victims that sexual relations with him would be beneficial. (Tr. 8/18/97 at 63; Curry Dep. 39-40.) Dr. Ballentine, after hearing of the allegations of one victim, speculated that Swami Rama was trying to help the women, explaining in his diary "I don't understand too much about [Swami Rama]; but I know he is unvaryingly selfless." (Tr. 8/20/97 at 80.) Ballentine further stated that it was inconceivable that Swami Rama would do anything to harm one of his disciples and that he could not see how sexual relations with Swami Rama were "abusive" because "I saw these women mature and grow and blossom."

(*Id.;* Tr. 8/21/97 at 101.) Swami Rama had indicated to Patel, herself, that sexual relations with him were part of his therapeutic regimen and had convinced her that he was simply "testing" her for her own good. (Tr. 8/25/97 at 80.) Dr. Clarke's wife and Deborah Willoughby both suggested to Patel that Swami Rama did things for her own good, even if it made her uncomfortable. (*Id.* at 53, 77, 90 A.2d 289.)

**\*10** Vicarious liability extends even to intentional or criminal conduct of the agent. *See United States v. American Radiator & Standard Sanitary Corp.,* 433 F.2d 174, 204 (3rd Cir.1970), *cert . denied,* 401 U.S. 948 (1971) (agent who engaged in price-fixing conspiracy was motivated at least in part by a desire to serve his principal and was thus acting in the course of his employment); *Barry v. Manor Care, Inc.,* No. Civ. A. 97-5883, 1999 WL 257663, at *3 (E.D.Pa., April 29, 1999) (whether nursing home employee was acting within the scope of his employment when he assaulted a patient while changing her diaper was a jury question). In this case, there was considerable evidence on which to base a rational conclusion that Swami Rama intended to further the interests of the Himalayan Institute by engaging in sexual relations with those seeking treatment there.

Finally, the jury had substantial evidence on which to base a conclusion that sexual relations between Swami Rama and Patel were to be expected or anticipated based upon prior notice to the Himalayan Institute of Swami Rama's propensity to engage in sexual relations with Himalayan Institute residents. As noted above, the Himalayan Institute concedes that there was sufficient evidence for a conclusion that the Institute "was aware of Swami Rama's activities but looked the other way...." Contrary to the Himalayan Institute's argument, however, such evidence would also permit an inference that the Himalayan Institute condoned sexual relations between Swami Rama and his disciples as part of the services he provided. Indeed, the Institute continued to provide Swami Rama with the opportunity to engage in improper sexual relations after receiving multiple reports of such misconduct.

It has been recognized that "where tortious conduct [of a sexual nature] arises out of and is reasonably incidental to the employees' legitimate work

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                          Page 9
(Cite as: 1999 WL 33747891 (M.D.Pa.))

activities, the 'motivation to serve' test [of vicarious liability] will have been satisfied." *Doe v. Samaritan Counseling Center,* 791 P.2d 344, 348 (Alaska 1990). *Accord, Simmons v. United States,* 805 F.2d 1363, 1371 (9th Cir.1986); *Marston v. Minneapolis Clinic of Psychiatry and Neurology, Ltd.,* 329 N.W.2d 306, 311 (Minn.1982). In this case, the Himalayan Institute's notice of Swami Rama's prior transgressions coupled with the continued untrammeled authority delegated to Swami Rama are sufficient to support a finding of vicarious liability. [FN7]

> FN7. *Sanchez v. Montanez,* 165 Pa.Cmwlth. 381, 645 A.2d 383 (1994), upon which the Himalayan Institute relies, is plainly distinguishable. In *Sanchez,* the court held that a community action agency could not be held responsible for a day care workers' molestation of a child because "[t] there can be no doubt that [the] actions were conducted for personal reasons only...." 645 A.2d at 391. In this case, by way of contrast, sexual abuse occurred on the property of the Himalayan Institute and there was evidence that Swami Rama was motivated, at least in part, to serve the interests of the Himalayan Institute, *i.e.,* he expressed that sex with him was good for his disciples. *Hutchinson v. Luddy,* 453 Pa.Super. 420, 683 A.2d 1254 (1996), the other case upon which the Institute relies, was reversed on November 24, 1999. *See, Hutchinson v. Luddy,* 560 Pa. 51, 742 A.2d 1052, 1999 WL 1062862 (Pa. Nov. 24, 1999). In *Hutchinson,* the Pennsylvania Supreme Court ruled that a Bishop and Diocese could be held liable for their failure to take action with respect to a priest who they knew to have a propensity for pedophilic behavior.

In summary, the evidence was indeed sufficient to support a finding of vicarious liability in accordance with the jury instructions. Accordingly, the Himalayan Institute is not entitled to a new trial on the ground that the vicarious liability findings somehow improperly inflated the punitive damage award. [FN8]

> FN8. Patel argues that the Himalayan Institute waived its claim that the vicarious liability finding improperly influenced the punitive damage award, pointing out that the Himalayan Institute did not object to the verdict form that required the jury to return a single award of punitive damages, rather than a separate award for vicarious liability and a separate award for direct liability. In light of the finding that the evidence was indeed sufficient to support the vicarious liability decision, there is no need to address the waiver argument.

**B. Claims of Trial Court Error that Purportedly Denied the Himalayan Institute a Fair Trial**

The Himalayan Institute contends that an aggregation of erroneous evidentiary rulings and improper remarks by counsel in opening statements and closing arguments deprived it of a fair trial. Specifically, the Himalayan Institute asserts that the court erred by admitting testimony and letters of other women who claimed to have had sexual relations with Swami Rama and by admitting portions of the *Yoga Journal* article beyond that which was necessary to establish notice of other incidents and Swami Rama's *modus operandi.* The Himalayan Institute further contends that the testimony of Dr. Peter Rutter, who opined concerning the improprieties of Swami Rama's sexual relations with Patel, should have been excluded under the *Daubert* rule. Finally, the Himalayan Institute insists that remarks made by counsel during opening statements that purportedly alluded to unsuccessful settlement efforts prior to the inception of litigation, and alleged inflammatory arguments made during closing argument on the subject of punitive damages, warrant a new trial. Each of these contentions will be addressed *seriatim.*

**1. Testimony and Evidence from Other Women who Claimed to Have Been Abused by Swami Rama**

*11 The Himalayan Institute contends that the court erred in allowing Dr. Leslie Smith McDaniel, a psychiatrist, to read into evidence her entire letter of January 24, 1990 to various members of the Himalayan Institute Board. (PX-11.) In this letter, Dr. McDaniel not only related the details of Swami Rama's sexual predation towards her, but also

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 1999 WL 33747891 (M.D.Pa.))

referred to accounts she had heard involving other women, as well as explained how such relationships could not be regarded as "consensual" and had the potential to cause serious emotional problems. This testimony was admitted in light of the Himalayan Institute's denial that Swami Rama had engaged in sexual relations with Patel and to establish the Himalayan Institute's direct liability in light of its assertion that it had been under no duty to investigate allegations of abuse and protect residents against such abuse. The jury was specifically cautioned that the McDaniel letter was admitted for a limited purpose only--"to show notice to the Institute of allegation or allegations of misconduct on the part of Swami Rama." (Tr. 8/15/97 at 73.) The jury was further instructed that it was not to consider the letter for the truth of the matters asserted in it, nor was the jury to consider the letter for purposes of assessing the validity or correctness of opinions expressed in it. (*Id.*) The jury was told that it should consider the letter only for the purpose of understanding what information was available to the Institute's officers and directors. (*Id.*)

Clearly, the jury was properly instructed on the limited purposes for which the McDaniel testimony and letter were admitted. Equally clearly, the testimony and letter were relevant: details of the sexual encounter were admissible to show Swami Rama's pattern of manipulation, making it more likely than not that he had indeed engaged in sexual relations with Patel; the detailed information and the opinions of a psychiatrist articulated in the letter were relevant to refute the Himalayan Institute's assertion that it had not been presented with sufficient information to trigger an investigation of Swami Rama and curb his conduct.

The Himalayan Institute contends that the court erred in allowing Dr. Sheila Culkin, a psychologist, to testify about her sexual relations with Swami Rama because she could not identify any officer or Board member of the Himalayan Institute who she had told about her sexual relations with Swami Rama. Notice of her claim of abuse, however, was conceded by several Board members. For example, Dale Colton testified that the Board had discussed allegations pertaining to Culkin in the early 1980's. (Tr. 8/14/97 at 31-32.) Julia Robling Griest talked to Dr. Tigunait about Culkin's allegations. (Tr. 8/20/97 at 32.) Dr. Ballentine recalled being aware

of Culkin's claims of immoral conduct by Swami Rama, but did not take them seriously. (Tr. 8/19/97 at 205-06; Tr. 8/20/97 at 57, 65-66.) Culkin provided testimony with respect to Swami Rama's *modus operandi* and also testified how Swami Rama could convince women to take otherwise irrational action, like wearing a dog collar and leash or picking poison ivy with their bare hands. This testimony was relevant to show how Swami Rama overcame the free will of those he manipulated. The relevance of this information was not substantially outweighed by its prejudicial effects.

**\*12** The Himalayan Institute also contends that the court erred in allowing Julia Robling Griest to testify about her experiences with Swami Rama and the letter she wrote to the Himalayan Institute. (PX-12.) Once again, the testimony and exhibit were admitted under limiting instructions so that the jury knew that it could consider the evidence only for the limited purpose of understanding the notice to the Himalayan Institute of allegations of sexual abuse. No error was committed in the admission of such evidence.

Contrary to the Himalayan Institute's assertions, evidence on notice and *modus operandi* should not have been limited to testimony as to "how, when, and to whom notice was given at the Himalayan Institute and how and in what circumstances Swami Rama propositioned them to have sexual relations with him." (Brief in Support of Motion for New Trial (Dkt. Entry 448) at 18.) Patel was plainly entitled to present not only evidence of the fact of notice, but also the contents of the notice. As Patel asserts, "[c]ommon sense particularly in light of the testimony of the officers of the Himalayan Institute that they had no reason to engage in any investigation, demonstrates that the detailed content of the notice that was provided to them was not only highly relevant, but absolutely necessary to establish the lack of credibility of the testimony of the officers of the Himalayan Institute." (Brief in Opposition to Motion for New Trial (Dkt. Entry 452) at 18.) Accordingly, the Himalayan Institute is not entitled to a new trial based upon the admission of evidence pertaining to Swami Rama's sexual proclivities.

2. The *Yoga Journal* Article

The jury was presented with a redacted version of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the *Yoga Journal* article, "The Case Against Swami Rama of the Himalayas." (Px-27.1) The Himalayan Institute contends that the article should not have been admitted in even its redacted state, contending that it constituted inadmissible hearsay.

As with respect to the testimony of other alleged victims of Swami Rama who notified the Himalayan Institute of improprieties, the *Yoga Journal* article was admitted for purpose of showing notice to the Himalayan Institute. A proper limiting instruction was given at the time of its introduction. (Tr. 8/19/97 at 119-20.) Contrary to the Himalayan Institute's assertion, Patel did not have to wait until the Himalayan Institute presented evidence contesting the credibility of the article. The Himalayan Institute had already disavowed the contents of the article in responding to articles that had appeared in a local newspaper. (Tr. 8/14/97 at 43-46; PX-34.) Patel was plainly entitled in her case-in-chief on the direct liability of the Himalayan Institute to show what it knew and what it did about it, and this included the *Yoga Journal* article and the Himalayan Institute's attempts to "sweep it under the rug." Admission of the *Yoga Journal* article does not entitle the Himalayan Institute to a new trial.

3. The Admissibility of Dr. Peter Rutter's Testimony

*13 Incorporating by reference arguments asserted in a pretrial *Daubert* motion, the Himalayan Institute argues that the Court erred in allowing the testimony of Dr. Peter Rutter, a board-certified psychiatrist. Dr. Rutter explained why Patel's consent to sexual relations with Swami Rama was the product of his abuse of the relationship of trust and confidence reposed in him as the spiritual leader of the Himalayan Institute and Patel's guru. He also opined that Swami Rama had breached the standard of care applicable to a holistic health care provider by engaging in sexual relations with Patel. (Tr. 8/26/97 at 88-102.) Finally, Dr. Rutter testified as to the standard of care applicable to the Himalayan Institute with respect to a duty to investigate allegations of Swami Rama's abuse of other women. (*Id.* at 103-08.)

Rule 702 of the Federal Rules of Evidence provides:
    If scientific, technical or other specialized

knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1994), the Court, focusing upon the admissibility of *scientific* expert testimony, held that it is the trial court's function to determine that such testimony is both reliable and relevant. The Court identified certain factors that bear on the question of reliability in the context of scientific testimony. [FN9]

    FN9. Our Court of Appeals has suggested that in making a preliminary determination pertaining to the reliability of scientific testimony, the district judge should consider the following factors:
    "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put."
    *United States v. Velasquez,* 64 F.3d 844, 849 n. 8 (3d Cir.1995).

Seizing on the factors suggested by the Supreme Court and the Third Circuit for assessing the reliability of proposed testimony from a scientist, defendants argued pre-trial that Dr. Rutter should not be allowed to testify at all. As set forth in Dr. Ballentine's Brief in Support of his Motion in Limine (Dkt. Entry 222): [FN10]

    FN10. The Himalayan Institute adopted by reference Dr. Ballentine's objections to Dr. Rutter's testimony.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                           Page 12
**(Cite as: 1999 WL 33747891 (M.D.Pa.))**

Rutter's methodology, if there is one at all, consists of a suggestive 'untestable' theory of human behavior which has not been subjected to any standards other than those of his own making; the potential rate of error for his theory is wholly unexplored; his theories have not been subjected to peer review or publication in a scientific as opposed to litigation or popular opinion forum; and his theory of transference, as applied to the facts of this case, is not generally accepted in the scientific or legal communities and, at best, is useful only for clinical purposes. Simply put, Rutter's opinions are not based on valid scientific principles or methodology, and thus are inadmissable in court. [*Id.* at 12-13.]

The unsound premise of the Himalayan Institute's argument is that the factors for assessing the reliability of scientific testimony necessarily apply in the social science context. In *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238, 246 (1999), the Court held that while *"Daubert's* general holding--setting forth the trial judge's general 'gatekeeping' obligation--applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' or 'other specialized' knowledge," the list of specific factors for assessing liability set forth in Daubert "neither necessarily nor exclusively applies to all experts or in every case." "Rather," wrote Justice Breyer, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* As recently explained in *Skidmore v. Precision Printing and Packing, Inc.,* 188 F.3d 606, 618 (5th Cir.1999):
    *14 Whether *Daubert's* suggested indicia of reliability apply to any given testimony depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony. It is a fact-specific inquiry. The district court's responsibility 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." '

A pertinent inquiry on the reliability of the proffered testimony and a threshhold requirement of Rule 702 of the Federal Rules of Evidence is that the proposed witness be an expert. As noted above,

Dr. Rutter is a board-certified psychiatrist trained as a psychoanalyst in the "Jungian School" of psychoanalysis. (Tr. 8/26/97 at 69-70.) He has been on the faculty of the University of California Medical School. (*Id.* at 70.) He has studied the subject of sexual abuse in the context of relationships in which trust is reposed in a health care professional or other professional counselor. (*Id.* at 71-73.) He is the author of a book published in 1989 titled, "Sex in the Forbidden Zone," which concerns use of positions of trust for sexually exploitive purposes. (*Id.* at 71-72.) In connection with his work, he has become familiar with various published standards pertaining to various relationships in which a female reposes a great deal of trust in a male professional, whether that be a psychiatrist, psychotherapist, doctor, clergyman, etc. (*Id.* at 73-74.) He has lectured on the subject across the country and has testified in court proceedings on a number of occasions. (*Id.* at 73-77.)

Clearly, Dr. Rutter possessed specialized knowledge on the subject of sexual relations between a therapist and a client or a patient and a doctor. This specialized knowledge is based upon years of study of the subject, clinical experience, and interviews of both victims and abusers. He thus had ample qualifications to testify with respect to the issues pertaining to Patel's consent to sexual relations with Patel, the impropriety of Swami Rama's actions, and the negligence of the Himalayan Institute in its reaction to complaints of abuse by Swami Rama.

Dr. Rutter's testimony also indicated that he employed "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 143 L.Ed.2d at 252. He testified that there was "universal agreement" that sexualization in a therapeutic environment, such as the holistic healthcare environment offered by the Himalayan Institute, was improper. (Tr. 8/26/97 at 91.) He applied to the facts of this case generally accepted principles, in particular, a concept known as the "transference phenomonon," which involves the "displacement of feelings derived from past relationships onto the current physician/patient relationship." [FN11] "[T]he 'transference phenomenon' refers to the tendency of patients to become emotionally dependent upon, and trusting

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 1999 WL 33747891 (M.D.Pa.))

of, their psychologist or psychiatrist." *Benavidez v. United States,* 177 F.3d 927, 930 (10th Cir.1999). Mishandling of the "transference phenomenon" by engaging in sexual relations with a patient or client has been recognized as a basis for imposing liability on the professional. *Id.* at 930; *Dausch v. Rykse,* 52 F.3d 1425, 1434 n. 5 (7th Cir.1994); *Simmons,* 805 F.2d at 1364-66; *Vetter v. Subotnik,* 844 F.Supp. 1352, 1356 (D.Minn.1992).

> FN11. *See generally,* Gabbard and Nadelson, "Professional Boundaries in the Physician-Patient Relationship," 273 JAMA 1445 (May 10, 1995).

**\*15** Dr. Rutter's application of this accepted principle to the relationship between Patel and Swami Rama was not irrational. Considering the holistic healthcare environment offered by the Himalayan Institute, Swami Rama's position as the embodiment of the Institute's combination of Eastern and Western approaches to healthcare, and the Patel family relationship to Swami Rama as the family guru, he could logically conclude that Patel reposed in Swami Rama tremendous trust such that she would be expected to rely upon his insistence that sex with him was for her good and that she understandably believed that she could not risk alienation of his care and affections by rejecting him. Clearly, application of the transference phenomenon to the factual scenario presented in this case did not render Dr. Rutter's opinions unreliable. [FN12]

> FN12. It should be noted that the defense did not proffer any expert witness to contradict Dr. Rutter and did not present any evidence disputing the reliability of the "transference phenomenon" as a problem encountered in the type of relationship existing between Patel and Swami Rama.

The final consideration for admissibility of Dr. Rutter's testimony was that it "fit" the matters at issue in the case. Plainly, Dr. Rutter's testimony was highly relevant. Moreover, it pertained to matters not necessarily within the ken of the average juror. As recognized in *Tyus v. Urban Search*

*Management,* 102 F.3d 256, 263 (7th Cir.), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2409, 138 L.Ed.2d 175 (1996), "[s]ocial scientists in particular may be able to show that commonly accepted explanations for behavior are, when studied more closely, inaccurate." This observation is plainly applicable where, as here, it is necessary to understand why Patel's acquiescence to sex with Swami Rama should not be regarded as consensual. Dr. Rutter's testimony was also helpful in assisting the jury understand why Swami Rama's activities should be regarded as improper. Even if the jury could have drawn this conclusion without his testimony, expert testimony may nonetheless be admissible as an aid in drawing that inference. *See United States v. Hines,* 55 F.Supp.2d 62, 64 (D.Mass.1999).

In *Kumho,* the Court stated:
> Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from ... specialized experience.' And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to [the jury's] own.' The trial judge's effort to assure the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge. 143 L.Ed.2d at 250-51.

Dr. Rutter applied his specialized experience and observation to the facts of this case. His specialized testimony was found to be reliable and relevant, and the Himalayan Institute has not presented any facts or authority to call into doubt these determinations. Accordingly, the Himalayan Institute is not entitled to a new trial based upon the admission of Dr. Rutter's opinions.

4. Improper Remarks during Opening Statements and Closing Arguments

**\*16** The Himalayan Institute contends that the Court erred in refusing to grant a mistrial based upon the following remark made by Patel's counsel during opening statements:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 14
**(Cite as: 1999 WL 33747891 (M.D.Pa.))**

[Jasmine Patel] went to a trusted friend of the family and told him what had happened. Ultimately, he advised that she tell the parents. She went to the parents, she told the parents, and they were absolutely floored, as well you can imagine. And the action that was decided upon was that they were going to have to do something about this. And so Mr. Patel took Jasmine's essay, wrote to everyone they knew about what happened to her, enclosing copies of her essay. Mr. Patel wrote letters to the lead persons of the Himalayan Institute, attaching copies of Jasmine's essay, saying this happened to my daughter. You know that these other allegations have to be true. We've got to do something about this. *And he offered a number of suggestions as to what might be done to stop Swami Rama from abusing the next victim.* [Tr. 8/12/98 at 49; emphasis added.]

The Himalayan Institute contends that the emphasized statement was an inappropriate allusion to evidence of settlement efforts proscribed by Federal Rule of Evidence 408.

Rule 408, in pertinent part, provides:
Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount.

Counsel's remark would not appear to constitute the type of evidence of settlement negotiations proscribed by Rule 408. It was made in the context of asserting that the Himalayan Institute was deliberately indifferent to charges of sexual improprieties by Swami Rama. The defense, itself, offered testimony of Jasmine Patel's father of conversations he had with Dr. Tigunait after Jasmine Patel had sent her essay to the Institute. (Tr. 8/29/97 at 104- 05.)

Improper remarks by counsel warrant a new trial only where it is "more than 'reasonably probable' that the verdict was influenced by the prejudicial statements." *Stanton by Brooks v. Astra Pharmacutical Products,* 718 F.2d 553, 579 (3d Cir.1983). The statement that Mr. Patel offered some suggestions as to how to prevent Swami Rama from abusing other women does not plainly contravene Rule 408. Nor is it the type of remark

that could have so prejudiced the jury as to deny the Himalayan Institute a fair trial. The isolated statement occurred at the inception of a lengthy trial, and it is not reasonably probable that the verdict was influenced by this remark.

The closing arguments to which the Himalayan Institute objects also were not of a nature to have so inflamed the jury as to " 'impair gravely the calm and dispassionate consideration of the case by the jury." ' *Neal v. Toyota Motor Corp.,* 823 F.Supp. 939-944 (N.D.Ga.1993). The Himalayan Institute contends that counsel improperly told the jury, "[I]n order to send the message, you need to consider whether "it is necessary to close down a facility like the Himalayan Institute, with its multi-millions in assets...." (Tr. 9/3/97 at 130.) The Himalayan Institute points out that its Honesdale facility was appraised at $1.6 million, the precise amount awarded in punitive damages, thus showing that plaintiff's counsel had improperly suggested a dollar amount of punitive damages.

**\*17** But Patel's counsel never mentioned a specific amount, and the Himalayan Institute had assets other than the Honesdale facility, including property located elsewhere having a value of several hundred thousand dollars and a $2 million endowment. In any event, the Himalayan Institute did not object to the argument that the jury should consider awarding an amount of punitive damages that would close down the Himalayan Institute, but instead only objected to the exhortation that the jury issue a "huge award...." (*Id.* at 131 .) Thus, the Himalayan Institute waived any argument that plaintiff's counsel had improperly suggested a specific dollar amount to be awarded. *See Dunn v. HOVIC,* 1 F.3d 1371, 1377 (3d Cir.) (*en banc* ), *cert. denied, sub. nom, Owens-Corning Fiberglas Corp. v. Dunn,* 510 U.S. 1031, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993).

As to plaintiff's counsel urging a "huge" award, the Himalayan Institute has not cited any case that would suggest that such a general statement is inappropriate. Punitive damages are intended to punish and to deter, and there is nothing inherently prejudicial in asking that a jury return a "huge" award in order to serve those purposes. *Id.* at 1378. Accordingly, the Himalayan Institute is not entitled to a new trial based upon remarks made by counsel during opening statements and closing arguments.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
**(Cite as: 1999 WL 33747891 (M.D.Pa.))**

C. The Alleged Excessiveness of the Punitive Damage Award

The Supreme Court has recognized the propriety of judicial oversight of a punitive damage award to assure that it is not greater "than reasonably necessary to punish and deter." *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 19, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *see also Dunn v. HOVIC,* 1 F.3d at 1385. The Court has identified three "guideposts" by which to assess the reasonableness of a punitive damage's award: (1) the degree of reprehensibility of the defendants' actions; (2) the relationship of the amount of punitive damages awarded to the actual or potential harm; and (3) the difference between the punitive damage award and civil penalties that may be authorized or imposed in comparable cases. *BMW of North America Inc. v. Gore,* 517 U.S. 559, 574-75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

As to the first factor--the reprehensibility of the defendant's conduct--our Court of Appeals recently suggested that consideration be given to whether the conduct (a) caused economic as opposed to physical harm; (b) would be regarded as unlawful in all states; (c) involved repetitive acts rather than an isolated incident; (d) is intentional; (e) included deliberate false statements rather than omissions; and (f) is aimed at a vulnerable target. *See InterMedical Supplies, Ltd. v. EBI Medical Systems, Inc.,* 181 F.3d 446, 467 (3d Cir.1999). Because the jury imposed both direct and vicarious liability for punitive damages, the factors identified above should be applied to the actions of both Swami Rama and the Himalayan Institute.

Swami Rama's conduct is indefensible. He abused his position as the revered spiritual leader of an organization devoted to physical and emotional well-being. He had his way with Patel by convincing her that he alone knew what was best for her and that it would be sinful to disobey him. This conduct caused extreme emotional harm. While it cannot be said that Swami Rama's conduct would be regarded as criminal in all states, Dr. Rutter testified without contradiction that it was unlawful in some states. (Tr. 8/26/97 at 113.) The conduct with Patel occurred over several months, and was but a pattern of sexually exploitive conduct he had pursued for years. Swami Rama lied to Patel and to those at the Himalayan Institute about his prior sexual

transgressions. Finally, he directed his conduct at a most vulnerable victim, a girl still in her teens whom he knew was dependant upon him for her emotional stability. The degree of reprehensibility of Swami Rama's conduct is, indeed, extreme.

**\*18** The conduct of the Himalayan Institute was no less reprehensible. Its officers and directors had received on numerous occasions credible information of Swami Rama's sexual transgressions. As an organization, the Institute buried its head in the sand of a delusional rationalization that the Swami Rama would not engage in conduct harmful to one of his disciples. (*E.g.,* PX-41; Tr. 8/20/97 at 179.) Not only did the Institute engage in denial of the worst sort, but it also sought to deflect attention from the Swami Rama by slandering the women who complained. They were the ones who were called "crazy" or "unstable." (Tr. 8/19/97 at 176; Tr. 8/18/97 at 117-18.) In response to the *Yoga Journal* article, the Institute sent out a letter to the community asserting that the allegations against Swami Rama were unsubstantiated and that those making the claims were psychologically unbalanced. (PX-34.) Drs. Ballentine, Clarke and Tigunait urged the members of the Himalayan Institute not to put much "energy into such negative things." (Tr. 8/20/97 at 175.)

In response to Dina Capobianco's complaint, Dr. Ballentine told her that she was hallucinating. (Tr. 8/18/97 at 69-72.) When Robert Hughes, Jr. raised questions in a letter to Drs. Ballentine and Clarke in May of 1989, Dr. Ballentine responded by removing Hughes from his position. (Tr. 8/21/97 at 51- 52.) He also wrote to Hughes, chastising Hughes for relying upon rumors of "emotionally disturbed," "jealous and vindictive" individuals. (PX-10; Tr. 8/19/97 at 63.) Neither Ballentine, Clarke nor Tigunait responded to the detailed allegations set forth in Dr. Leslie Smith McDaniels' letter. (Tr. 8/14/97 at 91-93.) Even when he learned in 1992 that his former wife had engaged in sexual relations with the supposedly celibate Swami Rama, Dr. Ballentine did nothing. (Tr. 8/20/97 at 191-95.) On the contrary, he rationalized that sex with the Swami Rama had caused his wife to "blossom." The evidence presented at trial showed that the Himalayan Institute engaged in the same pattern of denial and victim attacks when confronted with Jasmine Patel's allegations. (Tr. 8/14/97 at 52-57; Tr. 8/29/97 at 30-31.)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 1999 WL 33747891 (M.D.Pa.))

The Himalayan Institute seeks to minimize the severity of the conduct at issue here by pointing out that the jury found that Patel had consented to having sex with Swami Rama and that no officer or director of the Institute knew that Swami Rama was having sex with Patel while it was occurring. This argument disregards the fact that Patel's acquiescence to Swami Rama's predatory tactics was accomplished by his abuse of his position of authority and trust. It also ignores the fact that Patel became a victim because of the Himalayan Institute's repeated cover-ups of Swami Rama's prior sexual transgressions. Contrary to the Himalayan Institute's assertion, the conduct at issue here is not close to the "very bad side of the spectrum" for awarding punitive damages, but rather falls on the rather "completely amoral side of the spectrum." (Brief in Support of Motion for New Trial (Dkt. Entry 448) at 29.) Thus, the reprehensibility of the conduct of Swami Rama and the Himalayan Institute justified a large punitive damage award.

**\*19** The second guidepost for assessing the reasonableness of a punitive damage award is the ratio of the punitive damages to the actual harm inflicted. *See McDermott v. Park City Corp.,* 11 F.Supp.2d 612, 631 (E.D.Pa.1998). In this case, the punitive damages were less than six times the amount of compensatory damages. While there is no bright line test for comparing the amount of punitive damages to actual damages, the Court has held that a 4-to-1 ratio does not warrant setting aside a punitive damage award. *Haslip,* 499 U.S. at 23-24. In *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 460, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), the Court held that a ratio of 10-to-1 was not excessive given the potential harm to the plaintiff. In *McDermott,* a ratio of 8-to-1 was viewed as permissible. 11 F.Supp.2d at 631. Given the fact that the degree of reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award," *Gore,* 517 U.S. at 575, a ratio of punitive damages to compensatory damages of less than 6-to-1 in this case does not militate in favor of a reduction in punitive damages.

The final factor concerns a comparison of the punitive damage award to the civil or criminal penalties that could be imposed for comparable misconduct. *Id.* at 583. The Himalayan Institute

offers two potential comparisons. First, it suggests that the $300,000 cap on damages awarded for violations of Title VII of the Civil Rights Act of 1964, set forth at 42 U.S.C. § 1981a(b)(3)(D), should be considered. (Brief in Support of Motion for New Trial at 31.) Alternatively, it suggests that the cap of 200% of the compensatory damages awarded established in the Health Care Services Malpractice Act, 40 Pa.C.S. § 1301.812-A(g), be applied here.

As to the latter suggestion, the Pennsylvania legislation does not apply to intentional misconduct. This case involves intentional misconduct of Swami Rama. Moreover, the jury found that both Swami Rama and the Himalayan Institute engaged in intentional infliction of emotional distress. Thus, the statutory cap under the Health Care Services Malpractice Act does not offer a pertinent analogue here.

Nor do damage caps placed on employment discrimination awards fit the situation presented here. This is not an employment discrimination case under federal law. It is a case of sexual manipulation and exploitation under state law. The community's outrage, as expressed in the punitive damage award, should not be stifled by a federal statutory cap applicable to employment discrimination.

In *Inter Medical Supplies,* 181 F.3d at 468, our Court of Appeals observed:
'[A] violation of common law tort duties [may] not lend [itself] to a comparison with statutory penalties. The fundamental question is whether [the defendant] had reasonable notice that its [conduct] could result in such a large punitive award."
In this case, that fundamental question must be answered in the affirmative. The conduct at issue was so egregiously wrong that the Himalayan Institute could reasonably anticipate suffering the consequence of a huge punitive damage award. Accordingly, the Himalayan Institute's challenge to the size of the punitive damage award must be rejected.

D. "Delay Damages" under Pennsylvania Rule of Civil Procedure 238

**\*20** Rule 238 of the Pennsylvania Rules of Civil

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 1999 WL 33747891 (M.D.Pa.))

Procedure, in pertinent part, provides:

(a)(1) At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant ... found to be liable to the plaintiff in the verdict of a jury ..., and shall become part of the verdict, decision or award.

(2) Damages for delay shall be awarded for the period of time ... from a date one year after the date original process was first served in the action up to the date of the award, verdict or decision.

(b) The period of time for which damages for delay shall be calculated under subdivision (a)(2) shall exclude the period of time, if any,

(1) After which the defendant has made a written offer of (i) settlement in a specified sum with prompt cash payment to the plaintiff ... and continued that offer in effect for a least 90 days or until commencement of trial, whichever first occurs, which offer was not accepted and the plaintiff did not recover by award, verdict or decision, exclusive of damages for delay, more than 125% of ... the specified sum....

Both parties concede that Rule 238 has been regarded as substantive in nature and therefore binding in this diversity action. *See Fauber v. KEM Transportation & Equipment Co.,* 876 F.2d 327, 328 (3d Cir.1989). Patel claims delay damages from August 25, 1995 (one year after service of process was effected) through September 4, 1997, the date of the verdict. She has calculated the amount of the delay damages on the compensatory award to be $52,500.

The Himalayan Institute, while not contesting Patel's calculation, contends that its written offer of judgment in the amount of $350,000 terminated the running of delay damages as of the date it was made, July 10, 1997. In this regard, it notes that the compensatory damage award of $275,000 was below the amount of the written offer of judgment. Patel counters that the Court should consider the aggregate award of compensatory and punitive damages in determining whether the offer served to cut off delay damages as of July 10, 1997. Resolution of this dispute thus determines whether delay damages terminate on July 10, 1997 or September 4, 1997, a difference of 57 days.

There is no need to resolve the question of whether punitive damages should be considered in determining whether the verdict is more than 125% of the written offer. Rule 238 makes clear that to qualify as a written offer that terminates the running of delay damages the written offer must either be in effect for at least 90 days or until commencement of trial, whichever first occurs. In this case, the Offer of Judgment specified that it had to be accepted in writing within 10 days, or "it shall be deemed withdrawn." Trial did not commence until August 6, 1997, when the jury was selected. Because the offer stood open for only 10 days, and the trial did not commence during those 10 days, the Offer of Judgment did not serve to terminate the running of delay damages under Rule 238. Accordingly, the sum of $52,500 shall be added to the $275,000 in compensatory damages awarded by the jury.

IV. CONCLUSION

**\*21** For all of the foregoing reasons, the Himalayan Institute's Motion for a New Trial or a Remittitur will be denied. Patel's Motion for Rule 238 Delay Damages will be granted. An appropriate order is attached.

ORDER

And Now, this *9* day of December, 1999, for the reasons set forth in the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for New Trial or Remittitur (Dkt. Entry 363) is DENIED.

2. Plaintiffs' Motion for Rule 238 Delay Damages (Dkt. Entry 396) is GRANTED. The Clerk of Court is to amend the Judgment in favor of Plaintiff, Jasmine Patel, by adding the amount of $52,500 to the $275,000 in compensatory damages awarded by the jury.

3. The Clerk of Court is directed to mark this matter CLOSED.

1999 WL 33747891 (M.D.Pa.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works