# A CATHOLIC DICTIONARY

*"To what shall we liken the kingdom of God?
or to what parable shall we compare it? It is as
a grain of mustard seed: which when it is sown
in the earth, is less than all the seeds that are
in the earth: and when it is sown, it groweth
up, and becometh greater than all herbs, and
shooteth out great branches, so that the birds of
the air may dwell under the shadow thereof."*
—Mark 4:30-32



EXHIBIT

H

NIHIL OBSTAT:

    Georgius D. Smith, S.T.D., Ph.D.
    Censor deputatus

IMPRIMATUR:

    E. Morrogh Bernard
    Vic. Gen.
    Westmonasterii
    die 10 Maii, 1946

NIHIL OBSTAT:

    Hubertus Richards, S.T.L., L.S.S.
    Censor deputatus

IMPRIMATUR:

    ✝ Georgius L. Craven
    Epus. Sebastopolis
    Vic. Cap. Westmon.
    Westmonasterii
    die 30 Januarii, 1957

Third Edition copyright © The Macmillan Company 1958. Earlier editions: copyright © 1931, 1949 by The Macmillan Company. Copyright renewed 1958 by The Macmillan Company. Originally published in the United Kingdom by Cassell & Company, Ltd., as *The Catholic Encyclopaedic Dictionary.* Reprinted in 1997 by TAN Books and Publishers, Inc., from the 1961 Macmillan Paperbacks Edition, by arrangement with Macmillan Publishing Company, New York.

All rights reserved. No part of this book may be reproduced in any form without permission in writing from the publisher, except that brief selections may be quoted or copied for non-profit use without permission, provided full credit is given.

Library of Congress Catalog Card No.: 97-60871

ISBN 0-89555-549-2

Cover illustrations—*Top Row:* St. Peter's Basilica; St. Thomas Aquinas; statue of St. Joseph and the Child Jesus. *Middle Row:* a Guardian Angel (from a painting by Heinrich Kaiser); Tintern Abbey (Tintern, Gwent, Wales)—courtesy of the British Tourist Authority. *Lower Row:* Our Lady of Perpetual Help; Notre Dame de Paris (rear view)—courtesy of the French Government Tourist Office; Pope St. Gregory the Great (Barberini Palace, Rome).

Printed and bound in the United States of America.

TAN BOOKS AND PUBLISHERS, INC.
P.O. Box 424
Rockford, Illinois 61105
1997

certainly less developed, and set out in different terms, but it is substantially the same as that of the Catholic Church; they strenuously deny any element of material fire, but neither does the Church impose this. The position of the other dissident Eastern churches is similar. The Greek Orthodox English catechism appears to contradict itself in this matter, seeming to contain both an assertion and a denial of the particular judgement at death.

**PURIFICATION, The.** A feast of our Lady (Feb. 2), commemorating her ritual purification in the Temple after childbirth, according to the Jewish law. It is accompanied by the blessing, distribution and procession with candles, whence the English name Candlemas (*cf.*, Hypapante, Unclean).

**PURIFICATOR.** A small piece of linen used to dry the chalice and the celebrant's fingers when they have been cleansed with wine after the communion. In the Byzantine rite a small sponge is used for equivalent purposes. Used purificators, as well as corporals and palls (*qq.v.*), must not be handled by lay-people until they have been washed out once by a major cleric.

**PURITANISM.** i. Historically, a diffused movement, rather than a party, in English history, active and powerful from the reign of Elizabeth till the Restoration in 1660. It regarded the English Reformation as incomplete, reprobated all ritual and religious holidays whatsoever, practised a morality of great strictness, and condemned dancing, fine clothes, etc., as ungodly and sinful.

ii. An exaggerated rigorism which sees in remote or no occasions of sin proximate occasions, and in proximate occasions actual sin: condemning the use of fermented liquors, betting and gambling, social games, dancing and noisy amusements, uneuphemistic speech, images of nudity, and so on, as bad in themselves. In its worst forms it is found among some English-speaking non-Catholics and is a heritage from i above, buttressed by a philosophy sometimes admittedly manichæan. Among individual Catholics rigorism or scrupulosity sometimes results in a kind of Jansenistic puritanism.

iii. Among the irreligious or indifferent is sometimes observed a sort of puritanism which fears the censure of society on what may be deemed unusual or contrary to custom or etiquette. This is more properly conventionalism or prudery.

**PURITY.** That condition of innocence which is preserved by abstinence from sin and especially by the observance of continence and chastity according to one's state of life; freedom from stain, defilement, adulteration; hence purity of soul, heart, conscience, motive, or intention. Purity in its ordinary sense of chastity according to one's state is a peculiarly sacred precept. "Certain actions

are wrong, because in them some type is violated, some sacred symbolism outraged, and the dishonour done to the type redounds upon the antitype or thing typified. Such I conceive to be the radical reason of the grievousness of sins against purity. . . . The mischief and malice of such a life is not simply its unhealthiness, nor its undoing of character, nor even its uselessness and injury to the soul, but its offending against the symbolism of things mighty and holy" (Rickaby, S. J. *Cf.*, Matrimony.)

**PURPLE.** i. The liturgical colour of vestments used on Sundays and ferias in Septuagesima, Lent and Advent, on rogation and ember days (except at Whitsun) and on vigils (except Epiphany, Ascension, white, and Pentecost, red at Mass, white at office, purple at prophecies, etc.). It is also used at the blessing of candles and other occasions, and for votive Masses of penitence and the Passion and the feast of Holy Innocents on a week-day.

ii. Purple is the colour proper to prelates of the Western church, and their birettas, cassocks, *mozzette*, etc., are of that colour, unless they belong to a religious order. A priest is said to be "raised to the sacred purple" when he becomes a cardinal, though the cardinalitial colour is actually scarlet, Roman purple is reddish in shade.

**PUSEYISM.** An obsolete name for the activities and principles of the Oxford Movement (*q.v.*), from E. B. Pusey (1800-82), one of its leaders.

**PUSILLANIMITY** (Lat. *pusillus*, petty, *animus*, spirit). Mean-spiritedness: the vicious exaggeration of the virtue of humility. In his absolute and unreasoning contempt for himself and his abilities, the pusillanimous man lacks in respect for God who made him and endowed him with power, and in his refusal of the more favourable estimates of his fellow men he fails in deference towards the opinions of others perhaps better able to judge.

**PUTATIVE MARRIAGE** (Lat. *putatus*, supposed). A marriage which is invalid, but has been contracted in good faith by at least one party. Such marriage remains putative until both parties have certain knowledge of its nullity. The children of a putative marriage are legitimate, and children born out of wedlock are legitimatized even by a putative marriage.

**PYX** (Gr. πυξίς, box). i. A small round metal vessel in which the Blessed Sacrament is carried to the sick when this has to be done privately. It is enclosed in a silk bag and hung round the neck by a cord.

ii. A ciborium (*q.v.* i).

iii. A vessel, often in the shape of a dove (at Durham, a pelican), in which the Blessed Sacrament was formerly ordinarily reserved

JOHN DOE, JOHN DOE, SR.,    :   IN THE UNITED STATES DISTRICT
and JANE DOE,
          Plaintiffs    :   FOR THE MIDDLE DISTRICT OF PA


        VS          :


FATHER ERIC ENSEY, FATHER   :   CIVIL ACTION - LAW
CARLOS URRUTIGOITY, DIOCESE
OF SCRANTON, BISHOP C.      :
TIMLIN, THE SOCIETY OF ST.
JOHN, THE PRIESTLY          :
FRATERNITY OF ST. PETER,
and ST. GREGORY'S ACADEMY,  :

        Defendants   :   No.  2000-CIVIL-2961


: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :


      TRANSCRIPT OF DEPOSITION of STEPHEN FITZPATRICK, as

taken on behalf of the PLAINTIFFS, pursuant to notice,

before Gloria Anzalone, a certified shorthand reporter in

and for the County of Lackawanna, Commonwealth of

Pennsylvania, at The Video-Conferencing Facility at

Marywood University, 2300 Adams Avenue, Scranton, PA

18503, on the 10th day of November, 2003, commencing at

1:17 p.m. and concluding at 1:53 a.m., of said day.


ORIGINAL


EXHIBIT
I

1   discovery depositions, I think all of us in the

2   room understands that you're intending to use

3   them as trial depositions, and I think that

4   puts us at a great disadvantage.  But with that

5   objection on the record, I'm going to object

6   because I don't think your offer of proof is

7   sufficient.  I don't know if anybody else has

8   any objections.

9           MR. LEESON:  This is Joe Leeson

10   speaking, counsel for the Priestly Fraternity

11   of Saint Peter and Saint Gregory's Academy.  We

12   join in those objections.  We have no

13   additional objections to assert at this time.

14           MR. BENDELL:  James?

15           MR. O'BRIEN:  Yes, we would join in

16   the objection with regard to what we would see

17   as a violation of 30(b)7.  That's all I have.

18

19           STEPHEN FITZPATRICK, called as a witness,

20   having been first duly sworn, was examined and

21   testified as follows:

22                      EXAMINATION

23   BY MR. BENDELL:

24       Q       Good morning, Mr. Fitzpatrick.  Could you

25   tell me where you reside at the present time?

6

1    A        My home is in Ottawa, Canada, but right now

2    I'm going to school in Santa Paula.

3    Q        And that's at Thomas Aquinas College?

4    A        That's correct.

5    Q        What year are you in?

6    A        I'm a senior.

7    Q        And did you at one time attend Saint

8    Gregory's Academy?

9    A        I did.

10   Q        Was that from 1996 to 2000?

11   A        It was.

12   Q        Would you please look at Exhibit 1 for a

13   moment and tell us if you recognize that document.

14   A        I do.

15   Q        Is this a copy of a letter you sent to

16   Bishop Timlin in February of 2002?

17   A        I sent it to Bishop Timlin.  I'm not sure

18   if that's the date, I don't remember.

19   Q        Well at the top of it it says, it indicates

20   it's from, a Fax from Thomas Aquinas College, and it says

21   2/10, 2002, do you see that?

22   A        I do.

23   Q        Do you remember if you Faxed it to the

24   Bishop or mailed it to him?

25   A        I do not remember.

7

1      man I know.  Unquote.  Is that your opinion today?

2            A       Sir, could you repeat that.

3            Q       Okay, I'm quoting from your letter.  Quote,

4      I can say with complete confidence that Father Urrutigoity

5      is the holiest man I know.  Unquote.  Is that still your

6      opinion today?

7            A       Yes.

8            Q       On the same paragraph further down it says,

9      quote, I have been to the Society of Saint John's property

10     numerous times.  And then it goes onto say you know of

11     no -- And I know absolutely that no immoral actions of any

12     sort have ever taken place there between Father

13     Urrutigoity and anybody.  Unquote.  Do you see that?

14           A       I do.

15           Q       How many times were you at the Society of

16     Saint John's property?

17           A       I don't know.  I mean I can't give you a

18     number.

19           Q       Well, are you referring there to the

20     Shohola property?

21           A       Yes.

22           Q       Now I guess a few inches under there is the

23     following sentence.  Quote, I, myself, slept in the same

24     bed with Father Urrutigoity on one occasion.  Unquote.  Is

25     that a true statement?

9

under which you were in the same bed with Father

Urrutigoity?

      A     Sure.  There were a number of us staying --

we had spent the day in New York City and there were a

number of us staying at this boy's house.  And it wasn't,

as far as I recall, it wasn't a very large house and there

was a large double bed in one of the bedrooms and myself

and Father Urrutigoity and another boy spent the night in

the bed.

      Q     Who was the other boy?

      A     I don't recall.

      Q     Now you say some of us were on a trip to

New York, who is us?  Who are the other folks on this trip

to New York?

      A     It was my class from Saint Gregory's.

      Q     All of them?

      A     Yes.

      Q     Now do you remember if it was during the

academic year or during the summer?

      A     It was during the academic year.

      Q     Do you remember what the purpose of the

trip was?

      A     We visited the Metropolitan Museum of Art.

      Q     So that was the purpose of the trip, to go

to the art museum?

JOHN DOE, JOHN DOE, SR.,     :IN THE UNITED STATES DISTRICT
and JANE DOE,                 FOR THE MIDDLE DISTRICT OF PA
        Plaintiffs,

              VS

FATHER ERIC ENSEY, FATHER
CARLOS URRUTIGOITY, DIOCESE
OF SCRANTON, BISHOP C.
TIMLIN, THE SOCIETY OF ST.
JOHN, THE PRIESTLY FRATERNITY
OF ST. PETER, and ST.
GREGORY'S ADADEMY,
        Defendants.    :NO. 2000 CIVIL 2961

              TRANSCRIPT OF DEPOSITION of
FATHER CARLOS URRUTIGOITY, a witness of lawful age, taken
on behalf of the plaintiffs in the above-entitled cause,
wherein John Doe, et al, are the plaintiffs and Father
Eric Ensey, et al, are the defendants, pending in the
District Court of the United States for the Middle
District of Pennsylvania, pursuant to notice, before Neil
A. Helfant, a notary public in and for the County of
Lackawanna, at the business offices of the Lackawanna
County Bar Association, 338 North Washington Avenue,
Scranton, Pennsylvania and the law offices of Harry
Coleman, Esquire, 148 Adams Avenue, Scranton,
Pennsylvania, on the 2nd day of May, 2003, commencing and
concluding at 9:04 a.m. to 12:00 p.m. and 1:38 p.m. to
2:22 p.m., respectively, of said day.

        NEIL A. HELFANT REPORTING SERVICE - 570-586-0346

---

S T I P U L A T I O N

        It is hereby stipulated by and between counsel for
the respective parties that sealing, certification, and
filing are waived.

        It is further stipulated by and between counsel for
the respective parties that all objections, except to the
form of the questions, are reserved to the time of trial.

              I N D E X
              W I T N E S S E S
Examination of Father Urrutigoity by Mr. Bendell....P.  3
              E X H I B I T S
Father Urrutigoity Exhibit No. 1, a declaration,
marked for identification........................P. 153
Father Urrutigoity Exhibit No. 3, an affidavit,
marked for identification........................P. 156
Father Urrutigoity Exhibit No. 4, an affidavit,
marked for identification........................P. 158
Father Urrutigoity Exhibit No. 5, an affidavit,
marked for identification........................P. 161
Father Urrutigoity Exhibit No. 6, an affidavit,
marked for identification........................P. 166
Father Urrutigoity Exhibit No. 7, a letter,
marked for identification........................P. 167

2

---

A P P E A R A N C E S:

FOR THE PLAINTIFFS:          JAMES BENDELL, ESQUIRE

                             HARRY COLEMAN, ESQUIRE

FOR DEFTS. ENSEY/
URRUTIGOITY/ST. JOHN:        SAL COGNETTI, ESQUIRE

FOR DEFTS. DIOCESE OF
SCRANTON/BISHOP TIMLIN:      JOSEPH O'BRIEN, ESQUIRE

                             JAMES O'BRIEN, ESQUIRE

FOR DEFTS. FRATERNITY OF ST.
PETER/ST. GREGORY'S ACADEMY: JOSEPH LEESON, ESQUIRE

                             JOSEPH GAUGHAN, ESQUIRE



EXHIBIT
J

---

1     F A T H E R    C A R L O S    U R R U T I G O I T Y,
2         702 Route 434, Shohola, Pennsylvania, a witness
3         called by the plaintiffs, being first duly sworn,
4         was examined and testified as follows:
5     EXAMINATION BY MR. BENDELL:
6         Q     Father Urrutigoity, you were here yesterday
7     during Father Ensey's deposition.
8         A     Uh-huh.
9         Q     You have to say the word.
10        A     Yes.
11        Q     You heard the introductory language I gave
12    about what a deposition is, that it's under oath, and that
13    if there's any differences between your testimony now and
14    a trial, the jury can be shown that.
15        Do you understand that?
16        A     Yes.  Yes.
17        Q     Just do the best you can.  We don't want you
18    to guess.  Just tell us what you know.  You have to give
19    verbal answers.  If you say, "Uh-huh," he doesn't know
20    whether that's a "Yes" or a "No."
21        A     Yes.  Sorry.
22        Q     State your full name?
23        A     Carlos Roberto Urrutigoity.
24        Q     Have you ever been known by any other name?
25        A     No.

Q    What is your date of birth?

A    December the 15th, 1963.

Q    Where were you born?

A    Mendoza, Argentina.

Q    Are your parents living?

A    Yes.

Q    What are their names, and where do they live?

A    Well, my dad is Roberto Urrutigoity, and my mom Hortensia del Carmen Pidhod de Urrutigoity.

Q    Where do they live?

A    Mendoza.

Q    Do you have any siblings?

A    Yes, two brothers and two sisters.

Q    Tell us the names of your brothers, and where they live?

A    My oldest sister, Maria Ines Bistue.  She lives in Mendoza.  My oldest brother, Javier Urrutigoity.  He lives in Mendoza.  My younger brother, Diego Urrutigoity.  He lives in Mardelplata.  My youngest sister, Anna Maria Disso, and she lives in Buenos Aires.

Q    What is your Social Security number?

A    469-33-- Let me check to make sure it's right. --7126.

Q    Could you please describe your education beginning with grade school?

4

---

A    I went to Catholic elementary school, Claretian Elementary School.

Q    In Mendoza?

A    In Mendoza, yes.  Correct.  Then went to high school like a prep high school called Colegio University.  That was my--the high school I went to.  Then I did a year of architecture college, and three months, or six months of law school.

Q    How about your seminary training, also?

A    Then I went to the Seminary of Lareja, Buenos Aires.  Then to--I did my theology in Winona, Minnesota.  And that was it.

Q    Have you had any post-seminary studies, any training?

A    No.

Q    Now, at the seminary on Lareja, were you ever--were any charges ever made against you regarding sexual misconduct?

A    Not at Lareja.

Q    How about any place in Argentina?

A    No.

Q    Now, when I'm talking about "sexual misconduct," not only while you were there, but even after you left, did anybody--

A    Yes.  After I went to Winona, --

5

---

Q    Okay.

A    --the rector of the seminary in Lareja, who had left the seminary and have left the Society of St. Pius the Tenth, they wrote afterwards alleging that they--that they have been some misconduct on my part.

Q    Who was it that actually wrote?

A    I believe the former rector.

Q    He is?

A    Father, first name, Andres Morello.

Q    Who did he write that to, that letter?

A    The rector of Winona and the Superior General Office, The Society of St. Pius the Tenth.

Q    What type of sexual misconduct was alleged in that letter?

A    He said that we had a--I had a kind of a homosexual relationship with another seminarian, at that time, who is now a priest, and that--that it--that was like--you know, they said that it was improper or something like that.

Q    Was that allegation true?

A    No, completely false.

Q    Do you have an opinion as to why they would make a false allegation like that?

A    Yes.  I think they were trying to get back to us, because there was a kind of conflict at the seminary,

6

---

and because of some theological standing that they were having on some, you know, internal stuff at the seminary.  And they got-- When they were presented to the Superior General, they got dismissed.  They left The Society very unhappy, and then I think they kind of retaliated that way with that kind of accusation.

Q    Now, was there anybody else that they wrote letters about that were like this, allegations of false mis--false allegations of misconduct?

A    That they wrote to me?

Q    That they wrote about.  I mean, they wrote a letter to Winona, saying that you had done something, which you hadn't done?

A    Correct.

Q    Did they do that to anybody else, do you know?

A    I guess this other priest, this other--

Q    What's his name?

A    Father Dernardo Terrera.

Q    Where is he, now?

A    He's right now in France.

Q    Do you know what city in France?

A    Lyons.

Q    Is he affiliated with any particular religious order?

7

A   He is a member of our community and--

Q   Society of St. John?

A   But he's working for The Fraternity of St. Peter in the parish of The Fraternity of St. Peter.

Q   When did he become affiliated with The Society of St. John?

A   When he left The Society of St. Pius the Tenth and that was, I would say,-- I'm not sure exactly, you know. But I would say, maybe, March or around March, 1998, I believe, but I'm--I--I have to confirm that.

Q   The Society of St. John, when was it founded?

A   The Society was founded officially on May of 1998. But we were already, you know, kind of gathered as a group under the supervision of The Fraternity of St. Peter.

Q   Now, this Father Bernardo, did he have to make application to get into The Society of St. John? Was there a formal process?

A   No; because we know--we know--we knew him from before. It's like, you know, getting jobs. You--You go through application processes when you don't know the--the people involved. But most people in The Fraternity of St. Peter were members of The Society of St. Pius the Tenth and, hence, we kind of knew each other very well, so there was no need to do that kind of process.

8

Q   How about the persons who applied to join The Society who are not affiliated with either F.S.S.P. or S.S.P.X., do you do any type of investigation?

A   Yes. Correct.

Q   Could you describe that?

A   Yes. The-- Well, you go through a series of interviews, they have to also come for a visit to our houses, kind of meet with every member of the community, and, you know, get to have that input from the--our own members. Then if they have been in any other religious community or seminary before, you are asked to contact their Superiors, confidentially, and to see whether there is any kind of problem, or objection to them joining from their former Superiors to join our seminary or our community. Then if there is a need for, say, medical status or any further investigation of specialists, that has to take place. And then you get letters of recommendations from their pastor, one family member, a friend, and I believe like a co-worker, you know, in the environment of either fellow student or a co-worker, something like that.

And let me see if there's any other requirements. Then they are canonical requirements, you know, like they couldn't have been baptized very recently and so forth and so forth. They could not have been baptized too recently.

9

1   They have to have, at least, a year or two years, I
2   believe, span, you know, between their baptism and
3   entering, you know, a--a--a community. And I believe
4   that's--that's about--that's about it.

5   Q   Do you request a psychological evaluation
6   before you accept them?

7   A   We used not to, but--not necessarily. Now,
8   we do.

9   Q   When did this practice start?

10   A   I believe it started in August or--or
11   September of 2001, I believe.

12   Q   Why did that practice begin?

13   A   Because, you know, of all this crisis in the
14   Church and so forth, we thought that it was better to just
15   have that in--you know, as a record, to make sure that,
16   you know, there is also that element of evaluation of
17   somebody's personality and so forth.

18   Q   Did Bishop Timlin request that practice to
19   begin?

20   A   No. That's, you know, our internal--that's
21   our internal policy, so the Diocese does not, you know,
22   intervene on that.

23   Q   So from the day The Society of St. John was
24   founded until today, Bishop Timlin himself has never
25   requested that you do psychological evaluations of

10

1   candidates?

2   A   No. I think he just recommended that, but
3   never asked--you know, gave us a formal order to do that,
4   no.

5   Q   When did he recommend that?

6   A   I think casually several opportunities. You
7   know, that's what they do. That's a system they have in
8   the Diocese for seminary and so forth, so--.

9   Q   Was it recommended in writing or just
10   verbally?

11   A   No, verbally, verbally.

12   You know, like, "This is what we do."

13   And the Diocese has also--that's kind of an
14   engagement or--towards our own members to our
15   responsibility. If we present those members into orders,
16   then those things are required by the Diocese to take
17   place, anyhow. So that's why, you know, there is no need
18   for the Diocese to regulate so closely what we do.

19   Q   So once a priest has been in a Society--once
20   a candidate has been in The Society of St. John for
21   several years in training, when you then--when it becomes
22   time for him to be ordained, then the Diocese of Scranton
23   puts in him through their screening process?

24   A   Correct.

25   MR. JOSEPH O'BRIEN:   I object to the

11

**Page 44**

```
        A    No; because they were not going to our place, I
think.

             MR. COGNETTI:  Just to clear, when you
        say, "students," you're defining that as the
        then--

             THE WITNESS:  Present.
             MR. COGNETTI:  --students,--
             MR. BENDELL:  Then present students,
        that's right.

             THE WITNESS:  Yes.
             MR. COGNETTI:  --not graduate
        students?

             MR. BENDELL:  Not graduate students,
        no.
        A    As far as I recall, no.
        Q    Did you know a student named Conal Tanner?
        A    I knew him as a student as a--and as a dorm
later on, yes.
        Q    Did he ever sleep in the same bed with you?
        A    No.
        Q    Did he ever sleep on the floor next to you?
        A    I think so, once.
        Q    What circumstance was that?
        A    I cannot recall, exactly.  I don't recall
that.

                           44
```

**Page 45**

```
        Do you know a student named Daniel Kerr?  I
mentioned him before.
        Yes.  Yes.
        Did he ever sleep in the same room with you?
        Well, yes, when--when we--
        That one incident you couldn't--
        --the night.
        That was the only time?
        Yes.  As far as I remember, yes.
        Did you ever sleep in the same bed with
Jeffrey?
        I don't think so, no.
        Did you ever sleep on the floor next to him?
        No.
        Did you know a student named Sean
Kerr?
        Yes.
        Did you ever sleep in the same bed with him?
        No.
        Did you ever sleep on the floor with him?
        No.
        Do you know a student named Michale Detar?
        Yes.
        Did you ever sleep in the same room with

                           45
```

**Page 46**

```
 1    A    No.
 2    Q    --or on the floor,--
 3    A    No.
 4    Q    --or in bed?
 5    A    No.
 6    Q    Did you ever spend a lot of time visiting
 7 with Michael Detar?
 8    A    Not really, because he wasn't my spiritual
 9 director person.  I mean, we--we talked to him,
10 occasionally, but he--he wasn't my spiritual director, so
11 I didn't spend that much time talking to him.
12    Q    Now, you heard Father Ensey's testimony
13 yesterday where he said that he had--he made some sort of
14 consecration ritual to the Blessed Mother in conjunction
15 with Michael Prorock.
16         You heard that testimony?
17    A    Yes.  Yes.
18    Q    Do you know if he ever did that procedure
19 with anybody else?
20    A    No, I don't know what he did.
21    Q    Have you ever seen the liturgy that he wrote
22 out for that?
23    A    No.
24    Q    Is that a practice that you're familiar with,
25 that is, not simply consecration of the Blessed Mother,

                           46
```

**Page 47**

```
 1 but in conjunction with another male?
 2    A    That he would do-- Yes, that has always been
 3 historical case.  In other words, you have thousands of
 4 people consecrating themselves to Our Lady, yes,
 5 definitely.
 6    Q    I'm talking about where you have two men,
 7 just two, and there's actually a written out liturgy where
 8 their names are part of the consecration words that are
 9 spoken.
10         Are you familiar with that?
11    A    No, I never heard of that.  I mean, as a
12 special right of consecration?  No.  I mean, I presume
13 that, you know, you use St. Louis Marie Grignond de
14 Montfort.
15    Q    Now,--
16    A    You usually, you know, write down that, and
17 you put whatever names are consecrated.
18    Q    I haven't read all of St. Louis de Montfort's
19 work.  But I don't think I've ever read that he endorses
20 some procedure where two males do a consecration united to
21 the Bless Mother.
22    A    He encourages everybody to consecrate to Our
23 Lady, correct.
24    Q    But, I mean, two together, in a specific
25 ceremony for those two.

                           47
```

Q     Sure.

(Recess taken.)

(In open hearing.)

Q     Do you know Matthew Sellinger?

A     Yes.

Q     How do you know him?

A     He was a seminarian at--at Winona, Minnesota.

Q     Now, do you know that Matthew Sellinger, at some point, made an allegation that you committed or attempted to commit a sexual impropriety with him?

A     Yes, I think that he accused me that I tried to touch him in his private parts.

Q     Is that allegation true?

A     No.

Q     When was the first time that you heard that allegation?

A     From Matthew, a few days after the incident, you know, he claimed took place.

Q     He said it to your face?

A     Yes.

Q     What did you say in response?

A     That that was not the case.

Q     Do you remember, roughly, what his words were when he made this accusation?

A     That I have tried to touch him in his private

36

1     sleeping in the same bed with a student, or a novice was a
2     way of spiritual direction?
3          A     No.
4          Q     You don't believe that to be the case?
5          A     No.
6          Q     Do you know an Aaron Maderford?
7          A     Yes, I know him.
8          He was a seminarian at Winona, is that right?
9          A     Yes.
10         Q     Did you ever inappropriately touch him in a
11    sexual way?
12         A     No.
13         Q     Do you know whether not Mr. Maderford told
14    Sellinger that you had molested him?
15         A     Never heard that before.
16         Q     As far as you know, did any of the seminary
17    candidates at The Society of Pius the Tenth sleep with
18    other candidates or with instructors?
19         A     No.
20         Q     Do you know Dorm Father Fred Frazier?
21         A     Yes.
22         Q     Did you ever sleep in the same bed with Mr.
23    Frazier?
24         A     Yes.
25         Q     Okay.

38

parts.

Q     And you tried to explain the fact that it did not happen?

A     I didn't have to explain the fact, you know, it.

Q     You just said, "It did not happen"?

A     There was-- There was-- There was no fact, you know.

Q     What I'm trying to get at is, was there something he could have confused with that, something innocent that happened that he thought was an inappropriate attempt?

A     I didn't ask him that question.

Q     So you never inappropriately touched him,--

A     No.

Q     --or you never tried to inappropriately touch him?

A     No.

Q     Did you sleep in the same bed ever with Matthew Sellinger?

A     No, I don't think so.

Q     Did you sleep in the same bed with any man while you were at Winona?

A     No, we have everybody their own rooms.

Q     Did you ever, at any time, state that

37

1          A     And--
2          Q     Tell me the circumstances.
3          A     Well, we were talk-- I think he was waiting
4     for me one night when I was busy with something else.  And
5     I think he was waiting for me.  He fell asleep on my bed,
6     then I came in, we sat down and began talking, and then I
7     fell asleep, and I guess he kept talking, and then he fell
8     asleep.  And that's the way it happened.
9          Q     How many times did you sleep in the same bed
10    with him?
11         A     I think that one episode that I can remember.
12         Q     Forgive me.  I may have fouled up my
13    questioning.
14         But I thought I had asked you first whether you
15    ever slept in the same bed with any male at Shohola and
16    you said, "No," but that you had slept on the floor?
17         A     Yes.
18         Q     Let me go back and ask the same question
19    again.
20         Other then Fred Frazier, did you sleep in the same
21    bed with any other male while you were with The Society of
22    St. John, either at Shohola, St. Gregory's Academy, or at
23    some other location?
24         A     Not that I can recall at this point, no.
25         Q     So Fred Frazier would be the only one?

39

you're saying, "student." Then you're going
to events when they were no longer students.
It's confusing,--

    MR. BENDELL:  Sure.

    MR. COGNETTI:  --because it reads
like, "They were students at the time." You
asked him about a student, and then--

    MR. BENDELL:  Sure.

    MR. COGNETTI:  --he gave a time when
he was no longer a student, and he came back,
so I just want that clarified.

    MR. BENDELL:  That's fine.

    A    Yes.  Yes.  Everything that happened at
property is with college students, because they
already graduated from--.

    Q    So you're telling me that no St. Gregory's
students slept on the floor in your room while you
the Shohola property?

    A    Not that I can recall.  Unless, you know,
would some St. Gregory's students that would come
their parents, you know, because the the school
to keep clear, you know, not--not to have a
of spiritual direction there.

So once a school--once the Fraternity took over the
again, they wanted to make sure that, you

60

---

they were responsible for their own formation of
students.  So they made this law that--or this
they shouldn't be going over to our property.

    Let me ask you, first.  You never slept on
with any parents, did you?

    Hold on a second.  Let me think about it.  I
so.  But I--I--I don't remember, exactly.  I
don't think so, because, usually, you would
You know, your priority would be to treat the
people better, so we would give them beds and then
know,-- So I don't think so.  But it might have
You know, there was a lot of people, that
might be some parents, you know, sleeping in the
with us.

    MR. COGNETTI:  Ask him if he had a bed
at Shohola.

    MR. BENDELL:  I'll get to that.

    You had a mattress on the floor, didn't you?

    Not all the time.  I mean, I think I have
sometimes like a pad, or sometimes like a little
like a mattress for awhile like a little
cotton thing, you know, something like that.

    Then these males who slept next to you, if
so bed, then it would be a same as sleeping in the
you, wouldn't it?

61

---

1    A    No.

2        MR. COGNETTI:  Object to the form of

3    the question.

4    A    They are next to you.  There's so much of a

5  width, you know, those things are, you know.

6    Q    Let me see if I understand what you're

7  saying.  There's no instance when you slept in the same

8  bed with any past or future student of St. Gregory's

9  Academy, with the exception of Mr. Culley.

10    Is that what you testified to?

11    A    Can you repeat the question, again?

12    Q    There was only one student you actually slept

13  in a bed with-- When I say, "student," it means past or

14  future student. --you slept in your bed with, and that was

15  somebody--

16        MR. COGNETTI:  I object to form of the

17    question, because that's totally confusing as

18    to who it's going to be.  Use a name, because

19    the "student"--

20        MR. BENDELL:  I don't recall the name.

21    I think--

22        MR. COLEMAN:  It was Fred Frazier.

23    Q    Let me tell you this.  It was somebody who

24  fell asleep.  You fell asleep--

25        MR. COLEMAN:  Fred Frazier.

62

---

1        MR. BENDELL:  I want to make sure I

2    get it from him.

3    Q    Other than him, there's not one other student

4  of St. Gregory's Academy, past or future, who you slept in

5  the same bed with while you were at Shohola?

6    A    I think I getting confused, again.  You asked

7  me-- Fred Frazier was at St. Gregory's.  He was a dorm

8  father.

9    Q    Okay.

10    A    And so I don't know what-- Will you restate

11  your question, again?

12    Q    How long was he as a dorm father?

13    A    Twenty.  Twenty-one.  I don't even know.

14    Q    So then to further clarify, there's not any

15  student who was under the age of 18 from St. Gregory's

16  Academy that you slept in the same bed with, not one?

17    A    You mean, in St. Gregory's or in Shohola?

18    Q    Either.

19    A    No.

20    Q    Okay

21    A    Not I can recall, no.

22    Q    There were some individuals who you slept in

23  the same floor--on the floor with?

24    A    Correct.

25    Q    My question is, were any of those under the

63

go off.  You know, there was a problem with the alarm
system, so they would be coming there.  That's all.

Q     But you never saw police?

A     Well, there were police outside, too, yes.
Sometimes, the fire department comes with the police.  I
don't know that.  I-- I saw the fire department come
several times, you know, because these alarms would go
on--off.  And if you didn't call immediately the fire
department, then they--they would take that as a serious
threat, so they would come out, try to assist.  That was
the only time I saw them.

Q     You're not aware of any instances where the
police were summoned, or any law enforcement were summoned
because of alleged alcohol--

A     No.

Q     --consumption?

A     No.

Q     To your knowledge, did any law enforcement
official give any type of warning to The Society about
minors drinking there?

A     Absolutely not.

Q     I believe, at some point, Allen Hicks or
Howard Clark may have alleged that one or more Society
priest may have attempted to spike the punch at a party.

Do you remember that was discussed yesterday?

120

---

A     Correct.

Q     Is that true?

A     Well, that's what I said, that we had put a
bottle of champagne--.

Q     That's the champagne?

A     Correct.

Q     That's the only time?

A     Yes.

And they said, "Yes, you shouldn't have done this,
because it's against school rules," and then we stopped
doing it.

Q     Did you ever provide tobacco, of any form, to
students at St. Gregory's Academy?

A     No, I don't smoke.

Q     Did you ever go on camping trips with
students at St. Gregory's Academy?

A     Yes.

Q     Did you ever provide tobacco to them on those
trips?

A     No.

Q     Did you ever allow the boys to smoke on those
trips?

A     If they would do it, I would-- You know, it's
not role to be disciplinarian, you know.  I am not a dorm
father or a disciplinarian, so I--I--

121

---

1     You know, I--I would usually say, "Listen, you guys
2   should not do this because this is not according to your
3   rules," you know, "you shouldn't be doing that."
4         It's not my role to discipline them.  That was
5   wasn't in my--my authority.
6     Q     So you never gave cigars,--
7     A     No.  No.
8     Q     --for example, to any student--St. Gregory's
9   student?
10    A     No.
11    Q     Never?
12    A     Never.
13    Q     You never cigarettes to any St. Gregory's
14  students?
15    A     No.  No.
16    Q     You never gave any alcohol to any St.
17  Gregory's student?
18    A     Besides those occasions which I mentioned?
19    Q     Right.
20    A     Correct.
21    Q     Did you ever go on a camping trip with St.
22  Gregory's students?
23    A     I said, "Yes."
24    Q     Just once?
25    A     Just once.

122

---

1     Q     Was any alcohol consumed at that camping trip
2   by anybody?
3     A     Not that I know, no.
4     Q     Not by you?
5     A     No.
6     Q     Not by any students?
7     A     No.
8         MR. COGNETTI:  That he knows.
9     A     That I-- That I know, yes.  I mean, I can't
10  answer for what I don't know, you know.
11    Q     Who was the first person that introduced you
12  to Bishop Timlin?
13    A     Actually, we asked directly for a meeting
14  with him.  But people in our-- We knew The Fraternity was
15  here and, you know, other communities were here.  And he
16  was a very, you know, very welcoming Bishop, so that was a
17  general, you know, reason why we requested directly a--a
18  meeting with him, you know.
19    Q     Did you encourage any St. Gregory's students
20  to sit on your knee?
21    A     No.
22    Q     Did any Society priest do that, to your
23  knowledge?
24    A     No.
25    Q     Did you ever see any St. Gregory student on

123

111003McLau.txt

JOHN DOE, JOHN DOE, SR.,  :  IN THE UNITED STATES DISTRICT
and JANE DOE,
            Plaintiffs    :  FOR THE MIDDLE DISTRICT OF PA

            VS            :

FATHER ERIC ENSEY, FATHER :  CIVIL ACTION - LAW
CARLOS URRUTIGOITY, DIOCESE
OF SCRANTON, BISHOP C.     :
TIMLIN, THE SOCIETY OF ST.
JOHN, THE PRIESTLY         :
FRATERNITY OF ST. PETER,
and ST. GREGORY'S ACADEMY, :

            Defendants    :  No.  2000-CIVIL-2961


::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::


            TRANSCRIPT OF DEPOSITION of PATRICK

MCLAUGHLIN, as taken on behalf of the PLAINTIFFS, pursuant

to notice, before Gloria Anzalone, a certified shorthand

reporter in and for the County of Lackawanna, Commonwealth

of Pennsylvania, at The Video-Conferencing Facility at

Marywood University, 2300 Adams Avenue, Scranton, PA

18503, on the 10th day of November, 2003, commencing at

1:54 p.m. and concluding at 2:14 a.m., of said day.



A P P E A R A N C E S:

    FOR THE PLAINTIFFS:    JAMES BENDELL, ESQUIRE

    FOR DEFENDANTS ENSEY:  SAL COGNETTI, ESQUIRE
    AND URRUTIGOITY/
    SOCIETY OF ST. JOHN

    FOR DEFENDANTS:        JAMES O'BRIEN, ESQUIRE
    DIOCESE OF SCRANTON/
    BISHOP TIMLIN
                        Page 1



EXHIBIT

K

111003McLau.txt

```
21        because you noticed it as such.  I want to
22        know what your offer of proof is and what
23        that offer is based on.
24              MR. BENDELL:  I've been informed
25        secondhand --
```

5

```
 1              MR. COGNETTI:  By whom?
 2              MR. BENDELL:  By Mr. Bond and by a
 3        woman by the name of, her E-mail name is
 4        Dogmamom, D-O-G-M-A, mom, one word.  I
 5        think her first name is Vicky, that this
 6        witness knows, not that he's going to
 7        testify that the priests committed immoral
 8        acts but that he knows that the priests
 9        slept with boys at Saint Gregory's Academy.
10        That's my offer of proof even though I
11        don't have to make one.
12              MR. COGNETTI:  I think you do.
13              MR. BENDELL:  So what we're going
14        to do now is the objections have been made
15        for the record and the court reporter needs
16        to swear in the witness.
17
18        PATRICK MCLAUGHLIN, called as a witness,
19    having been first duly sworn, was examined and
20    testified as follows:
21                        EXAMINATION
22    BY MR. BENDELL:
23        Q     Mr. McLaughlin, did you at one point
```
Page 5

111003McLau.txt

1              get to those but once he answers the first

2              question then I'm going to go on one, two,

3              three, four, five.

4     BY MR. BENDELL:

5          Q     Mr. McLaughlin, what part of my

6     question don't you understand about sleeping in a

7     bed?

8          A     The, in the bed, part.

9          Q     What part of that is not clear?

10         A     Does with simply mean in the bed or in

11    the room or?

12         Q     In the bed, actually in the bed.

13         A     To the best of my knowledge I think I

14    have witnessed maybe one instance, but that's it.

15         Q     And when was that?

16         A     I can't recall when it was.

17         Q     Well, was it while you were a student

18    at Saint Gregory's Academy?

19         A     Yes.

20         Q     Where did this sleeping incident occur?

21         A     In the bedroom of one of the priests.

22         Q     And was that at the Shohola property?

23         A     No.

24         Q     Where was it, at Saint Gregory's

25    Academy building?

                          9


1          A     Yes.

2          Q     And who was the priest?

3          A     Father Urrutigoity.

                       Page 8

111003McLau.txt

```
16              MR. COGNETTI:  I object.  It calls
17          for speculation and he's here to tell the
18          truth of what he knows.
19   BY MR. BENDELL:
20          Q    Mr. McLaughlin, I'm already going to
21   move for an order to get Mr. Fitzpatrick back because
22   he wouldn't answer some questions.  Now if you won't
23   answer the question, I will ask for an order.
24              MR. COGNETTI:  He answered the
25          question.
```

                                14


```
1               MR. BENDELL:  I don't think he has.
2               MR. COGNETTI:  Well, that's your
3           opinion, he has answered the question.
4               MR. BENDELL:  Counsel stated the
5           objection; let's move on.
6    BY MR. BENDELL:
7           Q    Do you have any idea of who it was in
8    the bed with Father Urrutigoity?
9               MR. LEESON:  I object, you are now
10          badgering the witness.  The witness has
11          already answered the question he doesn't
12          know.
13              MR. BENDELL:  He can't talk,
14          everybody is talking instead of him.
15   BY MR. BENDELL:
16          Q    Mr. McLaughlin, do you have any idea
17   who was in the bed with Father Urrutigoity?
18          A    Yes, I have an idea.
```
                            Page 13

111003McLau.txt

19    Q    Who was it do you think to the best of
20   your knowledge?
21    A    I feel I've already answered the
22   question.  I don't recall.
23    Q    You don't recall for sure but you just
24   told me you have an idea of who it was.
25    A    That's right.

                              15


1    Q    And who was it?
2    A    I think it may have been Nicholas
3   Sauve.
4                MR. BENDELL:  No further questions.
5                     EXAMINATION
6   BY MR. COGNETTI:
7    Q    Did you know Father Urrutigoity well --
8   by the way, my name is Sal Cognetti and I'm an
9   attorney for Father Urrutigoity and Father Ensey.  If
10   the camera could flash back.  I don't know if you
11   remember Father Ensey, he's up in the back there.
12    A    Yes, I do remember him.
13    Q    Do you think Father Urrutigoity or
14   Father Ensey are homosexuals?
15    A    No.
16    Q    Did they ever make any sexual advances
17   at you?
18    A    No.
19    Q    Do you know anyone who they ever made
20   any sexual advances at?
21    A    No.

                         Page 14

```
JOHN DOE, JOHN DOE, SR.,      :IN THE UNITED STATES DISTRICT
and JANE DOE,                  FOR THE MIDDLE DISTRICT OF PA
            Plaintiffs,

        VS

FATHER ERIC ENSEY, FATHER
CARLOS URRUTIGOITY, DIOCESE
OF SCRANTON, BISHOP C.
TIMLIN, THE SOCIETY OF ST.
JOHN, THE PRIESTLY FRATERNITY
OF ST. PETER, and ST.
GREGORY'S ADADEMY,
            Defendants.    :NO. 2000 CIVIL 2961
```

TRANSCRIPT OF VIDEOTAPE

DEPOSITION of CONAL TANNER, a witness of lawful age, taken

on behalf of the plaintiffs in the above-entitled cause,

wherein John Doe, et al, are the plaintiffs and Father

Eric Ensey, et al, are the defendants, pending in the

District Court of the United States for the Middle

District of Pennsylvania, pursuant to notice, before Neil

A. Helfant, a notary public in and for the County of

Lackawanna, at the business offices of the Lackawanna

County Bar Association, 338 North Washington Avenue,

Scranton, Pennsylvania, on the 21st day of August, 2003,

commencing at 12:20 p.m. and concluding at 1:46 p.m., of

said day.

> **EXHIBIT**
>
> tabbies
>
> |___

NEIL A. HELFANT REPORTING SERVICE - 570-586-0346

COPY

THE VIDEO TECHNICIAN:   You may begin the deposition, gentlemen.  Sorry.  The person being deposed is Mr. Conal Tanner.

Mr. Tanner, would you raise your right hand, please?

MR. TANNER:   (Hand raised.)

THE VIDEO TECHNICIAN:   Do you swear the testimony you're about to give is the truth, the whole truth, and nothing but the truth, so help you God?

MR. TANNER:   I do.

THE VIDEO TECHNICIAN:   You may begin the deposition, gentlemen.

C O N A L     G.     T A N N E R,     112 Gardenview Private, Ottawa, Ontario, Canada, a witness called by the plaintiffs, being duly sworn by the video technician, was examined and testified as follows:

EXAMINATION BY MR. BENDELL:

Q     Conal, would you please spell your name?

A     C-o-n-a-l, my middle name is Gallager, G-a-l-l-a-g-h-e-r, Tanner, T-a-n-n-e-r.

Q     And where did you live?

A     I'm-- My permanent residency is Ottawa, Canada.  I'm currently living right now as a student at Thomas Aquinas College in Santa Paula, California.

10

1        Q        And what are your plans for the future in

2    terms of career?

3        A        Well, actually, I've just finished my

4    freshman year, and I'm planning on leaving the school.

5    I'm going to do a bit of a road trip.  I'm going to stay

6    at a monastery for awhile in Oklahoma.  And my plan is

7    right now to hop on a plane in about 12 months and join

8    the Royal British Marines.

9        Q        Okay.  And you're a citizen of Canada?

10       A        I am.

11       Q        Okay.  Did you ever attend St. Gregory's

12   Academy?

13       A        I did.  From the fall of 1998 until the

14   spring of 2000.  At which point, I graduated.

15       Q        And after you graduated, did you ever act as

16   a dorm father?

17       A        Yes, I did.  The immediate-- The fo-- The

18   year immediately following my graduation, that is, the

19   academic year of 2002 and 2001, I acted as a dorm father,

20   and I was also teacher of grammar to the ninth and tenth

21   grade in the first semester.

22       Q        Did you know a Father Carlos Urrutigoity?

23       A        Yes, I did.  My junior year, which was my

24   first year there, he was my religion teacher.  And at that

25   point, he became my spiritual advisor for the next three

11

1  years, roughly.  And he lived in the building, so I got to

2  know him rather well, yes.

3       Q    Did you ever sleep in the same bed with

4  Father Urrutigoity?

5       A    Yes, I did.

6       Q    Would you please explain the circumstances

7  under which that occurred?

8       A    It was, I believe, June of 2000.  I had

9  accidentally left some of my luggage at St. Gregory's

10 Academy after I graduated.  A friend of mine was supposed

11 to pick it up and bring it back to Ottowa.  But one of my

12 boxes was unmarked, so it just got left there by accident.

13 I needed to go retrieve it.  And it's a long drive, about

14 a six-hour drive.

15      So I called Father Urrutigoity and asked if I could

16 spend the night at The Society of St. John, knowing that

17 they had two fully furnished houses, and most of their

18 members were still studying abroad in France.  I presumed

19 there would be plenty of room.

20      And he said that, yes, that would be no problem and

21 that I should drop by around whenever I get in.  I told

22 him I'd be in around 10:30 or 11:00 at night.

23      I arrived at 10:40 that evening.  And the lights in

24 the house-- It's called the Drummond House, the first

25 house you reach upon entering the property. --they were

                              12

1  totally out.  I proceeded up the stairs to Father

2  Urrutigoity's bedroom and office.  The office is the main

3  room and the bedroom is attached to it through a small

4  corridor.  I noticed that the light was out, because

5  there's a big enough crack at the bottom of the door to

6  see whether the lights are on or not.  And I presumed that

7  Father Urrutigoity would be working, as he usually is at

8  that late hour.  It was about, again, 10:40, 10:45.

9       I knocked on the door.  At which point, I heard a

10  "Hello" or "Come in."  At which point, I opened the door.

11  And on my left, where the--the desk and chairs and

12  computer all are, it was pitch black and no one was there.

13  So, again, I heard another, "Hello."  And then I heard it

14  was coming from my right.

15       So I looked down the corridor on the right to a

16  little alcove where Father Urrutigoity sleeps.  And there

17  he was, with his head over his feet, just past the corner

18  of the wall.

19       He said, "Oh, hello, Conal," or something to that

20  effect.

21       And at that point, I walked in his little alcove

22  where he was sleeping.  He-- I noticed he was just in his

23  pajamas like a T-shirt and-- At which point, we exchanged

24  some pleasantries about how my trip was and the drive.

        And about a minute or two of talking, I quickly

                              13

asked, "Oh, by the way, do you have a bed set up for me, or is there a couch I can crash on?"

And he said, "Oh, well, why don't you sleep right here?"

And he's in this little fold-out mattress in the corner of the room. And he moves over to my right, making a little room for me, very little room for me, between him and the wall.

And I said, "Okay."

At which point, I took off my shoes, and I took my keys out of my pocket, so as not to stab myself while sleeping. And-- But I didn't feel it was totally kosher, so I stayed fully clothed besides that. And I slept on top of all the blankets.

At this point, when I first lied down, Father Urrutigoity put his right arm around my shoulders, while I was lying down. But I felt pretty uneasy at that. And I was stiff as petrified wood at that point. And after about 30 seconds to a minute, Father U slowly removed his arm from being around me. We continued our conversation for another five minutes. I fell asleep mid-sentence and woke up the next morning in the exact same position I was in the night before. I hadn't moved an inch.

Q       Let me ask you this. What was the condition of your fly when you went to sleep?

14

you?

    A    Yes, he did.  He'd get-- He was my spiritual
advisor for three years like I said or should have said at
the beginning of this.  And so sometimes, we'd have
private meetings.  And he would try and sit down very
close normal.  Then he'd lean over his chair, and put his
hand right on your knee for long periods of time while he
was talking to you, even both hands sometimes like folded
like this on the person's knee.

    Q    Did Father Urrutigoity have a nickname for
you?

    A    My "favorite little Puritan."

    Q    Okay.  What does that mean?

    A    It means I didn't go in for everything.  It
means--

            MR. COGNETTI:   I object to this
        interpretation.

            THE VIDEO TECHNICIAN:   1:03.  Off the
        record.

            (Discussion continues off the video
        record and on the stenographic record.)

            MR. COGNETTI:   It's an interpretation
        of a word, unless he has some factual
        foundation for it.  It's maybe his personal
        interpretation of it and it's irrelevant.

                        54

MR. LEESON:   Yes, I join in the relevance.  Also, ask for another standing objection on the issue of this physical touching, physical abuse,--

MR. BENDELL:   Granted.

MR. LEESON:   --physician activity--

MR. BENDELL:   Agreed.

MR. LEESON:   --between boys and priests, between boys and boys and adults and adults.

(The testimony continues on the video record and on the stenographic record.)

THE VIDEO TECHNICIAN:   1:04.  Back on the video regard.

Q    Well, let me ask you this.  Did Father igoity ever lecture on the topic of Puritanism?

A    Yes.

Q    Were you present at those lectures?

A    Yes.

Q    What he did he say on the topic of tanism?

MR. COGNETTI:   When and when?

MR. BENDELL:   Yes.

Q    When was this?

A    Certainly, of course.  It was in class.

Father Urrutigoity was my junior religion teacher. And this is during my junior year, in the first semester when he was more present than the second semester.

And he talked about how Puritanical the world or America is, how it's founded by the Puritans and by Puritanism. He made it clear that he meant this sort of repressiveness, don't have fun, don't relax, this sort of, you know, top button always done up tightly and, you know, very sexually repressed. And he said that's grossly unhealthy and that we must combat that.

Q     Did Father Urrutigoity have nicknames for any other students, do you know?

A     I don't know if he had particular nicknames. He used other nicknames for certain students. Like Gareth Hudson was, from a child, called by his sister Binty, so he took upon that nickname for Gareth Hudson.

Or there was another boy, Brennan Landell, who we usually called Boomer. He called Brennan Landell a Big Teddy Bear.

Q     Do you know if Father Urrutigoity slept with any other boys besides yourself?

A     Yes.

Q     Who else did he sleep with?

A     My brother, Simon. Simon admitted it to me. And my mother told me of it, first, that that happened

56

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE, JOHN DOE, SR. and JANE DOE,<br><br>                Plaintiff,<br><br>      vs.<br><br>FATHER ERIC ENSEY, FATHER CARLOS URRUTIGOITY, DIOCESE OF SCRANTON, BISHOP JAMES C. TIMLIN, THE SOCIETY OF ST. JOHN, THE PRIESTLY FRATERNITY OF ST. PETER and ST. GREGORY'S ACADEMY,<br><br>                Defendant. | Case No.: 3 CV 02-0444<br><br>Judge: Hon. Jones<br><br><br>**AFFIDAVIT OF JOHN ZOSCAK** |

Being first duly sworn, I declare as follows:

1.      I attended St. Gregory's Academy and graduated in 1999.

2.      I also enrolled in September, 1999 at the Society of St. John for studies.

3.      During either the Winter or Spring of my second year at the Society of St. John Fr. Carlos Urrutigoity asked me to sleep in the same bed with him.  I initially told him that I would feel uncomfortable doing this.  Fr. Urrutigoity said that the reason I felt uncomfortable was because I had a puritanical attitude, and that this was due to a bad relationship with my father.  He said that sleeping with him would heal this problem.  I therefore agreed to do so.  At the time I had great trust and respect for Fr. Urritigoity and though he was a perfect priest.

AFFIDAVIT OF JOHN ZOSCAK - 1



4.    For the first few months of sleeping with Fr. Urrutigoity nothing untoward

happened.   Then one night I was awoken because Fr. Urrutigoity had his hand touching his

abdomen.   Fr. Urrutigoity then gradually worked his hand down to my private area and

grabbed my penis.   At that point I grabbed his hand and pulled it up to my chest.   I held it

there for a while and finally let go.   Fr. Urrutigoity then moved his hand away.

5.    I told Fr. O'Conner about this but did not tell anyone else for a long time.   Fr.

Urrutigoity later told me that he did not do this and that he was sleeping.   He asked me to

believe him.

6.    I finally told these facts to the Chaplain here at Christendom College.   He told me

to contact the District Attorney which I did about over a month ago.   I was informed by

the DA's office that criminal prosecution was barred because of the statute of limitations.

_____
John Zoscak

STATE OF VIRGINIA          )
                           )ss
COUNTY OF _Warren____      )

SUBSCRIBED AND SWORN to before me this _7_ day of _July_, 2004.

_____
NOTARY PUBLIC residing at _Rappahannock County_
My commission expires _July 31, 2008_

AFFIDAVIT OF JOHN ZOSCAK - 2

**COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

A.L.M.,                                         :
               Plaintiff            : NO.  2004-C-78
      vs.                                   :
                          :
DIOCESE OF ALLENTOWN, BISHOP       :
EDWARD P. CULLEN and BISHOP        :
THOMAS J. WELSH,                        :
               Defendants           :
                          *********

JULIANN BORTZ,                           :
               Plaintiff            : NO.  2004-C-79
      vs.                                   :
                          :
DIOCESE OF ALLENTOWN, BISHOP       :
EDWARD P. CULLEN and BISHOP        :
THOMAS J. WELSH,                        :
               Defendants           :
                          *********

PATRICIA L. BEAUMONT,                    :
               Plaintiff            : NO.  2004-C-80
      vs.                                   :
                          :
DIOCESE OF ALLENTOWN, BISHOP       :
EDWARD P. CULLEN and BISHOP        :
THOMAS J. WELSH,                        :
               Defendants           :
                          *********

JOHN DOE,                                :
               Plaintiff            : NO.  2004-C-81
      vs.                                   :
                          :
DIOCESE OF ALLENTOWN, BISHOP       :
EDWARD P. CULLEN and BISHOP        :
THOMAS J. WELSH,                        :
                Defendants           :
                          *********

JOHN DOE 2,                              :
               Plaintiff            : NO.  2004-C-591
      vs.                                   :
                          :
DIOCESE OF ALLENTOWN, BISHOP       :
EDWARD P. CULLEN and BISHOP        :
THOMAS J. WELSH.                        :
               Defendants           :
                          *********

EXHIBIT
N

**COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

A.L.M.,
                Plaintiff        : NO. 2004-C-78
       vs.              :

DIOCESE OF ALLENTOWN, BISHOP  :
EDWARD P. CULLEN and BISHOP  :
THOMAS J. WELSH,          :
            Defendants   :
                         ********

JULIANN BORTZ,
                Plaintiff        : NO. 2004-C-79
       vs.              :

DIOCESE OF ALLENTOWN, BISHOP  :
EDWARD P. CULLEN and BISHOP  :
THOMAS J. WELSH,          :
            Defendants   :
                         ********

PATRICIA L. BEAUMONT,
                Plaintiff        : NO. 2004-C-80
       vs.              :

DIOCESE OF ALLENTOWN, BISHOP  :
EDWARD P. CULLEN and BISHOP  :
THOMAS J. WELSH,          :
            Defendants   :
                         ********

JOHN DOE,
                Plaintiff        : NO. 2004-C-81
       vs.              :

DIOCESE OF ALLENTOWN, BISHOP  :
EDWARD P. CULLEN and BISHOP  :
THOMAS J. WELSH,          :
            Defendants   :
                         ********

JOHN DOE 2,
                Plaintiff        : NO. 2004-C-591
       vs.              :

DIOCESE OF ALLENTOWN, BISHOP  :
EDWARD P. CULLEN and BISHOP  :
THOMAS J. WELSH,          :
            Defendants   :
                         ********



B.J.B. and R.D.K.,               :

          Plaintiff       : NO. 2004-C-592

      vs.                 :

                          :

DIOCESE OF ALLENTOWN, BISHOP    :

EDWARD P. CULLEN and BISHOP     :

THOMAS J. WELSH,              :

          Defendants      :

*******

Appearances:

      Jay N. Abramowitch, Esq.
      Richard M. Serbin, Esq.
         For Plaintiffs

      Joseph F. Leeson, Esq.
      C. Clark Hodgson, Jr., Esq.
      Timothy R. Coyne, Esq.
      Christine M. Debevec, Esq.
         For Defendants

**BEFORE THE HONORABLE CAROL K. MCGINLEY, ALAN M. BLACK AND J. BRIAN JOHNSON, SITTING *EN BANC***

## OPINION

**ALAN M. BLACK, J.**

      These six cases all arise from claims of sexual abuse allegedly perpetrated on the plaintiffs by clergy assigned to the Diocese of Allentown. Before the Court are identical motions for judgment on the pleadings filed by the defendants in each of these cases.[1]

---

[1] On March 10, 2004, upon the defendants' motion, the Honorable Alan M. Black entered an order consolidating the cases identified as Docket Nos. 2004-C-78, 2004-C-79, 2004-C-80, and 2004-C-81 for the sole purpose of determining the defendants' motions for judgment on the pleadings. On April 1, 2004, the Honorable William H. Platt, President Judge, appointed an *en banc* panel consisting of the Honorable Carol K. McGinley, the Honorable Alan M. Black and the Honorable J. Brian Johnson to hear and decide the motions for judgment on the pleadings. Since then, two additional cases, identified as Docket Nos. 2004-C-591 and 2004-C-592, have also been filed. Oral argument was heard by the *en banc* panel on all six cases on May 12, 2004. Under the Court's random assignment procedure, three of the cases had been assigned to Judge Black, two to Judge Johnson, and one to Judge McGinley.

2

For the reasons stated below, the motions are granted in part and denied in part. The motions are granted as to Count I in each case, this count being based on a claim of statutory violation/negligence per se. However, the motions are denied as to all remaining counts.

## BACKGROUND

Seven plaintiffs have filed six lawsuits against the defendants asserting fifteen counts: (1) statutory violation/negligence per se; (2) common law duty of reasonable care; (3) breach of fiduciary duty; (4) failure to provide a safe and secure environment; (5) negligent supervision; (6) persons acting in concert; (7) supplying false information/negligent misrepresentation; (8) failure to protect against foreseeable risks; (9) duty to warn of unreasonable risk of harm; (10) negligent supervision or use of improper persons as agents; (11) use of incompetent persons; (12) fraudulent concealment; (13) intentional failure to supervise; (14) intentional failure to warn; and (15) punitive damages.[2]

The defendants have filed answers to the complaints raising the statute of limitations as a defense under new matter. The plaintiffs have filed replies to the defendants' new matter, and the defendants have moved for judgment on the pleadings. The defendants' motions are now before the Court for disposition.

---

[2] The fourth and fifth causes of action are not asserted by B.J.B. and R.D.K. in Docket No. 2004-C-592. However, these plaintiffs have added counts for premises liability and negligent supervision and retention in their complaint.

3

In considering the defendants' motions, we must accept as true the allegations in the plaintiffs' complaints and in their replies to new matter. These allegations are summarized as follows:

The plaintiffs each suffered sexual abuse at the hands of clergy while they were parishioners within the Diocese of Allentown. Each incident of alleged abuse occurred when the plaintiffs were minors. The incidents occurred between 1965 And 1982. The pertinent facts are outlined in the table below:

| Docket No. & Plaintiff | Plaintiff's Date of Birth | Alleged Abuser | Date of Abuse | Plaintiff's Age When Abused |
|---|---|---|---|---|
| John Doe 2004-C-081 | 10/12/1969 | Father Michael Lawrence | August 1982 | 12 |
| Bortz 2004-C-0079 | 07/31/1949 | Father Francis Fromholzer | September 1965 | 16 |
| John Doe 2 2004-C-0591 | 03/05/1959 | Father William J. Shields | 1972 | 12 or 13 |
| A.L.M. 2004-C-78 | 05/28/1968 | Monsignor Dennis Rigney | 1977 and/or 1978 | 9 |
| Beaumont 2004-C-80 | 10/23/1957 | Father Richard Gulianni | October 1971 to 1975 | 14 |
| B.J.B. 2004-C-592 | 04/29/1971 | Father Gabriel M. Patil | 1978 to 1980 | 7 |
| R.D.K 2004-C-592 | 02/06/1972 | Father Gabriel M. Patil | 1978 to 1980 | 6 |

The plaintiffs have not brought suit against the individual priests who allegedly committed the acts of abuse, and the plaintiffs acknowledge that any suits against the individual priests would be barred by the statute of limitations. Instead, the plaintiffs initiated these actions against the Diocese of Allentown and the bishops who served the Diocese during and after the incidents of abuse.

4

Defendant Bishop Thomas J. Welsh served as the Bishop for the Diocese
of Allentown from March 21, 1983 to December 16, 1997, and Defendant
Bishop Edward P. Cullen has been the Bishop from February 9, 1998 to the
present. The bishops function as leaders of the Diocese.

The plaintiffs contend that the defendants were aware of sexual abuse of
children by clergy within the Diocese of Allentown, and had specific knowledge
of the pedophilic tendencies of the offenders in the present cases. According to
the plaintiffs, despite this knowledge, the Diocese continued to allow the
offending priests to have unsupervised contact with children, including the
plaintiffs, and then sought to conceal the problem.

A.L.M. makes the following specific allegations in her complaint:

33. Diocesan Defendants knew of the sexual abuse of children by
numerous Diocesan priests, including but not limited to
Monsignor Rigney, and that such abusive behavior was a long
standing [sic] problem with the Diocese, having received actual
notice of such abuse as more fully described herein.

43. On discovery of an offending cleric's misconduct, Diocesan
Defendants systematically concealed said knowledge, failed to
report the misconduct to authorities and prevailed upon others
not to report said misconduct to law enforcement officials,
despite the fact that the Diocese had a legal obligation to report
knowledge of cases of molestation to proper authorities.

58. For decades and continuing through the present, Diocesan
Defendants, including the Predator Priests, have engaged in a
covert policy and practice to conceal the problem of sexual
abuse of children by parish clergy.

62. Information as to the known criminal conduct of Diocese
priests was kept secret and confidential in secret archives
within the exclusive control of Bishops Cullen, Welsh and/or
McShea, thereby preventing the Plaintiff from having any
knowledge that the Diocesan Defendants had prior notice of
the abusive propensities of many Diocesan priests, including
the Predator Priests.

69. Prior to the aforesaid disclosures, the Plaintiffs did not know,
nor did she have reason to know, that she had a cause of
action against the Diocesan Defendants for causing tortious
injury to her due to Diocesan Defendants' concealment of their

5

knowledge of Monsignor Rigney actions toward other minor parishioners and their vehement public denials of any truth to the allegations contained in related matters that the Diocese had a plan and/or policy to ignore complaints made against its abusive priests, including the Predator Priests, and to conceal such criminal conduct.

71. The injuries that Plaintiff sustained as a result of the actions of Diocesan Defendants could not have been discovered by her earlier due to Diocesan Defendants' fraudulent concealment of their active involvement in protecting priests known to them to be child molesters.

Similar allegations are made in the other cases except that the name of the alleged "Predator Priest" is different in each case.

In 2002, representatives of the Catholic Church disclosed prior incidents of sexual misconduct against minors. These disclosures included statements made by Bishop Wilton B. Gregory, President of the United States Conference of Catholic Bishops, on June 13, 2002, and by the Diocese of Allentown on April 12, 2002 and May 22, 2002. According to the plaintiffs, prior to these disclosures the problem of on-going sexual abuse within the Diocese of Allentown was concealed by the defendants. The plaintiffs also contend they have suffered a new harm from the 2002 disclosures.

As a result of the foregoing, the plaintiffs allege that the defendants are legally responsible for the abuse they suffered. The plaintiffs assert that they were unable to discover that the defendants were a cause of the abuse before the church's disclosures in 2002.

### DISCUSSION

A motion for judgment on the pleadings is governed by Pennsylvania Rule of Civil Procedure 1034, which provides:

6

    (a) After the relevant pleadings are closed, but within such time as
       not to unreasonably delay the trial, any party may move for
       judgment on the pleadings.

    (b) The court shall enter such judgment or order as shall be
       proper on the pleadings.

The case law is clear that before a court may grant a motion for judgment

on the pleadings, the moving party must meet a high burden. In assessing

such a motion,

> [t]he court must accept as true all well pleaded statements of fact,
> admissions, and any documents properly attached to the
> pleadings presented by the party against whom the motion is filed,
> considering only those facts which were specifically admitted.
> Further, the court may grant judgment on the pleadings only
> **where the moving party's right to succeed is certain and the
> case is so free from doubt that trial would clearly be a
> fruitless exercise.**

*Conrad v. Bundy*, 777 A.2d 108, 110 (Pa.Super. 2001)(emphasis added), citing

*Pro Golf Manufacturing, Inc. v. Tribune Review Newspaper Co.*, 761 A.2d 553,

554 (Pa.Super. 2000).

## I. Count I: Statutory Violation/Negligence Per Se

In Count I the plaintiffs assert a claim of statutory violation/negligence

per se against the defendants. In this count the plaintiffs allege that the

defendants violated a statutory duty to report child abuse pursuant to the

Pennsylvania Child Protective Services Law (PCPSL), 23 Pa.C.S. § 6311 *et seq.*

The PCPSL was enacted on December 19, 1990, and amended to its

present form on December 16, 1994. The PCPSL requires that certain

enumerated persons report reasonable suspicions of child abuse to the

appropriate county agency. The 1994 amendment added members of the clergy

to the category of individuals who are required to report suspected abuse. Prior

to the 1994 amendment, clergy were not legally mandated to report suspicions of abuse.

The allegations of sexual abuse asserted by each of the plaintiffs occurred well before the 1994 amendment. The most recent allegation of abuse occurred in 1982. Thus, at the time of the alleged abusive behavior, the PCPSL did not apply to the defendants.

There is a presumption that the 1994 amendment to the PCPSL does not apply retroactively. "No statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa.C.S. § 1926. The Pennsylvania Supreme Court in *Commonwealth v. Scoleri*, 399 Pa. 100, 132-133, 160 A.2d 215, 226-227 (1960), held that

> [w]henever a section or part of a law is amended, the amendment shall be construed as merging into the original law, become a part thereof, and replace the part amended and the remainder of the original law and the amendment shall be read together and viewed as one law passed at one time; but the portions of the law which were not altered by the amendment shall be construed as effective from the time of their original enactment, *and the new provisions shall be construed as effective only from the date when the amendment became effective.* (emphasis in original)

There is no indication in the 1994 amendment to the PCPSL that the General Assembly intended it to be applied retroactively. Therefore, in accordance with *Scoleri*, the amendment does not apply to the cases before us. At the time of the events at issue, members of the clergy were not responsible under the PCPSL to report suspicions of child abuse.

Accordingly, Count I of the plaintiffs' complaints asserting statutory violation/negligence per se is dismissed.

8

## II. All Other Counts – The Statute of Limitations

The defendants argue that the remaining counts in the plaintiffs' complaints are barred by the two-year statute of limitations for personal injury claims. The Judicial Code provides:

> The following actions and proceedings must be commenced within two years:
>
> ....
>
> (7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter.

42 Pa.C.S. § 5524(7).

The statute of limitations begins to run on the date the plaintiff's cause of action accrues, *i.e.,* the date the events have occurred that entitle the plaintiff to bring suit. For a personal injury claim, this is generally the date of the plaintiff's injury. *Stroback v. Camaioni*, 674 A.2d 257, 262 (Pa.Super. 1996). Since the incidents of abuse occurred in the 1970's and 1980's, the two-year statute of limitations expired long before the filing of the plaintiffs' complaints, unless the limitations period was tolled or extended under one of the theories discussed below.

### A. Minority Tolling

The plaintiffs were all minors at the time of the incidents, ranging in age from six to sixteen. On May 30, 1984, the General Assembly enacted a minority tolling provision, which was amended to its present form on June 28, 2002. *See* 42 Pa.C.S. § 5533(b). This provision delays or tolls the statute of limitations for minors until they reach of age of majority. Before this

9

amendment, the limitations period for a cause of action on behalf of a minor was the same as for an adult.

The minority tolling provision is not applicable to the present cases for two reasons. First, each cause of action accrued prior to the enactment of the statute, and the statute is not retroactive. *Dalrymple v. Brown*, 549 Pa. 217, 221, 701 A.2d 164, 166 (1997); *Redenz by Redenz v. Rosenberg*, 520 A.2d 883 (Pa.Super. 1989). Second, all the plaintiffs reached the age of majority more than two years before they filed the cases now before us. Therefore, the age of the plaintiffs did not toll the statute of limitations.

### B. The Discovery Rule

The plaintiffs contend that the statute of limitations was tolled under the theory of delayed discovery. The discovery rule is an exception to the general rule that the statute of limitations begins to run as soon as the cause of action accrues. The discovery rule "arises from the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause;" it does not arise "upon a retrospective view of whether the facts were actually ascertained within the period." *Pocono Intern. Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 85-86, 468 A.2d 468, 471-472 (1983).

This rule has been applied by our appellate courts to extend the statute of limitations in a variety of cases. *See, e.g., Smith v. Bell Tel. Co. of Pa.*, 397 Pa. 134, 153 A.2d 477 (1959)(injuries to plaintiff's property from subsurface conditions); *Ayers v. Morgan*, 397 Pa. 282, 154 A.2d 788 (1959)(surgical sponges left in patient's body); *Giffear v. Johns-Manville Corp.*, 632 A.2d 880 (Pa.Super. 1993)(asbestosis discovered long after exposure to asbestos).

10

Under the discovery rule, the statute of limitations begins to run from the time the plaintiff knew or in the exercise of reasonable diligence should have known of both his injury and the cause of the injury. *Bohus v. Beloff*, 950 F.2d 919, 926 (3d Cir. 1991); *Pocono Intern. Raceway, Inc., supra.* Reasonable diligence, for purposes of the discovery rule, is defined as "a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case." *Cochran v. GAF Corp.*, 542 Pa. 210, 217, 666 A.2d 245, 249 (1995). Application of this rule is not always a question of law for the court.

> Where the issue involves a factual determination regarding what constitutes a reasonable time for the plaintiff to discover his injury and its cause, **the issue is usually for the jury.**

*Id.* at 215, 666 A.2d at 248 (emphasis added).

In the cases at issue, the plaintiffs claim that that they did not know or have reason to know that the defendants were a cause of their injuries until long after the abuse occurred. The plaintiffs acknowledge that they knew of their injuries at the time of the abuse and that they knew the identities of the individual clerics who abused them. However, they allege that the Diocese and the bishops were a separate cause of their harm, and that they did not know or have reason to know of **this** cause until 2002, when representatives of the Catholic Church disclosed the church's role in concealing incidents of sexual misconduct by priests against minors. These disclosures were made by Bishop Wilton B. Gregory, President of the United States Conference of Catholic Bishops on June 13, 2002, and by the Diocese of Allentown on April 12, 2002, and May 22, 2002. The plaintiffs allege that before these disclosures the problem of on-going sexual abuse within the Diocese of Allentown was

11

concealed by the defendants. Therefore, under the discovery rule, the plaintiffs contend that the statute of limitations did not begin to run until 2002, within two years prior to the filing of these actions.

Based on the allegations in the plaintiffs' pleadings, which we must accept as true at this stage, there remains a factual issue as to when the plaintiffs knew or should have known that the defendants were a cause of their harm. From the pleadings alone we cannot decide this issue. Although the plaintiffs knew of their injuries and of the priests who abused them many years ago, if the plaintiffs' allegations are correct, a question remains as to when the plaintiffs knew or had reason to know that the defendants were also a cause of their harm.

The plaintiffs' claims against the defendants are to be distinguished from claims based on the vicarious liability of an employer. Under Pennsylvania law,

> [i]t is well settled that an employer is held vicariously liable for the negligent acts of his employee which cause injuries to a third party, provided that such acts were committed during the course of and within the scope of the employment.

*R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692, 699 (Pa.Super. 2000). The defendants argue that the plaintiffs must have known that they could have sued them at the time of the initial abuse, since the priests were in the employ of the Diocese. However, the plaintiffs had no recourse against the Diocese or the bishops under a theory of vicarious liability. The Pennsylvania Superior Court held in *R.A. ex rel. N.A., supra*, that a church is not vicariously liable for the conduct of its minister where the minister sexually abused a minor living in his neighborhood. The Court reasoned that where an employee acts in an outrageous manner, which is unrelated to the performance of his job, the

12

actions are outside the scope of employment and the employer is not vicariously responsible.

The facts alleged in the present cases are very similar to the scenario in *R.A. ex rel N.A.* The acts of sexual abuse committed by the offending priests were, if true, clearly outrageous and outside the scope of their priestly duties. Thus, the plaintiffs could not have pursued claims against the defendants at the time of the abuse based upon vicarious liability.

The defendants rely on the case of *Dalrymple v. Brown, supra.* In *Dalrymple,* the plaintiff sued on the basis of a childhood sexual assault that had occurred twenty-three years earlier. The plaintiff argued that the statute of limitations was tolled because she had repressed her memories of the sexual assault. The Court held that repressed memory does not toll the statue of limitations under the discovery rule.

In the cases now before the Court, there are no assertions of repressed memory. Therefore, the holding in *Dalrymple* is inapplicable. For the same reason, the other cases relied upon by the defendants are distinguishable. *See Hartz v. Diocese of Greensburg, et al.,* __ F.3d __, No. 03-2536 (3d Cir. March 26, 2004)(victim given alcohol by offender to diminish capacity, resulting in repressed shame and unawareness of psychological injuries for twenty-two years), *Getchey v. County of Northumberland,* No. 4:CV-03-0826 (M.D.Pa. February 26, 2004)(repressed memories of sexual assault for more than forty-seven years), *Baily v. Lewis,* 763 F.Supp. 802 (E.D.Pa. 1991)(repressed memory of sexual abuse for more than fifteen years), and *E.J.M. v. Archdiocese of*

13

*Philadelphia*, 622 A.2d 1388 (Pa.Super. 1993)(victim unaware of "psychological and emotions injuries" suffered from sexual abuse for seven years).

Under the discovery rule, the statute of limitations was tolled until the plaintiffs knew or in the exercise of reasonable diligence should have known that the defendants were a cause of their harm. Based on the allegations in the complaints, this did not occur until 2002, when disclosures by church officials alerted the plaintiffs to a conspiracy within the church to conceal sexual abuse against minors.

### C. Fraudulent Concealment

The plaintiffs also allege that the statute of limitations was tolled by fraudulent concealment on the part of the defendants. The plaintiffs claim that the defendants actively concealed sexual misconduct by priests against minors,[3] and that as a result of this concealment, the plaintiffs did not become aware of their cause of action against the defendants until 2002.

Fraudulent concealment can also be a basis for tolling the statute of limitations. *Krevitz v. City of Philadelphia*, 648 A.2d 353, 357 (1994); *Molineux v. Reed*, 516 Pa. 398, 402, 532 A.2d 792 (1987). However, the test is the same as the test under the discovery rule: when did the plaintiff know, or in the exercise of reasonable diligence when should he have known, of both the injury and its cause? *Bohus v. Bellof*, 950 F.2d 919, 925-926 (3d Cir. 1991). Since we have concluded at this pleading stage that a factual issue remains as to when the plaintiffs knew or in the exercise of reasonable diligence should have known that the defendants were a cause of their injuries, the plaintiffs should have an

---

[3] Complaint A.L.M., ¶ 43; Complaint Borz, ¶ 44; Complaint Beaumont, ¶ 49; Complaint Doe, ¶ 50; Complaint Doe 2, ¶ 49; Complaint B.J.B. and R.D.K., ¶ 43.

14

opportunity to show that the statute of limitations may also have been tolled by the defendants' alleged fraudulent concealment.

This holding is consistent with the recent decision of the Westmoreland County Court of Common Pleas in *Bonson v. Diocese of Altoona-Johnstown, et al.*, No. 3104 of 2003 (C.P. Westmoreland February 2, 2004)(Caruso, J.).[4] In *Bonson*, the Court addressed the statute of limitations, as it relates to a fraudulent concealment claim, even though the issue was raised on preliminary objections. The Court held that

> [t]he resolution of when the plaintiff should have been aware of her claims and whether the defendants fraudulently withheld information from her cannot be resolved on the face of the complaint.

Therefore, the Court overruled the preliminary objections to the extent they were based upon the statute of limitations.[5] We reach the same conclusion in the cases now before us.

### D. The Claim of "New Harm"

Once the statute of limitations began to run on the plaintiffs' initial injury, it also began to run on any later injuries from the same tortious conduct. *Orozco v. Children's Hospital of Philadelphia*, 638 F.Supp. 280, 282 (E.D.Pa. 1986); *Cathcart v. Keene Industrial Insulation*, 471 A.2d 493, 507 (Pa.Super. 1984). The plaintiffs contend, however, that they suffered a new harm as a result of the 2002 disclosures, and therefore that they have a new

---

[4] The Philadelphia County Court of Common Pleas in *Aquilino v. The Philadelphia Catholic Archdiocese, et al.*, No. 00327 (C.P. Philadelphia August 19, 2003), granted the defendants' motion for judgment on the pleadings. However, there was no opinion written by the Court; so we do not know the basis for that Court's decision.

[5] In a later order dated May 11, 2004, Judge Caruso reconsidered other preliminary objections and sustained demurrers in favor of two of the defendants on other grounds.

15

cause of action beginning in 2002. The flaw in this argument is that the disclosures themselves were not tortious. Therefore, they cannot be the basis for a new cause of action. These disclosures establish the latest possible time for the commencement of the limitations period, since the plaintiffs certainly knew or should have known of the relevant facts by that time. The issue remains whether the plaintiffs knew or in the exercise of reasonable diligence should have known sooner of the defendants' alleged earlier misconduct.

## CONCLUSION

For these reasons, the motions for judgment on the pleadings are denied as to all but Count I of the complaints. We do not decide which, if any, of the remaining counts state a viable cause of action. This issue was not raised in the defendants' motion. Nor does our decision preclude the defendants from raising the statute of limitations issue again on a motion for summary judgment after the completion of discovery. We conclude merely that under the legal standard applicable to motions for judgment on the pleadings, requiring us to accept as true all properly pleaded averments of fact in the plaintiffs' complaints and replies to new matter, the pleadings alone do not clearly establish that the plaintiffs knew or in the exercise of reasonable diligence should have known more than two years prior to the filing of their complaints that actions of the defendants were a cause of their alleged sexual abuse. Therefore, we cannot dismiss the complaints at this juncture on the basis of the statute of limitations.

**ALAN M. BLACK, J.**

16

B.J.B. and R.D.K.,                      :
                     Plaintiff         : NO.  2004-C-592
          vs.                           :
                                        :
DIOCESE OF ALLENTOWN, BISHOP            :
EDWARD P. CULLEN and BISHOP             :
THOMAS J. WELSH,                        :
                     Defendants        :

## ORDER

NOW, this 24th day of June, 2004, upon consideration of Defendants'
motions for judgment on the pleadings and Plaintiffs' responses, after review of
the parties' briefs and oral argument, for the reasons set forth in the
accompanying Opinion, IT IS ORDERED that said motions be and the same
hereby are DENIED.

BY THE COURT:

CAROL K. MCGINLEY, J.

ALAN M. BLACK, J.

J. BRIAN JOHNSON, J.

2

**January 27, 2002**

**An open letter to Bishop James C. Timlin, Diocese of Scranton**

EXHIBIT

Dear Bishop Timlin,

It has come to my attention that you have removed Fr. Carlos Urrutigoity and Fr. Eric Ensey from the Society of St. John (SSJ), and have relocated them in Scranton. Your action is long overdue, though it is hardly a sufficient remedy for the sexual offenses these priests have committed. The fact that you have not suspended these priests shows your continued negligence in this matter. Indeed, you are guilty of gross negligence, for your inaction over a period of years has allowed these priests to continue their immoral relations with boys. Your guilt is established by a brief review of what you knew about these priests, and when you knew it:

### (1) YOUR KNOWLEDGE THAT SSJ PRIESTS PLIED BOYS WITH ALCOHOL

In March 1998, Fr. Paul Carr, then chaplain of St. Gregory's Academy, an all-boys school run by the Fraternity of St. Peter, discovered boys in the dormitory in a state of extreme intoxication. Fr. Carr then discovered that members of the Society of St. John had provided these boys with alcohol. Given the severely drunken state of these boys, Fr. Carr called the police. The police arrived and issued warnings to members of the Society for serving alcohol to minors. Fr. Carr subsequently informed you of the situation.

Your response was to do nothing so that scandal might be avoided. You not only allowed the Society to continue to live at St. Gregory's Academy, but you even permitted the Society priests to become the chaplains there during the following school year. As a result, Fr. Urrutigoity and Fr. Ensey were free to continue to ply the boys at St. Gregory's Academy with alcohol and lure some of them into bed. Indeed, members of the Society again served alcohol to boys to the point of intoxication after the graduation ceremonies at St. Gregory's Academy in June. Moreover, when the Society moved onto its own property in Shohola, PA, these priests continued to serve alcohol to boys and to lure them into bed.

### (2) YOUR FAILURE TO DO ADEQUATE BACKGROUND CHECKS ON SSJ MEMBERS

In May 1998, you canonically established the Society of St. John in the Diocese of Scranton without having done adequate background checks on the clerics in this group. Prior to that event, when you permitted the priests of the Society to serve as the chaplains to the boys at St. Gregory's Academy, you violated your own diocesan guidelines that require background checks for anyone working with youth. Had you followed your own diocesan guidelines in this matter, you would have learned from the authorities of the Society of St. Pius X that Fr. Urrutigoity had been dismissed from the seminary in La Reja, Argentina for homosexual molestation. The fact that you knew that Fr. Urrutigoity had also been dismissed from the St. Pius X seminary in Winona, MN, should have made you even more vigilant with respect to making proper background checks.

### (3) YOUR DISMISSAL OF SERIOUS TESTIMONY OF HOMOSEXUAL MOLESTATION

In February 1999, Bishop Bernard Fellay of the Society of St. Pius X informed you by letter that a young seminarian from the seminary in Winona had accused Fr. Urrutigoity of molesting him. This charge was supported by the personal testimony of the seminarian in July 1999 before your auxiliary, Bishop Dougherty, who told the seminarian that he believed his testimony. That seminarian, at the conclusion of his testimony, warned Bishop Dougherty that if Fr. Urrutigoity were not stopped, others would be molested. Nonetheless, you dismissed the testimony as "inconclusive," and allowed Fr. Urrutigoity to continue to serve as chaplain to the boys at St. Gregory's Academy. You even failed to warn the authorities at the Fraternity of St. Peter and at St.

Gregory's Academy of the danger to the boys under the "spiritual direction" of Fr. Urrutigoity and other members of the Society.

### (4) YOUR DISMISSAL OF ADDITIONAL INCRIMINATING EVIDENCE AGAINST SSJ

In the fall and winter of 1999, the key members of the Board of Advisors to the Society of St. John resigned. These distinguished Catholic businessmen made serious allegations against the Society for gross financial mismanagement. At that time, it was also brought to your attention that Fr. Daniel Fullerton, one of the founding members of the Society, had encouraged young men to swim naked at the Society's property in Shohola. Your response was to issue a formal statement in which you said that you were "morally certain" that the Society had committed no wrongdoing.

### (5) YOUR KNOWLEDGE OF FR. URRUTIGOITY'S HABIT OF SLEEPING WITH BOYS

In the summer and fall of 2001, you were informed by at least three different sources that Fr. Urrutigoity had a habit of sleeping with boys and young men. One of these sources was Fr. Paul Carr, now District Superior of the Fraternity of St. Peter. Another source was an eyewitness to the fact that Fr. Urrutigoity plied boys on the Shohola property with alcohol, and then slept with them in his private chambers. I myself was the third source, who, in numerous face-to-face meetings with you and Bishop Dougherty, presented compelling evidence of serious immoral behavior on the part of Fr. Urrutigoity. Bishop Dougherty, who had already heard the testimony of the two above-mentioned sources, told me that Fr. Urrutigoity was a "cult leader" who was "capable of pederasty at any time."

Each of the three sources approached you independently of the other two. Yet you ignored all of their dire warnings, including the judgment of your own auxiliary, Bishop Dougherty. And you did this knowing that Fr. Urrutigoity had been accused of homosexual molestation in 1999. In sum, you allowed a priest whom you knew was sleeping with boys, and who already had a history of sexual misconduct, to continue as Superior General of the Society of St. John.

### (6) YOUR LIES AND YOUR COVER-UP OF THE SSJ FINANCE AND SEX SCANDAL

From our very first conversation concerning Fr. Urrutigoity's habit of sleeping with boys, you vehemently insisted that this habit was not immoral. You repeatedly claimed to have thoroughly investigated the Society and cleared them of any immorality, a lie that was then repeated by the Society to its donors. You yourself contacted donors directly and lied to them by claiming that I had not accused Fr. Urrutigoity of any immorality. And yet Bishop Dougherty, who knew better, had admitted that Fr. Urrutigoity was "grooming" young men for future sexual encounters.

You also insisted that the College of St. Justin Martyr remain associated with the Society even though you knew that Society priests were sleeping with boys. When I was compelled, in order to protect the College's reputation, to dissociate the College from the Society, you suppressed the College even though the College had done no wrong. Later, under the pressure of adverse publicity, you contacted friends of the College and told them that you would allow the College of St. Justin Martyr to be established in your Diocese if I stopped my public and private criticism of Fr. Urrutigoity and the Society. When I wrote to you to inform you that I would not trade my silence for your permission for the College, you wrote back and again lied by denying that you had ever made such an offer.

Although Bishop Dougherty stated that Fr. Urrutigoity should be deposed, and that "radical intervention" was necessary to correct the Society's wayward conduct, you failed to intervene in a principled manner. Indeed, when the Society's developer tried to present you with his studies that demonstrated that the development was infeasible, you indicated that it was not necessary to discuss this matter. Why? Because, as you explained at the time, you had already decided that the

Case 3:02-cv-00444-JEJ   Document 106   Filed 07/19/04   Page 52 of 53

Society's property would have to be sold. Nonetheless, you continued to allow the Society to solicit funds for a development project that you admitted was "dead." When Bishop Dougherty was asked whether your failure to take disciplinary action indicated that you were held hostage by the Society's huge debt, he answered "yes."

In short, the above demonstrates a consistent and determined effort on your part to cover up the scandal surrounding the Society, and to protect yourself and priests who have abused their spiritual office.

### (7) YOUR KNOWLEDGE OF THE ACCUSATION OF MOLESTATION AGAINST FR. ENSEY

You learned from my e-mail of December 8, 2001 that a minor had accused Fr. Ensey of repeatedly molesting him. Yet you waited for well over a month before removing Fr. Ensey from pastoral activity on the Society's property. Had you made a genuine investigation of the Society in 1999 when a similar accusation was made against Fr. Urrutigoity, you would have learned then that Fr. Ensey was also a sexual predator who was molesting at least one boy at St. Gregory's Academy.

### (8) YOUR ACCEPTANCE OF SSJ PRIESTS SLEEPING WITH YOUNG MEN

Over the course of the last six months, you have told me and others on numerous occasions that you do not consider priests sleeping with young men to be immoral. This is why you have refused to take disciplinary action against Fr. Urrutigoity and Fr. Ensey, and why these priests have been able to pursue their perverse ends over a period of years.

* * *

The above known facts establish your gross negligence, Bishop Timlin, the consequence of which is that faith and lives have been severely damaged.

Yet even now you continue to talk about giving Fr. Urrutigoity the "benefit of the doubt" and treating him with "charity." All who are Catholic agree that charity is the law that must govern all our actions, but how can it be charitable to allow a sexual predator to continue to prey upon boys? Yours is a false notion of charity, Bishop Timlin, for it shows love for neither the victims nor even the predator himself, who must be stopped for his own good as well as for the good of those whom he seeks to abuse. Real charity would lead you to take salutary disciplinary action against Fr. Urrutigoity and Fr. Ensey.

You speak freely of charity for the accused priests, yet I have never yet heard you use the word "charity" in reference to the victims. In fact, you have still failed to contact the parents of the boys who were exposed to the priests of the Society of St. John. When recently asked why you had not informed the parents, you responded that you did not know their names. Are we to believe you could not have picked up the telephone to contact St. Gregory's Academy in order to find out who these boys were? Your lack of care for the victims is evident for all to see.

In addition to coddling the predators while ignoring the real needs of their victims, you have accused me and others of "attacking the Church" because we have sought to expose the wicked deeds of these priests. Turning a flashlight on the cockroaches in the Church can hardly be construed as an attack on the Church herself. It is rather you, and others in the hierarchy like you, who are destroying our beloved Church, for you have repeatedly sought to bury the truth of these ugly matters. You have sought to protect your own reputation and sympathies while invoking the authority of your office against those who are bringing the truth to light. You purport to be defending the Church against scandal, but fear of scandal is never an excuse for allowing harm to be done to souls. Pope St. Gregory the Great said it best: "It is better that scandals arise than that the truth be suppressed."

As an anointed of Christ, you are obliged to protect the souls of your flock, even if your attorneys and insurance agents instruct you otherwise. Who is running the Church, you or they? Your decision merely to relocate Fr. Urrutigoity and Fr. Ensey to Scranton, without even suspending them, is more of the same pattern of behavior suitable to a corrupt politician rather than a bishop of the Catholic Church. You are merely hedging your bets: if the bad publicity increases, you will stress the fact that you have removed these priests from pastoral life; but if the bad publicity decreases, you will allow them to return to Shohola, or to some other parish, where they will begin anew the cycle of abuse and deception. In the meantime, you have allowed Fr. Urrutigoity and Fr. Ensey to receive young men in their company while they are supposedly sequestered in Scranton. Have you no conscience?

Fr. Urrutigoity and Fr. Ensey must be immediately suspended, and canonical proceedings for their laicization initiated. Fr. Urrutigoity and Fr. Ensey, as Superior General and Chancellor, respectively, are the leaders of the Society of St. John. To uncover the extent to which their moral corruption has infected the rest of the Society, a full and independent investigation of the other clerics in the Society must be undertaken. The investigation must determine if the other clerics have been complicit in the sexual abuse of boys and the cover-up of such blatantly immoral and criminal acts. These clerics are: Fr. Daniel Fullerton, Fr. Basel Sarweh, Fr. Dominic Carey, Fr. Dominic O'Connor, Fr. Marshall Roberts, Fr. Bernardo Terrera, Deacon Joseph Levine, and Deacon James Lane.

Finally, Bishop Timlin, I ask you to find the moral courage to acknowledge your responsibility for the grave harm that you have done, and to resign as Bishop of Scranton, for you have repeatedly shown yourself unwilling to protect the souls entrusted to you by our Lord.

Sincerely,

**Dr. Jeffrey M. Bond**
**President**

**The College of St. Justin Martyr**
**142 Market Road**
**Greeley, PA 18425**

jmb3@ltis.net
www.saintjustinmartyr.org

## [NOTICES]

Home | About CSJM | Academics | Admissions | News & Events | Search | Privacy

Copyright © 2002 - College of St. Justin Martyr