IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE, JOHN DOE, SR. and JANE DOE,<br><br>        Plaintiff,<br>vs.<br><br>FATHER ERIC ENSEY, FATHER CARLOS URRUTIGOITY, DIOCESE OF SCRANTON, BISHOP JAMES C. TIMLIN, THE SOCIETY OF ST. JOHN, THE PRIESTLY FRATERNITY OF ST. PETER and ST. GREGORY'S ACADEMY,<br><br>        Defendant. | Case No.: 3 CV 02-0444<br><br>Judge: Hon. John E. Jones |

## EXHIBITS SUBMITTED IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF THE PRIESTLY FRATERNITY OF ST. PETER AND ST. GREGORY'S ACADEMY

James Bendell, being first duly sworn states that the attached exhibits are true and correct copies of the following documents:

AA.   Pages of the deposition of Fr. Paul Carr.

BB.   Pages of the deposition of F.r Arnoud Devillers.

CC.   Pages of the deposition of Alan Hicks.

DD.   Pages from the 'Friends of the Society of St. John' website.

EE.   Pages of the deposition of Fr. Robert Oppenheimer.

FF.   Pages of the deposition of Joseph Sciambra.

AFFIDAVIT OF JAMES BENDELL - 1

GG.    Pages of the deposition of Paul Hornak.

                                                                             _____

                                                            James Bendell, WSBA # 20820
                                                            Co-counsel for plaintiffs

SUBSCRIBED AND SWORN to before me this 7th day of July, 2004.

                                                            NOTARY PUBLIC residing at Port Townsend, WA
                                                            My commission expires 1-29-07

[Notary seal: MARY E. MULVANEY, COMMISSION EXPIRES, NOTARY PUBLIC, 1-29-07, STATE OF WASHINGTON]

I certify that I caused a true copy of this pleading to be sent my electronic mail to Joseph Leeson, Joseph O'Brien on Sal Cognetti on 7/18, 2004.

AFFIDAVIT OF JAMES BENDELL - 2

```
JOHN DOE, JOHN DOE, SR.,      : IN THE UNITED STATES DISTRICT
and JANE DOE,                   FOR THE MIDDLE DISTRICT OF PA
         Plaintiffs,
    VS
FATHER ERIC ENSEY, FATHER
CARLOS URRUTIGOITY, DIOCESE
OF SCRANTON, BISHOP C.
TIMLIN, THE SOCIETY OF ST.
JOHN, THE PRIESTLY FRATERNITY
OF ST. PETER, and ST.
GREGORY'S ADADEMY,
         Defendants.          : NO. 2000 CIVIL 2961
```

TRANSCRIPT OF DEPOSITION of FATHER PAUL CARR, a witness of lawful age, taken on behalf of the plaintiffs in the above-entitled cause, wherein John Doe, et al, are the plaintiffs and Father Eric Ensey, et al, are the defendants, pending in the District Court of the United States for the Middle District of Pennsylvania, pursuant to notice, before Neil A. Helfant, a notary public in and for the County of Lackawanna, at the business offices of the Lackawanna County Bar Association, 338 North Washington Avenue, Scranton, Pennsylvania, on the 20th day of August, 2003, commencing at 9:21 a.m. and concluding at 10:45 a.m., of said day.

NEIL A. HELFANT REPORTING SERVICE - 570-586-0346

## STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing, certification, and filing are waived.

It is further stipulated by and between counsel for the respective parties that all objections, except to the form of the questions, are reserved to the time of trial.

## INDEX
## WITNESSES

Examination of Father Carr by Mr. Bendell............P. 3

## EXHIBITS

Father Paul Carr Exhibit No. 1, an affidavit,
marked for identification............................P. 65
Father Paul Carr Exhibit No. 2, a letter,
marked for identification............................P. 67
Father Paul Carr Exhibit No. 3, three affidavits,
marked for identification............................P. 71

2

```
APPEARANCES:
FOR THE PLAINTIFFS:            JAMES BENDELL, ESQUIRE
                               HARRY COLEMAN, ESQUIRE
FOR DEFTS. ENSEY/
URRUTIGOITY/ST. JOHN:          SAL COGNETTI, ESQUIRE
FOR DEFTS. DIOCESE OF
SCRANTON/BISHOP TIMLIN:        JOSEPH O'BRIEN, ESQUIRE
                               JAMES O'BRIEN, ESQUIRE
FOR DEFTS. FRATERNITY OF ST.
PETER/ST. GREGORY'S ACADEMY:   JOSEPH LEESON, ESQUIRE
                               JOSEPH GAUGHAN, ESQUIRE
```


EXHIBIT AA

1    FATHER   PAUL   CARR,   St. Peter's
2       House, Griffin Road, Elmhurst, Pennsylvania, a
3       witness called by the plaintiffs, being first duly
4       sworn, was examined and testified as follows:
5    EXAMINATION BY MR. BENDELL:
6       Q    Good morning, Father Carr.
7       A    Good morning.
8       Q    Have you ever had your deposition taken
9    before?
10      A    No.
11      Q    Have you ever been to a deposition before?
12      A    No.
13      Q    What a deposition is is a procedure whereby
14   the attorneys in a case can ask questions of witnesses, so
15   they can prepare for trial.  The testimony is subject to
16   all the formality of in-court testimony, such as the fact
17   that it's given under oath, subject to the penalty of
18   perjury for false answer.  The testimony is then typed up
19   by the court reporter, who is electronically taking it
20   down and, in some instances, the deposition is actually
21   played or read to the jury at trial.  So it's important
22   that we're accurate in every respect.
23           If I confuse you with a question, please let me
24   know, I'll try to rephrase it.
25      A    Okay.

3

```
 1    Q    Feel free to take your time.  I'm going to
 2  try to go as quickly as possible.  But if you need a
 3  break, glass of water or something, just let me know.
 4         Father, where do you currently reside?
 5    A    St. Peter's House in Elmhurst.
 6    Q    Are you affiliated with a particular
 7  religious order?
 8    A    Yes.
 9    Q    What is that order?
10    A    The Priestly Fraternity of St. Peter.
11    Q    How long have you been affiliated with The
12  Fraternity?
13    A    Since 1995.
14    Q    Where were you born?
15    A    Manchester, England.
16    Q    What was your date of birth?
17    A    19/11/60.  Or 11/19/60, American.
18    Q    What is your Social Security number?
19    A    I'd have to get out of my card.  I don't know
20  it by heart.
21    Q    We'll do it during a break, how's that?  What
22  is your citizenship status in the United States?
23    A    I have a green card.
24    Q    Was there ever a time that you were a
25  chaplain at St. Gregory's Academy?
```

4

```
 1    A    Yes.
 2    Q    When was that?
 3    A    The academic years from September, 1995 to
 4  spring 1998, three academic years.
 5    Q    After 1998, were you transferred to a
 6  different position?
 7    A    Yes.
 8    Q    What was that position?
 9    A    Teaching at Our Lady of Guadalupe Seminary.
10    Q    That is in what state?
11    A    That was also in Pennsylvania at that time.
12    Q    How long did that position last?
13    A    One year.
14    Q    Then after that, where were you transferred?
15    A    They sent me to do studies in Rome, to get a
16  degree to return to continue teaching at the Seminary.
17    Q    Did you get a degree?
18    A    No.  After one year, there were elections for
19  assignments in The Fraternity, and I was sent back to this
20  country as District Superior.
21    Q    When were you made District Superior?
22    A    September, 2000.
23    Q    How long did you act as District Superior?
24    A    Up to one week ago.  That was the end of the
25  three-year term of office.
```

5

```
 1    Q    Who's the new District Superior?
 2    A    Father George Gabet, G-a-b-e-t.
 3    Q    Is he residing in the United States at this
 4  time?
 5    A    He's at St. Peter's House, also.
 6    Q    What were your duties as a chaplain at St.
 7  Gregory's Academy?
 8    A    I took care of the sacramental and spiritual
 9  welfare of the students, taught the religion classes.
10    Q    Did you have occasion to observe priests of
11  The Society of St. John?
12    A    While they were resident there, yes.
13    Q    So some of the period of time that you were
14  chaplain, they were also residing at St. Gregory's
15  Academy?
16    A    That's correct.
17    Q    That was which building?
18    A    St. Peter's House.
19    Q    St. Peter's House.  Do you remember what year
20  The Society of St. John priests were made chaplains at the
21  Academy?
22    A    That would be the year I left, so the
23  academic year 1998 to 1999.
24    Q    Do you know if anyone at The Fraternity of
25  St. Peter objected to The Society of St. John priests
```

6

```
 1  becoming chaplains?
 2    A    I'm not aware of it.
 3    Q    Did you ever hear any reports or rumors that
 4  Father Urrutigoity was sleeping in bed with boys at the
 5  Society of--at the St. Gregory's Academy?
 6    A    No.
 7    Q    You never heard that?
 8    A    Never once.
 9    Q    To this day even?
10    A    The only time I've ever heard of it is from
11  the e-mails that Jeffrey Bond has circulated.
12    Q    Have you ever communicated with any priests
13  of The Society of Pius the Tenth--
14    A    Can you clarify that?
15    Q    --in formal conversations, phone calls,
16  letters?  Did you ever meet a priest from The Society--
17    A    I was a member of The Society of St. Pius the
18  Tenth myself until--
19    Q    Okay.
20    A    --1994.
21    Q    Did any priests of The Society of Pius the
22  Tenth tell you that Father Urrutigoity was a homosexual?
23    A    No.
24    Q    Did you ever hear the expression "sleeping
25  sickness" with regard to Father Urrutigoity--
```

7

```
JOHN DOE, JOHN DOE, SR.,    : IN THE UNITED STATES DISTRICT
and JANE DOE,
            Plaintiffs     : FOR THE MIDDLE DISTRICT OF PA

       vs                  :

FATHER ERIC ENSEY, FATHER  : CIVIL ACTION - LAW
CARLOS URRUTIGOITY, DIOCESE
OF SCRANTON, BISHOP C.     :
TIMLIN, THE SOCIETY OF ST.
JOHN, THE PRIESTLY         :
FRATERNITY OF ST. PETER,
and ST. GREGORY'S ACADEMY, :

            Defendants     : No. 2000-CIVIL-2961
```

TRANSCRIPT OF DEPOSITION of FATHER ARNAUD DEVILLERS, as taken on behalf of the PLAINTIFFS, pursuant to notice, before Gloria Anzalone, a certified shorthand reporter in and for the County of Lackawanna, Commonwealth of Pennsylvania, at the law office at 148 Adams Avenue, Scranton, PA 18503, on the 11th day of November, 2003, commencing at 9:18 a.m. and concluding at 10:20 a.m., of said day.

NEIL A. HELFANT REPORTING SERVICE 570-586-0346

**APPEARANCES:**

FOR THE PLAINTIFFS: JAMES BENDELL, ESQUIRE

FOR DEFENDANTS ENSEY: SAL COGNETTI, ESQUIRE
AND URRUTIGOITY/ VINCENT S. CIMINI, ESQUIRE
SOCIETY OF ST. JOHN

FOR DEFENDANTS: JAMES O'BRIEN, ESQUIRE
DIOCESE OF SCRANTON/
BISHOP TIMLIN

FOR DEFENDANTS: JOSEPH LEESON, ESQUIRE
FRATERNITY OF ST. JOSEPH GAUGHAN, ESQUIRE
PETER/ST. GREGORY'S
ACADEMY

**INDEX TO WITNESSES**

Examination of A. Devillers by Mr. Bendell....... Pg. 3
No questions by Mr. Cognetti
No questions by Mr. Cimini
No questions by Mr. James O'Brien
No questions by Mr. Leeson
No questions by Mr. Gaughan

**INDEX TO EXHIBITS**

| FOR THE PLAINTIFF | IDENTIFIED |
|---|---|
| Ex. No. 1 - 2/26/01 Letter | 16 |
| Ex. No. 2 - Fax in French | 18 |
| Ex. No. 3 - 1/13/98 E-Mail | 22 |
| Ex. No. 4 - Hornak Affidavit | 24 |
| Ex. No. 5 - 3/14/02 E-Mail | 28 |

EXHIBIT BB

1 of 12 sheets

---

3

1  **STIPULATION**
2       It is hereby stipulated by and between
3  counsel for the respective parties that reading,
4  signing, sealing, certification and filing are not
5  waived.
6       It is further stipulated by and between
7  counsel for the respective parties that all
8  objections, except to the form of the questions, are
9  reserved to the time of trial.
10
11      FATHER ARNAUD DEVILLERS, called as a
12 witness, having been first duly sworn, was
13 examined and testified as follows:
14                EXAMINATION
15 BY MR. BENDELL:
16      Q     Good morning, Father. Let me begin by
17 asking if you've ever been to a deposition before?
18      A     **No, I've never been.**
19      Q     Well, what this is, it's a procedure
20 used in American courts in civil litigation wherein
21 the attorneys can ask questions of witnesses in order
22 to prepare for trial. The testimony is given under
23 oath subject to the penalty of perjury for false
24 answer just as if it was in-court testimony.
25            So if I ask you a question which is

4

1  confusing, let me know, I'll try to rephrase it. If
2  you don't know the answer, don't guess. And if you
3  need to pause, take a break, a glass of water, just
4  let us know, all right?
5            MR. LEESON: We're going to have
6       him read and sign.
7            MR. COGNETTI: And I don't know
8       what, if this is a perpetual deposition or
9       this is a discovery deposition, but I'm
10      going to treat it as a perpetual deposition
11      and I'll make the objections.
12           MR. BENDELL: First of all as I
13      indicated earlier this week, I'm
14      stipulating that all these depositions this
15      week are discovery depositions and this one
16      itself was never even noticed up as a
17      perpetuation. It's just plain vanilla
18      deposition.
19 BY MR. BENDELL:
20      Q     Father, what is your date of birth?
21      A     **2nd of February, 1959.**
22      Q     Where were you born?
23      A     **I was born in France.**
24      Q     What city?
25      A     **La-Celle-Saiad-Cloud.**

### Page 9

1  high school, for boys, and the project took place in
2  that year in 1993.
3  Q    Were you at all involved in the
4  decision to make the Society of Saint John priests
   chaplain at the school?
   A    Yes, I was.
7  Q    Could you explain your involvement.
8  A    Well, since once again I was district
9  superior of the Fraternity at the time, I, you know,
10 we were short of priests, the Fraternity of Saint
11 Peter was short of priests. Therefore, we ask the
12 Society of Saint John was residing in the building
13 already, if they could provide a priest to me.
14 Q    What building?
15 A    The building of Saint Gregory's
16 Academy. If they could provide a priest to be
17 chaplain of the school.
18 Q    And who did you make that request to?
19 A    Well, I ask the superior.
20 Q    That was?
21 A    I believe at the time it was Father
22 Fullerton but I couldn't swear it. It was either
23 Father Fullerton or Father Urrutigoity.
24 Q    Well, if the Society priests at that
25 time were not yet chaplains, why were they residing

### Page 10

1  in the Saint Gregory's building?
2  A    Because they had no place to reside in
3  the Diocese. The Bishop invited them in the Diocese
4  and since they had no place to reside we offer them
5  some accommodation which was used before by, on house
6  formation.
7  Q    Now before allowing them to stay there,
8  did you, did the Fraternity make any investigation of
9  the background of these priests?
10 A    I did ask around but the priests
11 knew --
12 Q    Who did you ask?
13 A    Well, the priests -- well, the priests
14 of the Society of Saint Pious X.
15 Q    Could you remember who you asked, which
16 of those priests?
17 A    One of them is my brother who is a
18 priest of the Society of Saint Pious X.
19 Q    Was he still with the Society at that
20 time?
21 A    Yes, he still is.
   Q    And who else did you ask?
23 A    I think, well, I can't remember really
24 right now, but there was a number of people we check.
25 We did not feel like we, I didn't feel like I should

### Page 11

1  do an official request to the Society of Saint Pious
2  X because first of all I was not sure I would get an
3  answer; secondly, since they were not joining the
4  Fraternity of Saint Peter I was not the one to do
5  this research.
6  Q    Did the Fraternity of Saint Peter do
7  any additional screening or any screening before they
8  became chaplains at Saint Gregory's Academy?
9  A    I don't think we did, no.
10 Q    At some time in the future did you ask
11 somebody to do some police background checks on the
12 priests?
13 A    I did, I did.
14 Q    And when was that?
15 A    It was when the Diocese established a
16 policy for this. It was in-between, I think it was
17 at the end of the first year, the way residing the
18 building before actually they became chaplain, one of
19 them became chaplain here.
20 Q    And so what year would that be?
21 A    Before, gosh, I just can't remember
22 which year was the first year here.
23 Q    You say it was at the end of the first
24 year that they were chaplains?
25 A    Yes.

### Page 12

1           MR. COGNETTI: I object to that, I
2       don't think he said it was the end of the
3       first year they were chaplains --
4           THE WITNESS: No, not at the end of
5       the first year.
6           MR. COGNETTI: The end of their
7       first year and before they became
8       chaplains.
9  BY MR. BENDELL:
10 Q    This was before they became chaplains?
11 A    Yes.
12 Q    And who did you ask to do this police
13 background check?
14 A    The headmaster of the school.
15 Q    And who was that?
16 A    Mr. Alan Hicks.
17 Q    And did he do any police background
18 checks?
19 A    I asked him several times but I've
20 never seen the actual criminal check.
21 Q    So you don't know if he ever did it?
22 A    No, because the policy of the Diocese
23 said it was up to the headmaster to do that.
24 Actually I, you know, gave him the information from
25 the Diocese so that, you know, he would do that.

**Page 13**

1  Q   Now at that time did you ask Mr. Hicks
2  also to contact the seminary in Winona to check up on
3  Father Urrutigoity?
4      A   No.
       Q   Why is it that Mr. Hicks' contract was
   not renewed for Saint Gregory's Academy?
7          MR. LEESON: Can I just go off the
8      record for a moment.
9      (Whereupon, a brief discussion was held off
10     the record.)
11         MR. BENDELL: While we were off
12     record, there was a dialogue between myself
13     and Mr. Leeson, counsel for the Fraternity.
14     He is instructing this witness not to
15     answer questions about the reasons for Mr.
16     Hicks' termination. I'm not stipulating to
17     that; however, what I will do is before I
18     file any motions on it, if, Mr. Leeson, if
19     you could just send me perhaps an affidavit
20     or some document over the next couple of
21     weeks and maybe they'll suffice and we
22     won't have to bother. At least we'll try
23     to do that.
24         MR. LEESON: Let's see if we can
25     resolve it at a subsequent date.

**Page 14**

1          MR. BENDELL: That's a little too
2      vague. Let's put it this way, at the
3      present time I'm not stipulating to him not
4      answering the question, but over the next
5      couple of weeks you can talk me out of it.
6      How's that?
7          MR. LEESON: That's fine.
8  BY MR. BENDELL:
9      Q   At any time that you were with the
10 Society of Saint Pious X, did anybody tell you that
11 Father Urrutigoity was a homosexual?
12     A   No.
13     Q   How about Father Ensey?
14     A   No.
15     Q   Subsequent to that time -- and you left
16 the Society in 1989, right?
17     A   Yes.
18     Q   And then you joined the Fraternity?
19     A   Yes.
20     Q   So since joining the Fraternity, did
21 anybody tell you that Father Urrutigoity was a
22 homosexual?
23     A   No.
24     Q   To this day, which would be November
25 11th of 2003, has anybody told you that Father

**Page 15**

1  Urrutigoity is a homosexual?
2      A   No.
3      Q   How about Father Ensey?
4      A   No.
5      Q   Did anybody tell you that Father
6  Urrutigoity was attracted to boys sexually?
7      A   No.
8      Q   How about Father Ensey?
9      A   No.
10     Q   Did any parent complain to you, you
11 personally, or to anybody at the Fraternity about the
12 conduct of the Society of Saint John priests with
13 regard to the Saint Gregory students?
14     A   I don't remember so; I don't remember
15 so.
16     Q   Does the Fraternity still own Saint
17 Gregory's Academy?
18         MR. LEESON: Let me just object to
19     the form of the question and the reason
20     being is there's a separate ownership for
21     the real estate and perhaps the school
22     as an institution --
23         MR. BENDELL: I'll withdraw the
24     question and try to be more precise.
25 BY MR. BENDELL:

**Page 16**

1      Q   Does the Fraternity still run Saint
2  Gregory's Academy?
3      A   Yes, we do.
4      Q   In what entity is the land titled, do
5  you know? Is it a corporation or something?
6      A   The land or the school itself?
7      Q   Well, let's start with the land.
8      A   Well the land currently belongs to the
9  Diocese of Scranton.
10     Q   How about the school?
11     A   The school is an entity of the
12 Fraternity of Saint Peter. It's actually not
13 separated from the Fraternity.
14     (Whereupon, a statement was produced and
15     marked for identification as Exhibit No.
16     1.)
17 BY MR. BENDELL:
18     Q   Father, could you please read over
19 Exhibit 1.
20     A   I have to read everything?
21     Q   It would be better if you read it over.
22 Just take your time.
23     A   February 26th --
24     Q   No, no, you don't have to read it out
25 loud, just read it to yourself.

```
JOHN DOE, JOHN DOE, SR.,       : IN THE UNITED STATES DISTRICT
and JANE DOE,                  :
         Plaintiffs            : FOR THE MIDDLE DISTRICT OF PA
                               :
    vs                         :
                               :
FATHER ERIC ENSEY, FATHER      : CIVIL ACTION - LAW
CARLOS URRUTIGOITY, DIOCESE    :
OF SCRANTON, BISHOP C.         :
TIMLIN, THE SOCIETY OF ST.     :
JOHN, THE PRIESTLY             :
FRATERNITY OF ST. PETER,       :
and ST. GREGORY'S ACADEMY,     :
         Defendants            : No. 2000-CIVIL-2961
```

:::::::::::::::::::::::::::::::::::::::::::::::

TRANSCRIPT OF DEPOSITION of ALAN HICKS, as taken on behalf of the PLAINTIFFS, pursuant to notice, before Gloria Anzalone, a certified shorthand reporter in and for the County of Lackawanna, Commonwealth of Pennsylvania, at the business offices of the Lackawanna County Bar Association, 338 North Washington Avenue, Scranton, PA 18503, on the 21st day of October, 2003, commencing at 11:00 a.m. and concluding at 1:35 a.m., of said day.

NEIL A. HELFANT REPORTING SERVICE 570-586-0346

APPEARANCES:

FOR THE PLAINTIFFS:   JAMES BENDELL, ESQUIRE

FOR DEFENDANTS ENSEY   SAL COGNETTI, ESQUIRE
AND URRUTIGOITY/
SOCIETY OF ST. JOHN

FOR DEFENDANTS:        JOSEPH O'BRIEN, ESQUIRE
DIOCESE OF SCRANTON/   JAMES O'BRIEN, ESQUIRE
BISHOP TIMLIN

FOR DEFENDANTS         JOSEPH LEESON, ESQUIRE
FRATERNITY OF ST.      JOSEPH GAUGHAN, ESQUIRE
PETER/ST. GREGORY'S
ACADEMY

INDEX TO WITNESSES

Examination of A. Hicks by Mr. Bendell........ Pg. 3
Examination of A. Hicks by Mr. Cognetti....... Pg. 99

No questions by Mr. Joseph O'Brien
No questions by Mr. James O'Brien
No questions by Mr. Leeson
No questions by Mr. Gaughan

INDEX TO EXHIBITS

| FOR THE PLAINTIFF | IDENTIFIED |
|---|---|
| Ex. No. 1 - Report | 93 |
| Ex. No. 3 - Hicks Response | 94 |
| Ex. No. 7 - Hicks Response | 95 |
| Ex. No. 8 - 1/18/02 Meeting | 98 |


EXHIBIT CC

1 of 29 sheets

---

                    STIPULATION

It is hereby stipulated by and between counsel for the respective parties that reading, signing, sealing, certification and filing are waived.

It is further stipulated by and between counsel for the respective parties that all objections, except to the form of the questions, are reserved to the time of trial.

ALAN HICKS, called as a witness, having been first duly sworn, was examined and testified as follows:

                    EXAMINATION

BY MR. BENDELL:

Q    Mr. Hicks, would you please tell us your full name.

A    Alan J. Hicks.

Q    What is your birth date?

A    July 19th, 1953.

Q    What is your social security number?

A    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.

Q    Have you ever been to a deposition before?

A    I have not.

3

Q    Basically these are procedures where the lawyers in a case to prepare for trial ask questions of witnesses subject to all the formalities of in-court testimony such as the fact that it's given under oath subject to the penalty of perjury for false answer. It takes place before a licensed court reporter who then transcribes t into a bound, written form which you are free to review and make any corrections you feel are necessary. So if I confuse you with any questions, let me know, I'll try to rephrase it. If you don't know the answer to something, don't guess, just tell us you don't know, all right?

A    Can I ask any questions now prior to proceeding?

Q    Fine.

A    What if there are questions that I don't think are appropriate, I mean do I have the right not to answer?

Q    Well, here's the way it works, and, of course, I'm not your attorney so I'm just going to give you my spin on it. There are some questions in a trial that are objectionable because the jury shouldn't hear them. If something is hearsay, if there is, if the question is leading, so forth and so

4

## Page 17

1  made any inquiry as to the fitness of these priests
2  to be chaplains?
3      A    I'm not aware of any.
4      Q    Do you know if he ordered or requested
5  any background checks on these priests?
6      A    I'm not aware of any, any requests for
7  that.
8      Q    Did you make any inquiries on your own
9  in that regard?
10     A    No, I did not.
11     Q    Did you feel it was not necessary?
12     A    I just didn't think about it.
13     Q    Well, had there been other chaplains at
14 Saint Gregory's Academy when you were headmaster?
15     A    Yes.
16     Q    Let's start with the first one.
17     A    The first chaplain was Father James
18 Jackson.
19     Q    Where is he now?
20     A    He's the rector of Our Lady of
21 Guadeloupe Seminary in Denton, Nebraska.
22     Q    Now, was he already a priest there as
23 chaplain when you came?
24     A    No, I mean I came at the very beginning
25 and he came at the same time.

## Page 18

1      Q    Do you know if any inquiry or check on
2  his background was done before he was made chaplain?
3      A    I know of no inquiry.
4      Q    When did his position, when did his job
5  end there?
6      A    Father Jackson was transferred sometime
7  in, I believe it was January of 1994 because it was
8  in the middle of the first school year.
9      Q    Now, did Father Jackson live at the
10 academy?
11     A    He did.
12     Q    And did he live in the same residence
13 where the boys were living?
14     A    He lived in a separate apartment in the
15 academy building.
16     Q    Who was the next chaplain?
17     A    The next chaplain was Father
18 Cassavantes.
19     Q    And where is he now?
20     A    I believe he's in, well, he's in Texas,
21 I'm not sure where in Texas. He was just recently
22 transferred from Saint Michael's here in Scranton.
23     Q    And he was a fraternity priest, as
24 well?
25     A    Yes.

## Page 19

1      Q    Do you know if any background check was
2  made of him?
3      A    I know of no background check.
4      Q    Did you ever discuss with Father
5  Devillers or anybody else at the Fraternity of Saint
6  Peter the issue of whether background checks should
7  be done on these priests before they become
8  chaplains?
9      A    No.
10     Q    Did the Saint Gregory's Academy do
11 background checks on other employees that they hired?
12     A    By background checks what do you mean?
13     Q    Let's assume you're going to hire a
14 janitor for Saint Gregory's Academy, you know, find
15 out if he's ever been convicted of a crime, any
16 complaints at his prior job, that sort of thing.
17     A    I would check out a former employment
18 or, you know, talk to people who knew them. I would
19 get letters of recommendation, that sort of thing.
20     Q    And you do that for all other employees
21 except the chaplains?
22     A    I wasn't involved in the hiring of
23 chaplains or the appointment of chaplains and they
24 really, that was not really a position that was under
25 me. That was something that was completely a

## Page 20

1  fraternity decision.
2      Q    But with regard to the other employees,
3  you did those inquires?
4      A    Well, I would do the sort of inquiries
5  that I just mentioned.
6      Q    How about a criminal check?
7      A    I didn't do criminal background checks
8  until, we began doing that, well, it would have been
9  2002, the beginning of 2002, or maybe it was when Joe
10 Gaughan, the attorney for the Fraternity, had a
11 meeting with us and told us that that was something
12 that we needed to do.
13     Q    And that is now done of all employees
14 at Saint Gregory's Academy, new employees?
15     A    I'm not the headmaster there now.
16     Q    As of the last time you were there in
17 May.
18     A    Yes, it had been done.
19     Q    How about already existing employees?
20     A    When Mr. Gaughan told us that we had
21 to, that these were required, then we did those for
22 all the employees, existing current employees.
23     Q    Now when did the third chaplain come
24 into Saint Gregory's Academy?
25     A    Well, let me think. Father Cassavantes

--- Page 74 ---

know, or difficulties that were escalating. And at
7    that time I informed him of my meeting with this --
8    it was a letter addressed to Father Carr but I also
9    copied it to Father Devillers.
10           I told him that there were issues that
11   Father Carr had been bringing up for the past several
12   months relating to facilities management and that we
13   had put together a Board of Advisors to help to
14   advise us in some of these matters and to help to
15   give us some guidance in this kind of escalating
16   issue regarding the Society of Saint John. So I
17   guess he had been informed, that was the first time
18   he was informed, beginning January 2002. We met with
19   them at the very end of 2001.
20       Q    Now did Father Devillers write back to
21   you in response to that letter?
22       A    No, he did not.
23       Q    This Board of Advisors, is that the
24   same one that you have now for, you called it Saint
25   Gregory Institute?

--- Page 77 ---

A    Saint Gregory the Great Foundation.
2    Q    Foundation.
3    A    There are some members of that Board of
4    Advisors who are on this Board of Directors of this
5    foundation.
6    Q    Did you ever ask Dr. Bond to write a
7    letter to Father Devillers about the subject?
8    A    About?
9    Q    The subject of alleged misconduct with
10   boys of Saint Gregory's Academy, the Society of Saint
11   John priests.
12   A    I don't remember asking Jeff to write
13   to Father Devillers.
14   Q    Were you present at a meeting that took
15   place just before Christmas in 2001 where there was a
16   director of the Fraternity of Saint Peter -- director
17   of development rather, and other officials?
18   A    Would you repeat that.
19   Q    Yes. It would be a meeting around
20   Christmas of 2001 you were there and also some
21   officials associated with the Fraternity of Saint
     Peter including the Fraternity of Saint Peter's
23   director of development.
24   A    Yes.
25   Q    At that meeting did Father Carr tell

--- Page 78 ---

not remember ever being asked. He said, he said
6    this: Father Devillers asked you to get background
7    checks on the Society of Saint John. We would like
8    to have copies of those.
9    Q    But there were no background checks?
10   A    There were no background checks. And I
11   said that I do not remember Father Devillers ever
12   asking me to get background checks on the Society of
13   Saint John. Police background checks.
14   Q    Do you remember a memo from a person
15   named John Victoria being discussed at that meeting?
16   A    Well, there were a series of memos from
17   John Victoria and replies by me to John Victoria; all
18   of those were discussed.
19   Q    You made written replies to John
20   Victoria?
21   A    Yes.
22   Q    Who is John Victoria?
23   A    John Victoria was at that time the
24   business manager of the Fraternity of Saint Peter.
25   Q    And those memos regarded, dealt with

--- Page 79 ---

the issue rather, the issue of liability, is that
2    correct?
3    A    Well --
4         MR. LEESON: I'm going to object,
5         here's the reason why. It's my
6         understanding that the purpose of this
7         meeting was for people gathered to receive
8         legal advice from Attorney Gaughan who was
9         present at that meeting. The questions you
10        asked so far and the answers solicited are
11        something that we've already been over in
12        the deposition earlier. But now we're
13        starting to get into the area where they
14        were receiving legal advice from another
15        attorney.
16        MR. BENDELL: That's fair enough;
17        that's fair enough. I won't pursue that.
18        MR. BENDELL: So you would object
19        to any questions or any discussion of
20        anybody at that meeting regarding the issue
21        of liability because the attorney is
22        present?
23        MR. LEESON: Um-hum.
24        MR. BENDELL: That was a yes?
25        MR. LEESON: Yes.

--- Page 80 ---

**Page 85**

1  Q   Did Father Devillers express any
2  unhappiness with the performance of Father Carr to
3  you?
4  A   From what I remember he just said that
5  Father Carr had problems, you know, he said
6  everywhere he had been.
7  Q   Now you mentioned before --
8  A   Getting along with people.
9  Q   You mentioned before that this panel,
10 that you talked to this panel in Kansas. I guess
11 everybody flew there to Kansas for this meeting, this
12 advisory --
13 A   Right.
14 Q   And one of the folks on the panel was a
15 judge?
16 A   Right.
17 Q   Do you remember if the judge told you
18 that based upon his knowledge of sex abuse cases that
19 he saw a disturbing pattern in the way the Society of
20 Saint John priests related to the boys of Saint
21 Gregory's Academy?
22 A   I think he said something to that
23 effect but I don't remember, you know, really the
24 detail of what he said.
25 Q   Did you ever talk to an Abbot Forgeot

**Page 86**

1  about the Society of Saint John?
2  A   No.
3  Q   Did the Board advise you to try to get
4  Saint Gregory's Academy to separate from the Society
5  of Saint John?
6  A   We weren't -- we weren't in any way
7  connected with them. There could have been no way --
8  Q   They already left to go to Shohola you
9  mean?
10 A   Yes.
11 Q   Did you ever allow seniors to drink on
12 graduation night at the Society of Saint John?
13 A   Say that -- would you repeat that,
14 please.
15 Q   Did you ever allow seniors to drink
16 alcohol on graduation night?
17 A   No. I mean I never told them that it
18 was all right for them to drink; I never gave them
19 permission to drink.
20 Q   Do you know if they drank graduation
21 night?
22 A   Do I know if the seniors drank
23 graduation night? Well, I know that there were times
24 when the graduated seniors, you know, would have a
25 party afterwards. I think we had made it very clear

**Page 87**

1  that they were not to do this on Saint Gregory's
2  property, but at that point they're no longer our
3  students. And so, you know, we told them, and
4  sometimes the students would stay though and stay at
5  the academy because perhaps there might be a little
6  lag time between their graduation and their ability
7  to go home. Some of them had little brothers who
8  still had a week of school so sometimes they would
9  get permission to stay.
10       But we made it very clear that the
11 rules of Saint Gregory's were that you cannot drink
12 at Saint Gregory's Academy. So if you are even a
13 graduated senior, you are not to drink at Saint
14 Gregory's Academy. But I wasn't going to try to seek
15 out where these seniors might go to have a beer.
16 They were technically no longer my students. But it
17 was fairly clear to everyone and to the students that
18 they were not to, I mean it was made clear to them
19 that they were not to drink while at Saint Gregory's
20 Academy even with their, you know, regardless of the
21 circumstances.
22 Q   Are you familiar with a person by the
23 name of Joseph Sauve?
24 A   Joseph Sauve.
25 Q   Sauve. And who is he?

**Page 88**

1  A   He is the parent of two boys who
2  graduated at the academy.
3  Q   And he took some Saint Gregory students
4  on a trip to Canada, is that right? Hockey trip?
5  A   Gosh, I don't remember him taking, I
6  mean he was one of the Canadian students, I mean one
7  of the Canadian parents from Ottawa, and they would,
8  you know, carpool in vans, you know? I mean we
9  always had a significant number of boys from Ottawa
10 and so the Sauves or the Mountains or the McCluskeys,
11 they're all these different families, that they would
12 come and pick up the Canadian boys and take them up
13 to Canada, up to their homes there.
14 Q   Did Diane Suave tell you or warn you
15 that her husband was an active homosexual and a
16 danger to the boys?
17 A   Well, she never said that.
18 Q   What did she say?
19 A   She said that she found some
20 pornography, that she expressed concern about it,
21 that she was, you know, that she thought I should be
22 aware of this.
23 Q   But you didn't stop the boys from going
24 on trips with Mr. Suave?
25 A   Well, I don't think that he was, ever

**Page 89**

1 took the boys on -- okay. Following that there was
2 one time that the boys were given permission to go
3 with Mr. Suave, okay?
4     Q    Now the pornography that you talked
5 about, was this homosexual pornography?
              MR. LEESON: Objection. Jim,
7     can I ask you a question?
8               MR. BENDELL: You can make an
9     objection.
10             MR. LEESON: It's both an objection
11     and a question. This does not involve your
12     client; this does not involve the Society
13     of Saint John --
14             MR. BENDELL: Objection as to
15     relevance, right?
16             MR. LEESON: It's objection to
17     relevance. I mean are we going to spend a
18     lot of time on things that --
19             MR. BENDELL: Nope, not a lot of
20     time. This is just one question.
21 BY MR. BENDELL:
22     Q    The pornography was homosexual
23 pornography, right?
24     A    I'm hesitating because I'm trying to
25 remember exactly what she said. Yes, I believe

**Page 90**

1 that's what it was that she said.
2     Q    Did any parents complain to you about
3 hazing at the Saint Gregory's Academy?
4     A    Well, I mean excuse me for my -- if you
5 ever run a boys' school you'll understand, I mean,
6 when you've got, you know -- yes. Let's put it this
7 way: I had boys who were sometimes, you know,
8 bullied by other boys or sometimes, you know, even
9 just goofing around and it gets out of hand and, you
10 know, parents of boys who were bullied or in any way
11 hurt by another boy would complain. Yes, sure.
12     Q    Do you know of a former priest by the
13 name of Paul Margand, or laitized priest I should
14 say, who visited Saint Gregory's Academy?
15     A    Well, we would have priests sometimes
16 come and visit. Where is he from?
17     Q    I think it's Nebraska. Well, let me
18 ask you this: Were there any restrictions on who you
19 allowed the Society of Saint John priests to have as
20 guests while they were residing at the academy?
21     A    Was this a guest at the Society of
Saint John?
23     Q    That's my understanding.
24     A    I don't remember any Paul Margand who
25 was a guest of the Society of Saint John.

**Page 91**

1     Q    Getting to my next question to you,
2 were there any restrictions on who the Society of
3 Saint John priests could invite as guests while they
4 were residing at the academy?
5     A    No, none that I was -- I mean I didn't
6 make any restrictions and I don't know that the
7 fraternity did. I mean I don't know that they
8 didn't, but I don't remember there ever being a
9 specific restriction as to guests that they could
10 have visit them and I don't remember this priest as a
11 guest at the Society of Saint John.
12     Q    At some point did you announce a policy
13 that there was to be no visitation whatsoever between
14 Society of Saint John priests and boys of the Saint
15 Gregory's Academy even after they went to Shohola?
16     A    Yes. Yes, after, you know, these --
17 there was sometime in the fall of 2001 when these
18 rumors were swirling around and Jeff Bond started
19 releasing these E-mails. At that time Father Carr
20 told Howard Clark and I that he had spoken with the
21 bishop, with Bishop Dougherty, and that it was Bishop
22 Dougherty's desire or statement that the academy
23 students should not have contact or should not go
24 over to Shohola, and Father Carr wanted me to
25 announce that.

**Page 92**

1     Q    And you did?
2     A    Not in those words.
3     Q    But in other words, similar words?
4     A    Yes, I mean getting the idea across
5 clearly that they were not supposed to, you know, be
6 going over. They shouldn't be asking to go over
7 there; they had their work to do and we had ours and
8 we didn't want -- something like that.
9     Q    Did you know Paul McCleary?
10     A    Yes.
11     Q    Was he at one point a member of the
12 Society of Saint John?
13     A    Yes.
14     Q    And did you invite him afterwards to
15 teach at Saint Gregory's Academy?
16     A    Yes.
17     Q    And this would be after this
18 announcement that you made at the request of Father
19 Carr?
20     A    Yes.
21     Q    Did he formally renounce his membership
22 in the Society of Saint John? I'm talking about
23 Father Paul McCleary now.
24     A    How do you formally renounce?
25     Q    I don't know, here's my question --

# FRIENDS OF THE SOCIETY OF ST. JOHN

## Diocese diligently responds to abuse allegations

When a Scranton Times column by Dr. Jeffrey Bond is entitled, "Bishop fails to meet duty in abuse cases," I feel I owe a response to the people of the Diocese. The following facts should be kept in mind by anyone reading Dr. Bond's charges.

• The Society of Saint John, a clerical association of priests, lived at Saint Gregory's Academy, Elmhurst, from 1997 to 1999, and since then they have been located in Shohola, Pike County. At no time did I ever appoint any one of them to duties at the academy.

For almost a year and a half, Dr. Bond taught for and worked in association with the Society in Shohola. On Oct. 15, 2001, I denied Dr. Bond permission to found a Catholic College. I believed Dr. Bond's founding a college was a "hostile takeover" of the Society, given a contentious atmosphere and disputes regarding liturgy and institutional vision.

• Though not one word of complaint about the conduct of the priests of the Society ever came to me all the while Dr. Bond taught for them, unceasing complaints about these same priests have been made by Dr. Bond since I denied him permission to found a Catholic college.

• Upon hearing of Dr. Bond's initial objections to the conduct of priests of the Society of Saint John, I asked him if he was accusing any of these men of immoral sexual behavior. He answered that he was not.

• About two months prior to Dr. Bond's campaign accusing the priests of misconduct, I had heard other allegations. I corrected the priests when I heard those complaints, insisting that their conduct must leave them above suspicions of even the appearance of wrongdoing. The priests complied.

• With the passage of time since Oct. 15, Dr. Bond made accusations of sexual misbehavior by these priests. The names of possible victims, however, he has steadfastly refused to turn over either to me or to law enforcement officials.

• On Jan. 12 I received the name of one alleged victim of sexual abuse by certain priests of the Society of Saint John. Immediately, though unsuccessfully, I made a number of efforts to reach out to this alleged victim. I also immediately acted to relieve the accused priests of their duties. These accusations were reported by the diocese to the appropriate district attorney for investigation.

Both priests are undergoing professional evaluations. Every young person with whom the priests may have had contact at Saint Gregory's Academy has been approached by the diocese in order to see whether there may be other possible victims, or evidence corroborating the allegations.

When the present investigation by the district attorney is completed, its results will govern my decisions.

What Dr. Bond chooses to say or think about me, I will bear. With the help of God, I will do so with no ill will towards him or his collaborators.

**BISHOP JAMES C. TIMLIN** is head of the Roman Catholic Diocese of Scranton.



## Media propel smear campaign

BY THE REV. DOMINIC O'CONNOR / GUEST COLUMNIST

The recent allegations made in the public media regarding the Society of St. John are unsubstantiated, untrue and seek to portray a picture of the Society of Saint John and our beloved bishop which is totally false. This is causing great sadness and hurt not only to the Society of Saint John and the bishop, but more important, the Catholic Church.

This campaign to discredit the Society of Saint John began with a series of e-mails sent by Dr. Jeffrey Bond at the end of last September. This campaign coincided with the refusal of the bishop to sanction Dr. Bond's attempt to separate the College of St. Justin Martyr from the Society and establish it as an independent Catholic college. Bishop Timlin was adamant that the college remain affiliated with the Society of Saint John.

This campaign became a vicious attack of rumor, innuendo and threats. The accusations made by Dr. Bond are false. These false accusations soon became widely disseminated and this smear campaign has now reached the national press.

To date only one allegation has reached the hands of Bishop Timlin. It comes from the parents of a young adult who, himself, never has made an accusation and in refuses to talk with the bishop and confirm the allegation. The two priests categorically deny these allegations of immorality.

Dr. Bond has applied intense pressure on the alumni of St. Gregory's Academy in order to manipulate them into giving damaging accusations. In fact, the Bishop has been inundated by testimony from the young men of Saint Gregory's denying any impropriety. Moreover, these young men are letting the Bishop know that their experience of the Society has led them to prayer, meditation and a deeper love of the church.

Contrary to recent press articles, there have never been charges against any member of the Society of Saint John in civil or ecclesiastical court. A few bitter and disenchanted critics seek to portray the Society and its mission as extravagant and luxurious. In fact the lifestyle of its members is simple and monastic. The Members of the Society of Saint John receive no salary; many sleep on the floor. The meals are plain and simple. Moreover, the Society's finances are regularly audited by a CPA and are overlooked by an independent financial advisory board.

The nature of these attacks in a situation where there has been no charge, no case, no lawsuit shows a reckless disregard for justice and truth and endangers the good reputation of the Church.

THE REV. DOMINIC O'CONNOR is director of the Society of Saint John.

---



OFFICE OF THE BISHOP

EXHIBIT DD

DIOCESE OF SCRANTON
300 WYOMING AVENUE
SCRANTON, PA 18603

February 15, 2002

TO WHOM IT MAY CONCERN:

Archives of the Defense of the Society of Saint John (2001-2002)

Last Update

Statement from SSJ Lawyers

Letter from SSJ Superior (pdf)

Bishop Timlin's Response

Testimonies from Friends

Other Related Articles

Letters Written to Editors

Friends of SSJ Home Page